```
 1

 2    - - - - - - - - - - - - - - - - - - - - - - - - - - -

 3    WILLIAM and BARBARA CAREY as ADMINISTRATORS,

 4                                    Plaintiff,
            - vs -
 5
      LISA SALVADORE, et al,          Civil Action No.
 6                                    6:18-cv-6307

 7                                    Defendant.

 8    - - - - - - - - - - - - - - - - - - - - - - - - - - -

 9

10                     EXAMINATION BEFORE TRIAL of CARL

11              KOENIGSMANN held pursuant to Subpoena via

12              Zoom on September 3, 2020 before Catherine M.

13              Darche, Court Reporter and Notary Public in

14              and for the State of New York.

15
      APPEARANCES:
16

17    LAW OFFICES OF ELMER ROBERT KEACH, III.
      Attorneys for Plaintiffs
18    One Pine West Plaza, Suite 109
      Albany, New York  12205
19    BY:  ELMER ROBERT KEACH, III, ESQ., of Counsel

20
      OFFICE OF THE ATTORNEY GENERAL
21    Attorneys for Defendant
      144 Exchange Boulevard
22    Rochester, New York  14614
      BY:  HILLEL DEUTSCH, Assistant Attorney General
23

24

25
```

```
 1
 2
 3                    INDEX TO WITNESSES
 4                                                 PAGE
 5    CARL KOENIGSMANN
 6       BY MR. KEACH                                 5
 7                                                   185
 8                                                   214
 9       BY MR. DEUTSCH                              177
10                                                   207
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1

2

3                          INDEX TO EXHIBITS

4
     FOR THE PLAINTIFF:                                    ID.
5
     1       Subpoena                                       5
6
     2       Final Report                                   5
7
     3       Koenigsmann Response                           5
8
     4       Preliminary Report of the Commission
9            On Correction                                  5

10   5       QI Report                                     33

11   6       OSI Final Disposition                         47

12   7       OSI Report                                    48

13   8       Incident Report                               69

14   9       Inmate death report                          102

15   10      Amended Commission on Correction Report      103

16   11      Notice of Discipline                         152

17   12      Autopsy Report                               211

18   13      Certificate of Death                         211

19

20

21

22

23

24

25
```

1

2

3

4                    S T I P U L A T I O N S

5

6          IT IS STIPULATED by and between the attorneys for

7    the respective parties that the testimony contained

8    herein my be used upon the trial of the action; that the

9    filing of the testimony is waived, but the reading and

10   signing are required; that all objections, except

11   objections as to form, are reserved until the time of

12   trial, and that objections as to form shall be noted on

13   the record; that the examining party will furnish the

14   examined party a copy of the transcript of testimony free

15   of charge, and that the testimony be taken before

16   CATHERINE M. DARCHE, a Shorthand Reporter and Notary

17   Public in and for the State of New York, whose oath is

18   waived.

19

20

21

22

23

24

25

```
 1                    ( Exhibits 1 through 4, inclusive, marked
 2                    for Identification )
 3                    ( Whereupon, the Examination commenced at
 4                    10:07 a.m. )
 5   D R.   C A R L    K O E N I G S M A N N, being duly
 6   sworn, testified as follows:
 7   EXAMINATION
 8   BY MR. KEACH:
 9        Q.    Okay.  Dr. Koenigsmann, my name is Attorney
10   Bob Keach.  I'm a civil rights lawyer from Albany.  And
11   I'm taking your Deposition today in a Federal civil
12   rights action filed by the parents of Michael Carey
13   against Lisa Salvadore who is a nurse employed, excuse
14   me, who was formerly employed by the New York State
15   Department of Corrections and Community Supervision.
16             What we are participating in today, sir, is
17   called a Deposition.  It's where I get to ask you
18   questions and you have to respond.  You have to respond
19   with a spoken response.  Our Court Reporter cannot take
20   down a shake or nod of the head.  That is particularly
21   important today since we're all, we're not all in the
22   same room.  We're doing this by video.  And that makes
23   the ability of the Court Reporter to be able to pick up
24   gestures even more difficult.  So just be sure to give
25   your answers in a spoken fashion.
```

1          It's also important today that you give me a

2    chance to finish my question before you respond.  And

3    I'm going to show you the same courtesy.  That avoids

4    you and I talking over each other.  People talking over

5    each other during a Deposition is bad.  It's especially

6    bad today when we're doing this remotely and there may

7    be some sort of delay between when the questions are

8    asked and the answers are given.  It also interferes

9    with the ability of the State's Counsel to interpose any

10   objections he may have to the questions I pose to you.

11   What I tell my witnesses before they get deposed is take

12   a breath before you answer.  That way, you'll be sure

13   the question is complete.

14          Furthermore, if at any point in time today

15   you need to take a break, you just need to let me know.

16   I'll be happy to accommodate your request for a break.

17   All I ask for in return, sir, is you not ask me for a

18   break when there is a question pending and you haven't

19   answered it or where there is a document on the table

20   that I'm asking you about.  Does that sound fair?

21        A.   Yes.

22        Q.   And Dr. Koenigsmann, do you still have

23   patient responsibilities or are you retired?

24        A.   I'm retired.

25        Q.   Okay.  If there was some urgent matter that

1   you needed to attend to, that would be different.  Okay.

2   And you just let me know if something like that comes

3   up.

4        A.    Okay.

5        Q.    Finally, if at any point in time today, you

6   need to take a break, you just let me know and I'll be

7   happy to accommodate your request for a break.  You

8   know.  This is not the Bataan Death March.  You can use

9   the bathroom.  You can get some food.  You know.  You

10  want to get up and stretch your legs, just tell me and

11  I'll give you a break.  Okay?

12       A.    Okay.

13       Q.    And finally, I think I already -- I just kind

14  of reiterated what I just asked you.  My apologies.

15  It's been awhile since I did this because of coronavirus

16  so I'm more rusty than I otherwise would be.

17            Finally, if you don't understand my question,

18  you need to let me know and I'll be happy to rephrase it

19  or restate it.  I don't want you to answer a question

20  you don't understand, neither does the State's lawyer,

21  Mr. Deutsch.  And so -- You know -- I can rephrase

22  questions.  I can have them read back.  So at any point

23  in time, you don't understand me, tell me, and I'll make

24  sure that you and I are speaking the same language.

25  Sometimes, especially if we're talking about medical

1    terms, that may be particularly important because -- You

2    know -- as a lawyer, I'm not as strong in the medicine

3    as you are.  I may use an improper term and I'll be

4    depending on you to help me have a conversation with you

5    about people -- You know -- being able to speak the same

6    language.  If I ask you a question today, however, sir,

7    I'm going to assume you understood me.  Sound fair?

8         A.    Yes.

9         Q.    All right.  Dr. Koenigsmann, can you -- I

10   know for a period of time, you served as the medical

11   director for the Department of Corrections, is that

12   correct?

13        A.    It was, my position officially was deputy

14   commissioner.

15        Q.    Okay.  Did you take over from Lester Wright?

16        A.    Yes, I did.

17        Q.    So what period of time did you hold the

18   position of deputy commissioner?

19        A.    From September of 2010 to October of 2018.

20        Q.    And how did it come to pass that you became

21   the deputy commissioner, the deputy commissioner for

22   what, would it be for medical services?  How would it

23   have been styled?

24        A.    Health services.

25        Q.    Okay.  How did it come to pass that you

1    accepted that position?

2         A.    Dr. Wright chose me and the, the

3    commissioner at the time accepted his recommendation.

4         Q.    All right.  And how did you know Dr. Wright?

5         A.    I was a regional medical director working

6    for Dr. Wright for several years prior to that.

7         Q.    All right.  So you were a regional -- so what

8    region were you responsible for, down where you live?

9         A.    I, over my course of regional medical

10   director, I had two regions, the, what was called the

11   Green Haven hub at one time and the New York City hub at

12   another time.

13        Q.    And so what period were you the regional

14   medical director for New York City and then versus what

15   period of time were you the medical director for the

16   Green Haven hub?

17        A.    I believe I became a regional medical

18   director around 2001, 2002 maybe.  And I was first a

19   regional medical director for Green Haven for about four

20   or five years.  And then I swapped, I was asked to

21   change and I became the regional medical director for

22   the New York City hub till the end.  So I, I would say

23   it was about five years each.  I was -- well, maybe four

24   years each.

25        Q.    And did you work for DOCCS as a physician

1  before you became a regional medical director?

2       A.    Yes, I did.

3       Q.    Where did you work at?

4       A.    I worked in two capacities.  I worked as a

5  primary care provider at Taconic Corrections initially.

6  And then I became the facility health services director

7  at Green Haven Correctional Facility.

8       Q.    All right.  Now, before I took your

9  Deposition, I did a little research into your

10 background.  It appears that you also maintained at some

11 point a private medical practice, am I right about that?

12      A.    Yes.

13      Q.    Where was your private medical practice?

14      A.    In Carmel, New York.

15      Q.    And when did you, did you maintain that

16 private medical practice at the same time you were

17 working for the Department of Corrections?

18      A.    Initially, I was half time private practice

19 and half time working for the State from 1990 to 1999.

20      Q.    Okay.  And your practice in Carmel, New York,

21 was that a primary care practice?

22      A.    Internal medicine.

23      Q.    Board certified?

24      A.    Yes.

25      Q.    In internal medicine?

1       A.      Yes.

2       Q.      Any other disciplines?

3       A.      No.

4       Q.      And are you Board certified today?

5       A.      Yes.

6       Q.      And when you become Board certified, you have

7    to take a recertification exam, what, every five years?

8       A.      When I took the -- Oh, I'm sorry.  When I

9    became Board certified, that was not the requirement and

10   we are all grandfathered in as permanent, permanent.  So

11   we just took our Boards when we took our Boards.

12      Q.      When you served as a regional medical

13   director, what knowledge would you have about any claims

14   filed against the State government for medical care?

15   When I use the term "claim," I mean a lawsuit filed by

16   an inmate against the State for medical care that's

17   filed in New York State Court in something called the

18   Court of Claims?

19      A.      I'm not exactly sure of your, of your

20   question.  I don't know what you're asking.

21      Q.      All right.  Let's assume that -- You know --

22   a lawyer like me files a lawsuit against the State

23   government because they failed to, I'm just, I'm not

24   referring to anything you may have been involved in,

25   sir, but I did a recent case involving a detainee who

1    had a ruptured triceps tendon and went to trial and that

2    type of thing.  So what I'm trying to figure out is, I

3    file a lawsuit against the State indicating that there

4    was deficient medical care provided to a detainee.  Is

5    that something that's brought to your attention as a

6    regional medical director?

7         A.    Not necessarily.

8         Q.    Okay.  How would it come to your attention as

9    a regional medical director if there was that sort of

10   lawsuit filed?

11        A.    If I was named or involved or if at the time

12   Dr. Wright would have brought it to my attention and

13   asked me to attend to it or investigate it or -- You

14   know -- possibly look into it, that's the same as

15   investigating.

16        Q.    Okay.  But -- You know -- hey, this person

17   makes an allegation, look into this and see what's going

18   on.  Mr., Dr. Wright may have asked you to do that at

19   some point in time, fair to say?

20        A.    It's possible, yes.

21        Q.    All right.  When you filled the role of

22   regional medical director, and I just want to make sure

23   I have the dates right, it's from 2010 to 2018?

24   Assistant commissioner for med, excuse me, deputy

25   commissioner for health services, you filled that role

 1    from 2010 to 2018?

 2         A.    Yes.

 3         Q.    Did you engage in similar practices with your

 4    regional medical directors to investigate what happened

 5    to detainees during that period of time?

 6         A.    Not every single case, but if a case caught

 7    my attention and I thought there was a problem,

 8    absolutely, I would ask the regional medical director to

 9    check into it and, and let me know.

10         Q.    Do you know if you did that relative to

11    Michael Carey's death?

12         A.    Absolutely not.

13         Q.    Okay.  When did you first learn about Michael

14    Carey's death?

15         A.    When I was contacted by the AAG.

16         Q.    When you were, which AAG, Mr. Deutsch?

17         A.    Yes.  Well, actually, that's, that's what I

18    remember.  Apparently, I was in the capacity as the

19    deputy commissioner when this case came to us from the

20    State Commission on Corrections because I was recently

21    able to review that.  And that State Commission on

22    Corrections report would have been reviewed by me and

23    we, we do an investigation on the State Commission of

24    Correction reports.  And we address that and respond to

25    them.  And that initial response was signed by me.  So I

14

1    was aware of this at that time.

2         Q.    Were you aware of Michael Carey's death

3    before you received the Commission of Corrections

4    report?

5         A.    I probably would have because the deputy

6    commissioner is informed of all deaths when they happen.

7    There is a mechanism in our system where death reports

8    are sent to the deputy commissioner.

9         Q.    Okay.  And so do you have any recollection of

10   being aware of Mr. Carey's death at or near the time it

11   occurred?

12        A.    Not at all.

13        Q.    April 19, 2015?

14        A.    Not at all.

15        Q.    Were you aware of the State Police

16   investigation that was done into Michael Carey's death

17   subsequent to that time?

18        A.    No.

19        Q.    How about the Office of Special

20   Investigations investigation?

21        A.    That was, that was done.  And at the time, I

22   must have been aware of that because I see that was part

23   of our response.  And so yes, I would have been aware of

24   that at the time.

25        Q.    Okay.  Were you aware that a, that a claim

1    had been filed by Mr. Carey's estate against the New

2    York State government relative to his death at any point

3    in time prior to learning about the Commission of

4    Correction report?

5         A.    Absolutely not.

6         Q.    How do you know that to be a fact, sir?

7         A.    The first time I heard anything about any

8    kind of a claim was in my conversations with Mr.,

9    Mr. Deutsch.

10        Q.    All right.  I want to caution you that I

11   don't want you to get into what you discussed with

12   Mr. Deutsch.  I doubt you will.  I doubt this is the

13   first time you've gone through this.  But I just want to

14   caution you in that regard.  Okay?

15        A.    Okay.

16        Q.    Well, so I don't -- so basically, you would

17   not ever be made aware as the, and I think the title you

18   have here on this letter from March 20th, 2018 is both

19   the, you're both acting as the deputy commissioner and

20   chief medical officer.  So you would not be made aware

21   at any point in time absent there being a Commission of

22   Corrections investigation that there was a claim filed

23   against the State government for someone's death?

24        A.    It's hard to say.  If I remember correctly,

25   the DOCCS Counsel might inform me at some point.  There

1    is a lot of initial phase of things that go on with

2    DOCCS Counsel where they may not necessarily bring that

3    to my attention.  But when they felt it was necessary

4    for me to know or needed input from me, they would have

5    informed me.  I don't recall being informed about such a

6    case.

7         Q.    All right.  Were you made aware at any point

8    in time prior to reviewing the Commission of Correction

9    report that there was an allegation that the Defendant

10   in this case, Lisa Salvadore, was sleeping while on duty

11   at Groveland Correctional Facility?

12        A.    I don't know.  I don't recall being made

13   aware of such information before the State Commission on

14   Corrections report.

15        Q.    Well, let's assume, let's assume for the

16   moment that DOCCS Counsel did make you aware of what

17   happened to Mr. Carey prior to receiving the Commission

18   of Corrections report, would that have been done by

19   e-mail, would that have been done by phone call,

20   internal memo, what manner of communication?

21                 MR. DEUTSCH:  Objection.  But you can go

22                 ahead and answer.

23        Q.    I'll do a better job.  Mr. Deutsch's

24   objection is well placed.  How would you have learned if

25   DOCCS Counsel was going to communicate with you about

1    Mr. Carey's death, how would you have learned about it?

2        A.    By e-mail or by a phone call.

3        Q.    Do you know if any effort was made to search

4    your e-mail relative to Mr. Carey's situation?

5        A.    No, I don't know.

6        Q.    All right.  And it's fair -- and what day in

7    2018 did you leave employment with the Department of

8    Corrections?

9        A.    October 1st.

10       Q.    Did you ever receive from anybody what, what

11   is called a litigation hold letter?

12       A.    Ever receive it?

13       Q.    Relative to Mr. Carey's case.

14       A.    Oh, I have no idea.

15       Q.    Okay.  Well, have you seen those types of

16   letters before called litigation hold letters?

17       A.    I believe DOCCS Counsel has some kind of

18   a -- I've seen it, I've seen e-mails from DOCCS Counsel

19   about litigation holds in terms of information.  But I

20   thought our system had some kind of an automatic thing

21   that did that, that held our e-mails.  So it never

22   really concerned me because I never really went in and

23   did any kind of purging of anything in my e-mails.  If

24   the system purged e-mails, then the system purged

25   e-mails.

1    Q.    Sir, I'm not suggesting that you purged any

2    e-mails.  What I'm trying to figure out is certainly

3    e-mails that would have been exchanged with you and

4    other people in the Department of Corrections would be

5    very relevant to your Examination today and would

6    potentially be relevant to Mr. Carey's claims in this

7    case.  And I haven't received any e-mail produced in

8    Discovery in this case that was either authored by or

9    sent to you nor have I received a privilege log.  Do you

10   know if you sent e-mail about Mr. Carey's situation?  I

11   would assume with the Commission of Corrections report,

12   you must have.

13                MR. DEUTSCH:  Objection to form.  You

14                can go ahead and answer.

15   A.    There clearly were e-mails that involved

16   the, this case because upon receipt of the Commission on

17   Corrections report, we would have sent that report to

18   other disciplines to look into.  We, we addressed health

19   services, security addresses security, etcetera.  So

20   there must have been some kind of e-mail traffic related

21   to that.

22   Q.    Okay.  Would there have been -- if the Office

23   of Special Investigations made determinations about

24   Nurse Lisa Salvadore, would you have been consulted

25   about those conclusions?

1     A.    Yes.

2     Q.    And if there was going to be a determination

3     that Nurse Salvadore had to be counseled, would you have

4     been, would you have been made aware of that?

5     A.    Yes.

6     Q.    And if there was going to be a decision to

7     place Nurse Salvadore on administrative leave based on

8     her conduct relative to Mr. Carey's death, would you

9     have been made aware of that?

10     A.    Yes.

11     Q.    And if there was going to be a Notice of

12     Discipline filed, well, let me step back.  If a decision

13     was going to be made about whether or not to impose a

14     Notice of Discipline against Nurse Salvadore, would you

15     have been made aware of that?

16     A.    Yes.

17     Q.    And would that, would you have been made

18     aware of those issues by electronic mail?

19     A.    I believe so, yes.

20     Q.    And how about this, the letter that you sent

21     to, to Commissioner Beilein from the Commission of

22     Corrections where you responded to the preliminary

23     report, knowing your agency as well as I do, I'm

24     assuming that you had to forward on your response to a

25     whole bunch of different people for them to review

```
 1   before you sent it out, is that accurate?
 2        A.    Actually, I -- It would have gone to the
 3   commissioner.
 4        Q.    Okay.  And who is -- was that Commissioner
 5   Annucci at the time?
 6        A.    What year was that?  Yes.  Yes.  It was,
 7   yes.
 8        Q.    In 2018.
 9        A.    Yes.
10        Q.    Okay.  So the commissioner would have
11   reviewed this before it went out?
12        A.    Yes.
13        Q.    Okay.  And --
14        A.    Let me, let me, let me correct that.  Before
15   it went out, I -- He would have reviewed it but I don't
16   believe he had to approve it.  I believe I was given
17   authorization to respond to the Commission on Correction
18   on my own.  But he clearly would have been privy to what
19   the response was.
20        Q.    How about, how about DOCCS Counsel, they
21   would have reviewed your letter to the Commissioner of
22   Corrections before it went out, correct?
23        A.    I don't believe so.
24             MR. DEUTSCH:  Object to the form.  Go
25             ahead.
```

     1          A.    Oops.

     2                MR. DEUTSCH:  Go ahead.  You can answer.

     3          Q.    Who is James O. Gorman who was acting deputy

     4     commissioner?

     5          A.    He was the acting deputy commissioner of,

     6     basically of security services.  His official title

     7     would have been -- Now I'm blocking on what his title,

     8     but he's basically in charge of security services.

     9          Q.    Okay.  And how about, how about Joan Smith,

    10     who is Joan Smith?

    11          A.    Joan Smith was my assistant commissioner of

    12     health services.

    13          Q.    How about Bryan Hilton?

    14          A.    Who is Bryan Hilton?  Bryan Hilton, I'm

    15     blocking on, on who Bryan Hilton was.  You're going to

    16     have to give me a little bit of time to think on that

    17     one.  It's been a couple years.  The name is very

    18     familiar but I just can't place him at this second.

    19          Q.    Okay.  I have him, the only information I

    20     have about Mr. Hilton is that he is styled as an

    21     assistant commissioner.

    22          A.    Hmm.  Bryan Hilton.  Yeah.  I'm blocking on,

    23     on where he fits in.  That's a name I haven't heard in

    24     several years.

    25          Q.    Let me see if I can find him just briefly

```
 1    here.  All right.  Well, all I can find about him, just

 2    based on a brief internet search is he's been sued a

 3    bunch of times, just like probably everybody else at

 4    DOCCS.  That's all I can find about the man.

 5              Okay.  We'll just move on from that.  And,

 6    sir, are you aware that I demanded from the New York

 7    State Department of Correctional Services by Subpoena

 8    copies of your electronic mail messages about

 9    Mr. Deutsch's situation?

10              MR. DEUTSCH:  Object to the form.

11    A.    You're asking if I'm aware of that?

12    Q.    Yeah.

13    A.    No, not at all.

14    Q.    Okay.  Are you aware that I sent a Subpoena

15    to your office requesting information?  And this would

16    have been before you left employment.  It would have

17    been in February, on February 8th, 2018 or thereabouts,

18    a Subpoena was served on, it was reported to me to have

19    been served on you requesting a range of information.

20    Are you aware of that?

21    A.    No, I don't recall.

22    Q.    Okay.  May I have you take a look at Exhibit

23    1?  Mr. Deutsch should have e-mailed you Exhibit 1

24    through 4 this morning.

25    A.    Oh, okay.  How do I do that?  Can I just go
```

 1    into my like apps and access my e-mail or that won't

 2    disconnect us, will it?

 3         Q.    No.  No.  What you can do with the window you

 4    have with the zoom meeting, you can move that around or

 5    minimize it and then pull up the e-mail and you should

 6    be able to pull up the document while I question.

 7         A.    Okay.  Let me see what I can do here.  Are

 8    you still there?

 9         Q.    Yeah, I'm here.

10         A.    Okay.  Because I can't see you but I can

11    hear you.  So I have up the, the one, two, three, four

12    documents, four Exhibits.

13         Q.    Dr. Koenigsmann, if you look in the bottom

14    left corner of your zoom window, I think you may have

15    hit stop video by mistake.  There we go.  Yup.

16         A.    Okay.  So how do I switch over to my e-mail

17    without, without losing you then?

18         Q.    I would just move the window, your zoom

19    window over.  Should be able to move it over.

20         A.    I'm on an iPad and it may be different.

21         Q.    Okay.  An iPad.  Well, just do the best we

22    can here.  It's fine.  Why don't you pull up the

23    document and take a look at it.

24         A.    Okay.

25         Q.    And take a look at it and let me know when

24

 1    you're ready to proceed.

 2         A.    Okay.  So which document, Exhibit 3, Exhibit

 3    1, 2?

 4         Q.    Exhibit 1, which is the Subpoena.

 5         A.    Exhibit 1.  Okay.  I have it up in front of

 6    me.

 7         Q.    Okay.  So I just want you to take a look and

 8    there is a section that's marked production.  And I want

 9    you to read that.  And then as soon as you're back on,

10    I'll read it into the record.

11         A.    Production.

12         Q.    You'll look down, you'll see testimony?

13         A.    Oh, production.  There it is.

14         Q.    Production, right.

15         A.    You want me to, what, read that?

16         Q.    Yeah.

17         A.    "You or your" -- oh, out loud or --

18         Q.    No.  No.  Just read it, just read it to

19    yourself.  And then I'm going to read it back to you.

20    I'll be honest with you, sir, I'm not sure the date that

21    was served so I'm going to try to get to the bottom of

22    that now.  That may not have been served, that may well

23    have been served on you after --

24         A.    Okay.  I read it.  And okay.  I've read it.

25         Q.    Okay.  Now, that document reflects a request

1    -- And now I'd ask you to come back on the screen for

2    me.

3         A.    Okay.

4         Q.    And says in this, it says, "Any and all

5    documents, records, reports, written or recorded

6    statements, investigations, audits, quality care

7    reviews, conclusions and electronic mail relating to the

8    DOCC's investigation of the death of Michael Carey on

9    April 19th, 2015 at Groveland Correctional Facility,

10   including the NYS DOCCS investigation of Lisa

11   Salvadore."

12        Now, it's been represented to me, although

13   I'm relatively sure as I look at this that this was not

14   served until 2019.  But it has been represented to me

15   that this was served on you and that I was going to

16   receive a response to this request for information.

17   You've never seen this document before, I take it?

18        A.    I don't recall seeing it.  If I would have

19   received it personally at my home now, I would have sent

20   that to DOCCS Counsel.

21        Q.    Well, do you know if any effort has been made

22   to identify any electronic mail that you sent me about

23   DOCCS's investigation of the death of Michael Carey?

24        A.    No, I don't.

25        Q.    How about, was a quality care review done in

1   response to Mr. Carey's death?

2        A.    All deaths are reviewed.

3        Q.    Okay.  And so when would that quality care

4   review of Mr. Carey's death have been done and who would

5   have done it?

6             MR. DEUTSCH:  Object to the form.  You

7             can go ahead and answer.

8        A.    The facility would have done a review of the

9   death and sent a report to health services to us.

10       Q.    Okay.  And what exactly would be contained in

11  that review of the death?

12       A.    There is a form that we used that asked for

13  all the details, times, what was happening before, had

14  he been seeking medical care prior to the death, a whole

15  variety of information.  And that would have been

16  reviewed by myself and the regional medical director.

17       Q.    Okay.  So that would have been basically a

18  death report, correct?

19       A.    Yes.

20       Q.    Do you know who Crista Sanders is?  Her title

21  is NA1.  Sanders, S-A-N-D-E-R-S.

22       A.    An NA1 is a nurse administrator for the

23  facility.

24       Q.    Would a quality care review involve

25  interviewing detainees that were present with Mr. Carey

```
 1   at the time that he passed?

 2        A.    Is that a question?  I didn't --

 3        Q.    Yes, it's a question.

 4        A.    I don't understand it.

 5        Q.    If there is a quality care, if there is a

 6   quality care review being conducted, wouldn't that also

 7   involve interviewing inmates that were present with

 8   somebody when they died?

 9        A.    From a health services standpoint, not

10   necessarily.

11        Q.    And why would a nurse administrator be

12   conducting a quality care review?  Why wouldn't that be

13   done by a physician?

14        A.    The nurse administrator, that is a nurse

15   administrator duty.  And obviously, the nurse

16   administrator is under, works under a facility health

17   services director sometimes.  At times, we have

18   facilities that don't have a facility health services

19   administrator, I'm sorry, a facility medical director,

20   FHSD, facility health services director who is a

21   physician.  So we like to think that they work in

22   conjunction.

23        Q.    I appreciate that.  I mean, did you ever work

24   in a hospital setting?

25        A.    Yes.
```

```
 1        Q.     You would agree with me in a hospital
 2   setting, if there is going to be a quality care review
 3   conducted about someone's death or about an adverse
 4   event affecting a patient, that's going to be done by a
 5   physician, is it not?
 6                MR. DEUTSCH:  Objection to form.  Go
 7                ahead.
 8        A.     I wouldn't say so necessarily.
 9        Q.     So under what circumstances would, let's
10   assume there is a patient death and there is a concern
11   about the circumstances of a patient death in a
12   hospital, under what circumstances would that quality
13   care review not be done by a physician?
14                MR. DEUTSCH:  Object to the form.  You
15                go ahead, you can answer.
16        A.     I believe a physician would be involved, but
17   the actual investigation could very well be carried out
18   by, by nursing, nurse administrators, in the nursing
19   line.  I could see that.
20        Q.     Okay.  Well, sure, I can appreciate that, as
21   well.  But the person who actually is in charge of the
22   quality care review in a hospital if there is a patient
23   death would be a physician, fair to say?
24                MR. DEUTSCH:  Object to the form.
25        A.     I, I mean I'm not in charge of hospitals so
```

1    I'm a little, I don't feel comfortable with answering

2    how hospitals should set things up or do things.  I'm

3    going to defer on answering that one.

4         Q.    All right.  Well, how about in the context of

5    a peer review, you're familiar with a peer review as it

6    relates to medical decisions, aren't you?

7         A.    Yes.

8                    MR. DEUTSCH:  Objection to form.

9         Q.    All right.  And have you ever participated in

10   a peer review of another physician?

11        A.    Yes.

12        Q.    And those peer reviews are supervised by

13   physicians, are they not?

14        A.    To be a peer, yes.

15        Q.    All right.  Can you -- I'm just trying to

16   figure this out.  Can you explain to me why the quality

17   care review of Mr. Carey's death was relegated to a

18   nurse administrator as compared to a licensed physician?

19        A.    Well, the quality care review is assembling

20   the information about the death.  That's sent to central

21   office.

22        Q.    Okay.  So it's sent to central office and

23   then what happens to it?

24        A.    Well, I personally would have been part of

25   the review.

1    Q.    Okay.  And what documentation would have been

2    generated about the review?  Because I have, at least

3    all that's been provided to me now that I can find is,

4    and I'll find the document for you here in just a

5    minute.  It says New York State DOCS Groveland

6    Correctional Facility QI report.  And it's directed to

7    Dr. Bozar who I know pretty well from other litigation

8    and yourself from Crista Sanders who is an NA1.  And

9    from what I can see, there is obviously a lot of

10   documents here so perhaps I'm mistaken about what I have

11   or have not been provided, but I don't see any follow-up

12   from that in any of the materials I've been given in

13   this case.

14   A.    Well, just to explain in a little more

15   detail --

16              MR. DEUTSCH:  Is there a question

17              pending here?

18              MR. KEACH:  He was about to say

19              something before you cut him off.  Don't do

20              that again.

21              MR. DEUTSCH:  I'm asking what's the

22              question?  I don't understand the question,

23              so I don't know.

24              MR. KEACH:  It's what the witness

25              understands, not what you understand.  You

1        can object to the form.  That's what the

2        rules require.  Can you continue your answer,

3        Doctor?

4            MR. DEUTSCH:  Just object to the form.

5        I have to know whether there is a privilege

6        issue, whether I should instruct him not to

7        answer.  And I can't do that if I don't

8        understand what the question is.

9            MR. KEACH:  My question doesn't even

10       remotely implicate privileged information,

11       Hillel.  And it was a question, yes.

12           MR. DEUTSCH:  Okay.  So no problem, just

13       repeat the question.

14           MR. KEACH:  It's objection to form.

15       It's objection to form.  You like to sit here

16       and bust my stones about the particulars of

17       these Federal rules, I'm going to show you

18       the same courtesy.  It's objection to form.

19       Period.

20           MR. DEUTSCH:  And what I'm saying is, I

21       don't understand the question.  Please repeat

22       it.

23           MR. KEACH:  It doesn't matter whether

24       you understand the question.  It matters

25       whether the witness understands the question.

```
 1              And the witness apparently did understand the
 2              question until you cut him off.  Don't do it
 3              again.  Madam Court Reporter, can you read
 4              back the Question?
 5                   ( The last Question was read by the
 6              Reporter. )
 7                   MR. DEUTSCH:  Okay.  Objection to form.
 8              You can go ahead and answer.
 9      A.    What I was about to say, now it's a little
10   clearer to me what we're talking about.  The facilities
11   require at a point after, after a death to include that
12   death in a monthly facility review.  The facility is
13   required to, to do these monthly quality reports.  The
14   quality report chairman is the FSHD.  The nurse
15   administrator is responsible for actually producing the
16   report.  That's why it's coming from a nurse
17   administrator.  In that monthly report, one of the
18   things they have to review are all deaths.
19      Q.    I'm just going to make sure we're speaking
20   the same language here, so just bear with me for one
21   moment, sir.  Okay.  I just sent on Exhibit 5 which I'll
22   identify for the record as soon as you have a chance to
23   read it.  I forwarded it to Mr. Deutsch's e-mail.  So
24   give it just a minute for that to percolate through
25   cyberspace and then we'll continue on.
```

 1                      ( Exhibit 5 marked for

 2                      Identification )

 3                  MR. KEACH:  Doc, why don't you check

 4              your e-mail and see if that came through to

 5              you.  Okay?  Doc, you ready?

 6      A.     I've got it.  I've looked it over.  Go right

 7  ahead.

 8      Q.     Sir, can you tell me, I've sent you Exhibit

 9  5.  What is Exhibit 5?

10      A.     I have no idea.

11      Q.     You have no idea.  I mean, it says on that

12  document, Exhibit 5, it says that it's been sent to you

13  and Dr. Bozar.

14      A.      Correct.

15      Q.     It's titled a QI report.

16      A.     I'm not familiar with that kind of report.

17  It looks like it's some kind of ad hoc report that that

18  nurse felt necessary to send.  That's not an official

19  format.  That's not in any way inclusive of anywhere

20  near all the information that should be in a QI report.

21      Q.     Okay.  Is there a QI report relative to

22  Mr. Carey's death?  And there is a lot of documentation

23  that's been, to qualify that.  I'm not being accusatory.

24  There is a lot of documentation that's been produced in

25  this case.  I have some handle of what's out there.

1    This is the only thing I've seen in the, I want to say

2    it's into the hundreds of pages or maybe even thousands

3    of pages that I've looked at that's anything resembling

4    what would be the quality assurance review or quality

5    improvement report.  Where would I find it?  Because I

6    don't have it.  What would it look like?  Start with

7    that.  What would it look like?

8        A.    There was an official format on e-mail that

9    started at a particular time.  By that, I mean it was

10   designed by the assistant commissioner, my assistant

11   commissioner at the time.  And it was instituted as an

12   official format for submitting QI reports specifically

13   on deaths.  I don't remember what year that occurred,

14   but that, that particular document was an e-mail

15   document.

16       Q.    Okay.  I have seen some sort of electronic

17   document that's like a report of a death or something,

18   is that, is that what you're talking about?

19       A.    No.  That, that's an initial one.  Well,

20   actually, yes, that is what I'm talking about.  That,

21   that -- There was, there was a report and then we

22   formalized it in much more detail at some point.  I

23   don't remember what year that was.  And it included a

24   lot more information that the facility had to put

25   together to report a death.

1          Q.    Do you know whether or not that was before or

2    after Mr. Carey died on April 19th, 2015?

3          A.    No, I don't know.

4                MR. KEACH:  All right.  Just give me

5                a moment to go off the record, please,

6                Cathy.

7                MR. KEACH:  All right.  Let's go back on

8                the record, please, Cathy.  Let the record

9                reflect that Mr. Deutsch and I spoke off the

10               record about my concerns that I have not been

11               provided with some of the documentation that

12               I've discussed with Dr. Koenigsmann today.

13               Mr. Deutsch and I agreed that he and I

14               will confer after this Deposition and

15               potentially go back to the Agency to

16               determine whether or not I am missing

17               documentation to which I would be entitled to

18               under the Subpoenas that have been produced

19               in this case.

20               And in the event that there is

21               additional documentation produced that the

22               witness will be reproduced for a continued

23               Deposition that will be limited to the new

24               documentation produced and any reasonable

25               follow-up questions.

1          And when I talk about my concerns about

2     document production in this case, there have

3     been a number of issues with the, this Agency

4     in a related Court of Claims action

5     withholding information from a Court of

6     Claims Judge.  That gives me considerable

7     concern here.  But that concern is not

8     directed at Mr. Deutsch or the Office of

9     Attorney General.  But that is also one thing

10    that underlies my concern about the

11    production of documents relative to Dr.

12    Koenigsmann.

13         Hillel, I'll leave any response to you.

14         MR. DEUTSCH:  Sure.  I mean with regard

15    to the agreement to confer and to go back to

16    DOCCS and to reproduce the witness should any

17    extra documents be produced, that is correct

18    and I have no objection to it.

19         With regard to the characterizations to

20    what's going on in the Court of Claims, I do

21    not claim to have any particular familiarity

22    with it.  I am not the attorney of record

23    there.  The very limited understanding that I

24    do have, that it was not a proper

25    characterization of what occurred.  But I

1                     will also say that I am not the attorney of

2                     record there and I do not know the details of

3                     it.

4                         MR. KEACH:  Okay.  All right.  With that

5                     discussion, we'll move forward with Dr.

6                     Koenigsmann's Examination.

7        Q.    Dr. Koenigsmann, looking at Exhibit 5, can

8    you tell me, sir, what you would have done receiving a

9    document like this?  And Dr. Koenigsmann, I can tell you

10   when you go and look at the document, we can still hear

11   you.  So when you go to the document and answer the

12   questions, we can still hear you and make a record, we

13   just can't see you.

14       A.    Right.  Right.  I'm just reviewing it over.

15   I don't recall ever seeing any kind of report like this.

16   I'm just looking.  So having re-reviewed it, what was

17   the question?

18       Q.    What would you will done in response to

19   receiving this document?

20       A.    Well, to me, it's not a document that I'm

21   familiar with.  The nurse points out a review of the

22   case, some deficiencies that they noted and some action

23   plan.  I probably wouldn't have done anything with that.

24   It was also sent to the regional medical director.  And

25   I would have been waiting for other documentation of the

1    event that I'm more familiar with.

2        Q.    What is a code sheet?

3        A.    I don't believe we had a, an official code

4    sheet.  But it's usually a minute-by-minute

5    documentation of the events of an emergency code.

6        Q.    All right.  Because I have at the bottom of

7    this document, Exhibit 5, the QI report, it says,

8    "Formal counsel nurse regarding the progress note and

9    code sheet."  And I'm trying to figure out what that

10   means.  I understand what the progress notes are.  I

11   don't understand what the code sheet is.

12       A.    The code sheet would be the documentation of

13   the minute-by-minute events that occurred at the actual

14   code, second-by-second actually.

15       Q.    When you say code, you're talking about when

16   an inmate is found in severe distress, a code is issued

17   and then they keep track of it, is that the deal?  Is

18   that what you mean?

19       A.    In severe distress or that has, yes, severe

20   distress or apparent has just died.

21       Q.    Okay.  That's when you prepare the code

22   sheet?

23       A.    Yes.

24       Q.    I want you to take a look for a moment,

25   Doctor, at Exhibit 3 which is entitled as the

1   Koenigsmann Response.

2       A.    Exhibit 3.  Okay.  I have it up in front of

3   me.

4       Q.    We're going to go through this document at

5   greater length later after we go over the Commission of

6   Correction report.  But I want you to go to

7   recommendation number two, response number three which

8   is at the top of page three of the document.  And if you

9   need to review the whole document before I question you,

10  that's fine, too, please do so, you just have to let me

11  know you want to do that.

12      A.    Okay.  I read number three.

13      Q.    Okay.

14      A.    Hold on.  Hold on.  Excuse me one second.

15  Oh, that was their recommendation.  You're talking about

16  the Response?

17      Q.    Yeah.  It would be on the top of page three.

18      A.    Let me take a look at that.

19      Q.    Paragraph starts, "The Office of Special

20  Investigations."

21      A.    Correct.  Okay.

22      Q.    Okay.  I'm going to read that into the record

23  and ask you about it.  It says, and this is Exhibit 3,

24  and I'll identify, Exhibit 3, for the record, is a

25  letter from yourself to Thomas Beilein who is the

1    Chairman of New York State Commission of Corrections

2    dated March 20th, 2018.  It's a three-page document.

3    And on the third page, identified as paragraph three, it

4    states, "The Office of Special Investigations conducted

5    an investigation into the conduct of RN LS.  It was

6    determined that RN LS did not make any medical rounds

7    and was identified by the inmates of sleeping on her

8    desk.  RN LS was initially placed on administrative

9    leave by the Bureau of Labor Relations but was

10   eventually returned with no discipline.  RN LS resigned

11   from DOCCS employment following this investigation."

12            What was the basis for you to state in this

13   letter to the Commission of Correction that inmate or RN

14   LS did not make any medical rounds and was identified by

15   the inmates as sleeping at her desk or sleeping on her

16   desk?  Excuse me.

17       A.    It says, I said the Office of Special

18   Investigations conducted an investigation into the

19   conduct of RN LS.

20       Q.    Right.  But you're not in the Office of

21   Special Investigations, fair to say?

22       A.    No.

23       Q.    Okay.  So I'm trying to figure out how that

24   second sentence about not making medical rounds and

25   identified as sleeping on her desk made it into this

1  letter.

2      A.    I assume it was from a report from the

3  Office of Special Investigations.

4      Q.    Okay.  I am not aware of any report from the

5  Office of Special Investigations that says that.  There

6  are statements taken from inmates by the Office of

7  Special Investigations that say that.  But the

8  conclusions of the Office of Special Investigations do

9  not support that.  Can you tell me if there is some

10  other source of information you relied upon to make that

11  statement to Commissioner Beilein?

12      A.    No.  We don't investigate these things.  It

13  would have been based upon the Office of the Special

14  Investigations.

15      Q.    And would you -- How, where was your office

16  physically?

17      A.    In Albany.  In, well, we were in a couple of

18  different places.  But it was in Albany in the central

19  office, offices.

20      Q.    Are you out at the Empire State or the office

21  complex, it is called the Harriman Complex?

22      A.    Correct.

23      Q.    Okay.  And -- You know -- I understand,

24  what's the building number out there that's like DOCCS'

25  building?  I forget.

1    A.    Now it's, well, when I was there --
2  originally it was Building, Building 4 and then we moved
3  to Building 9.
4    Q.    Okay.  And was the Office of Special
5  Investigations in the same building where your office
6  was?
7    A.    It was on both, both, both locations.
8    Q.    Okay.  And so -- You know -- would you have
9  ever met with anyone from the Office of Special
10 Investigations in person about this issue with Nurse
11 Salvadore?
12   A.    It's not impossible.
13   Q.    Would you have communicated with them by
14 electronic mail?
15   A.    Also not impossible.
16   Q.    Okay.  Do you know who you communicated with
17 at the Office of Special Investigations?
18   A.    I don't even know if I communicated with
19 them.
20   Q.    Okay.  Because I have here an investigative
21 report which was prepared by James Kessel.  Do you know
22 the name James Kessel?
23   A.    No.
24   Q.    How would you have received a copy of James
25 Kessel's investigative report?  Would that have been by

1    e-mail?

2         A.     Most likely, yes.

3         Q.     What -- You know -- there are different ways

4    that DOCCS characterizes its medical facilities.  And I

5    know they have regional medical units where they have

6    people that are in a more acute situation, am I accurate

7    about that?

8         A.     No, you're not accurate about that.

9         Q.     Okay.  Well, I'm just going to give you my

10   experience and then you can just help me break this down

11   a little bit.  I have a client named Vernon Botsford

12   who's at the Wende Regional Medical Unit.  Vernon was in

13   a catatonic state for awhile and was not ambulatory and

14   was in bed.  And they had him placed in that unit

15   because he required -- You know -- twenty-four hour

16   nursing care.

17              So that's why I say, hey, this is for someone

18   that's in more of an acute situation.  What's the

19   purpose of the regional medical unit?

20        A.     The regional medical unit provides a higher

21   level of care.  They don't really provide acute care,

22   but it is, you are one hundred percent correct.  It's a

23   higher level of care.  Acute care, they have to go to

24   the hospital.

25        Q.     All right.  My apologies for not recognizing

1    that, the significance of that medical term.  My

2    understanding is that Groveland -- Well, let me step

3    back.  I know at the Franklin Correctional Facility,

4    they have some sort of more specialized medical unit

5    there for the surrounding -- You know -- facilities up

6    in that area, Bare Hill, Upstate, that type of thing.

7    Are you familiar with what I'm talking about relative to

8    the Franklin Correctional Facility?

9         A.    No.

10         Q.    My understanding first off is that the

11    pharmacist for all of those facilities is at Franklin.

12    Do you coordinate pharmacy services or have anything to

13    do with it?

14         A.    Yes.

15         Q.    I'm assuming you supervise it.

16         A.    Yes.

17         Q.    All right.  And so -- You know -- does

18    Franklin Correctional Facility have some sort of

19    specialized designation for DOCCS medicine given that

20    the pharmacist is there and was dispensing medication

21    for all of the surrounding facilities?

22         A.    No.  Franklin has a hub pharmacy.  And that

23    hub pharmacy provides services to other facilities.

24    That's, that's completely separate from, from the level

25    of medical care provided at Franklin.

1       Q.    All right.  You have medical units at the

2   various facilities, correct?

3       A.    Yes.

4       Q.    And then above that would be what, the

5   regional medical unit where people who need more, need

6   more care go?

7       A.    Yes.  You have facilities, some facilities

8   have infirmaries, some facilities don't have

9   infirmaries.  Then, so you have facilities without

10  infirmaries, facilities with infirmaries.  I'm going up

11  the chain, and then facilities that are regional medical

12  units.  So those are our kind of three levels of, of

13  services available.

14      Q.    All right.  That's what I'm getting at.  And

15  I appreciate you volunteering that and clarifying that

16  for me.  Groveland is a facility with an infirmary,

17  correct?

18      A.    Yes.

19      Q.    And what is the significance of having an

20  infirmary at a correctional facility versus a

21  correctional facility with a lower level of care that

22  does not have an infirmary?

23      A.    One, it distinguishes what kind of patients

24  we can send to that facility.  If a facility doesn't

25  have an infirmary, we, we limit patients with medical

1   conditions, certain medical conditions that can't be

2   there and can only be in a facility that has an

3   infirmary where you have the ability to take the person,

4   the patient out of general population and put them in an

5   area of higher medical observation and care.

6              And then ultimately, the RMUs, the regional

7   medical units are a step above that.  Where it's a --

8   You can think of it as a facility with a much, much,

9   much larger infirmary.  But it goes beyond that.  It's

10  staffing changes, etcetera, that they can provide a, a

11  higher level of care and have more services.

12       Q.   So the infirmary, just so I'm clear, the

13  infirmary provides a higher level of observation and

14  care than you would find in an ordinary prison medical

15  unit?

16       A.   Without an infirmary, yes.

17       Q.   Okay.  And the infirmary houses detainees

18  overnight for various reasons, fair to say?

19       A.   Yes.

20       Q.   And those detainees, do they have access to a

21  call button?

22       A.   They, they have to have access to a means of

23  contacting the nurse.

24       Q.   Okay.  And so one of those means would be a

25  call button?

```
 1          A.    Yes.

 2                MR. DEUTSCH:  Objection to form.

 3                MR. KEACH:  I'm sorry, Hillel?

 4                MR. DEUTSCH:  Objection to form.  He

 5                answered.  Go ahead.

 6          Q.    And do you know whether or not they have call

 7    buttons at the Groveland Correctional Facility?

 8          A.    Well, I know that from the documents that

 9    I've seen.  I didn't know that off the top of my head.

10          Q.    All right.  What documents, what documents

11    did you review to prepare for your testimony today?

12          A.    The State Commission on Correction report,

13    our Response, and I believe a, I thought I saw something

14    from the Office of Special Investigations.

15          Q.    Okay.  There are two reports from the Office

16    of Special Investigations, one was completed on

17    September 17th, 2015, and then there was a later report

18    that was prepared, give me just a moment, on January

19    16th, 2020.  Do you know which of the two that you

20    reviewed?

21          A.    Not off the top of my head.

22                MR. KEACH:  Hillel, I'm pretty sure I

23                e-mailed you Exhibit 6, am I right about

24                that?

25                ( Exhibit 6 marked for Identification )
```

```
 1                    MR. DEUTSCH:  Yes.  I believe I sent it
 2           on to Dr. Koenigsmann.
 3                    MR. KEACH:  Okay.  Hillel, I just sent
 4           you Exhibit 7.  I would ask that you forward
 5           that on to Dr. Koenigsmann, as well.  I think
 6           this also represents a good time for us to
 7           take a short break.
 8                    ( Exhibit 7 marked for Identification )
 9                    MR. DEUTSCH:  Sure.
10                    ( Whereupon, a recess was taken )
11      Q.    All right.  Dr. Koenigsmann, I'm going to ask
12   that you take a look at Exhibit 6 and Exhibit 7.
13      A.    Which one do you want me to look at?
14      Q.    Well, I'm going to start at, I'd like you to
15   look at them both and tell me when you're ready.
16   They're both short documents.  Exhibit 6 is styled
17   Office of Special Investigation Final Disposition and
18   Closing Report, January 16th, 2020.
19           And Exhibit 7 is styled Office of Special
20   Investigations investigative report.  And then it's
21   closed by Investigator Kessel on September 17th, 2015.
22      A.    Okay.  I've looked at Number 6 during the
23   break and Number 7, I guess came after that.  So now
24   I've just had a chance to look at Number 7.
25      Q.    Okay.  It's fair, Number 6 was authored in
```

1    2000 -- it was authored earlier this year which was

2    obviously well after you left employment with DOCCS.

3    It's fair to say you have not seen that document before

4    today?

5         A.    6 or 7?

6         Q.    6.

7         A.    Oh, that's the one that's 2020.  No, I

8    didn't.  I didn't see that.  I think I saw this, I think

9    the AAG shared this with me, Mr. Deutsch.

10        Q.    Okay.  That would have been the first time

11   you've seen it?

12        A.    Yes.

13        Q.    And that would have been recently?

14        A.    Yeah.

15        Q.    Okay.  Did you -- Do you have a retainer

16   agreement with Mr. Deutsch?  Just yes or no.

17        A.    What is that?

18        Q.    Retainer agreement is an agreement that you

19   sign with a lawyer reflecting that that lawyer is going

20   to represent you and detailed terms of the

21   representation.

22        A.    No.

23        Q.    How many -- When you met with Mr. Deutsch,

24   was it in person or over the phone?

25        A.    Phone.

1      Q.    Was anyone else present on your end of the

2  phone besides yourself?

3      A.    No.

4      Q.    How many times did you and Mr. Deutsch speak

5  before today?

6      A.    Twice, I think.

7      Q.    Over what period of time?

8      A.    Maybe the last two weeks.

9      Q.    Okay.  It's fair to say you and I have spoken

10  on the phone once before, correct?

11      A.    I don't recall.

12      Q.    You don't remember me calling you up and

13  talking to you about taking your Deposition?

14      A.    Not really.

15      Q.    Okay.  So then it's fair to say, I just want

16  to make clear, at no point in time did I discuss with

17  you the substance of this case when I spoke to you, is

18  that accurate?

19      A.    I don't recall speaking to you before, so

20  yes.  I don't know how to answer that.  I don't recall

21  speaking to you before.

22      Q.    Okay.  All right.  So now moving on to

23  Exhibit 7, have you seen that document before today?

24      A.    I believe I must have seen this back in

25  2015.  I don't recall it.  But I believe this was also

1    shared, shared with me by Mr. Deutsch.

2        Q.    Okay.  And do you know if this is the

3    document that you relied upon to place part three into

4    your response to the Commission of Corrections from

5    March 20th, 2018?

6        A.    I would think this must have been.

7        Q.    Okay.  Are there policies and procedures in

8    DOCCS for someone who is in an infirmary setting where a

9    nurse is supposed to make rounds during her shift?

10       A.    Yes.

11       Q.    What are those, what were those policies and

12   procedures in April of 2015, as best as you can recall?

13               MR. DEUTSCH:  Objection, form.  Go

14               ahead, you can answer.

15       A.    I don't recall them specific enough to be

16   willing to go on the record and say this was the policy.

17       Q.    What is your understanding and substance of

18   those policies?

19       A.    Nurses were required to evaluate each, each

20   patient in an infirmary, I would have thought at a

21   minimum per shift.

22       Q.    Okay.  And were they required to, were nurses

23   required to walk around an infirmary at various

24   intervals during the course of their shift?

25       A.    I do not remember if that was a requirement.

1      Q.    Do you know the name of the policy that would

2   detail a nurse's responsibility under, under DOCC's

3   policies?

4      A.    It was health services policy.  And I'd have

5   to review the contents to see what the specific policy.

6   I'm sure there is a policy on infirmary care.

7      Q.    Okay.  And would that policy on infirmary

8   care detail a nurse's responsibility to make rounds

9   during her shift?

10     A.    Yes.

11     Q.    Is a nurse allowed to sleep on duty in an

12  infirmary setting?

13     A.    No.

14     Q.    Is that written in DOCCS' policies?  Or,

15  well, is that written in DOCC's policies?

16     A.    No.

17     Q.    All right.  That's just a common sense idea

18  that a nurse should not be sleeping when she's on duty

19  in an infirmary, fair to say?

20     A.    No one is supposed to be sleeping while on

21  duty in corrections.

22     Q.    And why would it be especially important that

23  a nurse not be sleeping on duty --

24              MR. DEUTSCH:  Objection to form.

25     Q.    -- in an infirmary setting in the Department

1    of Correctional Services?

2                    MR. DEUTSCH:  Objection.  You can go

3            ahead.

4        A.    The nurse is responsible for the care of the

5    patients under her, under her care.  She shouldn't be

6    sleeping.  She's being paid to do a job, not to sleep.

7        Q.    And would you agree with me that if a nurse

8    was sleeping and there was a, an emergent medical

9    situation that that could result in an adverse outcome

10   for a patient?

11                   MR. DEUTSCH:  Objection.  Form.  But go

12           ahead, you can answer.

13       A.    I don't know for a fact that it would cause

14   a bad outcome.  But a nurse should not be sleeping while

15   on duty.

16       Q.    Would you agree with me that it could cause a

17   bad outcome?  If there are circumstances where if

18   someone, if someone is having medical difficulty and

19   they can't reach a nurse in an infirmary setting that a

20   delay in providing them care because the nurse is

21   sleeping could lead to a bad outcome?

22       A.    I would have to say yes.

23       Q.    All right.  And have you had an opportunity

24   to review the autopsy in this case?

25       A.    Yes, I did.

1    Q.    Did you have an opportunity to review the

2  transcript of the medical examiner who prepared that

3  autopsy?

4    A.    A transcript, I don't know what that is, so

5  I, I don't, I don't think I saw that.

6    Q.    All right.  There is a gentleman, his name is

7  Dr. Catanese.  And he's the one who, he's the doctor who

8  performed the autopsy of Mr. Carey.  And he was deposed

9  in this case previously and provided testimony about his

10  opinions regarding the cause of death after being given,

11  after being provided additional documentation.

12        And a transcript is a physical document where

13  the Court Reporter prepares it and it shows the

14  questions I ask and the answers that Dr. Catanese

15  provided.  Have you seen that transcript?

16    A.    No.

17    Q.    All right.  And you would agree that

18  according to the autopsy that Mr. Carey died of a, of,

19  of a heart attack?

20    A.    Yes.

21    Q.    Okay.  And would you agree with me, sir, that

22  there are a number of medical interventions that can be

23  done to prevent someone who's having a heart attack from

24  dying?

25    A.    Yes.

1          Q.     And for instance, one thing that can happen

2     is someone can be given anti-coagulants which can

3     release a clot in one of the cardiac arteries, fair to

4     say?  Maybe anti-coagulant isn't the right word, maybe

5     clot buster is the right word.  I don't know exactly

6     what the medical term is for that.

7          A.     That, that intervention is possible.

8          Q.     Someone whose heart stops as a result of

9     having a heart attack, their heart can be revived

10    through the use of a defibrillator?

11         A.     In specific, oh, well, the way you ask that

12    question is odd.  The heart stops, generally a

13    defibrillator works for certain, certain malignant

14    arrythmias not necessarily when the heart stops.

15         Q.     My apologies.  And again -- You know -- I'm

16    not going to pretend that I'm the strongest lawyer on

17    the medicine, I'm not.  That's why I hire experts who

18    help me.  But there are people that are having cardiac

19    events that can have their life saved by the use of a

20    defibrillator, fair to say?

21         A.     Yes.

22         Q.     People who are having cardiac events can have

23    their life saved by surgery, fair to say?

24         A.     Yes.

25         Q.     They can have their life saved by the use of

1  aspirin?

2      A.     Aspirin can help.  I don't know if I'd go so

3  far as to say lives are saved by just aspirin.

4      Q.     All right.  What other interventions, if

5  someone is having a cardiac event, what other

6  interventions can a physician do besides the use of clot

7  busting drugs, a defibrillator or surgical intervention

8  to save that person's life?

9      A.     They can also apply oxygen.  They can

10  perform CPR if the heart stops or if the malignant

11  rhythm stops, stops the heart's ability to provide

12  circulation.  And obviously, they can call for the means

13  to get the person to the hospital.

14      Q.     Did you have a chance to review the report

15  from the New York State Police about Mr. Carey's death?

16      A.     I don't believe so.

17      Q.     All right.  Now, it says here in your letter

18  to the Commissioner of Corrections from March 20th, 2018

19  that Nurse Salvadore was identified by the inmates as

20  sleeping on her desk, fair to say?

21      A.     That's what it says, yes.

22      Q.     All right.  And --

23            MR. DEUTSCH:  Objection to the form.

24      Q.     -- where did you get your information about

25  that?

1      A.      I didn't, I didn't catch your question.

2      Q.      Why did you say that in this letter to the

3   Commissioner of the Corrections that inmates identified

4   her sleeping at her desk?

5      A.      I believe that was a significant issue that

6   the Commission on Corrections had mentioned in their

7   report so I was reiterating that.

8      Q.      Okay.  That's a pretty, that's a pretty

9   serious allegation against an employee from DOCCS if

10  they were sleeping on duty when someone died, you would

11  agree with me there, right?

12              MR. DEUTSCH:  Objection to form.  Go

13              ahead, you can answer.

14     A.      Yes.

15     Q.      And you would agree with me that there had

16  been instances where employees of DOCCS who have not

17  appropriately attended to the medical needs of a

18  detainee have been disciplined as part of the labor

19  relations process, correct?

20              MR. DEUTSCH:  Objection, form.  Go

21              ahead.

22     A.      I don't understand that.  You mean ever in

23  the past?

24     Q.      Yeah.  I mean I'm sure you're aware that

25  there have been nurses that have been disciplined

1  because they have somehow been negligent in failing to

2  provide care for a detainee.

3      A.    Yes.

4              MR. DEUTSCH:  Objection to form.

5      Q.    So we have a situation, and you're aware that

6  the -- Let me step back.  Are you aware of what the

7  inmates said about Nurse Salvadore sleeping at her desk?

8      A.    No.

9      Q.    Are you aware of what kind of medication Mr.

10  Carey had access to when he was in the infirmary on the

11  evening of April 19th, or excuse me, the evening of

12  April 18th, 2015 into the early morning of April 19th,

13  2015?

14              MR. DEUTSCH:  Objection to form.

15      A.    I see references to a medication.  I don't

16  know if that was, if that actually was what was

17  prescribed for the inmate.  But yes, I have seen

18  references to a medication.

19      Q.    And what was the medication that Mr. Carey

20  had access to according to the reports that you've read?

21      A.    Albuterol.

22      Q.    Was the medication -- Where did you see the

23  reference to Albuterol?

24      A.    I think I saw it in the Commission of

25  Corrections report.  I think.

1      Q.    All right.  The final report from the
2   Commission of Corrections has been sent to you as
3   Exhibit 2.  And give me just a moment's indulgence.  If
4   you need that report, that's where it is if you want to
5   look at it.  Okay?
6      A.    Do you want me to look at it?
7      Q.    Give me just a moment.  What's the difference
8   between Albuterol and Advair?
9      A.    I believe one is a generic.  Oh, Advair?
10   I'd have to look it up.  Advair may be a combination
11   medicine that has Albuterol in it.  I'm not sure if
12   Advair is just a brand name for Albuterol alone.
13      Q.    What is Salmeterol.  I'm going to spell it
14   for you, S-A-L-M-E-T-E-R-O-L?
15      A.    That's a steroid.
16      Q.    And steroids are used in the treatment of
17   asthma to, for the purposes of long-term care for
18   asthma, fair to say?
19      A.    Yes.
20      Q.    It's an inhaled steroid that's designed to
21   reduce inflammation in the lungs of someone who suffers
22   from asthma?
23      A.    Correct.
24      Q.    And there is a difference between an inhaled
25   cortical steroid product and Albuterol, is there not?

1       A.      Yes.

2       Q.      And the difference is that Albuterol is a

3  faster acting medication that goes into the lungs and

4  opens up the breathing tubes very, very quickly?

5       A.      Yes.

6               MR. DEUTSCH:  Objection to form.

7       Q.      And what is the mechanism for Albuterol?

8  Just explain to -- You know -- myself, as a lay person

9  how Albuterol works.

10      A.      It's called the beta agonist.  It works

11  directly on the beta receptors in the small air

12  passages, the bronchi and bronchioli to relax them.  And

13  they dilate and open up the air passages.

14      Q.      What is Fluticasone Propionate?  It's spelled

15  F-L-U-T-I-C-A-S-O-N-E   P-R-O-P-I-O-N-A-T-E.

16      A.      That is a steroid.  And I have to correct

17  myself.  The Salmeterol that you mentioned earlier was

18  not a steroid.  That is a long-acting bronchi dilator

19  that you mentioned earlier.

20      Q.      Okay.  Now, I just pulled up the Advair dot

21  com page.  And Advair contains both Fluticasone

22  Propionate and Salmeterol.  Those are the active

23  ingredients in that medicine.  Both of those medicines,

24  they are for the longer term management of asthma,

25  correct?

1    A.    Yes.

2    Q.    Okay.  Now, I just reviewed the Commission of

3    Correction report.  And there is reference to Mr. Carey

4    receiving Albuterol, an Albuterol prescription at some

5    point.  But I don't see anything in here about the days

6    preceding his death that that discusses him having

7    access to an Albuterol inhaler.  And in fact, it says

8    here, and I'm going to ask you to look, look at Exhibit

9    2, the final report, "The Medical Review Board finds

10   that the physician failed to provide adequate treatment

11   of asthma due to failing to provide orders for a rescue

12   inhaler for acute asthma episodes while in the

13   infirmary."

14          And that same paragraph, it's paragraph

15   twenty-nine talks about the only thing that he had at

16   his bedside was Advair, not Albuterol.  You'll find that

17   on page six near the bottom, sir.

18   A.    And which, which thing is this in, which

19   Exhibit?

20   Q.    Exhibit 2.  It's the Commission of Correction

21   final report.

22   A.    Exhibit 2.  All right.  I have Exhibit 2 up.

23   And where again?  I'm sorry.

24   Q.    Paragraph twenty-nine which is at the bottom

25   of page six.

```
 1        A.    Oh, bottom of page six.  Okay.  I see that.
 2        Q.    Okay.  So have you, have you had a chance to
 3   read paragraph twenty-nine?
 4        A.    Yeah.
 5        Q.    Okay.  Would you agree with me, sir, that if
 6   someone was having difficulty breathing because of
 7   having an asthma attack that the administration of
 8   Albuterol would have potentially resolved those
 9   problems?
10        A.    Yes.
11              MR. DEUTSCH:  Object to the form.  Go
12              ahead and answer if you can.
13        A.    Yes.
14        Q.    And so would you agree with me that a
15   detainee having an asthma attack would be a medical
16   emergency?
17        A.    Yes.
18        Q.    And would you agree with me that a nurse
19   employed by the Department of Correctional Services has
20   an affirmative obligation to assist a detainee who's
21   having a medical emergency?
22        A.    Yes.
23        Q.    And would you also agree with me, sir, that
24   Albuterol is a medication that could be found in the
25   infirmary of a DOCCS facility or, excuse me, in the
```

1    infirmary located in a correctional facility?

2        A.    Interesting question.  The infirmary may not

3    necessarily have stock medication.  So I really can't,

4    can't say that that's true.

5        Q.    Okay.  Well, let me ask you this question,

6    sir:  Albuterol would be a medicine that you would find

7    in an ambulance anywhere in the United States, am I

8    right about that?

9        A.    I can't say that that's necessarily true

10   either.  I don't know for a fact.

11       Q.    All right.  Would you expect as a physician

12   that a properly equipped ambulance would have Albuterol

13   as one of the medications available to it?

14       A.    Well, an EMT is not authorized to utilize

15   any medication that's not prescribed for a patient.  I

16   don't know if, if they have any kind of protocols that

17   override that and allow them to administer a medication

18   not necessarily prescribed for a patient.  A paramedic

19   might but a regular ambulance, I don't know.

20       Q.    All right.  My understanding is ambulances

21   have paramedics.  Is that your, is that your experience,

22   as well?

23                MR. DEUTSCH:  Objection to the form.

24       A.    No.

25       Q.    Doesn't a paramedic, doesn't an EMT have the

1    ability to call into an emergency room and report to a

2    physician what's going on with a patient and then have

3    that physician authorize the use of medication to help

4    that person in an emergent situation?

5        A.    Not that I'm aware of.

6        Q.    Okay.  So, so I just want to be clear that

7    you're not sure in an infirmary setting that the

8    Department of Corrections would have Albuterol

9    medication available to treat an asthma attack?

10       A.    No, I'm not sure.

11       Q.    Do they have nebulizers in these infirmaries?

12       A.    They should.

13       Q.    Okay.  And isn't one of the ways that you can

14   administer Albuterol through a nebulizer?

15       A.    Yes.

16       Q.    Isn't it in fact more effective to administer

17   Albuterol through a nebulizer than it is through one of

18   the little -- You know -- one of the handheld, the

19   handheld devices that people have that they keep on

20   their person?

21               MR. DEUTSCH:  Objection to form.  Go

22               ahead.  You can answer.

23       A.    Yes.  And if they have a nebulizer, they

24   should have liquid Albuterol, not Albuterol in a metered

25   dose inhaler which is patient specific.  That's what

1    I've been talking about is a metered dose inhaler, a

2    handheld device.  An infirmary may not have that.  An

3    infirmary should have liquid Albuterol for nebulizer

4    use.

5         Q.    All right.  I mean that would be, that's

6    something that would be standard at a DOCCS infirmary

7    would be, would be a nebulizer combined with liquid

8    Albuterol to treat the medical emergency of an asthma

9    attack, fair to say?

10        A.    Yes.

11        Q.    And one of the reasons why the liquid

12   Albuterol would be there to treat an asthma attack

13   because there are occasions where someone has an asthma

14   attack that's so severe that the use of the handheld

15   meter device is not sufficient to treat it but where a

16   nebulizer may be able to treat it more appropriately,

17   fair to say?

18        A.    Yes.

19        Q.    And would you agree with me, sir, that if

20   someone had an underlying cardiac problem and then

21   suffered from an asthma attack that was untreated that

22   the asthma attack could in fact precipitate a cardiac

23   event?

24        A.    It's theoretically possible.

25        Q.    And sir, what, I want you to assume that

1    Nurse Salvadore was sleeping and the statements by the

2    inmates are basically that Michael Carey got up, was

3    having problems breathing, and he hit the call button

4    and they saw Nurse Salvadore sleeping out at her desk

5    with her feet up.  He hit the call button, she didn't

6    wake up, she didn't respond.

7            Mr. Carey took his long-acting asthma

8    medication, went back to sleep.  Then he woke up again.

9    They looked out again, she was still sleeping.  They

10   tried to comfort him.  He went back to bed and then he

11   died.

12           Would you agree with me, sir, based on that

13   description from the inmates that a nurse should have

14   become involved in his situation?

15           MR. DEUTSCH:  Objection, form.  Go

16           ahead.

17       A.    If, if -- this is very theoretical.  I mean,

18   if a call bell is rang, a nurse should respond.

19       Q.    Okay.  And if a call bell is rung because

20   someone is having difficulty breathing, that makes it

21   even more important for a nurse to respond, fair to say?

22       A.    Yes.

23           MR. DEUTSCH:  Objection to form.

24       Q.    And if that call bell is rung because

25   somebody is having an asthma attack and does not have

1  access to Albuterol, that nurse could administer

2  Albuterol to relieve that asthma attack, we could agree

3  on that, right?

4       A.    No.

5       Q.    Why wouldn't the nurse be able to administer

6  Albuterol?

7       A.    She has to have an order.

8       Q.    Why would she need an order in an emergent

9  situation where -- Well, first off, do you have any

10  dispute that Mr. Carey actually had a prescription for a

11  metered dose Albuterol inhaler that wasn't filled?

12       A.    I have no idea.

13       Q.    And that's what the Commissioner of

14  Corrections says, said they didn't give him his rescue

15  inhaler.

16             MR. DEUTSCH:  Objection, form.

17       A.    I thought, I thought the report said it

18  wasn't prescribed for him.

19       Q.    Yeah, you may be right.  Said failed to

20  provide orders for a rescue inhaler.  My apologies.

21  You're right.  Can -- Now, getting -- but circling back

22  around here, all right, fair enough.  Let's assume there

23  is no order, Mr. Carey's having problems breathing.

24  There is a doctor on call twenty-four/seven that picks

25  up the phone in a DOCCs, at a DOCCS infirmary, fair to

1  say?

2        A.    Yes.

3        Q.    All right.  So and I know, I forget the,

4  Marfatia or whatever.  I've seen him before in other

5  cases.  I know he works out there.  That detainee or

6  that nurse can pick up the phone at three o'clock in the

7  morning, call a doctor and say, I've got an inmate here

8  who can't breathe who has -- You know -- who has asthma

9  or COPD, I want to give him, I want to give him inhaled

10  or liquid Albuterol in a nebulizer, can I have

11  permission to do that.  And that can happen, correct?

12       A.    Yes.

13       Q.    And that happens all the time, does it not,

14  in DOCCS facilities where there is a medical emergency,

15  the physician is contacted?

16            MR. DEUTSCH:  Objection, form.

17       A.    Yes.

18       Q.    So let's assume for the moment that, and I'm

19  going to give you more specific information.  This is

20  what's been recounted by Investigator Kessel who

21  interviewed Inmate Terry Nudd who was in the infirmary

22  with inmate Carey the night that he died.  "At

23  approximately 12:30 a.m., Inmate Carey woke up with

24  heavy breathing.  He went to the bathroom.  He used his

25  inhaler.  And Inmate Russell hit his call button.  He

1    banged on his window to get someone.  He couldn't see

2    the officers anywhere.  They weren't in the TV room.

3    They could see the nurse, though.  She was in her

4    office.  She had her eyes closed and it looked like she

5    was sleeping.  The door to her office was closed, too.

6    Inmate Carey went to sleep.  At approximately 12:15,

7    12:30 a.m., Inmate Carey got up again.  I gave him some

8    water and he went back to bed.  The nurse was still in

9    her office.  We could see her head down on the counter.

10   At six a.m., officers found inmate Carey dead."

11              MR. DEUTSCH:  Where were you reading

12         from?

13              MR. KEACH:  From the State Police

14         incident report.  You want me to mark it?  I

15         can e-mail and mark it.

16              MR. DEUTSCH:  It would probably be

17         easier to do it that way just so that --

18              MR. KEACH:  That's fine.  No problem.

19              MR. DEUTSCH:  I think we're up to this

20         would be 8.

21              ( Exhibit 8 marked for Identification )

22              MR. KEACH:  Yeah.  Give me a moment.

23         Okay.  Hillel, I just forwarded that on to

24         you.

25              MR. DEUTSCH:  Hang on one second.

1          Here's the issue.  Apparently there is some

2          protests in the area and we were advised by

3          police that we need to evacuate the building

4          immediately.  So what I'm going to do is I

5          guess maybe we'll take our lunch break a

6          little early.  I will evacuate the building.

7          I will go home and --

8              MR. KEACH:  Hillel, I'm okay with that.

9          There is a question pending.  We're going to

10         be taking a break.  I'll ask for your

11         assurance you're not going to be speaking

12         with Dr. Koenigsmann during the break.  Do I

13         have that?

14             MR. DEUTSCH:  Yeah.  I mean, what we can

15         do is, I mean if the issue is that there is a

16         question pending -- Yes.

17             MR. KEACH:  I want you to --

18             MR. DEUTSCH:  That's fine.  That's fine.

19         I'm not going to speak to him during the

20         break.  That's fine.

21             MR. KEACH:  That's all I need to hear.

22         There is an emergency.  You go.  Get out of

23         there.  How are we going to reconvene?

24             MR. DEUTSCH:  I think we just click the

25         zoom link and it will bring us back here or

1           do we need a new link?

2               MR. KEACH:  I can give you a new link.

3           I just want to know how long it's going to

4           take you to get home.

5               MR. DEUTSCH:  Including everything,

6           probably a half hour max unless there is some

7           sort of blockage because the situation which

8           I don't know if the police have blocked

9           things off.

10              MR. KEACH:  Let's plan on reconvening at

11          one.  If you have a problem, send me an

12          e-mail from your phone.  Okay.

13              MR. DEUTSCH:  Okay.  Sounds good.  Thank

14          you very much.

15              MR. KEACH:  Does that work for you, sir,

16          reconvene at one?

17              THE WITNESS:  Yup.

18              MR. KEACH:  Okay.

19              ( Whereupon, a recess was taken.)

20      Q.   Dr. Koenigsmann, do you have Exhibit 8?  I

21   know I forwarded it, I believe I forwarded that to

22   Mr. Deutsch before the break.

23      A.   Yes, I believe it came.  Yes, I see it on

24   Exhibit 8.

25      Q.   Okay.  I'm going to ask you to open that

1    document and go to page three.

2         A.    Page three.  Okay.  Okay.

3         Q.    And I'm going to read back, will be near the

4    bottom of page three, you'll see paragraph sixteen.

5         A.    Sixteen.

6         Q.    Recounting a statement from, from Inmate

7    Terry Nudd who is in the infirmary with Carey.  "At

8    approximately twelve-thirty a.m., Inmate Carey woke up

9    with heavy breathing.  He went to the bathroom.  He used

10   his inhaler.  And Inmate Russell hit his call button.

11   He banged on his window to get someone.  He couldn't see

12   the officers anywhere.  They weren't in the TV room.

13   They could see the nurse, though.  She was in her

14   office.  She had her eyes closed and it looked like she

15   was sleeping.  The door to her office was closed, too.

16   Inmate Carey went to sleep.  At approximately twelve-

17   fifteen a.m. to twelve-thirty a.m., Inmate Carey got up

18   again.  They gave him some water and he went back to

19   bed.  The nurse was still in her office.  He could see

20   her head down on the counter.  At six a.m., officers

21   found Inmate Carey dead."

22             And it's a similar statement from what Inmate

23   Russell gave who was also present with Mr. Carey in

24   the -- You know -- in that infirmary room.  And that

25   would be paragraph fifteen.

1              MR. DEUTSCH:  Objection to form, because

2              you said I think twelve-fifteen to

3              twelve-thirty, is that what you meant to say?

4              Because I'm reading two-fifteen to two-thirty

5              in what I've got.

6              MR. KEACH:  Two-fifteen to two-thirty is

7              what I meant to say in the latter part of the

8              paragraph, yes.

9         Q.    Just so the time period is clear, it's

10   twelve-thirty he woke up the first time.  Between two-

11   fifteen to two-thirty, he woke up the second time.  Have

12   you had a chance to review those, have you had a chance

13   to review that, Dr. Koenigsmann?

14        A.    Yeah, I see that.

15        Q.    And so assuming what the inmates say about

16   Nurse Salvadore's conduct is true, what is your opinion

17   of the fact that she was sleeping on duty at Groveland

18   Correctional Facility in the early morning hours of

19   April 19th, 2015?

20             MR. DEUTSCH:  Objection to form but you

21             can go ahead and answer.

22        A.    If, if that's, that's truly accurate, then

23   that's, that goes against, not that it's written

24   officially in policy, that goes against everything in

25   nursing.  You don't sleep on the job.

```
 1          Q.    Okay.  And have you been deposed before?
 2          A.    Yes.
 3          Q.    On how many occasions?
 4          A.    A number.  I don't know off the top of my
 5    head how many.
 6          Q.    Okay.  And was that all associated with your
 7    role in DOCCS or were you also deposed relative to your
 8    individual medical practice?
 9          A.    No, only related to DOCCS.
10          Q.    Are you, in your role as the chief medical
11    officer for DOCCS, are you familiar with the term
12    negligence?
13          A.    Yes.
14          Q.    How about the term gross negligence?
15          A.    Yeah.
16          Q.    How about the term reckless indifference?
17          A.    I understand what it means, yup.
18          Q.    Okay.  Would you agree with me that if an
19    inmate needed medical care and that a nurse -- Well,
20    excuse me.  If an inmate was having a medical emergency
21    which having difficulty breathing is a medical
22    emergency, we can agree there, right?
23          A.    Yes.
24          Q.    If an inmate is having a medical emergency
25    and the nurse was sleeping on the job and did not get up
```

1    and help that inmate, would you agree that that's

2    negligent on behalf of the nurse?

3              MR. DEUTSCH:  Objection, form.  You can

4              answer.

5    A.    I would say yes.

6    Q.    Would you agree that that's grossly negligent

7    on behalf of the nurse?

8    A.    I would go so far as to say yes.

9    Q.    How about recklessly indifferent?

10             MR. DEUTSCH:  Objection, form.  Go

11             ahead, you can answer.

12   A.    In my mind, that I would not say.

13   Q.    Okay.  Why not?

14   A.    If she knew he needed help and refused to

15   help, that's indifferent.  Not knowing he needed help

16   because she was sleeping is not indifferent.

17   Q.    Okay.  Well, wouldn't someone who has the --

18   wouldn't someone who is a nurse -- Let me step back.  To

19   my knowledge, she was the only person on duty in the

20   medical unit that night.  Do you have any contrary

21   indication?

22   A.    No.

23   Q.    Excuse me.  Contrary knowledge?

24   A.    No.

25   Q.    Okay.  So if you're the only member of

1    medical staff that's on duty overnight in an infirmary

2    in the Department of Correctional Services where you

3    have detainees that have higher, their higher need for

4    medical care and you're sleeping at your desk for the

5    majority of your shift, you don't think that that's

6    indifferent conduct by somebody?

7        A.    In my mind, well, you characterize that

8    oddly.  You said the, the bulk of her shift.  I forget

9    how you just phrased it.  And I don't know if she has

10   any issues or medical problems that could have

11   precipitated her falling asleep.  But regardless, in my

12   mind, there is a nuance distinction here and I would not

13   call it indifferent.

14       Q.    Okay.  What if she didn't have a medical

15   condition that caused her to fall asleep?

16       A.    Still, I don't know.  Call me -- I'm just

17   saying, my own definition, in my mind, definition of

18   indifference is it would have to be that she knew he

19   needed help and refused to help him.  That's what I

20   would use as, as an indifferent term.

21       Q.    Okay.  Well, I guess -- You know -- the last

22   question is:  You and I can agree in an infirmary

23   setting that there is always the possibility that a

24   detainee who's housed in that, in that medical unit is

25   going to need help, we can agree there, right?

1    A.    Yeah.

2    Q.    That's why you have the nurse on duty

3  overnight in case there is a problem, you have medical

4  staff there who can help the detainee out, right?

5    A.    Yes.

6    Q.    All right.  And so it's certainly foreseeable

7  during any shift in a DOCCS facility that an inmate is

8  going to have a medical emergency, can we agree there?

9    A.    Can you just repeat that again?

10   Q.    Wouldn't you agree with me that it's always

11  possible during any shift in a medical unit at the

12  Groveland Correctional Facility that an inmate could

13  have an emergent medical problem and have to seek

14  assistance from the nurse?

15   A.    Yes.

16   Q.    We've got the whole litany of medical

17  problems.  You and I can agree that there are medical

18  emergencies everyday all throughout the DOCCS medical

19  system, right?

20   A.    Yes.

21   Q.    And so you and I can agree that it would be

22  foreseeable for, it would be foreseeable -- Let me step

23  back.  That Nurse Salvadore could have foreseen that

24  there may have been a problem during her shift, correct?

25                MR. DEUTSCH:  Objection to form.

1    A.    Wow.  May have foreseen.  I don't think I

2  could agree to the way you formed that, may have

3  foreseen.  If you could just phrase that a little

4  differently maybe.

5              MR. KEACH:  Give me a moment's

6              indulgence, Doctor.  Okay.  My apologies for

7              the interruption.  Can you read back the

8              Answer, please, Cathy?

9              ( The last Answer was read by the

10             Reporter. )

11    Q.    Sure.  You would agree with me that it's

12  always possible during any given shift that a nurse has

13  in a Department of Corrections facility that there could

14  be a medical emergency that requires her assistance?

15    A.    Yes.

16             MR. DEUTSCH:  Objection to form.

17    Q.    That's fine.  Mr. Deutsch didn't like how I

18  worded my question but you were free to answer it.

19             MR. DEUTSCH:  Yes, that's correct.

20    Q.    And you would, you and I could also agree

21  that the chances of there being a medical emergency for

22  an inmate during a nurse's shift would be higher in the

23  infirmary setting than it would be say out in the

24  general population?

25    A.    Yes.

1      Q.      And that infirmary, I think you told me

2    before was set up, the infirmary is specifically set up

3    to provide a higher level of care to detainees that need

4    assistance?

5      A.      Higher level of care than general

6    population, yes.

7      Q.      Okay.  And can you -- In your letter to the

8    Commission of Correction, which I believe, give me just

9    a moment here to find it.  Exhibit 3.  It says here, "RN

10   LS was initially placed on administrative leave by the

11   Bureau of Labor Relations but was eventually returned

12   with no discipline."

13           Sir, if what it says in this report is true

14   and Nurse Salvadore was sleeping when Mr. Carey was

15   having breathing problems and Mr. Carey died, not

16   receiving any care, wouldn't you agree with me that

17   something should have been done --

18           MR. DEUTSCH:  Objection to form.

19     Q.      -- for her conduct?

20           MR. DEUTSCH:  Objection, form.

21     A.      I don't know what you mean by something

22   should have been done.

23     Q.      I'm sorry, sir.  I didn't mean to cut you

24   off.  My apologies.

25     A.      Our recourse is to refer the patients to

1    Labor Relations.  There are Union issues here.  That's

2    the most we can, we can do from a disciplinary

3    standpoint.

4         Q.    Okay.  Would you agree with me that she

5    should have been disciplined?

6         A.    If it's true that she was sleeping.

7         Q.    Yeah.

8         A.    If it's true that she was sleeping, yes.

9         Q.    Do you know whether or not the mortality

10   review conducted by DOCCS into Mr. Carey's death

11   addressed the fact, or excuse me, addressed the

12   allegation that Nurse Salvadore was sleeping on duty?

13        A.    No, I don't know if that was addressed.

14        Q.    All right.  Now, I just want to break this

15   down a little bit more.  If Mr. Carey was having a

16   cardiac event, one of the, one of the consequences for a

17   person having a cardiac event can be shortness of

18   breath, fair to say?

19        A.    Yes.

20        Q.    And that can occur for instance if there is

21   an arrythmia that's causing problems with heart

22   function, correct?

23        A.    Yes.

24        Q.    All right.  And we can agree that if someone

25   is suffering shortness of breath from a cardiac event

1    that there are treatments that can be given to that

2    person to save that, to save their life or avoid some

3    other adverse medical consequence, fair to say?

4        A.    Yes.

5        Q.    And we can also agree that if someone is

6    suffering from asthma that obviously that would indicate

7    itself by someone having difficulty breathing?

8        A.    Yes.

9        Q.    And we can also agree that if someone is

10   suffering from an asthma attack that they can be given

11   treatments that can avoid either their death or a

12   serious adverse consequence for the patient, correct?

13       A.    Yes.

14       Q.    And both of those, and for both of those

15   circumstances for the heart attack and for the asthma

16   attack, there are things that Nurse Salvadore could have

17   done, assuming that she was asleep, or excuse me,

18   assuming she was awake to provide care and would see Mr.

19   Carey that could have helped Mr. Carey address those

20   problems, fair to say?

21       A.    I'm going to need you to start that one from

22   the beginning again.

23       Q.    That was a little unwieldy.  I'll give you

24   credit there, sir.  I'm sure Mr. Deutsch told you in

25   preparing you for your Deposition that I am the model of

1   perfection.  You've seen the one instance where I am

2   not.  I'll start over.

3              Would you agree with me that if someone, if

4   Mr. Carey was having a cardiac event in the early

5   morning hours of April 19th, 2015 that Nurse Salvadore

6   could have, if she knew about those problems could have

7   intervened and taken steps that may have saved Mr.

8   Carey's life?

9       A.   Yes.

10      Q.   Would you agree the same for the asthma

11  issue, if he died of an asthma attack, would you agree

12  that there are steps Nurse Salvadore could have taken

13  had she known about what was happening and could have

14  saved Mr. Carey's life?

15      A.   Yes.

16      Q.   Were you aware that a Court of Claims Judge

17  had asked the Attorney General's office to produce

18  documents -- Let me step back.  Are you aware that a

19  Court of Claims Judge had requested documentation about

20  Mr. Carey's death roughly about eight or nine months

21  before you sent your letter to the Commission of

22  Correction?

23      A.   No.

24      Q.   Did you have any knowledge at all about --

25  You know -- Judge Renee Minarik in the Court of Claims

```
 1    requesting information from the State government about
 2    what happened to Mr. Carey?
 3         A.    No.
 4         Q.    So at the time that you sent this letter to
 5    Commissioner of Corrections in March, I believe it was
 6    March of 2018.  Let me just take a look here.  March of
 7    2018, at the time that you sent your letter to the
 8    Commissioner of Corrections, you had no knowledge that a
 9    Court of Claims Judge had asked the State government to
10    provide information to her about what happened to Mr.
11    Carey?
12         A.    No.
13         Q.    Okay.  And you would agree with me that
14    having an opportunity to review the Commission of
15    Corrections report that the Commission of Corrections
16    found substantial deficiencies in the medical care
17    provided to Mr. Carey for his asthma?
18                   MR. DEUTSCH:  Objection to form.
19         A.    You say substantial.  There were
20    deficiencies, some technical.  I don't know if I would
21    go so far as to say substantial.
22         Q.    Well, I'll tell you what, Exhibit 2 is the
23    final COC report.  And I'm going to read from the second
24    page, the first paragraph about the third of the way
25    through the paragraph.  "The Medical Review Board has
```

1    determined that the medical care provided to Carey was

2    substandard and did not meet acceptable standards of

3    care.  DOCCS medical staff at Groveland Correctional

4    Facility failed to properly follow health care policies

5    in providing care for Carey and failed to provide proper

6    medical management for his asthma.  The Medical Review

7    Board has determined that had Carey received proper

8    medical care in accordance with DOCCS treatment

9    guidelines, his death may have been prevented."

10            So having an opportunity to review that

11    language, sir, what would you characterize the findings

12    of the Commission of Corrections as it relates to

13    Mr. Carey's death?

14        A.    I agree that there were deficiencies in his

15    care.  I don't know what else to say.

16        Q.    Well, when you prepared the Department, the

17    Department of Correctional Services Response to

18    Mr. Carey's -- You know -- to, to the report on Mr.

19    Carey by the Commission of Corrections, you didn't

20    disagree with these determinations, did you?

21        A.    I don't remember specifically at the time.

22    Certainly my concern would have been about the, the

23    reports of a nurse sleeping and being inattentive.  The

24    SCOC characterizes things in a very negative and

25    inflammatory way very often.  But I mean I had certain

1    concerns but the concerns were much more about the, the

2    immediate care rendered to the patient than the long-

3    term care of his asthma.

4        Q.    And what did you, and what did you do in

5    response to your concerns about the immediate care of

6    the patient?

7        A.    Sounds like we went through the channels and

8    the case was referred to Labor, Labor Relations for

9    possible disciplinary action towards the nurse.

10       Q.    Anything else?

11       A.    Oh, I'm sure there was, there was a variety

12   of other things, retraining of staff on the, on the

13   asthma treatment protocol, retraining of staff on, on

14   response to emergencies.  I'm sure there was a whole

15   host of other things that, that were part of the action

16   plan.

17       Q.    Do you remember what conversations you had

18   with Labor, the Bureau of Labor Relations about the

19   possibility of disciplining Nurse Salvadore?

20       A.    No, I don't.

21       Q.    Do you have any knowledge about Nurse

22   Salvadore's subsequent employment history with DOCCS

23   after Mr. Carey died?

24       A.    No.

25       Q.    All right.  You're not aware that prior to

1    Nurse Salvadore resigning, as you detailed in your

2    letter, that she faced a Notice of Discipline that I

3    believe had more than forty items in it, including

4    violence towards staff members, failure to provide

5    proper care to inmates and a whole range of other

6    misconduct.

7                    MR. DEUTSCH:  Objection, form.

8         A.    No, I'm not aware of that.

9         Q.    Okay.  It also included, I believe it was

10   either seven or eight counseling memos for the various

11   issues that, some of which then were raised in the

12   Notice of Discipline.

13        A.    You're asking if I knew that?

14        Q.    Yes.

15        A.    No, I didn't know that.

16        Q.    Okay.  I want you to take a look at Exhibit 4

17   which is styled, it's called a preliminary COC report?

18        A.    Okay.  I have it up.

19        Q.    Okay.  And do you see down at the, and I want

20   you to again go to page two.  And just confirm for me

21   that it has the same language that I read to you from

22   the final report about substandard care, did not meet

23   acceptable standards of care, that type of thing.

24        A.    Where -- Are you talking about findings,

25   number one?

1      Q.    Yes, findings, number one.

2      A.    Okay.

3      Q.    Would you agree with me that's similar

4  language to what you had in or what was in the final

5  report?

6      A.    Yes, it looks like it.

7      Q.    Okay.  How would you have received that

8  preliminary report, sir?

9      A.    From the SCOC?

10     Q.    Yeah.

11     A.    They mail it to us.

12     Q.    Well, did you get a copy of that directly or

13  did that go to Commissioner Annucci and then come to

14  you?  How would you -- what would happen there?  What's

15  the mechanics of it?

16     A.    I believe it would have gone to the

17  Commissioner and then he sends it to me.

18     Q.    Okay.  And do you know how long after the

19  commissioner gets it that he would send it to you?

20     A.    Fairly quickly.

21     Q.    Okay.  Within a matter of a day or two?

22     A.    Yeah, I would say so.

23     Q.    Do you know who else Commissioner Annucci

24  would provide a copy of that report to?

25     A.    For SCOC issues, it was pretty much me.

 1          Q.    Okay.  Would a copy of it go to Counsel's

 2    office?

 3          A.    I don't know.

 4          Q.    Okay.  Would you receive this from

 5    Commissioner Annucci by e-mail or in some other way?

 6          A.    He would send me the hard copy of the

 7    Commission's letter.

 8          Q.    Okay.  And would he send that with some sort

 9    of memo or letter or how would you get it?

10          A.    There is always a face attachment, but the

11    handling of SCOC, SCOC issues was, there is the process.

12    So he really wouldn't have to say very much on that,

13    probably for my attention or, or take appropriate action

14    or I don't remember exactly what he would put.

15          Q.    Okay.  Well, if, but there would be some sort

16    of memo associated with you receiving that document,

17    correct, some sort of writing?

18          A.    Some form of a cover sheet, yes.

19          Q.    And in the -- how many times have you seen

20    those sorts of reports during your eight years working

21    as the chief medical officer for the Department of

22    Corrections?

23          A.    The Commission is very slow in these things.

24    I would say we, we would get batches at least on a

25    yearly basis, if not, when I say batches, several,

1    several cases reviewed in a batch.  And I would say we

2    would get that maybe once to twice a year.

3        Q.    Okay.  Well, how many other times have there

4    been -- Well, let me step back.  The Commission of

5    Corrections investigates any inmate death, fair to say?

6        A.    Yes, I believe they do.

7        Q.    All right.  And there are routinely occasions

8    where people die -- You know -- for lack of a better

9    descriptor of a normal death, someone has a heart

10   attack, they die.  Someone -- You know -- inmates commit

11   suicide and they die.

12           And when the Commission of Correction looks

13   at a, looks at a death like that, they generally do not

14   issue the sort of report that we see here as it relates

15   to Mr. Carey.  Would you agree with me there?

16       A.    Yes.

17               MR. DEUTSCH:  Objection to form.

18       A.    Yes.

19       Q.    Okay.  And I've seen, it's a very short

20   letter, says -- You know -- this person -- You know --

21   the Commission -- You know -- finds this death to be a

22   suicide or finds this to be a death by natural causes,

23   fair to say?

24       A.    Yes.

25       Q.    Okay.  So how many occasions in the eight

1    years that you were working for DOCCS did you see a

2    report like we have here for Mr. Carey where there are

3    findings and then there are, then there are

4    recommendations about what should occur?

5         A.    Many.

6         Q.    On many occasions?

7         A.    Yes.

8         Q.    Okay.  Anything where they've used the type

9    of language that we see here, substandard care?

10        A.    Yes.

11        Q.    Okay.  And so when you get a report like

12   this, what do you do in response?

13        A.    We, we evaluate it and well, we have to

14   respond to it.  So we look into it and respond to it,

15   try to be as proactive as possible with these cases

16   where if there were concerns about care that we ferreted

17   out at the time of death because these were usually

18   delayed by one if not more than a year before we would

19   get something from SCOC.

20             Many times, we identify deficiencies in care

21   and have already taken action about the deficiencies in

22   care, retraining even, even referrals to Labor Relations

23   and things.  So we, we were prepared to respond to the

24   SCOC responses.  Very often the SCOC was incorrect in

25   their evaluations, missed things or just

1    mischaracterized things.

2         Q.    Okay.  Do you know if, if any, were there any

3    identified deficiencies in the care provided to Mr.

4    Carey besides what the Commission on Corrections found?

5         A.    Through our own internal review?

6         Q.    Yes.

7         A.    No, I don't recall.

8         Q.    And if in the past if you believed that the

9    Commission of Correction was incorrect in its

10   evaluation, you would say as much in response to one of

11   their reports, fair to say?

12        A.    Yes.

13        Q.    And you did not do that relative to

14   Mr. Carey's death, did you?

15        A.    No.  The response does not, does not appear

16   to, to indicate that.

17        Q.    All right.  So if we accept as true the

18   Commission of Corrections report about Mr. Carey's

19   death, you would agree that the State government -- You

20   know -- New York State government is negligent in the

21   care provided to Mr. Carey, would you not?

22              MR. DEUTSCH:  Objection, form.

23        A.    Interesting question.  There were

24   deficiencies in his care.  I wouldn't characterize it

25   necessarily as negligence.  No, I'm not going to go so

 1  far as to say that.

 2      Q.    If the medical care provided to Mr. Carey was

 3  substandard and did not meet acceptable standards of

 4  care.  That's the definition of negligence in the

 5  medical?

 6              MR. DEUTSCH:  Object to the form.

 7      A.    Good question.  That is, there is legal

 8  issues with the nuances of that language.  I don't know

 9  if I would go so far to say that that's the definition

10  of negligence.

11      Q.    All right.  You're familiar with the concept

12  of -- Well, let me step back.  Would you agree with me

13  that this report at least provides an argument that the

14  State Government was negligent in providing care for Mr.

15  Carey?

16              MR. DEUTSCH:  Objection, form.

17      A.    Provides an argument.  I guess so.

18      Q.    All right.  I'll do a better job.  It

19  provides the basis for a claim against the State

20  government for Mr. Carey's death, that his death was

21  caused by negligent medical care.

22              MR. DEUTSCH:  Objection to form.

23      A.    You're going to have to say that again.

24      Q.    Sure.  Would you agree with me that myself,

25  as the attorney for the Carey estate can rely upon the

1    report of the Commission of Correction to argue to the

2    Court of Claims that Mr. Carey's death was caused by the

3    negligence of New York State?

4                    MR. DEUTSCH:  Objection, form.

5        A.    That is the weirdest question I've ever been

6    asked.

7        Q.    I have good reason for asking it, sir.

8                    MR. DEUTSCH:  I object to that comment.

9                    But that's fine, go ahead and answer if you

10                   can answer.

11       A.    You're going to have to say that again.

12       Q.    I'm going to phrase it a little differently.

13   This report says, quote, "Medical care provided to Carey

14   was substandard and did not meet acceptable standards of

15   care."  The New York State Attorney General's office

16   represented to Court of Claims Judge Renee Minarik on

17   December 27th, 2017, roughly a week after this report

18   was, was completed by the Commission of Corrections that

19   Mr. Carey's claim against New York State had no merit.

20   The Attorney General's office did not provide a copy of

21   this report to Judge Minarik even though it was in

22   possession of the agency before that Affidavit was

23   submitted to the Court.  Can you explain that to me?

24                   MR. DEUTSCH:  Objection.  Form.  Answer

25                   if you can answer.

1    A.    I can't explain that to you at all.

2    Q.    Okay.  And you can't tell me right now

3  whether or not this made it to DOCCS Counsel's office at

4  the same time it came to you given that there was

5  ongoing litigation about Mr. Carey's death?

6    A.    No.  I have no idea if that Commission of

7  Corrections made it to Counsel's office.

8    Q.    Do, did you ever, just yes or no, did you

9  ever discuss Mr. Carey's situation with anybody from

10  Counsel's office at the Department of Corrections?

11    A.    Not that I recall.

12    Q.    Do you know Charles Quackenbush?

13    A.    Absolutely.

14    Q.    And have you talked with Mr. Quackenbush in

15  the past about different cases, just yes or no,

16  different situations?

17    A.    Yes.

18    Q.    Okay.  And how about, one case I know about

19  because I achieved a successful verdict on his behalf in

20  the Court of Claims.  Do you know a gentleman by the

21  name of Charles Gray?  Have you ever heard that name?

22    A.    No.

23    Q.    Charles Gray had a ruptured tricep tendon

24  that wasn't treated for over three months by the

25  Department of Correctional Services.  It was a complete

1    rupture of the tricep tendon.  Do you know of an inmate

2    with that sort of situation that you may have talked

3    with Mr. Quackenbush about?

4         A.    No.

5                   MR. DEUTSCH:  Objection, form.

6         Q.    And would you agree with me that

7    Mr. Quackenbush is the person in DOCCS Counsel's office

8    that is the, for lack of a better term, the lead defense

9    attorney for the agency as it relates to these medical

10   claims?

11                  MR. DEUTSCH:  Objection, form.

12        A.    I do not know that for a fact.

13        Q.    Okay.  Have you conferred with

14   Mr. Quackenbush about, you've conferred with

15   Mr. Quackenbush about medical claims raised by inmates

16   in the past though, fair to say?

17                  MR. DEUTSCH:  Objection to form.

18        A.    Yes.

19        Q.    All right.  Was -- I think I may have asked

20   this before but I just want to be clear.  Was this

21   letter that you sent to the Commission of Correction on

22   March 20th, 2018 reviewed by anyone from DOCCS Counsel's

23   office, yes or no?

24        A.    I have no knowledge that it was reviewed by

25   DOCCS Counsel as well as, as far as I remember, there

1    was no process for it to be reviewed by DOCCS' Counsel.

2    It was not part of a protocol to have it reviewed by

3    DOCCS Counsel.

4        Q.    Have there been occasions in the past where

5    your correspondence to the Commission of Corrections has

6    been reviewed by DOCCS Counsel?

7        A.    Prior to sending it to the Commission of

8    Corrections?

9        Q.    Yes.

10        A.    No, not that I'm aware of.

11        Q.    Okay.  And you don't have any recollection of

12    receiving a litigation hold letter as it related to

13    Mr. Carey?

14        A.    No.  I don't recall.

15        Q.    Do you know an attorney by the name of Tamara

16    Christy?

17        A.    That name doesn't ring a bell.

18        Q.    Apart from Mr. Deutsch, have you conferred

19    with any other lawyers at the, at the Rochester office

20    of the Attorney General about Mr. Carey's situation?

21        A.    About Mr. Carey, not that I recall.

22        Q.    And you cannot recall, sir, at any point in

23    time after July 3rd, 2018 receiving a litigation hold

24    letter in this case?

25        A.    After when?

1        Q.      I'll do a better job.  After June 19th, 2018

2   until the end of your employment with DOCCS, did you

3   ever receive a litigation hold letter about Mr. Carey's

4   situation?

5        A.      Again, not that I recall.

6        Q.      When a final report from the Commission of

7   Correction is generated, do you know who that report is

8   delivered to in the Department of Corrections?

9        A.      Final report.

10       Q.      Right.  There was a final report April, I

11  believe it's April 19th, 2018, the final report came

12  back.  Do you -- Let me just -- I'll give you the

13  precise dates if you give me just a moment.  The final

14  report was issued on April 12th, 2018.  Do you know who

15  that final report is provided to in DOCCS?

16       A.      I assume they send that to the Commissioner

17  and he sends it to me.  I believe that's what happens.

18       Q.      Wouldn't that final report also go to

19  Counsel's office?

20       A.      I have no idea.

21       Q.      Okay.  So I'm assuming the person I should

22  ask about that would be the Commissioner?

23       A.      The Commission secretary would know.

24       Q.      Okay.  I just want to be clear, you can't

25  explain to me why the preliminary report dated December

1    19th, 2017, your letter dated March 20th, 2018 and the

2    Commission of Corrections final report dated April 12th,

3    2018 was not provided to the Court of Claims despite the

4    fact that the Court of Claims had asked for

5    documentation about Mr. Carey's death and that a

6    decision relative to an application for leave to file a

7    late claim was still pending at that time?

8              MR. DEUTSCH:  Objection to form.

9        A.    No, I can't explain why, why that occurred.

10       Q.    All right.  And your testimony is you had no

11   idea, you had no idea that there were any legal

12   proceedings pending at any point, at any point in time

13   prior to talking to Mr. Deutsch, fair to say?

14       A.    Yes.

15       Q.    All right.  So no one from either Counsel's

16   office or the Office of the Attorney General came to you

17   at any point in time prior to the end of your employment

18   and said, hey, there is a lawsuit pending about Mr.,

19   about Michael Carey, what documents do you have, give

20   them to me please so I can preserve them.  Fair to say?

21       A.    Correct.  Because there was an internal

22   mechanism for preserving e-mails and things.  That was

23   automated or automatic or something.  So it was not

24   something that I worried about.

25       Q.    All right.  I'm not, sir, I want to make it

1  clear, I'm not blaming you for these issues.  I'm just

2  trying to establish that you didn't know about them.  So

3  I'm just asking you, I understand there may be some

4  internal mechanism involved that would preserve e-mails.

5  I appreciate that.  You generate documentation in your

6  work that involves something besides e-mail, correct?

7      A.    Most of it was done by e-mail.

8      Q.    All right.  This letter to the Commission of

9  Corrections, that was held in a hard copy, held on a

10 server somewhere, right?

11     A.    The letter for the --

12     Q.    Exhibit 3, the letter you sent to the

13 Commissioner of Corrections in response to their report,

14 that was held, that was held on a server or in some

15 other location, wasn't it?

16     A.    Yes, it would have been.

17     Q.    Okay.  I mean, and I'm just asking you, was

18 this a paper file or does DOCCS just keep electronic

19 records now?  How would this letter have been preserved,

20 Exhibit 3?

21     A.    That letter would have been produced by my

22 secretary and stored by her.

23     Q.    Okay.  You leave that up to her and she'd

24 save it somewhere?

25     A.    Yes.

1    Q.    Did you ever print out e-mail that you needed

2    to be preserved?

3    A.    Print out e-mails.  As I said, there was a

4    mechanism for saving our e-mails.  No, I wouldn't have

5    printed out e-mails to specifically save.

6    Q.    Let me do a better job.  Okay.  Sometimes in

7    my line of work, something happens, and there is an

8    e-mail back and forth with -- You know -- with my

9    adversary or -- You know -- with a party or somebody and

10   I feel that -- You know -- I see that and I'm like yeah,

11   I'm going to keep this in my electronic records but I'm

12   going to print this out and make sure it gets into the

13   file, too, to make sure it's preserved.  Have you ever

14   done anything like that?

15   A.    Yeah.  Oh, yes.

16   Q.    Okay.  And so that would then go to your

17   secretary and she would figure out how to save it?

18   A.    Well, not exactly.  I did keep my own files

19   predominantly for a certain kind of thing, Hepatitis C

20   approvals, things like that where, where the e-mail

21   conversations back and forth were important and I would

22   save them.

23   Q.    Okay.  And what would you do with those, what

24   did you do with those files when you left employment

25   from the Department of Corrections?

1        A.    I left them there at the Department.

2        Q.    Okay.  And so if I wanted to find them today,

3    how would I go about doing that?

4        A.    You'd probably have to contact my office at

5    Health Services and my secretary would have been, would

6    be able to tell you if they're still there.

7        Q.    What's the name of your secretary?

8        A.    Linda Brown.

9        Q.    She still work there?

10       A.    As far as I know.

11       Q.    Who took over for you when you left the job

12   of chief medical officer?

13       A.    Dr., I think his first name is John, John

14   Morley.  I believe he was, I think his name is on the

15   second response to the SCOC, the final.

16       Q.    I haven't seen that name before.  The second

17   response to the SCOC.

18       A.    Wasn't there something I saw that that had

19   his name on it.

20       Q.    It may have been -- Let me take a look here.

21       A.    Well, that's who it is, it's John Morley,

22   Dr. Morley.  I thought I saw something that he sent.  An

23   amendment or something, an Amended Response.  I don't

24   know.

25       Q.    I haven't seen an Amended Response.

```
 1                    MR. DEUTSCH:  Can we just go off the

 2              record for one second just to clarify this

 3              and make life easier?

 4                    MR. KEACH:  Sure.

 5                    ( Discussion off the record )

 6         Q.   Is it fair to say, Dr. Koenigsmann, you were

 7    never consulted --

 8                    MR. KEACH:  And I guess, Hillel, I'm

 9              going to mark this as -- I just forwarded you

10              Exhibit 9, I believe.  Did you receive that?

11                    ( Exhibit 9 marked for Identification )

12                    MR. DEUTSCH:  Dr. Koenigsmann, did you

13              get it?

14                    MR. KEACH:  No, I'm talking to you,

15              Hillel.

16                    MR. DEUTSCH:  I got it.  I sent it to

17              him.

18                    MR. KEACH:  So we're going to style this

19              as Exhibit 10.

20                    MR. DEUTSCH:  Okay.

21                    MR. KEACH:  And I'll send this on to you

22              so we'll label it correctly and we'll send it

23              on to the Witness.  This is a pretty unwieldy

24              way to do things but this is what we got

25              these days.
```

      1                    ( Exhibit 10 marked for Identification )

      2        A.    Just got it.  Okay.

      3              MR. KEACH:  Okay.  Hillel, I labeled

      4         Exhibit 10 and sent it on to you.  If you

      5         could forward it to the Doctor, please.

      6              MR. DEUTSCH:  Exhibit 10, Exhibit 10 is

      7         the updated COC response, January 21st, 2020?

      8              MR. KEACH:  Yup.

      9              MR. DEUTSCH:  He has that already.

     10              MR. KEACH:  I just wanted -- I'm sending

     11         it to you.  I'm going to mark it as Exhibit

     12         10.

     13              MR. DEUTSCH:  Sure.  Understood.  I'm

     14         sorry.  Absolutely.

     15        Q.    Do you have that document in front of you

     16    now, Doctor?

     17        A.    The new one, the deaths in custody?

     18        Q.    No, the Amended Response to the Commission of

     19    Correction.

     20        A.    Oh, boy.

     21        Q.    Mr. Deutsch just e-mailed it to you because I

     22    just e-mailed it to him a moment ago.

     23        A.    Because I have to go back digging through

     24    all those old things to try to find it.

     25              MR. DEUTSCH:  No problem.  I'll just

1          forward it to you right now.

2                THE WITNESS:  All right.  Thanks.

3     A.    I looked it over.

4     Q.    Okay.  Is it fair to say that document was

5     prepared without talking with you?

6     A.    I don't recall anybody talking to me about

7     this.

8     Q.    I guess that's what I'm trying to figure out,

9     Dr. Koenigsmann, you didn't, it's not like Dr. Morley

10    called you up and said, hey, we're going to provide an

11    Amended Response to the COC and we want to get your

12    input.  Fair to say?

13    A.    No, he did not.

14    Q.    All right.  And you don't have any idea when

15    this document was prepared compared to events in the

16    underlying litigation in this case in Federal Court,

17    fair to say?

18    A.    No.  I, no, I have no idea.

19    Q.    All right.  And you have -- Do you stand by

20    what you wrote in the Commission of Corrections on March

21    20th, 2018 based on the knowledge you had at the time?

22    A.    Well, based on the knowledge I had at the

23    time, but after reviewing -- Well, doesn't matter.

24    Based on the knowledge I had at the time, yes, that was,

25    that was my response.

1      Q.    Okay.  And you would agree, just to be fair,

2   we have Dr. Morley's letter here.  So we have two

3   inmates who say that Nurse Salvadore was sleeping when

4   Mr. Carey tried to get help.  And then we have Nurse

5   Salvadore denying it.  And apparently the Office of

6   Special Investigations decided that the inmates weren't

7   credible and that Nurse Salvadore was.  Would you agree

8   with me that's basically the gist of what Dr. Morley is

9   saying here with the conclusions, we don't believe the

10   inmate, we believe Nurse Salvadore and there is no basis

11   for us to have taken any action?

12                    MR. DEUTSCH:  Objection, form.

13      A.    No, I would not characterize it that way.

14      Q.    Okay.  Well, why would you, how would you

15   characterize it?

16      A.    Well, it says the Office of Special

17   Investigations determined there was insufficient

18   evidence to corroborate.  I don't know if only they used

19   the, what the inmates said to reach that determination.

20   I believe I saw something somewhere about officers, the

21   officers also said that they never saw call, heard or

22   saw the call bell lights come on.

23      Q.    That's the same officer that the Office of

24   Special Investigation disciplined for not doing his

25   rounds?

1          MR. DEUTSCH:  Objection to form.

2      A.     There was more than one officer involved.

3  There was also a security supervisor, if I'm not

4  mistaken which would have been a sergeant that I saw, I

5  saw reference to who was in the area around the

6  nighttime.  But -- You know -- I, I don't recall exactly

7  -- I'm just -- all I'm saying is that there may have

8  been more than, than the Office of Special Investigation

9  going with the, the nurse rather than the inmates.

10  There might have been more information that they had to

11  make that basis, that judgement on.

12     Q.     Don't they have video in the medical units of

13  DOCCS facilities?

14     A.     No.

15     Q.     There is no video anywhere in the medical

16  units of DOCCS facilities?

17     A.     Generally not.  There is -- generally not.

18     Q.     How about at the entrance?

19     A.     I don't know.

20     Q.     How about in the hallways?

21     A.     Again, it's facility specific.  There is no

22  generalized way of videoing.  I know, I know they don't

23  video inmate rooms.

24     Q.     No.  That I understand.  I'm not, this isn't

25  about inmate rooms.  This is about common areas.  I've

1   seen plenty of video from DOCCS facilities of hallways,

2   of entranceways and all that video feed goes back to the

3   central control and is preserved on a video recorder.

4   So that's what I'm trying to, that's what I'm trying to

5   get at here.  Do you, do you have any, do you have any

6   knowledge as part of your effort to investigate what

7   happened to Mr. Carey whether or not there is any video

8   that would reflect people's comings and goings into that

9   medical unit?

10              MR. DEUTSCH:  Objection to form.

11      A.    I have no idea of the video, the video

12   capabilities at Groveland Correctional Facility in the

13   infirmary or in the medical areas, none at all.

14      Q.    Okay.  And wouldn't there be some sort of

15   record generated when a call light is initiated?

16      A.    Not that I'm aware of.

17      Q.    Okay.  So it's not hooked up to any sort of

18   like computerized medical system or anything like that

19   if a call light is initiated, how long it's on for, when

20   it's responded to?

21      A.    Not that I'm aware of.

22      Q.    Okay.  Did you prepare any sort of

23   documentation that would reflect why Nurse Salvadore was

24   referred to Labor Relations?

25      A.    Can you say that again?

1    Q.    Sure.  Did you prepare like some sort of memo

2  or letter to Labor Relations not, either you or someone

3  under your supervision saying, hey, we want Nurse

4  Salvadore to be disciplined because of X, Y and Z?

5    A.    No.  I don't recall writing or calling

6  anyone about that.  Clearly that was an issue.  How, how

7  that made its way to Labor Relations, I don't know.

8  It's very possible when I got the SCOC report and I saw

9  an allegation of sleeping, I may have called the, the

10 assistant commissioner in charge of personnel, for

11 better, I think there is a better name for his term, for

12 his name and mentioned the concern.  This what I would

13 have done, I would have mentioned a concern about that

14 and, and say should that be forwarded to Labor

15 Relations.

16    Q.    All right.  My understanding is that Nurse

17 Salvadore was suspended or placed on administrative

18 leave shortly after Mr. Carey died but then was returned

19 to duty sometime later in 2015.  I'm not aware of there

20 being any action with Labor Relations after your letter

21 of March 20th, 2018 or even after the preliminary report

22 from December of 2017.  If you did make that sort of

23 referral, there would be some sort of writing or other

24 document generated, correct?

25    A.    Not necessarily.  I could have made a call.

1      Q.     Okay.  Once Labor Relations gets involved,

2   then the Counsel's office for DOCCS would be involved as

3   well, correct?

4      A.     I have no idea.

5      Q.     Who would you, who's the person you would

6   have called at Labor Relations?

7      A.     I would not have called Labor Relations, I

8   would have called our assistant commissioner for

9   personnel, for lack of a better, I think it's human

10  resources.

11     Q.     What would his or her name be?

12     A.     At the time, I'm not sure if that was Dan

13  Martuscello or if he had been promoted by that time.

14  When was this, 2018?

15     Q.     Yes.  Early 2018 to mid 2018.  I do know

16  Mr. Martuscello.  I've taken his testimony before, too.

17  I may have to ask him.

18     A.     I think this is probably after he was

19  promoted so it would have been his successor who, I'm

20  blocking on his name.  I can picture him but I can't

21  remember his name.  That was who was in charge of human

22  resources.

23     Q.     Would it be the assistant commissioner for

24  human resources?

25     A.     Yup.

1    Q.    The only name that comes up on that is

2  Mr. Martuscello.  I can deal with that at a later time.

3  That's fine.  Okay.  We clarified off the record that

4  Brian Hilton was the assistant commissioner for mental

5  health services, is that accurate?

6    A.    Yes.

7    Q.    Dr. Koenigsmann, where did you go to medical

8  school?

9    A.    Medical school, New York Medical College.

10    Q.    And what year did you graduate?

11    A.    1984.

12    Q.    And did you do a residency program?

13    A.    I did my internal medicine residency at

14  Westchester Medical Center and I stayed on an extra year

15  as the Chief Medical Resident.

16    Q.    Where did you go from there?

17    A.    From there I went to, I worked at Jacobi

18  Hospital but I was employed by Albert Einstein College

19  of Medicine and I was fifty percent teaching and fifty

20  percent patient care.

21    Q.    When did you open up your own private

22  practice in Carmel?

23    A.    I opened that up in 1990.

24    Q.    Is that about the same time you started

25  working for DOCCS, too?

1       A.      Exactly the same time.

2       Q.      You worked for DOCCS half time and you ran

3   your medical practice half time?

4       A.      Yes.

5       Q.      You're familiar with the Office of

6   Professional, what's called Professional Medical Review?

7       A.      No.  Office of Professional Medical Conduct,

8   OPMC.

9       Q.      Okay.  And you're familiar that for nurses,

10  it's the Office of the Professions in the Department of

11  Education that regulates nurses, correct?

12      A.      Correct.

13      Q.      And would you agree with me, sir, that if

14  Nurse Salvadore fell asleep on duty when a patient died

15  that that is the sort of event that should be reported

16  to the Office of Professions for an investigation, as

17  well?

18      A.      For an investigation or if we knew that she

19  was sleeping -- So are you asking that theoretically or

20  are you asking is that what happened?

21      Q.      No.  No.  I'm asking you -- You know -- that

22  is an option that could be pursued here, fair to say?

23      A.      It is.

24      Q.      Let me go back.  If it's true that Nurse

25  Salvadore was sleeping on duty at the same time that an

1    inmate either had a cardiac event or an asthma attack

2    and died without care, that that is the sort of event

3    that could result in Nurse Salvadore being disciplined

4    relative to her licensure with the State of New York?

5         A.    Yes.

6         Q.    Okay.  And so you had, as the chief medical

7    officer of DOCCS, you had not only the ability to refer

8    her to Labor Relations but to refer her to the, the

9    Department of Education for an investigation, correct?

10        A.    Yes.

11        Q.    And you would agree with me that there is a

12   difference between someone being investigated by the

13   Department of, Department of Education and being

14   investigated by the Office of Special Investigations and

15   DOCCS, isn't there?

16        A.    There is a difference, yes.

17        Q.    Yeah.  The Office of, the Office of the

18   Professions, or excuse me, the Department of Education

19   and the Office of Professions, they could care less

20   about the liability of the agency, correct?

21              MR. DEUTSCH:  Objection to form.

22        A.    I guess so.

23        Q.    Okay.  And they have the ability to go in and

24   issue Subpoenas, take testimony, all that stuff, don't

25   they?

1                    MR. DEUTSCH:  Objection, form.

2        A.    I do not know exactly what, what abilities

3    they have.

4        Q.    I'm going to ask you to assume that the

5    Office of Professions has the ability to issue

6    Subpoenas, to take testimony, to compel testimony and to

7    do a full and thorough investigation just like the

8    Commission of Correction.  So with that -- You know --

9    with that assumption, why wasn't this referred for an

10   investigation by the Office of the Professions?

11       A.    First off, I would have, I would have

12   depended on the nursing ranks to weigh in on this

13   situation but also, I, I am very, very much in belief of

14   the Office of Special Investigations investigations, if

15   they would have come back saying this nurse was

16   sleeping, we would have reported her to the Department

17   of Education.

18       Q.    Why do you, your, you don't agree with me,

19   sir, that there are many occasions that the Office of

20   Special Investigations will believe what they are told

21   by an employee of DOCCS over the testimony of an inmate?

22                    MR. DEUTSCH:  Objection, form.

23       A.    My personal experience with the Office of

24   Special Investigation is that they do a very, very good

25   and thorough job of investigating things.  Very often

1    not believing staff and taking action against staff.  I

2    believe in them tremendously.  I worked with them.  I've

3    seen their, their skills.  I've been very impressed with

4    them.

5        Q.    Okay.  You're going to forgive me as someone

6    that looks from the outside looking in at your agency

7    that I don't share that perspective.  And I had placed

8    far more credence in an investigation from the Office of

9    the Professions or from the Commission of Corrections

10    than I would in a million years the Office of Special

11    Investigations.  So I'll ask you -- You know -- again,

12    why wasn't this referred to -- Well, let me step back.

13    You said you wanted to wait for the nursing ranks to

14    weigh in.  You're not aware, as you sit here now, you're

15    not aware of the number of statements that have been put

16    forward by nurses employed at Groveland about Nurse

17    Salvadore's conduct?

18              MR. DEUTSCH:  Objection to form.

19        A.    No, not off the top of my head.  The name

20    doesn't ring a bell to me about a problematic employee.

21    Maybe I've forgotten.  But I don't recall that name as

22    being something that is risen up to my level as being a

23    problematic person.

24        Q.    Okay.  One moment, please.  All right.  I can

25    just give you one of I'm not sure how many examples.  I

1    mean this woman's, Nurse Salvatore's personnel file runs

2    into the hundreds of pages.  And that's not really the

3    point of your Deposition today.  This is an Affidavit

4    given by Nurse Wolf who was interviewed after

5    Mr. Carey's death.  And I'm going to quote, "I think RN

6    Salvadore conducts herself unprofessionally and gives

7    inaccurate care.  She makes lots of mistakes and takes

8    no responsibility for them.  If I needed help and she

9    was the only RN, I wouldn't let her touch me."

10           That is the, that is the opinion of one of

11   her fellow nurses at Groveland Correctional Facility.

12   And that's back when Mr. Carey died.  That's not

13   involving scores of subsequent incidents where Nurse

14   Salvatore's conduct was questioned.  And all of these

15   incidents occurred before your letter to the Commission

16   of Correction in March of 2018.

17           So what did you do affirmatively to try to

18   figure out -- You know -- what the opinion was of Nurse

19   Salvadore from the quote, unquote nursing ranks?

20                 MR. DEUTSCH:  Objection.  Form.  If you

21            understand it, you can go ahead and answer.

22                 MR. KEACH:  If he doesn't understand it,

23            he can tell me.  You don't need to tell him.

24                 MR. DEUTSCH:  If you don't understand

25            it, you can go ahead and tell him.

1      A.     Well, let me clarify.  When I refer to the

2  nursing ranks is my assistant commissioner, Joan Smith,

3  was a DOCCS nurse and rose to the ranks as a DOCCS

4  nurse.  So she, she would work with me in the review of

5  these SCOC cases very closely.  So a nursing issue is

6  something she would look at very, very carefully.  And

7  if she had concerns or if she felt it was necessary to

8  refer something to the New York State Education

9  Department regarding nursing licensure, clearly, not

10  only would I have supported that but she could have done

11  that.  So that's what I meant by relying on or waiting

12  to hear from the nursing sector.  She's, she, she would

13  have been looking at this from a nursing standpoint in

14  particular.

15      Q.     Okay.  Well, did you ever talk with her about

16  Nurse Salvadore?  What was her name again?

17      A.     Assistant commissioner Joan Smith.

18      Q.     Joan Smith.  Did Joan Smith rise up through

19  the ranks of DOCCS or did she come into DOCCS leadership

20  from some other way?

21      A.     No.  She rose through the ranks.  She has

22  been with DOCCS for like forty years.

23      Q.     All right.  So you don't have any

24  recollection talking with Joan Smith about Nurse

25  Salvatore's conduct, fair to say?

1      A.    No.

2      Q.    You don't have any knowledge about whether or

3   not Nurse Salvadore was subject to a Notice of

4   Discipline at any point prior to you writing this letter

5   to the Commissioner of Corrections?

6      A.    No.

7      Q.    All right.  Well, I don't want to sit here

8   and burden your time looking for this information.  But

9   I do want to convey to you, sir, that Nurse Salvadore

10  had, at the time that you wrote to the Commission of

11  Correction an employment history with the Department of

12  Corrections that shocks the conscience, at least it

13  shocks mine.  There are multiple instances --

14          MR. DEUTSCH:  I'm going to ask that that

15          be stricken.  I'm objecting as to form.  You

16          can't do stuff like that.  Come on.

17          MR. KEACH:  Sure I can.  I can do

18          whatever I want.  It's my Examination.  You

19          can object to the form.

20     Q.    So -- You know -- there are multiple

21  instances of gross negligence in providing care to

22  detainees.  There are instances of violence toward her

23  fellow employees, including hitting one with a cane.

24  There are instances of outright refusal to follow

25  instructions from medical providers and superior nurses.

```
 1  I mean I could go on for an hour detailing all of the
 2  instances of this woman's misconduct.  So I'm going to
 3  ask you to assume that what I said to you about her
 4  conduct is true.  Explain to me why, in light of the
 5  concern that she was sleeping on duty when an inmate
 6  died at Groveland Correctional Facility she was not
 7  referred to the Office of the Professions for an
 8  investigation relative to her nursing licensure?
 9              MR. DEUTSCH:  Objection to form.
10     A.    As I said before, in my mind, we would have
11  waited for some form of corroboration that that
12  allegation of sleeping was true before we referred it.
13     Q.    Well, what about everything else that I told
14  you, which again, resulted in the Notice of Discipline?
15     A.    I don't know what you're saying.  I wasn't
16  aware of that at the time.  So I don't know what to say.
17     Q.    Well, if you were made aware -- Well, I don't
18  understand, if one of your subordinate nurses was going
19  to be disciplined, you would have been aware of that,
20  would you not?
21     A.    No.
22              MR. DEUTSCH:  Objection to form.
23     Q.    Okay.  Give me just a moment here.  I don't
24  understand, if one of -- I don't understand.  If one of
25  your nurses was going to be disciplined, I thought that
```

1    would be something that would come to your level, you'd

2    have to sign off on that as the medical director.

3         A.    No.   Fired, I think they'd let me know,

4    although I wouldn't have to sign off on it.  Notice of

5    Discipline, no.

6              MR. DEUTSCH:  At this point, we've been

7              going for ninety minutes so I'm going to ask

8              that we take a five-minute break.

9              MR. KEACH:  No problem, Hillel, I could

10             use the break to locate the document I'm

11             looking for anyway.  No problem at all.

12             MR. DEUTSCH:  Thank you very much.

13             ( Whereupon, a recess was taken )

14             MR. DEUTSCH:  Just wanted to make a note

15             for the record that there has been

16             significant discussion of personnel records

17             and other documents which have been

18             designated as confidential.  Based on the

19             confidentiality stipulation that could not

20             have been discussed and cannot be shown to a

21             witness who does not receive them in the

22             regular course of business.

23             Dr. Koenigsmann has testified repeatedly

24             he had never seen them before and did not

25             review them in the course of business.  And I

1              would note for the record that I object to

2              any description of the content thereof that

3              Mr. Keach made.  I'm going to request that it

4              be deemed confidential and that it be

5              stricken in its entirety.  And I do not

6              believe that any such documents should be

7              shown to the Witness at this point.

8                   MR. KEACH:  Okay.  Well, we agree to

9              disagree.  I think you have a better chance

10             of trying to sanction me again than you do of

11             having this testimony stricken.  I can

12             address that with the Witness.

13       Q.    Dr. Koenigsmann, there is a Protective Order

14   in place in this case that, that involves Nurse

15   Salvatore's personnel records.  Now, that Protective

16   Order does not preclude me from utilizing them in the

17   course of this litigation.  And I have forwarded on an

18   Exhibit to Mr. Deutsch and asked him to send that to

19   you.  I'm advising you that that document is protected

20   by Protective Order and that you are not allowed to

21   discuss it outside of this, outside of this Deposition.

22   Do you understand?

23       A.    Yup.

24       Q.    Do I have your assurance, sir, and there have

25   been questions I've asked you today based on my

1    knowledge of Nurse Salvatore's disciplinary history

2    which is also protected by that Protective Order.  Do I

3    have your assurance that you are going to keep that

4    confidential pursuant to the Court's direction?

5        A.    Yeah.  Okay.

6        Q.    And the other thing I'm going to do is I'm

7    going to forward a copy of the Protective Order on to

8    our Court Reporter.  When she forwards the transcript to

9    Mr. Deutsch, and I believe that there is an undertaking

10   associated with that Court Order that you can sign.  And

11   that way, you will be in compliance with the Protective

12   Order and are aware of it.  When you sign such -- and

13   basically the undertaking says you know about the

14   Protective Order and you're going to follow through with

15   what the Court says.  Do you have a problem signing that

16   undertaking?

17       A.    No, I guess not.

18            MR. KEACH:  Okay.  Will you forward the

19            record to the witness, please?

20            MR. DEUTSCH:  Hang on one moment.  Why

21            don't you send me what you have as the copy

22            of the stipulation?

23            MR. KEACH:  Okay.  Hold on a second.

24            MR. DEUTSCH:  Thank you.

25            MR. KEACH:  Hillel, I just read this

1          over and I don't think this precludes me in

2          any way from showing this document to the

3          Doctor.  This is not designated attorney's

4          eyes only.  It doesn't have anything to do

5          with the safety and security of the facility.

6               It's only designated confidential.  And

7          paragraph two makes it clear that I can use

8          confidential information for the purposes of

9          prosecuting or defending the action.  And I

10         think it places the burden on you to try to

11         get portions of the transcript designated as

12         confidential.

13              MR. DEUTSCH:  I've already stated on the

14         record my belief that this is confidential

15         and the --

16              MR. KEACH:  You marked it as

17         confidential.  That's a fact.

18              MR. DEUTSCH:  Sorry?

19              MR. KEACH:  It's marked confidential.

20              MR. DEUTSCH:  Right.

21              MR. KEACH:  Go ahead.

22              MR. DEUTSCH:  All right.  I've placed on

23         the record that the, any and all testimony

24         regarding personnel files is confidential and

25         has to be treated accordingly.  And the, I

```
 1              would add that the, the agreement, the

 2              stipulation explicitly says, "Counsel for the

 3              respective party shall be responsible for

 4              obtaining prior to disclosure as a condition

 5              thereof the written agreement of any persons

 6              to whom any confidential information is

 7              disclosed pursuant to paragraph 6(a) of the

 8              IBBAI to be done by the terms of this Order

 9              in this certification attached hereto as

10              Exhibit A."  That has clearly not happened in

11              this case.

12                   MR. KEACH:  Well, first off, the Order

13              doesn't have Exhibit A.  And the Doctor said

14              he will sign it.  I don't have -- I don't

15              think there ever was a designation filed,

16              Hillel.  So, but I'm showing the witness the

17              document.  So either you can, you can send it

18              to him or I'll ask him for his e-mail.  I'll

19              send it to him directly.  You want to lighten

20              me up under this Protective Order, knock

21              yourself out.

22                   I advised him it's confidential

23              information.  And I think frankly, in light

24              of what I'm seeing here, I'm going to

25              challenge the confidentiality associated with
```

1          this information in the public interest.  You

2          know.

3               This, this documentation, first off,

4          Section 50(b) got repealed by the State

5          Legislature.  So personnel records now I

6          believe are fair game in the public forum

7          anyway.  And second, I don't agree that this,

8          this sort of information about misconduct

9          from a public employee should be confidential

10         information anyway.

11              So I'm going to bring, I think

12         especially in light of dispute and if we're

13         going to continue to have this problem, I'm

14         just going to move that all this stuff be, to

15         have the designation removed.

16         MR. DEUTSCH:  That's fine.  What I'm

17         trying to figure out is because the specific

18         reference to 6(a), so he does not fall under

19         any of the categories on 6(a) which is what

20         section 6(a) specifically anticipates.

21         MR. KEACH:  No.  No.  No.  That's

22         information designated as attorney's eyes

23         only.

24         MR. DEUTSCH:  Right.  And the thing

25         is --

1           MR. KEACH:  This isn't designated as

2      attorney's eyes only.

3           MR. DEUTSCH:  9 specifically talks about

4      confidential information and says that

5      confidential information needs to be treated

6      that way under these circumstances.

7           MR. KEACH:  Hillel, either you're going

8      to give the document to the Witness or not.

9      If you're not going to give it to him, I'm

10     going to give it to him.  You want to try to

11     lighten me up for the Protective Order, you

12     knock yourself out.

13          MR. DEUTSCH:  You're obviously not going

14     to give it to him because you're not going to

15     get his e-mail address.

16          MR. KEACH:  I already have his e-mail

17     address.  I'll e-mail it to him right now.

18     I've been in contact with him before.

19          MR. DEUTSCH:  Okay.  So here's the

20     thing:  There is a thing, if you're going to

21     do that, then I'm -- Well, I'm going to

22     instruct him not to answer because it's in

23     violation of the stipulation.

24          MR. KEACH:  No, you're not.  Call the

25     Judge, man.  We're going to call the Judge.

1       I've heard enough.  I'm going to see if I can

2       get Judge Pedersen on the line.

3            MR. DEUTSCH:  That's fine.  What I'm

4       trying to do right now is I'm trying to read

5       through the stipulation and make a

6       determination as to what should happen with

7       this document.

8            MR. KEACH:  What should happen with this

9       document, it should never have been marked

10      confidential in the first place.  And I

11      should be allowed to show it to the witness

12      during the course of a Deposition after I

13      just advised him of the content of the

14      Protective Order and he's agreed to sign the

15      certification.  And you're telling me that,

16      A, you won't show it to the witness.  And B,

17      if I ask him questions about the content of

18      this document, you're going to try to, you're

19      going to instruct him not to answer.  So in

20      light of that, we're going to call the Judge.

21           MR. DEUTSCH:  Right.  That's a

22      fundamental misrepresentation of everything

23      that I just said.  So if you're going to go

24      and represent that to the Judge --

25           MR. KEACH:  You just said to me a moment

1          ago, Hillel, that you're going to tell him

2          not to answer.  That's what you said.

3              MR. DEUTSCH:  No.  What I said was I am

4          making that determination.  I am looking

5          through the document.  I'm looking through

6          the attachment.  I am at a disadvantage here

7          because I had -- You know -- I was literally

8          forced out of my office.  And I am in a

9          situation where I'm working off a laptop.  I

10         don't have access to the full set of records.

11         I'm doing the best I can here but I'm not

12         able to do this on the fly.

13              There is a reason why these things are

14         supposed to be provided in advance.  There is

15         a reason why there is supposed to be a signed

16         agreement in advance.  Specifically so this

17         doesn't happen, where we're not at a

18         Deposition and you're suddenly giving

19         documents and I'm trying to review a

20         confidentiality stip to make a determination

21         as to whether or not it's something he's

22         allowed to see and something you're allowed

23         to ask him about and what the designation

24         should be.

25              MR. KEACH:  Well, I mean sometimes,

1     Hillel, given that I've at this point in my

2     career conducted over fifteen hundred

3     Depositions that things come up when you're

4     in the course of taking a Deposition that jog

5     your memory about other documentation that

6     you didn't foresee.

7          And that's why I'm going to go back to

8     the Court and I'm going to ask that this

9     Order be modified.  Because I'm not going to

10    put up with this again.  In fact, I'm not

11    going to ask that it be modified, I'm going

12    to ask that the confidentiality designation

13    be lifted for all of these records.  And

14    that's going to be based on I think some

15    action my client is going to take in response

16    to some of this stuff.

17         MR. DEUTSCH:  That's fine.  But right

18    now I'm trying to deal with the issue we

19    actually have in front of us.

20         ( Discussion off the record )

21         MR. KEACH:  Okay.  Hillel, listen, I

22    want to move forward with this Witness'

23    Examination.  The easiest way to address this

24    is call the Judge and get a ruling from him

25    based on the representations I made to you

1          which is I told him there is a Protective

2          Order, told him he's not allowed to talk

3          about it.  He just provided me assurance that

4          he wouldn't talk about it.

5              And I asked him, I indicated to him I

6          would get him an appropriate designation for

7          him to sign so that -- You know -- which

8          wasn't attached to the Protective Order but

9          which I can draft and send to him which he

10         indicated he would sign reflecting he's aware

11         of the Protective Order and he's not going to

12         disclose the information.  That seems like a

13         perfectly reasonable way to deal with that

14         given that we have the Doctor here.

15             MR. DEUTSCH:  Right.  So here's the

16         thing, as I said several times, I'm trying to

17         review the document, both the document you

18         sent and the confidentiality stip.  When

19         you're talking to me and repeating your

20         position, I need to listen to you which means

21         I can't read the document which means I can't

22         do the assessment.

23             MR. KEACH:  What exactly do you want to

24         do now, Hillel?  Whatever -- Let me finish.

25         Whatever your position is, take the time you

```
1          need to formulate it, let's put it on the
2          record.  And then I'll decide how to respond.
3               MR. DEUTSCH:  I don't believe we were
4          off the record.
5               MR. KEACH:  We're not.  But you're
6          indicating you need time, you need time to
7          review the Notice of Discipline I forwarded
8          to you.  You need time to review the Court's
9          confidentiality stipulation and go ahead.
10              MR. DEUTSCH:  So as I understand it, you
11         are, in effect, asking for a let's say nunc
12         pro tunc waiver of the, of paragraph nine of
13         the confidentiality stip.
14              MR. KEACH:  No.
15              MR. DEUTSCH:  That says --
16              MR. KEACH:  I'm not asking for a nunc
17         pro tunc waiver.  He agreed that he's willing
18         to sign the confidentiality stipulation.
19              MR. DEUTSCH:  Right.  That's not what
20         paragraph nine says.  Paragraph nine says, it
21         shall be obtained prior to disclosure and as
22         a condition thereof.  Now you are asking that
23         that be waived, right?
24              MR. KEACH:  I have that right under the
25         agreement in paragraph sixteen and paragraph
```

1       seventeen to seek relief from the Court at

2       anytime which is what I'm planning to do if

3       you and I cannot reach an agreement otherwise

4       which is also reflected in paragraph sixteen

5       and paragraph seventeen.

6           MR. DEUTSCH:  I understand that.  What

7       I'm asking is what you are saying is, okay,

8       let's start with this:  You would agree with

9       me, paragraph nine says you are required to

10      get in writing that particular document,

11      right?  You have to disclose it and you have

12      to obtain the written agreement prior to

13      Deposition.  That's what it says, right?

14          MR. KEACH:  It does.

15          MR. DEUTSCH:  Okay.  Now, you didn't do

16      that, right?

17          MR. KEACH:  I didn't think this was

18      going to come out, Hillel.

19          MR. DEUTSCH:  Okay.  That's fine.  Just

20      taking this step by step.  What you're saying

21      is you didn't anticipate this happening.  I

22      don't think you're trying to sandbag me.  I

23      don't think this is a trick.  But what you're

24      saying is, you didn't think -- so you didn't

25      think you were going to go into the personnel

1          file at this Deposition.  That's what you're

2          saying?

3              MR. KEACH:  I thought I was going to get

4          into it in a very general sense.  And he's

5          indicated that he doesn't -- I thought he

6          would have knowledge of these things.  And I

7          got into it in a very general sense.  He

8          indicated he doesn't have knowledge.  And so

9          I figured I'd go from there and rely upon the

10         actual Notice of Discipline, yes.

11             MR. DEUTSCH:  Basically what I'm trying

12         to figure out is what you're, what you're

13         trying to do here.  So this Exhibit, right,

14         you orally described what's in the personnel

15         file.  Why is it necessary for him to have a

16         copy of this document?

17             MR. KEACH:  It's not.  I can go through

18         it orally.

19             MR. DEUTSCH:  Okay.

20             MR. KEACH:  I'll go through it point by

21         point.

22             MR. DEUTSCH:  And the question becomes,

23         right, since nothing in that document is an

24         allegation pertaining to Mr. Carey, right?

25             MR. KEACH:  Right.

1           MR. DEUTSCH:  Okay.  So what is it that

2      you're going to ask, I mean, where are you

3      going where the specific details of this are

4      necessary?

5           MR. KEACH:  I'm going -- I'm happy to

6      have this discussion with you outside the

7      presence of the Witness.  And I'm trying to

8      figure out how to do that.

9           MR. DEUTSCH:  That's fine.  Dr.

10      Koenigsmann, do you know how to mute?

11           ( Discussion off the record.)

12           ( Whereupon, Dr. Koenigsmann left the

13           Deposition )

14           MR. KEACH:  I think that this entire

15      response from the State Government to this

16      man's death is one gigantic conspiracy

17      designed to deny the Carey family justice

18      based on refusal to produce documents, the

19      willful deception of Judge Minarik in the

20      Court of Claims, which Judge Minarik has

21      already commented about.  And which, the

22      willful deception of which has been further

23      exposed in recent Motion proceedings.

24           Some of your conduct, Hillel, towards me

25      personally in light of some of the problems I

1          had, seeking sanctions, trying to take money

2          out of my pocket.  And all of this post hoc

3          nonsense with the, with -- You know -- the

4          Office of Special Investigation and Dr.

5          Koenigsmann's office -- You know -- trying to

6          in a post hoc fashion put the rabbit back in

7          the hat.  Okay.

8               This entire response from the State

9          Government is garbage.  Your argument is

10         going to be that none of this happened, that

11         none of this response from the State

12         Government implicates Nurse Salvadore.  I

13         disagree.

14              And it's of particularly importance --

15         of particular importance that this woman's

16         personnel history is really unbelievable.

17         It's unbelievable she kept her job as long as

18         she did.  And the fact that she kept her job

19         for as long as she did is one of many things

20         that reflects very poorly both upon the State

21         Government and upon the argument that, oh,

22         well, the State Government found there was

23         nothing wrong, so, hey, there is nothing to

24         see here.

25              You want -- you've raised that argument

```
 1              repeatedly.  You're clearly going to raise it
 2              again.  And I'm going to come back swinging.
 3              And the way I'm going to come back swinging
 4              is to expose this woman for what she is, a
 5              heartless, nasty, unprofessional, evil nurse
 6              who basically was sleeping on the job because
 7              she didn't give a crap about Mr. Carey or any
 8              of the other inmates that she was
 9              supervising.
10                  That is the hallmark of deliberate
11              indifference of serious medical needs.
12              That's how it was described by Judge Walker
13              from the First Circuit of just not giving a
14              damn.  That's what this woman is about.
15                  And to the extent you're going to try to
16              circle the wagons and have the State
17              Government say, oh, there is nothing to see
18              here.  I'm going to respond.
19                  So that's why I'm asking this, man.  Why
20              in light of this woman's personnel history he
21              didn't turn her in to the, not only turn her
22              in to the Bureau of Labor Relations but at
23              the time that he learned about these events,
24              why he didn't turn her in to have her
25              licensure questioned.  Because this woman
```

1          doesn't deserve to be a nurse.

2               That's my offer of proof.  And in light

3          of the defenses that you've raised and the

4          comments that you've raised and the effort

5          generated undoubtedly by you to come up with

6          this post hoc nonsense and all these

7          documents produced after we've been in

8          litigation in this case for three years,

9          yeah, this is a perfectly appropriate line of

10         questioning for this witness.  And I'm going

11         to ask her, and I'm going to ask him.

12              To the extent you're going to stop me,

13         I'm going to move to compel.  Not only that,

14         I can tell you right now, I'm going to ask

15         the Court to toss the confidential

16         designation on all of these records because

17         once I have a chance to sit down and talk

18         with my client on what these records say,

19         I've got a feeling there is something they're

20         going to want to do about it.  That kind of

21         sums up where I am, Hillel.

22              MR. DEUTSCH:  Okay.  So if I understand

23         you correctly, what you're saying is that you

24         would like to ask the witness why it is that

25         in light of a dis, allegations of misconduct

1          that occurred significantly after the events

2          that are the subject of this Deposition, he

3          didn't report the Defendant.  That's what

4          you're asking?

5               MR. KEACH:  Yeah.  Well, in response to

6          his answers --

7               MR. DEUTSCH:  He's already responded to

8          your questions.

9               MR. KEACH:  Yes.  Yes.

10              MR. DEUTSCH:  That's what he said, he

11         was not aware of any of these allegations.

12         That's what he said.

13              MR. KEACH:  He also, he also testified

14         that if action was going to be taken against

15         one of his subordinate medical staff that he

16         would be involved and would know about it.

17              MR. DEUTSCH:  Right.  And what he said

18         was, he said was that when you said what

19         about all these allegations and you described

20         the allegations in some detail, he said he

21         was not familiar with it.  Right?

22              MR. KEACH:  Right.  And so I'm showing

23         him this document to refresh his recollection

24         to see if that familiarizes himself with this

25         particular person which is perfectly

1           appropriate in a Deposition.

2                   MR. DEUTSCH:  Okay.  So what you're

3           telling me, what you're representing to me is

4           that you want to send him the document and

5           ask does that refresh your recollection about

6           allegations against the nurse.  If that's

7           what you're going to ask --

8                   MR. KEACH:  I'm going to ask to recite

9           in the general sense the allegations in the

10          document to move past this.

11                  MR. DEUTSCH:  Again, I'm just trying to

12          get through what is actually happening.  So

13          if you're representing to me is you're going

14          to ask him if this refreshes your

15          recollection, and if his answer is no, then

16          we're moving on.  And if it's yes, then

17          you're going to ask him about the contents of

18          it, then that's fine.  I don't have a

19          problem.  I don't have a problem showing him

20          the document with the -- You know --

21          representation that -- You know -- you're

22          going to send him the form and he's going to

23          sign it.  That's all fine with me.

24                  My issue is if he's going to basically

25          be saying no, this doesn't refresh my

1          recollection and you're just going to keep --

2          You know -- quite frankly yelling, which is

3          what you've been doing both in this portion

4          and in previous portions and saying -- You

5          know -- she's evil and heartless and done all

6          these horrible things.  I, then I'm going to

7          object to it because that's just harassing

8          the witness.

9              So what I'm asking is if you're going to

10         ask him, does that refresh your recollection

11         and he's going to say no, are we moving on?

12             MR. KEACH:  No.

13             MR. DEUTSCH:  Okay.  So if you ask, does

14         this refresh your recollection, he says no,

15         where are we going from there?

16             MR. KEACH:  Well, first off, just let me

17         say a couple things.  Hillel, you've made

18         that allegation against me before that I've

19         harassed witnesses.  It's too bad we didn't

20         record this video because the only time that

21         I've even been excited taking this Deposition

22         is in making this record in response to kind

23         of the -- You know -- the breadth of just

24         kind of off kilter conduct that I've seen

25         litigating this case from the beginning.

1           So there is some claim that I'm yelling

2       at the witness or I'm harassing the witness,

3       that's just nonsense.  And if you think that,

4       man, you should go to Judge Pedersen and

5       light me up.  Give it your best shot.  I'll

6       respond and seek sanctions against you.

7       Okay?  I'm not harassing the witness.  I'm

8       not yelling at anybody.  If you want to see

9       the difference and see me start yelling,

10      believe me, you'll know the difference.

11          So -- You know -- if you want to make

12      those kind of accusations against a lawyer

13      with my experience, Hillel, you better come

14      prepared to have that lawyer sling back at

15      you.  Don't make those allegations against me

16      again.

17          And if you're going to make them, you do

18      them on the record in front of the Judge and

19      then we can, and then we'll have a decision

20      about whether or not I've harassed or yelled

21      at a witness because I have not.  So that's

22      the first point.

23          The second point is, of course I'm going

24      to follow up on it.  So I just want to be

25      clear now, your position is I can show the

1          witness the document but then I'm not allowed

2          to do what any normal examiner would do which

3          is basically to follow up and say, okay,

4          fine, this doesn't refresh your recollection

5          but here's what the document says -- You know

6          -- what do you think about that.  That's

7          perfectly appropriate to do, Hillel.

8              So I don't understand -- You know -- if

9          you're okay with me showing the witness the

10          document but you want to tell me what I can

11          and cannot ask him.  That's not how a

12          Deposition works, man.

13              MR. DEUTSCH:  Right.  So what you're

14          saying is you want to ask what you think

15          about allegations that happened that have

16          nothing to do with this case?

17              MR. KEACH:  That's not what I said.  And

18          I want to -- You know -- and it does, you

19          have made it part of this case.  You have

20          created post hoc documentation saying, oh,

21          there is nothing to see here.  I mean, I

22          don't know if you have.  I don't know what

23          your role in this is.  I don't really care

24          because I think it's great.  We're going to

25          try this case.  And you can mark my words,

1          Hillel, we are going to try it.  You know.

2          For one reason and one reason only, and I'm

3          sure you can figure out why.

4               But all that being said, okay -- You

5          know -- yeah, I think it's great you did

6          this.  I can't wait to try this case against

7          you.  I can't wait to sit up in front of that

8          Jury and talk about all this post hoc garbage

9          that you're trying to pawn off on me in this

10         case.  I think it's great.

11              But you've made it an issue and now

12         you're going to live with it.  So this is an

13         issue here, what happened after the fact is

14         an issue.  You've made it an issue.  You're

15         not going to cut me off and preclude me from

16         being able to get to the bottom of this.

17              MR. DEUTSCH:  Well, if I understand your

18         argument, what you're saying is that because

19         the COC, I'm sorry, because there was an

20         amended response to the COC about the Carey

21         situation, because as we've already heard

22         testimony to, there was a misstatement as to

23         what was in the OSI report.  That's fine.

24              MR. KEACH:  Yeah.

25              MR. DEUTSCH:  How exactly does that

1          implicate allegations of wrongdoing that

2          occurred months and years afterwards?

3               MR. KEACH:  You know, Hillel, it's not a

4          question of whether or not it's relevant.

5          It's a question of whether or not it's

6          material.  Relevance is a trial question.

7          Materiality is a Deposition question.  This

8          is clearly material area.  I'm really not

9          going to dignify this discussion more.  You

10          know.  When you say there is a quote, unquote

11          misstatement, your misstatement is for me an

12          effort to cover up the truth.  You claim it's

13          an effort to correct a misstatement, I

14          maintain it's an effort to cover up the

15          truth.

16               This is like, hey, we just got caught

17          with our pants down.  Here comes this, here

18          comes this lawyer who's held us accountable

19          before, he's about to get out the paddle.

20          And so we're going to try to make something

21          up.  That's exactly what happened here.

22          That's how it's going to be spun by me.  And

23          this kind of whole effort here is all part of

24          that.

25               So -- You know -- I don't understand why

1          we're having this discussion.  We just should

2          have called Judge Pedersen and done it in

3          front of him.  We just wasted a whole bunch

4          of time.

5              MR. DEUTSCH:  Okay.  So I just want to

6          make sure my position is clear so we don't

7          have any misrepresentations here.  My

8          position is if you want to show the document

9          to the witness and then ask him if it

10         refreshes his recollection, then that's fine.

11         And if the answer is yes and you want to

12         respond accordingly, that's fine.  If the

13         answer is no, then we move on.

14             If your position is, even if he says it

15         doesn't refresh his recollection, you start

16         to ask him questions about what's in the

17         document anyway, is that correct?

18             MR. KEACH:  Right.  Well, that document

19         was generated before he left employment.

20             MR. DEUTSCH:  Okay.  That's fine.  And

21         again --

22             MR. KEACH:  So let me -- I just want to

23         accurately state your position then we're

24         calling the Judge.  Okay?

25             MR. DEUTSCH:  Sure.

1             MR. KEACH:  I can show the witness the

2        document for purposes of refreshing his

3        recollection and you'll comply with

4        exactly -- You know -- the exact procedure

5        I've laid out to do this with, but you won't

6        let me ask him any questions about it after

7        he looks at it.

8             MR. DEUTSCH:  No.

9             MR. KEACH:  So you're basically trying

10       to control -- Oh, no, if he says it doesn't

11       refresh his recollection, then you're telling

12       me I can't ask him any questions about it.

13       You're basically trying to tell me what I can

14       ask the Witness.

15            MR. DEUTSCH:  What I'm saying is that it

16       is extremely, extremely tenuous ground to say

17       that there is anything relevant or material

18       in a bunch of allegations about things that

19       have nothing to do with this case that

20       occurred significantly after this case.

21       You're not even asking that of the witness.

22       You're asking that of a third party.

23            MR. KEACH:  This is a civil rights case.

24       If I can show that there is a course of

25       conduct which is exactly what I'm trying to

1          do here then I am allowed to get into it.  A

2          high burden to get over.  I'll admit, under

3          the Rules of Evidence, it's a high burden to

4          get over but you're wrong.  Just because it

5          happened after the fact doesn't mean I can't

6          get into it.

7              MR. DEUTSCH:  I appreciate that you

8          think I'm wrong.  But I would also appreciate

9          it if you wouldn't interrupt me.  So --

10         Okay.  If you are going to just do that,

11         that's fine.

12             MR. KEACH:  Well, if you're trying to

13         tell me, if you're going to tell me how to

14         run my case.  You try to do that repeatedly

15         here.  My favorite is -- You know -- when you

16         try to tell me I can't Subpoena Dr.

17         Koenigsmann because he's a former employee of

18         the Department of Corrections.  I think you

19         made that representation to me four or five

20         times.

21             Maybe you missed the day they taught

22         civil procedures at law school.  But Rule 45

23         is very specific and I've served thousands of

24         Subpoenas asking for documents and asking for

25         production of testimony from third-party

1    witnesses.  Okay.

2        You continue to try to tell me how to

3    run my case.  You continue to try to tell me

4    what I can and cannot ask.  Okay.  I don't

5    lose any sleep worrying about what the

6    Attorney General wants.  All right.  I lose

7    sleep about whether or not I'm conducting

8    myself within the Rules.  And I am conducting

9    myself within the Rules here.

10        This is a Deposition.  It's for purposes

11    of gaining information, gaining, gaining --

12    You know -- gaining admissions and the like.

13    I know you don't like the testimony.  That's

14    not my problem.

15        MR. DEUTSCH:  Okay.  First of all --

16        MR. KEACH:  We're wasting a lot of time

17    here.  What do you want to do?  Because I'm

18    going to ask, if you're telling me I can show

19    the witness the document, I'm asking him

20    about the document whether it refreshes his

21    recollection or not.  And by the way,

22    refreshing recollection in a Deposition isn't

23    just showing someone the document.  When you

24    start going through the document, oftentimes

25    witnesses do recall things.  I've had that

1          happen several times.

2               MR. DEUTSCH:  So what I would start by

3          saying is, I would appreciate it if you would

4          lay off the insults.  It's not necessary.

5          Second of all --

6               MR. KEACH:  I'm not insulting you,

7          Hillel.  Stop that.  I'm not insulting you,

8          Hillel.  I'm speaking, I'm talking about

9          facts.  Okay.

10              MR. DEUTSCH:  Okay.  Saying things like

11         I guess you were absent the day they taught

12         that in Civil Procedure is an insult.  It is

13         not a fact.

14              MR. KEACH:  Right.  As is --

15              MR. DEUTSCH:  Second of all --

16              MR. KEACH:  As is taking shots at a

17         lawyer's mental health and trying to destroy

18         his client's case when he's having problems.

19         As is -- You know -- refusing to comply with

20         assurances that you provided with that

21         lawyer.  So don't sit here and lecture me

22         about insults, Hillel.

23              As is trying to take money out of that

24         lawyer's pocket because he had to bring a

25         motion that was necessitated by your conduct

1           and you tried to sanction him.  You're going
2           to have to forgive me, just spare me the soap
3           box lecture.  Make your point, let's call the
4           Judge.  Let's move on.
5                MR. DEUTSCH:  Second of all, I would
6           also appreciate it if you didn't interrupt
7           me, which has now happened about four times
8           in the last five minutes.
9                MR. KEACH:  You interrupted me.
10               MR. DEUTSCH:  Third of all --
11               MR. KEACH:  Go ahead.
12               MR. DEUTSCH:  Okay.  Third of all,
13          fundamentally what we're talking about here
14          is you would like to ask the witness about a
15          bunch of events that happened after the event
16          that we're discussing, don't relate to event
17          we're discussing.  I am objecting to that.  I
18          don't think it's relevant.  I don't think
19          it's material.  And I don't think that if you
20          would have sent me that document in advance I
21          would have, I would have advanced those
22          arguments at that time.
23               Now what you're telling me is that you
24          didn't foresee this happening.  I think
25          that's, given the circumstances where you

1            said you fully intended to go into the

2            personnel record, it is what it is.

3                 The point is, had you given that

4            document to me, that document to me in

5            advance, I would have been having this

6            discussion in advance.  You didn't do so.

7                 Now, you want it, instead of doing it

8            this way, if you have a different way of

9            proceeding, you can, obviously, you can

10           proceed as you see fit.  But what I'm saying

11           is, the language of the, the language of the

12           confidentiality stipulation is crystal clear.

13           You're asking for essentially a waiver.  And

14           what I'm saying is, I'm granting -- I would

15           be willing to agree to that waiver under one

16           set of circumstances.  And you're saying

17           that's not good enough.  That's where we are.

18                MR. KEACH:  Okay.  I'm not, you've

19           agreed to the waiver bur you're not going to

20           let me ask the Witness questions which I'm

21           just not going to tolerate.

22                So, first off, you're right, my comment

23           to you about the law school thing was out of

24           line.  You're going to have to forgive me

25           but-- You know -- some of the positions that

1          you've taken in this case toward me are

2          personal.  I've taken them personally.

3          And -- You know -- certainly I've never had

4          those interactions with another lawyer from

5          your office and I hope never to again.

6              But it certainly has destroyed any

7          credibility you have with me.  To the extent

8          that I did insult you and I would agree

9          arguably that is an insulting comment.  You

10         have my apologies.  Can we call the Judge

11         now, please?

12             MR. DEUTSCH:  You can move forward in

13         the way you see fit.

14             ( Discussion off the record. )

15             MR. KEACH:  I've had a chance to think

16         through this a little more calmly, I think

17         this discussion with the Court about the

18         terms of this Protective Order and whether or

19         not the documents in question should, sorry

20         about that, should remain confidential is I

21         think part of a larger issue here in terms

22         of -- You know -- whether -- You know --

23         whether and how these documents should remain

24         confidential.

25             This is a tangential point, Mr. Deutsch

1              is right.  It's an important point.  And I'm

2              going to try to muscle through here and get

3              the Examination done but there is, we talked

4              earlier about bringing the witness back.  So

5              certainly if that occurs and this issue is

6              resolved by the Court in the intervening time

7              period, then I can address this with the

8              Witness at that time.  So let's get him back

9              on the line and keep going here.  Unless,

10             Mr. Deutsch, you have a different opinion.

11                  MR. DEUTSCH:  No.  No.  If that's how

12             you want to proceed, that's fine with me.

13      Q.    Dr. Koenigsmann, are you there?

14      A.    I am here.

15      Q.    All right.  Hit the video button in the

16 bottom left corner.

17      A.    Yup.

18      Q.    Okay.  All right.  You missed all the fun.

19 Sorry about that.  This was the most excitement I've had

20 in awhile.  All right.  We're going to show you a

21 document that has been marked as Exhibit 11.

22 Mr. Deutsch should have e-mailed it to you.  I want you

23 to take a look at it.

24                  ( Exhibit 11 marked for Identification )

25                  MR. DEUTSCH:  Hang on a second.  I

1    haven't e-mailed it.  Now I'm more confused

2    than I was before.  I thought we were not

3    doing this now.

4         MR. KEACH:  No.  You told me that you

5    were going to allow me to show the witness

6    the document for purposes of refreshing his

7    recollection.

8         MR. DEUTSCH:  As long as you agreed that

9    there would be no follow up and then you said

10   you were not agreeing to that.

11        MR. KEACH:  Well, no, what I'm going to

12   do is I'm going to show the witness the

13   document and see if it refreshes his

14   recollection and then I'm going to reserve my

15   right for further questioning after we

16   involve the Court.

17        MR. DEUTSCH:  Okay.  So there is going

18   to be that question.  And if his response is

19   that it doesn't refresh his recollection then

20   we'll move on for the purpose of this

21   Deposition.  And you're reserving the right

22   to petition the Court about that and deal

23   with that at a later point.  Am I

24   understanding that correctly?  I'll go e-mail

25   him the document right now.

1      A.    Okay.  It just arrived.  Now am I supposed

2  to look at it?

3      Q.    Yes.

4      A.    Okay.

5            MR. KEACH:  I mean, let Mr. Deutsch

6            convey that to you.

7            MR. DEUTSCH:  Sure.  Basically it's

8            just -- You know -- look it over and then I

9            think there is going to be one question and

10           then we will, based on your response, where

11           we go next.

12     A.    Okay.  So I'll go look at it.  All right.

13  Okay.  I read it through.

14     Q.    Dr. Koenigsmann, have you seen that document

15  before today?

16     A.    No, I've never seen that document.

17     Q.    Is that type of document, is that the type of

18  document that you would review in the ordinary course of

19  your day as chief medical officer for DOCCS?

20     A.    No.

21     Q.    Would you be consulted if those sorts of

22  disciplinary charges are going to or would be pressed

23  against one of the nurses that you supervise as the

24  chief medical officer?

25     A.    Not necessarily.

1      Q.    Okay.  Who would be the person that would be

2      responsible to make that decision if it wasn't you?

3      A.    The labor relations people personnel would,

4      on occasion, they would consult, they would consult with

5      me if they felt that they were going to ask for

6      termination, not in all cases, in a few cases.  I don't

7      know why there was no standard of, or protocol for doing

8      it, but on a few occasions, they would bring it to my

9      attention that they were going to seek termination of an

10     inmate, of an employee.  On other occasions, they sought

11     termination and didn't consult me.

12     Q.    So it's your testimony that relative, you

13     would agree with me that the document you have reflects

14     there is going to be an effort to seek termination,

15     right?

16     A.    I didn't catch that.  I didn't see that

17     there was an effort to seek termination.  Was that on

18     there?

19            MR. DEUTSCH:  This is already going,

20            yeah, this is already going past what we've

21            agreed to.  This is exactly what I thought

22            was inappropriate and what we should not be

23            getting into it.

24            MR. KEACH:  I'm not asking him about the

25            specific incidents indicated in the document.

1           MR. DEUTSCH:  Right.  You're asking him

2           what the document is calling for.  This is --

3           You know -- nothing in this document.

4           MR. KEACH:  I'm trying to get that

5           question answered and then I'm going to make

6           my record and move on.

7           MR. DEUTSCH:  Okay.  If that's the last

8           question.  If that's the last question you've

9           got and then you want to put what you want on

10          the record, then that's fine.

11          MR. KEACH:  It's not the last question I

12          have.  It will be the last question I have

13          about the content of the document.

14          MR. DEUTSCH:  I understand.

15     Q.    All right.  Dr. Koenigsmann, if you look at

16  page one of Exhibit 11, you're going to see that the,

17  that the government or that the State is seeking a

18  penalty which is dismissal from service and loss of any

19  accrued annual leave.  It's in bold caps on the front

20  page?

21     A.    I don't seem to have that.  Oh, here it is,

22  dismissal.  Okay.  There it is.  Okay.  Yeah.  Yeah.

23  Yeah.  Yeah.  Okay.

24     Q.    Okay.  So in this occasion, it's your

25  recollection that you were not consulted that that

1    penalty was being sought?

2        A.    No, I've never seen this.  I've never heard

3    of this.

4        Q.    Okay.  What were you told about the

5    circumstances of Miss Salvatore's resignation from DOCCS

6    before you prepared your letter to the Commission of

7    Correction on March 20th, 2018?

8        A.    I don't recall.  In other circumstances,

9    just that, that she's no longer in service.  She's left

10    service.  I don't remember what it was specifically in

11    that case.  But I knew nothing of this, this, this thing

12    here, this Notice of Discipline and action taken.  This

13    is news to me.

14                MR. KEACH:  All right.  I'm going to

15                make my record here and then request to make

16                kind of one follow-up question.  The witness

17                is seeing the document.  We agreed that the

18                witness could see the document and reserve

19                my right to ask further questions about the

20                document.

21                Certainly I wanted to go through some

22                of the specifics in a very brief action with

23                the witness to build a foundation for

24                further questioning.  We're not going to be

25                able to do that today.  I very much disagree

1          with that, about this being interfered with

2          in this way.  And it's something we're going

3          to deal with with the Court as part of a

4          different proceeding.

5              But I'm reserving my right to bring the

6          Witness back if and when the Court rules in

7          my favor, excuse me, in the favor of the

8          Careys.  And then to, and then to -- You

9          know -- to seek -- You know -- to question

10         the witness further about these particular

11         documents.  Hillel, do you have anything to

12         add there?

13             MR. DEUTSCH:  Yeah.  Obviously any, any

14         further questions about this would be based

15         on our presumably conference with the Court

16         at some future date.  Anything else can be

17         brought up at that time.

18             MR. KEACH:  I really only have one or a

19         handful of additional questions so let's take

20         them one at time.  And if you tell the

21         witness not to answer, you tell him not to

22         answer.

23             MR. DEUTSCH:  Wait.  So hang on a

24         second.  You mean about this or about other

25         things?

1              MR. KEACH:  About his representations to

2         the Commission of Corrections and his actions

3         taken at that time.

4              MR. DEUTSCH:  Okay.  So -- okay.  So not

5         pertaining to Exhibit 11?

6              MR. KEACH:  Well, it's the question

7         would be prefaced with, if you knew, what

8         would you have done differently.  That's all

9         I'm going to ask him.

10             MR. DEUTSCH:  Okay.  So you just want to

11        ask him if he had seen this document before

12        what would he have done differently in terms

13        of his response to the Commission on

14        Correction?

15             MR. KEACH:  Yes.  And his own actions.

16             MR. DEUTSCH:  Okay.  Doctor.

17   A.   Is that a question?

18   Q.   Yes.  If you had seen this document before,

19   if you had seen the Notice of Discipline that we showed

20   you as Exhibit 11 and you were writing up this letter to

21   the Commission of Corrections, would you have made

22   different representations about the circumstances of

23   Nurse Salvatore's departure from DOCCS?

24   A.   No.

25   Q.   Would it have changed your opinion about

1  whether or not this should be referred to regulatory

2  agencies that supervise Nurse Salvadore?

3      A.    Yes.

4      Q.    How would it have affected your opinion in

5  that regard?

6      A.    Well, this Notice of Discipline demonstrates

7  multiple instances where she refused to provide care,

8  care to patients.  That's unacceptable behavior on the

9  part of a nurse and should be reported to the office, to

10  the, the Department of Education.

11          MR. KEACH:  That's it for me, Hillel,

12          on this document.  I'm not even sure we have

13          to take that particular issue to the Court

14          at this point.

15          MR. DEUTSCH:  Okay.  That's fine with

16          me.

17      Q.    Dr. Koenigsmann, do you know like, I know

18  that DOCCS has different kind of numbers for procedures.

19  You know.  I've seen a lot of security procedures over

20  the day -- You know -- over time.  There is procedures

21  about labor relations and stuff like that.  I'm going to

22  request from DOCCS all of their medical procedures.  And

23  I'm just trying to figure out, does that have like a

24  title, like Title 14 or something like that that you can

25  recall?

1          A.    I have no idea what you're talking about.

2          Q.    All right.

3          A.    Are you talking about those, those citations

4    in that letter?  That's from the Employees Manual.

5          Q.    Okay.  When you say the Employees Manual, are

6    you talking about the policy and procedure manual?

7          A.    No.  There is an employees manual that, that

8    tells, everybody gets one and it tells you that you have

9    to obey a direct order or you have to -- all the things

10   you have to do.  Actually, somewhere in there, it may

11   say that you can't sleep.  I don't know.  I don't

12   recall.  But everybody gets one.  Everybody is supposed

13   to say that they've read it.  And everybody is supposed

14   to hold onto it and return it when they retire.  It's an

15   Employees Manual.

16         Q.    I know that that DOCCS has directive numbers.

17   Okay.  And that they have -- You know -- kind of, they

18   begin with certain numbers, like 22, a directive -- You

19   know -- 2209 has to do with personnel policies, like

20   absences excused, absences with pay.  I'm trying to

21   figure out what the preface number is for the medical

22   policies.  And if you don't know it, that's fine, I'll

23   just ask for it.  I'm trying to phrase a more kind of

24   direct question.  I've got maybe it's 4320, is it?

25         A.    Health service, health services section of

1    the directives falls in the, in the four thousand range,

2    somewhere in there.

3         Q.    All right.  I'll figure that one out later.

4    Were you ever interviewed by the Commission of

5    Correction?

6         A.    Interviewed.  I, I went to see the

7    Commission on Corrections early in my career.  I, I

8    thought it was a good idea so I contacted the then

9    Commissioner and she advised me to come to a meeting.

10   And I introduced myself and, and spoke to the, to the

11   Commission members that were present.

12        Q.    You say was that the Commissioner or was that

13   the Medical Review Board?

14        A.    Good question.  I don't recall.

15        Q.    Okay.  Was the woman that you met a doctor?

16        A.    The one -- I met a whole bunch of people.

17   At the time, it was a physician that was the, the

18   chairwoman at the time.

19        Q.    Yeah.  She was the head of the Medical Review

20   Board.

21        A.    Yeah.  Sorry.  I met with them and

22   introduced myself and, and we had a nice meeting.

23        Q.    Okay.  Do you know, do you know Dr. Michael

24   Boden?

25        A.    No, I don't.  I know his name.  I don't know

1    him personally, never met him.

2        Q.    All right.  I was trying to figure out, I

3    know Dr. Boden sits on the Medical Review Board.  I was

4    curious to know if you met him at the time?

5        A.    I don't believe I met him at the time.

6        Q.    Are you aware that Dr. Boden is on the

7    Medical Review Board?

8        A.    I know his name from other situations and I

9    believe I do recall that he was, that had come later to

10   the Medical Review Board.  I don't think he was on it

11   back in, when I first was part of the, when I first got

12   my, my position as Deputy Commissioner.

13       Q.    Okay.  I may have asked you this before but I

14   just want to be thorough.  We can agree that if someone

15   has an underlying cardiac problem and then has some sort

16   of incident that causes them to be short of breath, that

17   that shortness of breath can then lead to an

18   exacerbation of the cardiac problem?

19       A.    That's theoretically possible, yes.

20       Q.    Can you tell, would you agree with me that

21   asthma is one component of conditions that make up COPD?

22       A.    Asthma is distinct from COPD, but in

23   essence, they're treated the same and in a lot of ways

24   they are similar.  In the spectrum of disease, they are

25   different though.  There is different pathophysiology

1    involved in asthma versus COPD.

2         Q.    What would the difference be?

3         A.    Well, the difference is COPD is in its worst

4    form is emphysema.  And there are clear changes in the,

5    in the lungs and air passages with emphysema that are

6    not necessarily the same as you see in asthma.  And

7    that's, you generally after long standing, long issues

8    like smoking or disease or exposure to dusts and, and

9    other inhaled materials and things, so there is a lung

10   damage spectrum.  Generally asthma in its purist form is

11   just airways reactiveness and you don't have that kind

12   of lung damage.

13        Q.    I've got a couple more Exhibits that I want

14   to show you that I don't think we've viewed yet just to

15   establish what these document are.  So I'm going to

16   start with Exhibit 9, which Mr. Deutsch should have

17   forwarded to you.  It's a computerized form.

18        A.    He sent it to me?  Oh, yeah, here it is,

19   Exhibit 9.

20        Q.    Okay.  And can you tell me what this is?  Is

21   it, with an emphasis on, you told me before that there

22   was some sort of form that was filled out as part of a

23   quality care review.

24        A.    This is not that.

25        Q.    Okay.  What is this?

1      A.    This is a, every inmate death has to be

2    reported to the, to the Federal U.S. Department of

3    Justice.  And this is a form that's completed by Central

4    Office and sent to the United States Department of

5    Justice on every inmate's death.

6      Q.    And do you know, did the Department of

7    Justice respond at all to this death report?

8      A.    They've never responded to any of them.

9    There is just a report that we have to send.

10     Q.    All right.  So there was no kind of follow on

11   civil rights investigation or anything like that, fair

12   to say?

13     A.    No.

14     Q.    And I think that covers the landscape.

15          MR. KEACH:  Madam Court Reporter, can

16          you confirm that we've identified Exhibits 1

17          through 11 so far in this Deposition?

18          ( Discussion off the record )

19     Q.    All right.  I'm just going to take a break

20   for a few minutes here.  I want to have a chance to kind

21   of collect my thoughts and I'm going to come back and

22   conclude your Examination, sir.

23     A.    Okay.

24          ( Whereupon, a recess was taken )

25     Q.    Doctor, are you ready to proceed?

1    A.    Yes.

2    Q.    Okay.  Some follow-up questions here and

3    should be hopefully done in ten minutes absent any

4    follow up Mr. Deutsch has.  Have you ever referred a

5    nurse for discipline by the Office of the Professions?

6    A.    I don't believe I've ever referred a nurse.

7    I have supported nurses reporting a nurse or nurse

8    administrators reporting a nurse.

9    Q.    Okay.  But to your knowledge, nobody

10   approached you about any concern they have about Nurse

11   Salvadore, fair to say?

12   A.    No.  No.  Not that I remember.

13   Q.    Tell me everything that you know about the

14   circumstances of Michael Carey's death.

15                MR. DEUTSCH:  Objection.  Form.

16   A.    So what was it?  Tell you everything I know

17   about it?

18   Q.    Yeah.  From your own, I mean, do you have any

19   knowledge about what happened to Mr. Carey besides

20   what's reflected in the documents in this case, COC

21   report, some of the information we've looked at today.

22   A.    No.  I have no personal knowledge of what

23   happened to Mr. Carey other than the information that

24   I've been able to put together from the material that

25   you've given me and Mr. Deutsch had given me prior.

1          Q.    All right.  I need to know kind of everything

2    that you were given to prepare for your Deposition

3    today.  I know you've given me that before but then I

4    learned that there was another piece of information I

5    didn't have.  So I just want to be thorough.  Tell me

6    everything you were given to prepare for your testimony

7    today.

8          A.    I was given -- Let me see if I can go back

9    while you're on.  I can review the documents.  Let's

10   see.  These are all the Exhibits.  Oh, I know where

11   they're saved.  Hold on.

12              MR. DEUTSCH:  If it would save a little

13              bit of time, I'm happy to let you know,

14              unless you specifically want him to answer,

15              but otherwise, I can just --

16              MR. KEACH:  Okay.  If you would tell me

17              what he looked at, that would make our life a

18              lot easier, yes.

19              MR. DEUTSCH:  I can tell you, I can tell

20              you what it is that was sent to him.  Hang on

21              one second.

22          A.    Well, I'll start with the things I can see

23   already.  The first one is Office of Special

24   Investigations investigative report and final

25   disposition and closing report from the Office of

1    Special Investigations.  That was one thing.

2        Q.    Both of those documents we've looked at

3    today, correct?

4        A.    I believe so.  Then I have a Certificate of

5    Death.  Oh, I did have this.  I've seen this before,

6    that U.S. Department of Justice report, Mr. Hillel --

7                MR. DEUTSCH:  Deutsch, it's okay.

8        A.    Deutsch had sent that to me, also, a

9    Certificate of Death, an autopsy report, case summary

10   report from the Office of the Medical Examiner in Monroe

11   County.  Let's see what's next.  SCOC preliminary

12   report.  An SCOC preliminary report.  And then what's

13   this document.  This document is our response to the

14   preliminary report, and that was dated March 20th, 2018.

15   And then there were a couple of things that were, that

16   here, what's this, that I couldn't open.  Yeah.  This

17   one, I don't think, oh, here we are.  What's this.  This

18   is, oh, the same thing again.  This is, oh, is this the

19   one from Dr. Morley?  No.  No.  That was mine.  It was a

20   response again.

21       Q.    The March 20th, 2018 response?

22       A.    Yes.  And then here's another copy of the

23   U.S. Department of Justice.  See, some of these, I had

24   trouble opening so he had to send them to me again.

25   This is the SCOC report again, autopsy, death

1    certificate.  All right.  What's this group.  That one I
2    couldn't open.  Okay.
3            MR. KEACH:  Hillel, does that cover the
4            landscape of what he's seeing or is there
5            anything else?
6            MR. DEUTSCH:  I believe that's it.  It's
7            a little bit hard because it was disjointed,
8            especially if you want, I can review the
9            transcript when we get it, if there was
10           anything else that's missing, I'm happy to
11           supplement it.  I think that's everything.
12           There is nothing else that I'm seeing here.
13           There was the death certificate.  There was
14           the autopsy report.  And there was a whole
15           bunch of the documents that are already in
16           evidence here or that were already marked as
17           Exhibits here.
18       A.    The thing I had most trouble picking up was
19    the Amended Response from Dr. Morley which we ultimately
20    got through to earlier.  That's the thing that I can't,
21    for some reason, it doesn't come up easily.
22       Q.    Okay.  All right.  Let's, let's move on here
23    and I've got a couple of questions to ask you about
24    Exhibit 3 which was your response to the COC.
25       A.    Exhibit 3.

1      Q.    And then we're going to move on.

2      A.    Exhibit 3, so you want me to go to that,

3   Exhibit 3?

4      Q.    Yes.

5      A.    Exhibit 3.  Okay.  I have it open.

6      Q.    All right.  So we're just going to start with

7   recommendation number one in the response.  And I just

8   want to make clear, according to your description, the

9   Office of Special Investigation found that the officer

10  who was responsible to monitor the medical unit on the

11  morning of Mr. Carey's death claimed he made his

12  security rounds, did not in fact make his security

13  rounds and then placed false documentation in a log book

14  that he did so.  Is that an accurate summary of what you

15  know about that officer?

16              MR. DEUTSCH:  Objection, form.  Can you

17              give me one second here to deal with a child

18              care situation?  One second.

19              ( Discussion off the record )

20      A.    So if you could just repeat your question.

21  I've read it very thoroughly now.  Go ahead.

22              MR. KEACH:  Off the record for just a

23              second.

24              ( Discussion off the record )

25      Q.    Okay.  Let's, so Dr. Koenigsmann, you want me

1  to rephrase the question?

2      A.    Yes, or just state it again.

3      Q.    All right.  Do you agree with me that in your

4  submission to the Commissioner of Corrections, you found

5  that the corrections officer that was responsible to

6  monitor the medical unit on the morning Mr. Carey died

7  did not do his security rounds but then placed false

8  entries in the log book reflecting that he did?

9           MR. DEUTSCH:  Objection, form.

10     A.    That, yes, that's what we said, yes.

11     Q.    And in response to that, based on your

12  knowledge, this gentleman was not disciplined for making

13  false entries into a Department of Corrections log book?

14     A.    Evidently, that's the case.

15     Q.    Okay.  Moving down to page two, response one.

16  And that talks about -- You know -- response one talks

17  about obviously point one from earlier about the

18  Commission of Corrections findings and conducting a

19  confidence and quality assurance review.  It says "DOCCS

20  has reviewed the active health care record for Inmate

21  Carey and agrees with the Medical Review Board's

22  findings."

23     A.    Right.  That's what it says, yes.

24     Q.    Okay.  Who are the people that reviewed the

25  Medical Review Board's findings and decided that they

1    were going to agree with them?

2        A.    More than likely the regional medical

3    director reviewed the medical records and compared them

4    to the allegations of the, of the SCOC and concluded

5    that, that there were deficiencies.

6        Q.    And that regional medical director would be

7    Dr. Bozar, right?

8        A.    Groveland, yes.

9        Q.    And do you know if Dr. Bozar generated any

10   documentation about her quality assurance review?

11       A.    No, I don't believe, she may have sent an

12   e-mail to me or to Joan Smith who would have been in

13   charge of these SCOC reports.  She gathers all the

14   information when we divvy it out and we say there is a

15   problem here, send it to security.  There is a problem

16   here.  She's responsible for gathering it all back and

17   putting it kind of all together.  And then I do like a

18   master review and formulate the response.

19       Q.    Okay.  So what documents would you, did you

20   review prior to providing paragraph, paragraph one of

21   this response for recommendation two?  It's the one that

22   DOCCS has reviewed the active health records for Inmate

23   Carey and agrees with the Medical Reviews Board's

24   findings.

25       A.    I don't recall.  I don't know what I looked

1   at.

2        Q.    Okay.  But you, it's fair to say in the past

3   where you believed that the Commission of Corrections

4   has made mistakes that you would point those out in your

5   responding letter to a preliminary report, fair to say?

6        A.    Yes.

7        Q.    And you did not do that here, correct?

8        A.    Correct.

9        Q.    And you did not do that here even though the

10  Medical Review Board has determined that the medical

11  care provided to Carey was substandard and did not meet

12  acceptable standards of care, correct?

13              MR. DEUTSCH:  Objection, form.  Go

14              ahead.

15       A.    The way you phrased that, my response in

16  number one specifically pertains to what they point out

17  in recommendation number two number one about the asthma

18  rescue plans.  Documentation of peak flows, vital signs,

19  failure of medical staff, noncompliance with self-

20  administered medicine for treatment of asthma.  That's

21  what we're agreeing to.

22       Q.    All right.  Well, at no point in this

23  response did you raise any concerns about the language I

24  just read to you, fair to say?

25       A.    We did not.

1        Q.    And you also agree, I think at least your

2   agency agrees with the Medical Review Board's finding

3   that Inmate Carey was not appropriately evaluated by a

4   provider within the time frame outlined in the health

5   service policies regarding inmate, regarding infirmary

6   care, correct?

7        A.    That's a good question.  That was something

8   that came out of, I noticed that and I'm a little

9   confused on that.

10             MR. DEUTSCH:  Can you just read back --

11             just for the steno, can you just read back

12             the last question and answer, just to make

13             sure I have it.

14       Q.    Okay.  Do you agree, your agency agrees with

15   the response number two at the bottom of page two,

16   correct?

17       A.    You lost me.  Recommendation number two

18   number two?

19       Q.    All right.  At the bottom of page two of

20   Exhibit 3, there is paragraph two.  It says response and

21   then there is paragraph one and paragraph two.  Do you

22   see that?

23       A.    Yes.

24       Q.    Okay.  All right.  Your agency made clear in

25   response to the COC report that it agreed that Mr. Carey

1    had not been evaluated within an appropriate time period

2    as required by the DOCCS health services policies?

3        A.    Yes, it says that.

4        Q.    And I don't understand that last sentence, it

5    says, "Health service policy 7.11 was changed to reflect

6    that our infirmaries" -- the next sentence says

7    subsequent, the next sentence says, "Health services

8    policy 7.11 was changed to reflect that our infirmaries

9    are intended for subacute care and not acute care."  Do

10   you see that?

11       A.    Yes.

12       Q.    What does that mean?

13       A.    That means, that's why I was confused.  At

14   one time, we had a standard in our policy on infirmary

15   care that an inmate had to be seen every day.  And if

16   they were admitted to, every day and on the date that

17   they were admitted to infirmary.  Our facilities are not

18   staffed that way.  They're staffed Monday through Friday

19   by physicians, by physicians, physician assistants and

20   nurse practitioners.

21             So that was always an issue with our

22   policies.  And in review of that and multiple

23   discussions of it, we decided to change our policy

24   because our infirmaries are not acute care setting,

25   they're subacute care setting.  That we changed, the

```
1   policy that inmates would be seen on a, I'm not sure if

2   it was on a daily basis Monday through Friday or if it

3   was up to the providers to determine how often they

4   should be seen.

5           I'd have to review the policy to see if

6   that's the case.  But I believe it clearly did not

7   require inmates to be seen on the weekends.

8       Q.   And now it does?

9       A.   No, now it doesn't.  It used to but it

10  doesn't.

11      Q.   Okay.  So what happens, so what should happen

12  differently with Mr. Carey's situation if this new

13  policy was in effect?

14      A.   Well, I don't know what day he was admitted,

15  was he -- or seen.  If he was admitted on a, on a

16  Saturday or a Sunday, he would be seen by a, by a

17  provider, prescribing provider on Monday.  So I don't

18  know if he was admitted on the weekend or if he was

19  admitted during the week.

20      Q.   Okay.  And what about this acute care

21  situation?  Is there a change now where the acute care

22  is transferred to the regional medical unit?

23      A.   No acute care is provided in DOCCS.  Acute

24  care is a hospital setting.  We only, we only provide

25  subacute care.
```

1        Q.    Okay.  I don't understand why there would be

2    that language change to reflect not acute care.  I don't

3    get it.

4        A.    Well, at the time, I was reminding the SCOC

5    that we, our level of care is subacute.  We don't

6    provide acute care.  They would make references in their

7    reports as if we were running hospitals, not references.

8    It was clear to me that their, the thought that they had

9    in their mind about the level of care that we had in the

10   facilities was that we were at the level of a hospital.

11   We are not.  So I just took the opportunity to remind

12   them of that.

13              MR. KEACH:  That concludes my

14              Examination absent any follow-up from

15              Mr. Deutsch.

16              MR. DEUTSCH:  I've got a couple of

17              follow-up questions but I do not expect it's

18              going to take very long.

19              EXAMINATION

20              BY MR. DEUTSCH:

21       Q.    Dr. Koenigsmann, first of all, thank you for

22   your patience.  I know this has been, okay, I guess

23   we're coming up on six and a quarter hours.  But, I

24   guess I just want to start by asking, there were some

25   questions quite awhile ago about gross negligence,

1  reckless indifference, when you were answering those

2  questions, were you answering them from a legal

3  perspective or from a lay perspective?  Just to be clear

4  what I'm asking, were you saying that in your opinion

5  this was or wasn't gross negligence using the legal

6  standard for gross negligence or for whatever that would

7  mean to you as a doctor, as a non lawyer?

8      A.    For the most part, I was applying my own

9  standard as a layperson and as a physician.

10      Q.    Okay.

11      A.    But I was trying to refer that there could

12  be nuances, legal nuances to the definitions that I am

13  not applying.

14      Q.    Okay.  Thanks.  I appreciate you clarifying

15  that.  To the best of your knowledge, is there, was

16  there any finding by any agency anywhere that Nurse

17  Salvadore fell asleep on the night in question?

18      A.    No, there was not.

19      Q.    Okay.  Turning to the event, itself, as you

20  might recall a few hours ago, you read through the

21  statements from the inmates.  And let me tell you what

22  my recollection is of what they said, you can tell me if

23  that was your recollection, as well.  My recollection is

24  they started out by saying that sometime at

25  approximately twelve-thirty, Mr. Carey had shortness of

1  breath.  Is that your recollection, as well?

2      A.    Yes.

3      Q.    Okay.  And that they provided him with his

4  inhaler and they pressed the button, is that also your

5  recollection?

6      A.    Yes.

7      Q.    And that after give or take three minutes,

8  the nurse didn't appear and he was calmed and going to

9  sleep so they canceled the button, was that your

10 recollection, as well?

11     A.    Yes.

12          MR. KEACH:  Objection to form.

13     Q.    Okay.  Based on that, that sequence of

14 events, would you describe what is being, that shortness

15 of breath, assuming that it was an asthma attack, would

16 you describe that as being a severe asthma attack or not

17 a severe asthma attack?

18          MR. KEACH:  Objection to form.

19     A.    Clearly not a severe asthma attack.

20     Q.    Let's assume for the moment that Mr. Carey

21 had presented with that shortness of breath and he had

22 rang the bell and the nurse had responded.  What should

23 the nurse have done?

24     A.    If the nurse responded, the nurse should

25 have assessed the patient, obtained vital signs,

1    including a pulse oximetry.  If the patient was

2    complaining of shortness of breath and she identified

3    wheezing, she should have done a peak flow.  And at that

4    point in her assessment, she would have judged is this

5    patient having an acute asthma attack or not.  If he was

6    having an acute asthma attack, he had wheezing, his

7    pulse oximetry was low, doesn't have to be low and his

8    peak flow was not at its max or its par, then her, her

9    actions should be, what can I do at this point for this

10   patient.  What orders do I have.

11        That's when she should resort to the asthma

12   treatment rescue plan if she has one that's in effect

13   for the patient.  That has specific orders of what to

14   do, what oxygen flow that she can put on, what

15   treatments she can give him like a nebulizer treatment,

16   etcetera.

17        And if she doesn't have an asthma rescue

18   treatment plan or if she doesn't have any other specific

19   orders to that patient that were given to her by the

20   admitting physician or provider, then she should call

21   the on-call provider to get orders for what to do for

22   the patient.

23        Q.   Let's say, based on what you testified to

24   earlier that she reached the determination that it was

25   not a severe asthma attack, that she provided him his

1    inhaler, the pulse ox and within a few minutes,

2    everything had resolved and the patient was asleep.

3    Would any further action be required on her part?

4         A.    No.  I would like to think that she would

5    check in on the inmate at some point later in the

6    evening to make sure that he was, that he was okay.  But

7    that would have been about it.

8         Q.    Was there, would there be any reason for her

9    to begin any sort of protocol for a cardiac arrest?

10        A.    No.  No.  Not based on the scenario that you

11   provided.

12        Q.    Okay.  Based on, let's again, let's assume

13   for the moment that the inmate's version was correct,

14   even though I know you've testified that nobody has ever

15   found that to be the case that the nurse was asleep,

16   let's assume for the moment that the nurse was asleep

17   and that she didn't respond in those three minutes

18   before the call ball was pushed and he was given his

19   inhaler and went back to sleep.  Do you also recall that

20   those same inmates said approximately two hours later,

21   he was awake and walking around?

22        A.    Yeah.  There was something about awake and

23   drinking water.  I don't know where he got the water

24   from.  But I assume he had to go some place to get the

25   water.

1        Q.    Okay.  Based on that, do you believe there is

2    any reason to conclude that assuming the call bell was

3    pushed and assuming that the nurse didn't respond, that

4    that conduct, that failure to respond brought about

5    Mr. Carey's death?

6                    MR. KEACH:  Object to the form.

7        A.    No, I can't see that.

8        Q.    And then I believe -- Oh, yeah, I think that

9    had a little bit more.  Going back to Exhibit 3.

10       A.    You want me to look at that?

11       Q.    Sure.  Just the very last page, the very last

12   paragraph where it says three.

13       A.    Exhibit 3.  Exhibit 3.  Our response three

14   or --

15       Q.    Yes.  It's the last page, page three,

16   paragraph three, so it says that paragraph, the Office

17   of Special Investigations, that paragraph, is that based

18   on an investigation that you or your office conducted or

19   is that your summarizing OSI's conclusion?

20       A.    We don't conduct any kind of investigations

21   on, on a person's conduct.  That was based on the Office

22   of Special Investigations investigation, Office of

23   Special Investigations investigation.

24       Q.    Okay.  Now --

25                    MR. KEACH:  What page, which part of the

1          document were you referring to with that last

2          question?  I lost that.

3               MR. DEUTSCH:  Sure.  It's page three,

4          the last page, last paragraph.  So it's page

5          three, paragraph three.

6               MR. KEACH:  Thank you.

7     Q.    So what it says in the second sentence there,

8     it says, "It was determined that RN LS did not make any

9     medical rounds."  Based on your review of the OSI

10    report, the initial report, I'm not talking about the

11    amended report, did the initial report conclude that she

12    hadn't made any rounds?  Did it say that anywhere?

13    A.    Good question.  I don't recall.

14    Q.    Okay.  So I think that may be an Exhibit that

15    we have.  Hang on a second.

16               MR. KEACH:  It is.

17               MR. DEUTSCH:  Do you recall offhand

18          which one?

19               MR. KEACH:  Yup.

20               MR. DEUTSCH:  I've got it here as

21          Exhibit --

22               MR. KEACH:  Exhibit 7.

23               MR. DEUTSCH:  Yes, Exhibit 7.

24    Q.    So do you have -- Can you access Exhibit 7?

25    A.    I have Exhibit 7.

1      Q.    Okay.  So turning to where it says closing

2  report on the last page.  I'm just going to take a

3  moment to review.

4      A.    Yeah.

5      Q.    Review the conclusion.

6      A.    I'm reading it.

7      Q.    Let me know when you've done that.

8      A.    Okay.  The closing report you're talking

9  about?

10     Q.    Yes.

11     A.    Okay.  I kind of read it through.  Okay.

12     Q.    Okay.  So does it say anywhere in the

13  conclusion that, that the nurse did not make rounds?

14     A.    No, it does not.

15     Q.    Okay.  Is it fair to say that when you

16  characterized the OSI report as saying she didn't make

17  rounds, that was a mistake?

18     A.    You know.  After reviewing all this material

19  and looking back, I believe that that may have been an

20  error, that it was an error and that that may be the,

21  the reason for the amended, the amended response that

22  Dr. Morley did.

23            MR. DEUTSCH:  Okay.  Thank you.  I

24            appreciate that.  That is a full response.

25            And I think that's all I've got.

1    EXAMINATION

2    BY MR. KEACH:

3        Q.    Doctor, relative to your last response to

4    Mr. Deutsch's question, looking at this, looking at this

5    Exhibit 7, that's just speculation on your part about

6    why Dr. Morley did what he did, fair to say?

7        A.    It's only speculation.

8        Q.    Right.  Okay.  I mean, you didn't talk to Dr.

9    Morley, he didn't consult with you, nobody from the AG's

10   office called you, no one from Counsel's office called

11   you, is that correct?

12       A.    No, I knew nothing about any amended

13   response.

14       Q.    Okay.  Now, Mr. Deutsch asked you a couple

15   questions about the severity of the asthma attack and

16   your opinions in that regard, you and I can agree that

17   whether or not someone is having a severe asthma attack

18   should be done based on direct observation by a

19   provider, we can agree with that, can't we?

20       A.    Say that again.

21       Q.    We can agree that if, the determination of a

22   severity of an asthma attack needs to be done by

23   observation from a trained medical professional, can we

24   agree there?

25       A.    More than that.

1    Q.    Observation plus the gathering of data?

2    A.    Correct.

3    Q.    All right.  So -- You know -- the way that

4    you figure out if you're looking at somebody that's

5    having a problem and they're having an asthma attack,

6    the way you figure out how severe it is, you hook them

7    up to the pulse ox, you observe them, you look to see

8    whether or not there is any cyanotic changes in the

9    skin.  That would be three things I can come up with.

10   Sound right?

11   A.    Correct.

12   Q.    All right.  What else would you do?

13   A.    Do a peak flow, and take vital signs,

14   measure their blood pressure and pulse rate.

15   Q.    And we can agree if someone is having a

16   severe asthma attack, their blood pressure and pulse

17   rate would be elevated, wouldn't they?

18   A.    Generally, yes.

19   Q.    All right.  Well, the pulse would be elevated

20   because there is not enough oxygen in the blood so the

21   heart has to work harder to get oxygen out to the organs

22   and cells of the body, correct?

23   A.    Yes.

24   Q.    And then the blood pressure would be

25   elevated, one, because the heart's working harder and

1   two because the person is under stress, fair to say?

2         A.    Yes.

3         Q.    Okay.  And so, and we can agree that -- You

4   know -- the medical records here reflect that that

5   wasn't done at any point in time in the morning hours of

6   April 19th of 2015, fair to say?

7         A.    Correct.

8         Q.    All right.  So I appreciate that we're -- You

9   know -- that Mr. Deutsch and I are both left with the

10  disadvantage of relying upon the statements of these

11  inmates who have no medical training to characterize

12  what Mr. Carey was or was not doing and -- You know --

13  and relying upon that on the context of it being double

14  hearsay because it's, the inmate is saying that to the

15  State Police Officer who's taking that down into the

16  statement.

17          The only way that we would have known what

18  was going on with Mr. Carey, whether he was having a

19  heart problem or whether he was having an asthma attack

20  is if somebody properly evaluated him and made those

21  determinations, fair to say?

22                MR. DEUTSCH:  Objection to form.

23        A.    Yes.

24        Q.    Okay.  And a nurse is trained to do all these

25  things that we've talked about, is she not, do a peak

1    flow -- peak flow is the thing where you like, they give

2    you a tube and it's got a little meter on the end and

3    you pump out into it.  And that says what your flow is,

4    am I right about that?

5         A.    Yes.

6         Q.    Okay.  Nurse is trained how to use a peak

7    flow device, correct?

8         A.    Yes.

9         Q.    She's trained how to use a pulse oximeter?

10        A.    Yes.

11        Q.    She'd be trained how to take blood pressure

12   and pulse?

13        A.    Yes.

14        Q.    And she'd also be trained on how to use a

15   nebulizer?

16        A.    Yes.

17        Q.    All right.  So we can agree that what Mr.

18   Carey did or did not go through on that evening is a

19   matter of kind of speculation on everyone's part because

20   we don't have any data --

21               MR. DEUTSCH:  Objection to form.

22        Q.    -- about what happened when he woke up at

23   twelve-thirty in the morning, fair to say?

24               MR. DEUTSCH:  Objection to form.

25        A.    Rephrase.  Can you, can you run through that

1    one again?

2        Q.    Since we don't have any data, we're just

3    basically all speculating about what happened to

4    Mr. Carey based on what's in these inmate statements,

5    accurate?

6        A.    Not exactly, no.

7        Q.    Well, Mr. Deutsch asked you to provide an

8    opinion about the severity of an asthma attack, how are

9    you qualified to provide an opinion about the severity

10   of an asthma attack when we don't have any data?

11       A.    We have one bit of additional data and that

12   was two hours later, he was out of bed walking around.

13   You don't do that in a secure, in a severe asthma

14   attack.

15       Q.    That is not reflected in the records that you

16   reviewed, sir.  It is not reflected that he was walking

17   around or, Mr. Deutsch put some words into his questions

18   that were not accurate.

19            MR. DEUTSCH:  Objection to form.

20       Q.    I'll read to you what it says.  "At about

21   two" -- This is the later incident and we'll first talk

22   about what Inmate Russell said.  "About two a.m., he

23   woke up again and Inmate Nudd and I got him a glass" --

24            MR. DEUTSCH:  What Exhibit are you

25            reading from?

1              MR. KEACH:  I don't know.  The, the

2         Exhibit 8.

3              MR. DEUTSCH:  Hang on a second.  Give me

4         a second here.  Exhibit 8.  Okay.  And you're

5         reading paragraph sixteen?

6              MR. KEACH:  Paragraph fifteen.

7              MR. DEUTSCH:  Fifteen.  Okay.

8    Q.    "About two a.m., he woke up again and Inmate

9    Nudd and I got him a glass of water and gave him his

10   Albuterol inhaler.  Inmate Carey took both and then went

11   back to sleep."

12             And then there is a later description in

13   paragraph sixteen, "At approximately two-fifteen to two-

14   thirty a.m., Inmate Carey got up again.  They gave him

15   some water and he went back to bed."  Doesn't say

16   anything about him getting up and walking around, sir.

17   A.    Okay.

18   Q.    So Mr. Deutsch put those words in your mouth.

19   So I'm going to ask, are you prepared to change your

20   opinion in that regard?

21   A.    Wait.  Wait.  There are several things here.

22   I thought he only had Advair.  They said he had

23   Albuterol.  Albuterol is a rescue inhaler.  That's a

24   whole different picture here.  What's going on?

25   Q.    Basically what's going on is that these

1  inmates represented to, untrained medical inmates

2  represented to a State Trooper who doesn't have any

3  medical training that this was an Albuterol inhaler or

4  somebody put that in there that is an Albuterol inhaler.

5  The Commissioner of Corrections found, did not find any

6  evidence of him having an Albuterol inhaler.  In fact it

7  was --

8           MR. KEACH:  I'll slow down.  Tell me

9           where you left off.  It's been a long day.

10    Q.    I'm going to start over.  The Commission of

11  Corrections looked at the medical records and found that

12  there was no Albuterol inhaler.  That -- You know -- he

13  only had long lasting, long lasting asthma medication in

14  his room not his Albuterol inhaler.  That's an important

15  finding by the Commission of Corrections.  So relative

16  to this finding of Albuterol, maybe the inmates thought

17  it was Albuterol and represented that to the trooper or

18  the trooper thought it was Albuterol -- You know --

19  again, we're dealing with the representations of three

20  people with no medical training for you to opine and

21  respond to Mr. Deutsch's questions that you did not

22  believe he was suffering from a severe asthma attack.

23           So -- You know -- I'll ask you again, sir --

24  You know -- you don't have any basis to say he wasn't

25  suffering from a severe asthma attack based on the

1    representations of these inmates, fair to say?

2                    MR. DEUTSCH:  Objection, form.

3        A.    First of all, no, I can't say that.  First

4    of all, I don't recall exactly what you, what you said

5    the inmates said about the two-thirty to three whatever

6    it was time frame.  Second thing is, I still am hung up.

7    An inmate in an infirmary should not have an Advair

8    inhaler at their disposal, at their bedside.  The only

9    thing an inmate should have in any circumstance, well,

10   in an infirmary is a rescue inhaler which would have

11   been Albuterol.  So there is an issue with that.  There

12   is a problem with that.

13                    The Commission on Corrections looks at these

14   cases a year out.  I don't know on what basis they said

15   he didn't have an Albuterol inhaler.  But that's,

16   that's, I guess it's neither here nor there.  So if you

17   could go back and read to me what the inmate said that

18   second event, they got him a glass of water and what?

19       Q.    They said in words or substance, one inmate

20   said he woke up and he got him a glass of water and gave

21   him his Albuterol inhaler.  The other inmate said that

22   he got up again, they gave him some water and he went

23   back to bed.  That's the description, not that he got up

24   and walked around.  That's the earlier incident at

25   twelve-thirty, twelve-thirty in the morning he got up

1    and went to the bathroom and couldn't breathe.

2            Okay.  So are you prepared to change your

3    testimony about whether or not he suffered from a severe

4    asthma attack now that you've been given an accurate

5    recitation of what's in these documents?

6        A.    No.

7        Q.    You're not?

8        A.    No.

9        Q.    Why not?

10        A.    If this inmate was suffering an acute asthma

11    attack and he was writhing in bed, wheezing and that

12    short of breath what would be characterized as severe

13    asthma attack, it would not be the way the inmates

14    described him and he wouldn't go back to sleep.

15        Q.    Okay.  Well, how about if he was suffering,

16    how about if he was suffering shortness of breath

17    associated with a cardiac problem?

18        A.    Hard to say.  The degree of shortness of

19    breath depends on how bad the angina attack is, also

20    usually associated with that, tightness in the chest,

21    pain in the jaw, pain in the left arm.  So it's hard to

22    say, very hard to say.  But it doesn't sound to me from

23    that reading that something that acute was going on at

24    that time.

25        Q.    All right.  Well, if that's the case, then

1    why did he end up dead?

2        A.    Don't know.  You can die from your, you can

3    die from an arrythmia, cardiac arrythmia due to an acute

4    occlusion of a coronary artery in your sleep.  It

5    happens all the time.

6        Q.    There is nothing in the autopsy to reflect

7    there was an acute occlusion of the coronary artery.

8                    MR. DEUTSCH:  Objection, form.

9        A.    He died of a myocardial infarction.  That's

10   what they said.

11       Q.    Well, you didn't read the follow on

12   Deposition that Mr. Deutsch and I conducted of Dr.

13   Catanese where he indicated once he had access to the

14   records that we do now and the Commission of Correction

15   report that he would have changed the cause of death to

16   both myocardial infarction and as a secondary cause,

17   COPD, asthma.

18                    MR. DEUTSCH:  Objection.  Well,

19                    objection, form, and -- You know -- let's

20                    just leave it at that.  Objection, form.

21       Q.    Right -- You know.  So -- You know -- I guess

22   I'm just, and I think I'm kind of beating a dead horse

23   here, Doctor, because you're not a pulmonologist, are

24   you?

25       A.    No, I'm not.

1    Q.    You're not, I know there are pulmonologists

2    that specialize in the treatment of COPD, you're not one

3    of those type of doctors, are you?

4    A.    No.

5    Q.    You're not a cardiologist?

6    A.    No, I'm not.

7    Q.    And you're not a forensic pathologist?

8    A.    No, I'm not.

9    Q.    Okay.  So you and I can agree when you opined

10   in response to Mr. Deutsch's question which incidentally

11   misrepresented some important aspects of this document,

12   you will not admit that your opinion about Mr. Carey

13   suffering from a severe asthma attack is based on

14   speculation versus data, correct?

15               MR. DEUTSCH:  Objection to form.

16   A.    Yeah, I'm, I don't know what I'm saying

17   there.  I would not, I would not change my opinion that,

18   that, that that was an acute asthma attack.

19   Q.    Okay.  But if it's, if it's people, as we

20   talked about before, if you are not having an acute

21   asthma attack, but you're still having an asthma attack,

22   depriving the heart of oxygen, that can then lead to a

23   cardiac problem, can't it?

24   A.    Yes, it can.

25   Q.    If it is not corrected?

1    A.    Yes, it can.

2    Q.    And it can also lead, could it not, if

3    someone is having, let's just say, for lack of a better

4    term, a mild asthma attack, that asthma attack isn't

5    treated properly, it can then reach the point where it

6    becomes acute, can it not?

7    A.    Yes, it could.

8    Q.    Okay.  And we have no idea -- You know --

9    what happened relative to what symptoms Mr. Carey did or

10   did not have because Mr. Carey is dead and he's not here

11   to tell us, fair to say?

12              MR. DEUTSCH:  Objection, form.

13   A.    Say that again.

14   Q.    We don't have the ability to ask Mr. Carey

15   what his symptoms were, fair to say?

16   A.    Correct.

17   Q.    And we don't know what happened after he went

18   to bed at two-thirty in the morning because those,

19   because -- You know -- the inmates went back to sleep,

20   he went back to sleep and died?

21              MR. DEUTSCH:  Objection to form.

22   A.    That's what happened.

23   Q.    All right.  You and I can agree that there is

24   a concept in modern medicine that medical intervention

25   is always better than no intervention, correct?

1          MR. DEUTSCH:  Objection, form.

2      Q.    I'll do a better job of describing it.  If

3  you're having a medical problem -- You know -- you're

4  better off as a patient to seek out either a nurse or a

5  doctor to try to figure out what's going on, fair to

6  say?

7      A.    Yes.

8      Q.    And if you're seeing a nurse, that nurse then

9  has a responsibility to do nursing assessments that

10  are -- You know -- has a responsibility to do nursing

11  assessments to determine what's wrong with that patient,

12  correct?

13      A.    Yes.

14      Q.    And then that nurse is required under her

15  standard of care to then report the results of her

16  nursing assessment to a physician in order for that

17  physician to make a differential diagnosis about what's

18  going on with the patient, fair to say?

19          MR. DEUTSCH:  Objection, form.

20      A.    Yes.

21      Q.    Okay.  And none of those steps could have

22  occurred here in the event that the inmates are to be

23  believed that Nurse Salvadore was sleeping, fair to say?

24      A.    That wouldn't happen if she was sleeping,

25  correct.

1      Q.    Okay.  And I just want to be clear, do you

2    have an opinion either way about whether or not these

3    inmates are telling the truth about Nurse Salvadore

4    sleeping?

5      A.    I have twenty plus years of experience in

6    DOCCS dealing with inmates.  And the one thing I've

7    learned is that it is near impossible to go with exactly

8    what inmates are saying.

9      Q.    Oh.  Okay.  Well, if inmates say something

10   that's untrue, they end up getting disciplined, do they

11   not?

12            MR. DEUTSCH:  Objection to form.

13     A.    Not always.

14     Q.    But that's one of the, that's one of the

15   possible consequences that an inmate faces for not

16   telling the truth is that they can be punished, correct?

17     A.    Correct.  And a lot of times they don't tell

18   the truth to not be punished.

19     Q.    Okay.  Well, so is it your testimony, sir,

20   that every inmate is a liar and they never tell the

21   truth?

22            MR. DEUTSCH:  Objection.

23     A.    No.

24     Q.    Do you know any of these men, Mr. Nudd or

25   Mr. Russell?

1      A.      Absolutely not.

2      Q.      What incentive would these men have to lie

3   about what happened to -- You know -- what happened to

4   Mr. Carey?

5      A.      I believe there is a, part of the inmate,

6   part of the inmate rules is that that they're obligated

7   to report if they, if they themselves are injured or if

8   they're aware of injuries to someone else.  And it's,

9   maybe they were concerned that since they didn't report

10  this, what would happen to him, it was, there was an

11  issue there.

12     Q.      Okay.  Well, you're aware, and I didn't show

13  you these documents today but both of these inmates

14  signed Depositions in front of a State Trooper where

15  they put down what they had observed.  And they, they

16  affirmed that Deposition under penalty of perjury and

17  under penalty under the Criminal Procedure Law, or

18  excuse me, under the Penal law that they could be

19  prosecuted for filing a false statement.  Are you aware

20  of that?

21     A.      No, I wasn't aware of that.

22     Q.      Does that change your opinion that these

23  inmates are willing to put this down on a document that

24  can result in their prosecution if they didn't tell the

25  truth?

```
 1      A.    No.

 2      Q.    Okay.  That doesn't change your perspective

 3  at all?

 4                  MR. DEUTSCH:  Objection to form.

 5      A.    No.

 6      Q.    So it's your perspective that -- You know --

 7  these inmates who you don't know basically were willing

 8  to lie and be prosecuted again for telling a lie,

 9  correct?

10                  MR. DEUTSCH:  Objection, form.

11      A.    I'm saying it is possible.

12      Q.    Is it possible that they're telling the

13  truth?

14      A.    Yes, it's possible.  Yes.

15      Q.    Okay.  Would you agree with me that it is a

16  mentality of people that are employed by the Department

17  of Correctional Services to question what they're told

18  by inmates?

19                  MR. DEUTSCH:  Objection.  Form.

20      Q.    Let me phrase that different.  Let me phrase

21  that differently.  You know.  They have an adage for

22  lawyers -- You know -- when is a lawyer lying, how do

23  you know a lawyer is lying, his lips are moving, right.

24  It's a big joke which is actually -- You know -- I think

25  offensive to most lawyers that there's that perception
```

1    out there.  But that's a running joke, how do you know a

2    lawyer is lying, his lips are moving.  Isn't it the same

3    mentality in DOCCS generally towards inmates is how do

4    you know an inmate is lying, their lips are moving?

5                    MR. DEUTSCH:  Objection, form.

6         A.    You, you must question what inmates, what

7    inmates tell you.  It's just the nature.  You have to

8    question it.  They're in prison for a reason and you

9    have to question whether they're being truthful or not.

10   And in dealing with inmates and working with them, that

11   is affirmed over and over and over again.

12        Q.    Okay.  And you use kind of your standard

13   faculties to determine whether or not an inmate is lying

14   to you, right?

15                   MR. DEUTSCH:  Objection, form.

16        A.    I don't know what you mean by standard

17   faculties.

18        Q.    Go ahead.  I'm sorry.

19        A.    You do the best you can.  A lot of times

20   what they tell you just doesn't make sense.  And other

21   times, there is things that you can do to verify what

22   they're saying.  You know.  The common thing we deal

23   with with inmates is pain.  And there are physiologic

24   markers that you can use to help assess whether someone

25   is truly in pain or if they're just saying they're in

1    pain.  So you have to use those things as best you can

2    to sort out what's going on.

3        Q.    Tell me everything you know about Inmate Nudd

4    and Inmate Russell that would cause you to not believe

5    what they told the State Troopers about what happened to

6    Mr. Carey, besides obviously just kind of the general

7    perspective you have that you should take what an inmate

8    says -- You know -- with some caution.

9                MR. DEUTSCH:  Objection to form.

10       A.    Other than, other than there being inmates

11   and you must take everything an inmate says with a grain

12   of salt, I have no reason to believe that they were not

13   telling the truth.

14       Q.    Okay.  And what effort was made, if any, by

15   your office to get to the bottom of whether or not these

16   inmates were telling the truth?

17       A.    That was not our health services obligation.

18   That was the investigatory department's job to sort out

19   what was going on.

20       Q.    Okay.  But whoever started this process with

21   the Bureau of Labor Relations believed in these inmates

22   enough that they recommended that Nurse Salvadore be

23   placed on administrative leave, didn't they?

24                MR. DEUTSCH:  Objection, form.

25       A.    Yes.

1      Q.      And we can also agree, sir, that if someone

2   has an arrythmia that's severe enough to cause them to

3   have shortness of breath that over time that arrythmia

4   can get worse and lead to their death, correct?

5      A.      Yes.

6      Q.      And the only way to determine whether or not

7   that arrythmia would lead to a later cardiac arrest

8   would also be to have data, correct?  Let me do a better

9   job.  There are ways that someone can be evaluated to

10  determine whether or not they're having an arrythmia

11  that could be life threatening, aren't there?

12     A.      Yes.

13     Q.      One of those is the use of an EKG machine?

14     A.      Yes.

15     Q.      And they have EKG machines in the infirmaries

16  in the DOCCS medical system, don't they?

17     A.      Yes.

18     Q.      And nurses are trained how to use an EKG

19  machine, are they not?

20     A.      Yes.

21     Q.      And they're qualified to use an EKG machine?

22     A.      Yes.

23     Q.      And so if Mr. Carey was having an arrythmia

24  that was causing him to have shortness of breath, that

25  could have been demonstrated by hooking him up to an EKG

1    machine?

2         A.    Yes.

3         Q.    And an EKG machine, in fact, has software to

4    identify what sorts of heart rhythms are associated with

5    different cardiac conditions, am I right about that?

6         A.    I would phrase that a little differently but

7    I know what you're saying, yes.

8                        MR. DEUTSCH:  Sorry.  There was an

9                   objection to form to the last question.  I

10                  just want to put that on the record.

11        Q.    All right.  That's fine.  If you have a

12   certain kind of cardiac arrythmia that presents itself

13   on an EKG, that EKG machine would then notify the

14   operator of that particular problem, am I right?

15        A.    Yes.

16                       MR. DEUTSCH:  Objection to form.

17        Q.    What else could you do besides hooking

18   someone up to an EKG machine to see if they were having

19   a cardiac arrythmia that could later lead to a fatal

20   event?

21        A.    Take their pulse.

22        Q.    And then feel the pulse and you could feel

23   there is an arrythmia based on feeling the wrist or

24   wherever you're taking the pulse, correct?

25        A.    Yes.

1      Q.     You could also observe, you could also

2   observe the respiration, correct?

3      A.     Yes.

4      Q.     And if the respiration appeared labored, that

5   could lead one to the conclusion there was some sort of

6   problem involved, fair to say?

7      A.     Yes.

8      Q.     If someone was having a cardiac arrythmia,

9   that could later lead to a fatality that that was

10  associated with shortness of breath, that would be

11  evident by looking at the person breathing, wouldn't it?

12              MR. DEUTSCH:  Objection to form.

13     A.     In general, yes.

14     Q.     Okay.  What else could a nurse have done if,

15  if the hypothetical situation we're talking about here

16  was the case, this person was suffering a cardiac

17  arrythmia and -- You know -- evaluating that to see

18  what's going on.  Besides taking the pulse, hooking him

19  up to the EKG machine and viewing their respiration?

20     A.     You have to listen to their lungs, listen to

21  the heart and also -- You know -- ask, ask the person

22  some pertinent questions.  That's what an assessment is.

23     Q.     Okay.  And a nurse is trained to listen to

24  the heart and the lungs as well with a stethoscope

25  aren't they?

1       A.    Yes.

2       Q.    Okay.  And you would, and can you agree with

3  me that Mr. Carey was having some sort of cardiac

4  arrythmia that caused him to wake up at twelve-thirty in

5  the morning being short of breath, caused him to wake up

6  again short of breath -- You know -- You know -- a

7  little under two hours later.  And then caused him to

8  die, that would be, that could be indicative of cardiac

9  arrythmia that was worsening to the point that it would

10  lead to cardiac arrest?

11            MR. DEUTSCH:  I'm sorry.  Can you repeat

12            the question?  I was not able to follow that

13            or read it back.  Before you answer, can you

14            have the stenographer read it back?

15            MR. KEACH:  I'm just asking if the

16            doctor understood the question because if he

17            didn't understand the question, I'll rephrase

18            it.

19            MR. DEUTSCH:  Okay.  Sure.

20       A.    It's not that I didn't understand the

21  question, I didn't quite get that there was a question.

22  How did you start that?

23       Q.    All right.  I'll rephrase it.  It's fine.  We

24  have a situation twelve-thirty in the morning, Mr. Carey

25  gets up, short of breath, right, can't breathe, gets up

1  again an hour and forty-five minutes later, did not get

2  up in terms of walking around, wakes up, can't breathe

3  again.  And then at some point later on, he dies.  Could

4  that, could a cardiac arrythmia that would result in a

5  fatality manifest itself that way?

6           MR. DEUTSCH:  Objection, form.

7  A.    It is possible.

8           MR. KEACH:  That's, that's all I've got

9           mercifully for all of us unless Mr. Deutsch

10          has some follow up.

11          MR. DEUTSCH:  Yeah, I definitely do.

12          Thank you.

13          EXAMINATION

14          BY MR. DEUTSCH:

15  Q.    Going back to Exhibit 8 for a moment because

16  I just want to -- You know -- sort of lock down on this

17  he didn't get out of bed business.  If you look at

18  paragraph sixteen, if you count one, two, three, four

19  five, six lines down.  So the first word on the line is

20  sleep, and then it says, "At approximately

21  twelve-fifteen a.m.," I'm sorry, "two-fifteen a.m. to

22  two- thirty a.m., Inmate Carey got up again.  They gave

23  him some water and he went back to bed."

24          Now, is it reasonable to your mind that if

25  someone says they got up and then they went back to bed

1    that at some point, they got out of bed?

2                    MR. KEACH:  Objection to form.

3         A.    That's, that's how I read it.

4         Q.    Okay.  And can you describe what the symptoms

5    would be like if somebody was having a severe asthma

6    attack?

7         A.    A severe asthma attack, the person is

8    wheezing, gasping, it's really, it's really an

9    uncomfortable thing to see.  They're wheezing, they're

10   short of breath, they're gasping.  Very often they might

11   have some cyanosis of the lips.  And it's, it's really

12   an uncomfortable thing to see.  A normal person could

13   not leave a person like that.

14        Q.    Okay.  And if, is there anything, do you see

15   anything in the description that was given by the

16   inmates that would indicate that anything like this was

17   going on?

18        A.    No.

19        Q.    Now, there was a question, something along

20   the lines we don't have data because Mr. Carey went back

21   to sleep and they went to sleep.  Is there anything in

22   paragraph fifteen or sixteen that indicates that either

23   Inmate Nudd or Inmate Russell went back to sleep after

24   this two-thirty incident or went to sleep at all at any

25   point?

1    A.    No.    There is nothing in, in the, in the

2    narrative here that says anything more about them.

3    Q.    Okay.    Now, with regard to, if there was an

4    inmate who was having a reaction because of a cardiac

5    event, shortness of breath because of a cardiac event,

6    if they were having shortness of breath because of a

7    cardiac event and then they took an inhaler, would that

8    cause the shortness of breath to subside?

9    A.    Generally not.    There could be some

10    theoretical instances where an inhaler might help, but

11    generally not.    Actually, in some instances, a meter

12    dose inhaler, if it was Albuterol is not the best thing

13    to be giving to someone who is having an acute coronary

14    event because it does cause a tachycardia.    It does

15    cause the heart to raise.    It's a beta agonist.    So it

16    does speed up the heart.

17    Q.    Okay.    So in theory, if he was actually

18    having a cardiac event and had given him an Albuterol

19    inhaler, it could potentially have made matters worse?

20    A.    Yes.

21    Q.    Okay.    And just a couple, one other sort of

22    line of questioning here.    What did Mr. Carey die of?

23    A.    Well, what I saw, what I saw was

24    arteriosclerotic cardiac disease.    And then they had,

25    well, I should look at it officially because it's

1    important the way they, they, they write it.  Where is

2    that Exhibit.  I think that was in the Exhibits.  Let's

3    see.  Where is the autopsy report.  That's not it.  Do

4    you remember where the autopsy report is, which --

5        Q.    I don't believe it is an Exhibit that is in

6    evidence, although I do believe it is something that I

7    sent to you.

8        A.    That you sent to me.  Okay.

9        Q.    Yes.

10       A.    Okay.  Let's see.  All right.  Then I know

11   where I have to go for that.  Just give me one second.

12   Here we go.  Okay.  Now here is the Certificate of Death

13   pending studies.  Then you sent me another one.  Is it

14   this one?  Yes.  Okay.  They have, well, actually,

15   actually the only one that I have as an amended death

16   certificate, has, it has -- no, that's not the amended

17   one.  I did see another one.  Hold on.  I'm still

18   looking.  I'm not able to locate the one, the only one I

19   have here has A, pending further studies and then B, due

20   to or as a consequence of hypertensive arteriosclerotic

21   cardiovascular disease.

22       Q.    Sure.  Hang on.  Let's hang on one second

23   here.

24              MR. KEACH:  Hillel, just to make sure

25              we're doing, we're making a good record here.

1          MR. DEUTSCH:  Yeah.

2          MR. KEACH:  I am forwarding the six-page

3     autopsy report to you now.  So we can mark it

4     as 12.

5          ( Exhibit 12 marked for Identification )

6          MR. DEUTSCH:  I appreciate it.  I was

7     attempting to do this on my laptop rather

8     than my work computer and it was not working

9     very well.

10          MR. KEACH:  That's fine.  I'm e-mailing

11     it to you now.  No worries.

12          MR. DEUTSCH:  I appreciate that.

13          MR. KEACH:  What he's referencing is the

14     death certificate, not the autopsy report I

15     just forwarded on Exhibit 12 to you, Hillel.

16          MR. DEUTSCH:  Okay.  Just sent to you,

17     Doctor.  Cathy, do you want me to forward

18     that on to you, or Bob, have you done that

19     already?

20          MR. KEACH:  Forwarding you the

21     Certificate of Death marked as Exhibit 13, as

22     well.  So 12 is the autopsy report.  13 is

23     the death certificate that he's referring to

24     in his testimony.

25          ( Exhibit 13 marked for Identification )

 1                        MR. DEUTSCH:  Okay.  Have you sent them

 2                 to Cathy, as well?

 3                        MR. KEACH:  No, I'll take care of that

 4                 in a minute.

 5                        MR. DEUTSCH:  Okay.  Thanks.

 6        A.    Now I've lost my, my train of thought here.

 7   The death certificate, I, I didn't know if they,

 8   sometimes they parse out the death was due to, due to or

 9   as a consequence versus that the person also had

10   concurrent, basically, other conditions.  That's what I

11   was looking to the death certificate to say.  And it

12   doesn't.  It doesn't really say that.  Mine just says

13   arteriosclerotic, hypertensive arteriosclerotic heart

14   disease.

15        Q.    Let me ask you this:  You're looking at

16   Exhibit 12 right now, what I just e-mailed you?

17        A.    No.  No.  I was referring back to the actual

18   death certificate.  What you sent me was the autopsy

19   report.

20        Q.    Right.  So let's start by looking at the, at

21   the autopsy report.  So according to the autopsy report,

22   what was the cause of death?

23        A.    Manner of death was, natural cause of death

24   was hypertensive and arteriosclerotic cardiovascular

25   disease.

1    Q.    So I guess my question is:  Is there any way

2    of reading this document that you can think of where a

3    medical expert would conclude that Mr. Carey died of

4    anything other than hypertensive arteriosclerotic

5    cardiovascular disease?

6    A.    You mean reading through the entire, the

7    entire autopsy report?

8    Q.    Sure.

9    A.    I mean grossly going through this, the most

10   pathology that this inmate had, this patient had was

11   cardiovascular.  He had, certainly had coronary artery

12   disease.  He had, they also refer to that he had nephro-

13   arteriosclerosis which means he had generalized, he had

14   generalized arteriosclerotic disease.  And he had left

15   ventricular hypertrophy which goes along with a history

16   of hypertension.  So I mean that's the main pathology

17   that he had.  There is no other --

18   Q.    Let me rephrase the question, put it this

19   way:  If there was an individual who said, was asked

20   what was Mr. Carey's cause of death and the response was

21   pulmonary congestion and edema, would that be an

22   accurate response?

23   A.    He had pulmonary congestion and edema.  That

24   was a finding.  That was a finding.  So what are you

25   asking?

1      Q.    The question is:  Was there a finding that

2   that was the cause of death?

3      A.    No.

4      Q.    Okay.  And would there be any reasonable

5   basis for an individual to read the autopsy report and

6   conclude that the cause of death was, that the cause of

7   death was pulmonary congestion and edema?

8      A.    That's a hard, that's hard to answer.  I

9   mean, that was a finding.  That was a finding.  Clearly

10  a cardiac event causes pulmonary congestion and edema.

11   -- You know -- an MI, myocardiac infarction, a heart

12  attack.  Part and parcel of that is pulmonary congestion

13  and edema.  So is that finding consistent with that form

14  of death, yes.

15     Q.    Okay.  But it's not the cause of death?

16     A.    No.

17             MR. DEUTSCH:  Okay.  Yeah.  That's all

18             I've got.  That's fine.  Thank you.

19  EXAMINATION

20  BY MR. KEACH:

21     Q.    Okay.  Doctor, just to follow up and

22  reiterate, you were not provided before you testified

23  today a copy of Dr. Catanese's Deposition, correct?

24     A.    No.  No.  Absolutely not, no.

25     Q.    All right.  And you were aware that Dr.

1   Catanese was the medical examiner who performed

2   Mr. Carey's autopsy?

3       A.    Was I aware of that, I see his name on the

4   autopsy now, yes.

5       Q.    Okay.  And so you're not aware that Dr.

6   Catanese indicated after considering some of the

7   documentation in this case that he would put a secondary

8   cause of death on Mr. Carey's death certificate if he

9   had this to do over again?

10              MR. DEUTSCH:  Objection, form.

11      A.    If you can go back and start that from the

12  beginning, that Dr. Catanese would now what?

13      Q.    Dr. Catanese was deposed.  He was provided

14  with documentation about the circumstances of

15  Mr. Carey's death.  And he indicated, based on that

16  documentation, that he would put a secondary cause of

17  death in Mr. Carey's death certificate indicating that

18  asthma or COPD had contributed to his death.  You are

19  not aware of that testimony?

20      A.    No, I'm not aware of that.

21              MR. DEUTSCH:  Object to the form.

22              MR. KEACH:  Okay.  That's all I've got.

23              Hillel, do you have anything further?

24              MR. DEUTSCH:  No, I'm good.

25              MR. KEACH:  Okay.  I'm assuming you want

1          the doctor to read and sign?

2                    MR. DEUTSCH:  Yes.

3                    MR. KEACH:  Okay.  Dr. Koenigsmann, Mr.,

4          Mr. Deutsch will get a copy of your

5          transcript from me once we get it from the

6          Court Reporter, he'll forward it on to you.

7          You'll have an opportunity to review it, make

8          any changes to the content and then return it

9          back to Mr. Deutsch.  With that, with that

10         being said, that closes the record with my

11         thanks to the Witness and the Court Reporter.

12         I hope everyone has a nice afternoon.

13                   MR. DEUTSCH:  Thanks.

14                   THE WITNESS:  Thanks.

15                   ( Whereupon, the Examination concluded

16                   at 5:11 p.m. )

17

18

19

20

21

22

23

24

25

```
 1

 2

 3                        CERTIFICATE

 4

 5           I HEREBY CERTIFY that I have read

 6      pages _____ to and including page_____ and

 7      that the same constitutes a true and accurate

 8      transcript of the testimony given by me,

 9      under oath, at the time and place indicated

10      herein.

11

12

13

14                   _____

15                   Subscribed and sworn to before me

16                   this _____ day of

17                   _____, _____.

18

19

20                   _____

21                   NOTARY PUBLIC

22

23                   My commission expires _____ day of

24                   _____, _____.

25
```

1                          ERRATA SHEET

2            Please make your corrections on the

3       lines below indicating the page and line

4       numbers of the transcript.

5       _____

6       _____

7       _____

8       _____

9       _____

10      _____

11      _____

12      _____

13      _____

14      _____

15      _____

16      _____

17      _____

18      _____

19      _____

20      _____

21      _____

22      _____

23      _____

24      _____

25      _____

1

2

3                    C E R T I F I C A T E

4

5          I, CATHERINE M. DARCHE, a Shorthand

6     Reporter and Notary Public in and for the

7     State of New York, DO HEREBY CERTIFY that the

8     foregoing is a true and accurate transcript

9     of my shorthand notes in the above-entitled

10    matter.

11

12

13    DATED:   September 14, 2020

14

15

16

17             _____

18

19

20

21

22

23

24

25

**A**

**a.m (14)**
5:4 68:23 69:7,10
72:8,17,17,20
189:22 190:8,14
207:21,21,22
**AAG (3)**
13:15,16 49:9
**abilities (1)**
113:2
**ability (9)**
5:23 6:9 46:3 56:11
64:1 112:7,23 113:5
196:14
**able (14)**
5:23 8:5 13:21 23:6
23:19 65:16 67:5
101:6 127:12
142:16 157:25
166:24 206:12
210:18
**above-entitled (1)**
219:9
**absences (2)**
161:20,20
**absent (4)**
15:21 148:11 166:3
177:14
**absolutely (7)**
13:8,12 15:5 94:13
103:14 199:1
214:24
**accept (1)**
91:17
**acceptable (5)**
84:2 86:23 92:3
93:14 173:12
**accepted (2)**
9:1,3
**access (10)**
23:1 46:20,22 58:10
58:20 61:7 67:1
127:10 183:24
194:13
**accommodate (2)**
6:16 7:7
**accountable (1)**
143:18
**accrued (1)**

156:19
**accurate (13)**
20:1 43:6,8 50:18
73:22 110:5 170:14
189:5,18 193:4
213:22 217:7 219:8
**accurately (1)**
144:23
**accusations (1)**
140:12
**accusatory (1)**
33:23
**achieved (1)**
94:19
**acting (4)**
15:19 21:3,5 60:3
**action (18)**
1:5 4:8 5:12 36:4
37:22 85:9,15 88:13
90:21 105:11
108:20 114:1 122:9
128:15 137:14
157:12,22 181:3
**actions (3)**
159:2,15 180:9
**active (3)**
60:22 171:20 172:22
**actual (4)**
28:17 38:13 132:10
212:17
**acute (23)**
43:6,18,21,23 61:12
175:9,24 176:20,21
176:23,23 177:2,6
180:5,6 193:10,23
194:3,7 195:18,20
196:6 209:13
**ad (1)**
33:17
**adage (1)**
200:21
**add (2)**
123:1 158:12
**additional (4)**
35:21 54:11 158:19
189:11
**address (7)**
13:24 81:19 120:12
125:15,17 128:23

152:7
**addressed (4)**
18:18 80:11,11,13
**addresses (1)**
18:19
**adequate (1)**
61:10
**administer (5)**
63:17 64:14,16 67:1
67:5
**administered (1)**
173:20
**administration (1)**
62:7
**administrative (5)**
19:7 40:8 79:10
108:17 202:23
**administrator (9)**
26:22 27:11,14,15,16
27:19 29:18 32:15
32:17
**administrators (3)**
1:3 28:18 166:8
**admissions (1)**
147:12
**admit (2)**
146:2 195:12
**admitted (6)**
175:16,17 176:14,15
176:18,19
**admitting (1)**
180:20
**Advair (9)**
59:8,9,10,12 60:20
60:21 61:16 190:22
192:7
**advance (5)**
127:14,16 149:20
150:5,6
**advanced (1)**
149:21
**adversary (1)**
100:9
**adverse (4)**
28:3 53:9 81:3,12
**advised (4)**
70:2 123:22 126:13
162:9
**advising (1)**

120:19
**Affidavit (2)**
93:22 115:3
**affirmative (1)**
62:20
**affirmatively (1)**
115:17
**affirmed (2)**
199:16 201:11
**afternoon (1)**
216:12
**AG's (1)**
185:9
**agencies (1)**
160:2
**agency (11)**
19:23 35:15 36:3
93:22 95:9 112:20
114:6 174:2,14,24
178:16
**ago (4)**
103:22 127:1 177:25
178:20
**agonist (2)**
60:10 209:15
**agree (72)**
28:1 53:7,16 54:17
54:21 57:11,15 62:5
62:14,18,23 65:19
66:12 67:2 74:18,22
75:1,6 76:22,25
77:8,10,17,21 78:2
78:11,20 79:16 80:4
80:24 81:5,9 82:3
82:10,11 83:13
84:14 87:3 89:15
91:19 92:12,24 95:6
105:1,7 111:13
112:11 113:18
120:8 124:7 131:8
150:15 151:8
155:13 163:14,20
171:3 172:1 174:1
174:14 185:16,19
185:21,24 186:15
187:3 188:17 195:9
196:23 200:15
203:1 206:2
**agreed (8)**

35:13 126:14
130:17 150:19
153:8 155:21
157:17 174:25
**agreeing (2)**
153:10 173:21
**agreement (10)**
36:15 49:16,18,18
123:1,5 127:16
130:25 131:3,12
**agrees (4)**
171:21 172:23 174:2
174:14
**ahead (29)**
16:22 18:14 20:25
21:2 26:7 28:7,15
32:8 33:7 47:5
51:14 53:3,12 57:13
57:21 62:12 64:22
66:16 73:21 75:11
93:9 115:21,25
122:21 130:9
149:11 170:21
173:14 201:18
**air (3)**
60:11,13 164:5
**airways (1)**
164:11
**al (1)**
1:5
**Albany (4)**
1:18 5:10 41:17,18
**Albert (1)**
110:18
**Albuterol (46)**
58:21,23 59:8,11,12
59:25 60:2,7,9 61:4
61:4,7,16 62:8,24
63:6,12 64:8,14,17
64:24,24 65:3,8,12
67:1,2,6,11 68:10
190:10,23,23 191:3
191:4,6,12,14,16,17
191:18 192:11,15
192:21 209:12,18
**allegation (8)**
12:17 16:9 57:9
80:12 108:9 118:12
132:24 139:18

**allegations (11)**
136:25 137:11,19,20
138:6,9 140:15
141:15 143:1
145:18 172:4
**allow (2)**
63:17 153:5
**allowed (8)**
52:11 120:20 126:11
127:22,22 129:2
141:1 146:1
**ambulance (3)**
63:7,12,19
**ambulances (1)**
63:20
**ambulatory (1)**
43:13
**amended (13)**
3:15 101:23,25
103:18 104:11
142:20 169:19
183:11 184:21,21
185:12 210:15,16
**amendment (1)**
101:23
**angina (1)**
193:19
**annual (1)**
156:19
**Annucci (4)**
20:5 87:13,23 88:5
**answer (40)**
6:12 7:19 16:22
18:14 21:2 26:7
28:15 31:2,7 32:8
37:11 50:20 51:14
53:12 57:13 62:12
64:22 73:21 75:4,11
78:8,9,18 93:9,10
93:24,25 115:21
125:22 126:19
127:2 138:15
144:11,13 158:21
158:22 167:14
174:12 206:13
214:8
**answered (3)**
6:19 47:5 156:5
**answering (4)**

29:1,3 178:1,2
**answers (4)**
5:25 6:8 54:14 137:6
**anti-coagulant (1)**
55:4
**anti-coagulants (1)**
55:2
**anticipate (1)**
131:21
**anticipates (1)**
124:20
**anybody (4)**
17:10 94:9 104:6
140:8
**anytime (1)**
131:2
**anyway (4)**
119:11 124:7,10
144:17
**Apart (1)**
96:18
**apologies (7)**
7:14 43:25 55:15
67:20 78:6 79:24
151:10
**apparent (1)**
38:20
**apparently (4)**
13:18 32:1 70:1
105:5
**appear (2)**
91:15 179:8
**APPEARANCES (1)**
1:15
**appeared (1)**
205:4
**appears (1)**
10:10
**application (1)**
98:6
**apply (1)**
56:9
**applying (2)**
178:8,13
**appreciate (13)**
27:23 28:20 45:15
99:5 146:7,8 148:3
149:6 178:14
184:24 187:8 211:6

211:12
**approached (1)**
166:10
**appropriate (6)**
88:13 129:6 136:9
138:1 141:7 175:1
**appropriately (3)**
57:17 65:16 174:3
**approvals (1)**
100:20
**approve (1)**
20:16
**approximately (8)**
68:23 69:6 72:8,16
178:25 181:20
190:13 207:20
**apps (1)**
23:1
**April (14)**
14:13 25:9 35:2
51:12 58:11,12,12
73:19 82:5 97:10,11
97:14 98:2 187:6
**area (5)**
44:6 46:5 70:2 106:5
143:8
**areas (2)**
106:25 107:13
**arguably (1)**
151:9
**argue (1)**
93:1
**argument (6)**
92:13,17 134:9,21,25
142:18
**arguments (1)**
149:22
**arm (1)**
193:21
**arrest (3)**
181:9 203:7 206:10
**arrived (1)**
154:1
**arrythmia (16)**
80:21 194:3,3 203:2
203:3,7,10,23
204:12,19,23 205:8
205:17 206:4,9
207:4

**arrythmias (1)**
55:14
**arteries (1)**
55:3
**arteriosclerosis (1)**
213:13
**arteriosclerotic (7)**
209:24 210:20
    212:13,13,24 213:4
    213:14
**artery (3)**
194:4,7 213:11
**asked (18)**
6:8 7:14 9:20 12:13
    12:18 26:12 82:17
    83:9 93:6 95:19
    98:4 120:18,25
    129:5 163:13
    185:14 189:7
    213:19
**asking (30)**
6:20 11:20 22:11
    30:21 86:13 93:7
    99:3,17 111:19,20
    111:21 130:11,16
    130:22 131:7
    135:19 137:4 139:9
    145:21,22 146:24
    146:24 147:19
    150:13 155:24
    156:1 177:24 178:4
    206:15 213:25
**asleep (8)**
76:11,15 81:17
    111:14 178:17
    181:2,15,16
**aspects (1)**
195:11
**aspirin (3)**
56:1,2,3
**assembling (1)**
29:19
**assess (1)**
201:24
**assessed (1)**
179:25
**assessment (4)**
129:22 180:4 197:16
    205:22

**assessments (2)**
197:9,11
**assist (1)**
62:20
**assistance (3)**
77:14 78:14 79:4
**assistant (12)**
1:22 12:24 21:11,21
    34:10,10 108:10
    109:8,23 110:4
    116:2,17
**assistants (1)**
175:19
**associated (8)**
74:6 88:16 121:10
    123:25 193:17,20
    204:4 205:10
**assume (17)**
8:7 11:21 16:15,15
    18:11 28:10 41:2
    65:25 67:22 68:18
    97:16 113:4 118:3
    179:20 181:12,16
    181:24
**assuming (10)**
19:24 44:15 73:15
    81:17,18 97:21
    179:15 182:2,3
    215:25
**assumption (1)**
113:9
**assurance (7)**
34:4 70:11 120:24
    121:3 129:3 171:19
    172:10
**assurances (1)**
148:20
**asthma (69)**
59:17,18,22 60:24
    61:11,12 62:7,15
    64:9 65:8,12,13,21
    65:22 66:7,25 67:2
    68:8 81:6,10,15
    82:10,11 83:17 84:6
    85:3,13 112:1
    163:21,22 164:1,6
    164:10 173:17,20
    179:15,16,17,19
    180:5,6,11,17,25

185:15,17,22 186:5
186:16 187:19
189:8,10,13 191:13
191:22,25 193:4,10
193:13 194:17
195:13,18,21,21
196:4,4 208:5,7
215:18
**attached (2)**
123:9 129:8
**attachment (2)**
88:10 127:6
**attack (50)**
54:19,23 55:9 62:7
    62:15 64:9 65:9,12
    65:14,21,22 66:25
    67:2 81:10,15,16
    82:11 89:10 112:1
    179:15,16,17,19
    180:5,6,25 185:15
    185:17,22 186:5,16
    187:19 189:8,10,14
    191:22,25 193:4,11
    193:13,19 195:13
    195:18,21,21 196:4
    196:4 208:6,7
    214:12
**attempting (1)**
211:7
**attend (2)**
7:1 12:13
**attended (1)**
57:17
**attention (7)**
12:5,8,12 13:7 16:3
    88:13 155:9
**attorney (15)**
1:20,22 5:9 36:9,22
    37:1 82:17 92:25
    93:15,20 95:9 96:15
    96:20 98:16 147:6
**attorney's (3)**
122:3 124:22 125:2
**attorneys (3)**
1:17,21 4:6
**audits (1)**
25:6
**authored (3)**
18:8 48:25 49:1

**authorization (1)**
20:17
**authorize (1)**
64:3
**authorized (1)**
63:14
**automated (1)**
98:23
**automatic (2)**
17:20 98:23
**autopsy (21)**
3:17 53:24 54:3,8,18
    168:9,25 169:14
    194:6 210:3,4 211:3
    211:14,22 212:18
    212:21,21 213:7
    214:5 215:2,4
**available (3)**
45:13 63:13 64:9
**avoid (2)**
81:2,11
**avoids (1)**
6:3
**awake (3)**
81:18 181:21,22
**aware (52)**
14:1,2,10,15,22,23
    14:25 15:17,20 16:7
    16:13,16 19:4,9,15
    19:18 22:6,11,14,20
    41:4 57:24 58:5,6,9
    64:5 82:16,18 85:25
    86:8 96:10 107:16
    107:21 108:19
    114:14,15 118:16
    118:17,19 121:12
    129:10 137:11
    163:6 199:8,12,19
    199:21 214:25
    215:3,5,19,20
**awhile (4)**
7:15 43:13 152:20
    177:25

---

**B**

**B (2)**
126:16 210:19
**back (68)**
7:22 19:12 24:9,19

25:1 32:4 35:7,15
36:15 44:3 50:24
58:6 66:8,10 67:21
69:8 70:25 72:3,18
75:18 77:23 78:7
82:18 89:4 92:12
97:12 100:8,21
103:23 107:2
111:24 113:15
114:12 115:12
128:7 134:6 135:2,3
140:14 152:4,8
158:6 163:11
165:21 167:8
172:16 174:10,11
181:19 182:9
184:19 190:11,15
192:17,23 193:14
196:19,20 206:13
206:14 207:15,23
207:25 208:20,23
212:17 215:11
216:9
**background (1)**
10:10
**bad (7)**
6:5,6 53:14,17,21
139:19 193:19
**ball (1)**
181:18
**banged (2)**
69:1 72:11
**BARBARA (1)**
1:3
**Bare (1)**
44:6
**based (29)**
19:7 22:2 41:13
66:12 104:21,22,24
119:18 120:25
128:14,25 133:18
154:10 158:14
171:11 179:13
180:23 181:10,12
182:1,17,21 183:9
185:18 189:4
191:25 195:13
204:23 215:15
**basically (18)**

15:16 21:6,8 26:17
66:2 105:8 121:13
132:11 135:6
138:24 141:3 145:9
145:13 154:7 189:3
190:25 200:7
212:10
**basis (9)**
40:12 88:25 92:19
105:10 106:11
176:2 191:24
192:14 214:5
**Bataan (1)**
7:8
**batch (1)**
89:1
**batches (2)**
88:24,25
**bathroom (4)**
7:9 68:24 72:9 193:1
**bear (1)**
32:20
**beating (1)**
194:22
**bed (13)**
43:14 66:10 69:8
72:19 189:12
190:15 192:23
193:11 196:18
207:17,23,25 208:1
**bedside (2)**
61:16 192:8
**beginning (3)**
81:22 139:25 215:12
**behalf (3)**
75:2,7 94:19
**behavior (1)**
160:8
**Beilein (3)**
19:21 39:25 41:11
**belief (2)**
113:13 122:14
**believe (53)**
9:17 17:17 19:19
20:16,16,23 28:16
38:3 47:13 48:1
50:24,25 56:16 57:5
59:9 71:21,23 79:8
83:5 86:3,9 87:16

89:6 97:11,17
101:14 102:10
105:9,10,20 113:20
114:2 120:6 121:9
124:6 130:3 140:10
163:5,9 166:6 168:4
169:6 172:11 176:6
182:1,8 184:19
191:22 199:5 202:4
202:12 210:5,6
**believed (4)**
91:8 173:3 197:23
202:21
**believing (1)**
114:1
**bell (8)**
66:18,19,24 96:17
105:22 114:20
179:22 182:2
**best (8)**
23:21 51:12 127:11
140:5 178:15
201:19 202:1
209:12
**beta (3)**
60:10,11 209:15
**better (16)**
16:23 89:8 92:18
95:8 97:1 100:6
108:11,11 109:9
120:9 140:13 196:3
196:25 197:2,4
203:8
**beyond (1)**
46:9
**big (1)**
200:24
**bit (7)**
21:16 43:11 80:15
167:13 169:7 182:9
189:11
**blaming (1)**
99:1
**blockage (1)**
71:7
**blocked (1)**
71:8
**blocking (4)**
21:7,15,22 109:20

**blood (5)**
186:14,16,20,24
188:11
**Board (13)**
10:23 11:4,6,9 61:9
83:25 84:7 162:13
162:20 163:3,7,10
173:10
**Board's (4)**
171:21,25 172:23
174:2
**Boards (2)**
11:11,11
**Bob (2)**
5:10 211:18
**Boden (3)**
162:24 163:3,6
**body (1)**
186:22
**bold (1)**
156:19
**book (3)**
170:13 171:8,13
**Botsford (1)**
43:11
**bottom (12)**
23:13 24:21 38:6
61:17,24 62:1 72:4
142:16 152:16
174:15,19 202:15
**Boulevard (1)**
1:21
**box (1)**
149:3
**boy (1)**
103:20
**Bozar (4)**
30:7 33:13 172:7,9
**brand (1)**
59:12
**breadth (1)**
139:23
**break (18)**
6:15,16,18 7:6,7,11
43:10 48:7,23 70:5
70:10,12,20 71:22
80:14 119:8,10
165:19
**breath (22)**

6:12 80:18,25
163:16,17 179:1,15
179:21 180:2
193:12,16,19 203:3
203:24 205:10
206:5,6,25 208:10
209:5,6,8
**breathe (4)**
68:8 193:1 206:25
207:2
**breathing (11)**
60:4 62:6 66:3,20
67:23 68:24 72:9
74:21 79:15 81:7
205:11
**Brian (1)**
110:4
**brief (2)**
22:2 157:22
**briefly (1)**
21:25
**bring (6)**
16:2 70:25 124:11
148:24 155:8 158:5
**bringing (1)**
152:4
**bronchi (2)**
60:12,18
**bronchioli (1)**
60:12
**brought (4)**
12:5,12 158:17 182:4
**Brown (1)**
101:8
**Bryan (5)**
21:13,14,14,15,22
**build (1)**
157:23
**building (8)**
41:24,25 42:2,2,3,5
70:3,6
**bulk (1)**
76:8
**bunch (7)**
19:25 22:3 144:3
145:18 149:15
162:16 169:15
**bur (1)**
150:19

**burden (4)**
117:8 122:10 146:2,3
**Bureau (5)**
40:9 79:11 85:18
135:22 202:21
**business (3)**
119:22,25 207:17
**bust (1)**
31:16
**buster (1)**
55:5
**busting (1)**
56:7
**but-- (1)**
150:25
**button (9)**
46:21,25 66:3,5
68:25 72:10 152:15
179:4,9
**buttons (1)**
47:7

_____

**C**

**C (4)**
5:5 100:19 219:3,3
**call (32)**
16:19 17:2 46:21,25
47:6 56:12 64:1
66:3,5,18,19,24
67:24 68:7,25 72:10
76:13,16 105:21,22
107:15,19 108:25
125:24,25 126:20
128:24 149:3
151:10 180:20
181:18 182:2
**called (17)**
5:17 9:10 11:17
17:11,16 41:21
60:10 86:17 104:10
108:9 109:6,7,8
111:6 144:2 185:10
185:10
**calling (4)**
50:12 108:5 144:24
156:2
**calmed (1)**
179:8
**calmly (1)**

151:16
**canceled (1)**
179:9
**cane (1)**
117:23
**capabilities (1)**
107:12
**capacities (1)**
10:4
**capacity (1)**
13:18
**caps (1)**
156:19
**cardiac (33)**
55:3,18,22 56:5
65:20,22 80:16,17
80:25 82:4 112:1
163:15,18 181:9
193:17 194:3
195:23 203:7 204:5
204:12,19 205:8,16
206:3,8,10 207:4
209:4,5,7,18,24
214:10
**cardiologist (1)**
195:5
**cardiovascular (4)**
210:21 212:24 213:5
213:11
**care (98)**
10:5,21 11:14,16
12:4 25:6,25 26:3
26:14,24 27:5,6,12
28:2,13,22 29:17,19
43:16,21,21,23,23
44:25 45:6,21 46:5
46:11,14 52:6,8
53:4,5,20 58:2
59:17 74:19 76:4
79:3,5,16 81:18
83:16 84:1,3,4,5,8
84:15 85:2,3,5 86:5
86:22,23 90:9,16,20
90:22 91:3,21,24
92:2,4,14,21 93:13
93:15 110:20 112:2
112:19 115:7
117:21 141:23
160:7,8 164:23

170:18 171:20
173:11,12 174:6
175:9,9,15,24,25
176:20,21,23,24,25
177:2,5,6,9 197:15
212:3
**career (2)**
128:2 162:7
**carefully (1)**
116:6
**Carey (88)**
1:3 5:12 16:17 25:8
25:23 26:25 35:2
54:8,18 58:10,19
61:3 66:2,7 67:10
68:22,23 69:6,7,10
72:7,8,16,17,21,23
79:14,15 80:15
81:19,19 82:4 83:2
83:11,17 84:1,5,7
84:19 85:23 89:15
90:2 91:4,21 92:2
92:15,25 93:13
96:13,21 98:19
105:4 107:7 108:18
115:12 132:24
133:17 135:7
142:20 166:19,23
171:6,21 172:23
173:11 174:3,25
178:25 179:20
187:12,18 188:18
189:4 190:10,14
195:12 196:9,10,14
199:4 202:6 203:23
206:3,24 207:22
208:20 209:22
213:3
**Carey's (44)**
13:11,14 14:2,10,16
15:1 17:1,4,13 18:6
18:10 19:8 26:1,4
29:17 33:22 56:15
67:23 80:10 82:8,14
82:20 84:13,18
91:14,18 92:20 93:2
93:19 94:5,9 96:20
97:3 98:5 115:5
166:14 170:11

213:20 215:2,8,15
215:17
**Careys (1)**
158:8
**CARL (2)**
1:10 2:5
**Carmel (3)**
10:14,20 110:22
**carried (1)**
28:17
**case (48)**
11:25 13:6,6,19 16:6
16:10 17:13 18:7,8
18:16 30:13 33:25
35:19 36:2 37:22
50:17 53:24 54:9
77:3 85:8 94:18
96:24 104:16
120:14 123:11
136:8 139:25
141:16,19,25 142:6
142:10 145:19,20
145:23 146:14
147:3 148:18 151:1
157:11 166:20
168:9 171:14 176:6
181:15 193:25
205:16 215:7
**cases (8)**
68:5 89:1 90:15
94:15 116:5 155:6,6
192:14
**Catanese (7)**
54:7,14 194:13 215:1
215:6,12,13
**Catanese's (1)**
214:23
**catatonic (1)**
43:13
**catch (2)**
57:1 155:16
**categories (1)**
124:19
**Catherine (3)**
1:12 4:16 219:5
**Cathy (5)**
35:6,8 78:8 211:17
212:2
**caught (2)**

13:6 143:16
**cause (19)**
53:13,16 54:10
194:15,16 202:4
203:2 209:8,14,15
212:22,23 213:20
214:2,6,6,15 215:8
215:16
**caused (6)**
76:15 92:21 93:2
206:4,5,7
**causes (3)**
89:22 163:16 214:10
**causing (2)**
80:21 203:24
**caution (3)**
15:10,14 202:8
**cells (1)**
186:22
**Center (1)**
110:14
**central (5)**
29:20,22 41:18 107:3
165:3
**certain (7)**
46:1 55:13,13 84:25
100:19 161:18
204:12
**certainly (8)**
18:2 77:6 84:22
151:3,6 152:5
157:21 213:11
**certificate (16)**
3:18 168:4,9 169:1
169:13 210:12,16
211:14,21,23 212:7
212:11,18 215:8,17
217:3
**certification (2)**
123:9 126:15
**certified (4)**
10:23 11:4,6,9
**CERTIFY (2)**
217:5 219:7
**chain (1)**
45:11
**chairman (2)**
32:14 40:1
**chairwoman (1)**

162:18
**challenge (1)**
123:25
**chance (11)**
6:2 32:22 48:24
56:14 62:2 73:12,12
120:9 136:17
151:15 165:20
**chances (1)**
78:21
**change (9)**
9:21 175:23 176:21
177:2 190:19 193:2
195:17 199:22
200:2
**changed (5)**
159:25 175:5,8,25
194:15
**changes (4)**
46:10 164:4 186:8
216:8
**channels (1)**
85:7
**characterization (1)**
36:25
**characterizations (1)**
36:19
**characterize (6)**
76:7 84:11 91:24
105:13,15 187:11
**characterized (2)**
184:16 193:12
**characterizes (2)**
43:4 84:24
**charge (7)**
4:15 21:8 28:21,25
108:10 109:21
172:13
**charges (1)**
154:22
**Charles (3)**
94:12,21,23
**check (3)**
13:9 33:3 181:5
**chest (1)**
193:20
**chief (8)**
15:20 74:10 88:21
101:12 110:15

112:6 154:19,24
**child (1)**
170:17
**chose (1)**
9:2
**Christy (1)**
96:16
**circle (1)**
135:16
**circling (1)**
67:21
**Circuit (1)**
135:13
**circulation (1)**
56:12
**circumstance (1)**
192:9
**circumstances (13)**
28:9,11,12 53:17
81:15 125:6 149:25
150:16 157:5,8
159:22 166:14
215:14
**citations (1)**
161:3
**City (3)**
9:11,14,22
**civil (7)**
1:5 5:10,11 145:23
146:22 148:12
165:11
**claim (10)**
11:15 14:25 15:8,22
36:21 92:19 93:19
98:7 140:1 143:12
**claimed (1)**
170:11
**claims (18)**
11:13,18 18:6 36:4,6
36:20 82:16,19,25
83:9 93:2,16 94:20
95:10,15 98:3,4
133:20
**clarified (1)**
110:3
**clarify (2)**
102:2 116:1
**clarifying (2)**
45:15 178:14

**clear (17)**
46:12 50:16 64:6
 73:9 95:20 97:24
 99:1 122:7 140:25
 144:6 150:12 164:4
 170:8 174:24 177:8
 178:3 198:1
**clearer (1)**
32:10
**clearly (10)**
18:15 20:18 108:6
 116:9 123:10 135:1
 143:8 176:6 179:19
 214:9
**click (1)**
70:24
**client (3)**
43:11 128:15 136:18
**client's (1)**
148:18
**closed (5)**
48:21 69:4,5 72:14
 72:15
**closely (1)**
116:5
**closes (1)**
216:10
**closing (4)**
48:18 167:25 184:1,8
**clot (3)**
55:3,5 56:6
**COC (9)**
83:23 86:17 103:7
 104:11 142:19,20
 166:20 169:24
 174:25
**code (10)**
38:2,3,5,9,11,12,14
 38:15,16,21
**collect (1)**
165:21
**College (2)**
110:9,18
**com (1)**
60:21
**combination (1)**
59:10
**combined (1)**
65:7

**come (21)**
8:20,25 12:8 25:1
 87:13 105:22
 113:15 116:19
 117:16 119:1 128:3
 131:18 135:2,3
 136:5 140:13 162:9
 163:9 165:21
 169:21 186:9
**comes (4)**
7:2 110:1 143:17,18
**comfort (1)**
66:10
**comfortable (1)**
29:1
**coming (2)**
32:16 177:23
**comings (1)**
107:8
**commenced (1)**
5:3
**comment (3)**
93:8 150:22 151:9
**commented (1)**
133:21
**comments (1)**
136:4
**commission (68)**
3:8,15 13:20,21,23
 14:3 15:3,21 16:8
 16:13,17 18:11,16
 19:21 20:17 39:5
 40:1,13 47:12 51:4
 57:6 58:24 59:2
 61:2,20 79:8 82:21
 83:14,15 84:12,19
 88:23 89:4,12,21
 91:4,9,18 93:1,18
 94:6 95:21 96:5,7
 97:6,23 98:2 99:8
 103:18 104:20
 113:8 114:9 115:15
 117:10 157:6 159:2
 159:13,21 162:4,7
 162:11 171:18
 173:3 191:10,15
 192:13 194:14
 217:23
**Commission's (1)**

88:7
**commissioner (48)**
8:14,18,21,21 9:3
 12:24,25 13:19 14:6
 14:8 15:19 19:21
 20:3,4,10,21 21:4,5
 21:11,21 34:10,11
 41:11 56:18 57:3
 67:13 83:5,8 87:13
 87:17,19,23 88:5
 97:16,22 99:13
 108:10 109:8,23
 110:4 116:2,17
 117:5 162:9,12
 163:12 171:4 191:5
**commit (1)**
89:10
**common (3)**
52:17 106:25 201:22
**communicate (1)**
16:25
**communicated (3)**
42:13,16,18
**communication (1)**
16:20
**Community (1)**
5:15
**compared (3)**
29:18 104:15 172:3
**compel (2)**
113:6 136:13
**complaining (1)**
180:2
**complete (2)**
6:13 94:25
**completed (3)**
47:16 93:18 165:3
**completely (1)**
44:24
**complex (2)**
41:21,21
**compliance (1)**
121:11
**comply (2)**
145:3 148:19
**component (1)**
163:21
**computer (1)**
211:8

**computerized (2)**
107:18 164:17
**concept (2)**
92:11 196:24
**concern (9)**
28:10 36:7,7,10
 84:22 108:12,13
 118:5 166:10
**concerned (2)**
17:22 199:9
**concerns (8)**
35:10 36:1 85:1,1,5
 90:16 116:7 173:23
**conclude (5)**
165:22 182:2 183:11
 213:3 214:6
**concluded (2)**
172:4 216:15
**concludes (1)**
177:13
**conclusion (4)**
182:19 184:5,13
 205:5
**conclusions (4)**
18:25 25:7 41:8
 105:9
**concurrent (1)**
212:10
**condition (3)**
76:15 123:4 130:22
**conditions (5)**
46:1,1 163:21 204:5
 212:10
**conduct (18)**
19:8 40:5,19 73:16
 76:6 79:19 111:7
 114:17 115:14
 116:25 118:4
 133:24 139:24
 145:25 148:25
 182:4,20,21
**conducted (8)**
27:6 28:3 40:4,18
 80:10 128:2 182:18
 194:12
**conducting (4)**
27:12 147:7,8 171:18
**conducts (1)**
115:6

**confer (2)**
35:14 36:15
**conference (1)**
158:15
**conferred (3)**
95:13,14 96:18
**confidence (1)**
171:19
**confidential (19)**
119:18 120:4 121:4
    122:6,8,12,14,17,19
    122:24 123:6,22
    124:9 125:4,5
    126:10 136:15
    151:20,24
**confidentiality (9)**
119:19 123:25
    127:20 128:12
    129:18 130:9,13,18
    150:12
**confirm (2)**
86:20 165:16
**confused (3)**
153:1 174:9 175:13
**congestion (5)**
213:21,23 214:7,10
    214:12
**conjunction (1)**
27:22
**conscience (1)**
117:12
**consequence (4)**
81:3,12 210:20 212:9
**consequences (2)**
80:16 198:15
**considerable (1)**
36:6
**considering (1)**
215:6
**consistent (1)**
214:13
**conspiracy (1)**
133:16
**constitutes (1)**
217:7
**consult (4)**
155:4,4,11 185:9
**consulted (4)**
18:24 102:7 154:21

156:25
**contact (2)**
101:4 125:18
**contacted (3)**
13:15 68:15 162:8
**contacting (1)**
46:23
**contained (2)**
4:7 26:10
**contains (1)**
60:21
**content (5)**
120:2 126:13,17
    156:13 216:8
**contents (2)**
52:5 138:17
**context (2)**
29:4 187:13
**continue (5)**
31:2 32:25 124:13
    147:2,3
**continued (1)**
35:22
**contrary (2)**
75:20,23
**contributed (1)**
215:18
**control (2)**
107:3 145:10
**conversation (1)**
8:4
**conversations (3)**
15:8 85:17 100:21
**convey (2)**
117:9 154:6
**coordinate (1)**
44:12
**COPD (8)**
68:9 163:21,22 164:1
    164:3 194:17 195:2
    215:18
**copies (1)**
22:8
**copy (14)**
4:14 42:24 87:12,24
    88:1,6 93:20 99:9
    121:7,21 132:16
    168:22 214:23
    216:4

**corner (2)**
23:14 152:16
**coronary (4)**
194:4,7 209:13
    213:11
**coronavirus (1)**
7:15
**correct (58)**
8:12 20:14,22 26:18
    33:14 36:17 39:21
    41:22 43:22 45:2,17
    50:10 57:19 59:23
    60:16,25 68:11
    77:24 78:19 80:22
    81:12 88:17 98:21
    99:6 108:24 109:3
    111:11,12 112:9,20
    143:13 144:17
    168:3 173:7,8,12
    174:6,16 181:13
    185:11 186:2,11,22
    187:7 188:7 195:14
    196:16,25 197:12
    197:25 198:16,17
    200:9 203:4,8
    204:24 205:2
    214:23
**corrected (1)**
195:25
**Correction (26)**
3:9,15 13:24 15:4
    16:8 20:17 39:6
    40:13 47:12 61:3,20
    79:8 82:22 89:12
    91:9 93:1 95:21
    97:7 103:19 113:8
    115:16 117:11
    157:7 159:14 162:5
    194:14
**correctional (24)**
10:7 16:11 22:7 25:9
    30:6 44:3,8,18
    45:20,21 47:7 53:1
    62:19 63:1 73:18
    76:2 77:12 84:3,17
    94:25 107:12
    115:11 118:6
    200:17
**corrections (65)**

5:15 8:11 10:5,17
    13:20,22 14:3 15:22
    16:14,18 17:8 18:4
    18:11,17 19:22
    20:22 40:1 51:4
    52:21 56:18 57:3,6
    58:25 59:2 64:8
    67:14 78:13 83:5,8
    83:15,15 84:12,19
    88:22 89:5 91:4,18
    93:18 94:7,10 96:5
    96:8 97:8 98:2 99:9
    99:13 100:25
    104:20 114:9 117:5
    117:12 146:18
    159:2,21 162:7
    171:4,5,13,18 173:3
    191:5,11,15 192:13
    218:2
**correctly (4)**
15:24 102:22 136:23
    153:24
**correspondence (1)**
96:5
**corroborate (1)**
105:18
**corroboration (1)**
118:11
**cortical (1)**
59:25
**counsel (16)**
1:19 6:9 15:25 16:2
    16:16,25 17:17,18
    20:20 25:20 38:8
    95:25 96:1,3,6
    123:2
**Counsel's (10)**
88:1 94:3,7,10 95:7
    95:22 97:19 98:15
    109:2 185:10
**counseled (1)**
19:3
**counseling (1)**
86:10
**count (1)**
207:18
**counter (2)**
69:9 72:20
**County (1)**

168:11
**couple (9)**
21:17 41:17 139:17
164:13 168:15
169:23 177:16
185:14 209:21
**course (10)**
9:9 51:24 119:22,25
120:17 126:12
128:4 140:23
145:24 154:18
**Court (39)**
1:13 5:19,23 11:17
11:18 32:3 36:4,5
36:20 54:13 82:16
82:19,25 83:9 93:2
93:16,23 94:20 98:3
98:4 104:16 121:8
121:10,15 128:8
131:1 133:20
136:15 151:17
152:6 153:16,22
158:3,6,15 160:13
165:15 216:6,11
**Court's (2)**
121:4 130:8
**courtesy (2)**
6:3 31:18
**cover (4)**
88:18 143:12,14
169:3
**covers (1)**
165:14
**CPR (1)**
56:10
**crap (1)**
135:7
**created (1)**
141:20
**credence (1)**
114:8
**credibility (1)**
151:7
**credible (1)**
105:7
**credit (1)**
81:24
**Criminal (1)**
199:17

**Crista (2)**
26:20 30:8
**crystal (1)**
150:12
**curious (1)**
163:4
**custody (1)**
103:17
**cut (4)**
30:19 32:2 79:23
142:15
**cyanosis (1)**
208:11
**cyanotic (1)**
186:8
**cyberspace (1)**
32:25

**D**

**D (1)**
5:5
**daily (1)**
176:2
**damage (2)**
164:10,12
**damn (1)**
135:14
**Dan (1)**
109:12
**Darche (3)**
1:13 4:16 219:5
**data (8)**
186:1 188:20 189:2
189:10,11 195:14
203:8 208:20
**date (3)**
24:20 158:16 175:16
**dated (6)**
40:2 97:25 98:1,2
168:14 219:13
**dates (2)**
12:23 97:13
**day (12)**
17:6 87:21 146:21
148:11 154:19
160:20 175:15,16
176:14 191:9
217:16,23
**days (2)**

61:5 102:25
**dead (5)**
69:10 72:21 194:1,22
196:10
**deal (8)**
38:17 110:2 128:18
129:13 153:22
158:3 170:17
201:22
**dealing (3)**
191:19 198:6 201:10
**death (91)**
3:14,18 7:8 13:11,14
14:2,7,10,16 15:2
15:23 17:1 19:8
25:8,23 26:1,4,9,11
26:14,18 28:3,10,11
28:23 29:17,20
32:11,12 33:22
34:17,25 54:10
56:15 61:6 80:10
81:11 82:20 84:9,13
89:5,9,13,21,22
90:17 91:14,19
92:20,20 93:2 94:5
98:5 115:5 133:16
165:1,5,7 166:14
168:5,9,25 169:13
170:11 182:5
194:15 203:4
210:12,15 211:14
211:21,23 212:7,8
212:11,18,22,23,23
213:20 214:2,6,7,14
214:15 215:8,8,15
215:17,17,18
**deaths (5)**
14:6 26:2 32:18
34:13 103:17
**December (3)**
93:17 97:25 108:22
**deception (2)**
133:19,22
**decide (1)**
130:2
**decided (3)**
105:6 171:25 175:23
**decision (5)**
19:6,12 98:6 140:19

155:2
**decisions (1)**
29:6
**deemed (1)**
120:4
**Defendant (4)**
1:7,21 16:9 137:3
**defending (1)**
122:9
**defense (1)**
95:8
**defenses (1)**
136:3
**defer (1)**
29:3
**defibrillator (4)**
55:10,13,20 56:7
**deficiencies (9)**
37:22 83:16,20 84:14
90:20,21 91:3,24
172:5
**deficient (1)**
12:4
**definitely (1)**
207:11
**definition (4)**
76:17,17 92:4,9
**definitions (1)**
178:12
**degree (1)**
193:18
**delay (2)**
6:7 53:20
**delayed (1)**
90:18
**deliberate (1)**
135:10
**delivered (1)**
97:8
**demanded (1)**
22:6
**demonstrated (1)**
203:25
**demonstrates (1)**
160:6
**deny (1)**
133:17
**denying (1)**
105:5

**Department (36)**
5:15 8:11 10:17 17:7
  18:4 22:7 52:25
  62:19 64:8 76:2
  78:13 84:16,17
  88:21 94:10,25 97:8
  100:25 101:1
  111:10 112:9,13,13
  112:18 113:16
  116:9 117:11
  146:18 160:10
  165:2,4,6 168:6,23
  171:13 200:16
**department's (1)**
202:18
**departure (1)**
159:23
**depended (1)**
113:12
**depending (1)**
8:4
**depends (1)**
193:19
**deposed (5)**
6:11 54:8 74:1,7
  215:13
**Deposition (29)**
5:11,17 6:5 10:9
  35:14,23 50:13
  81:25 115:3 120:21
  126:12 127:18
  128:4 131:13 132:1
  133:13 137:2 138:1
  139:21 141:12
  143:7 147:10,22
  153:21 165:17
  167:2 194:12
  199:16 214:23
**Depositions (2)**
128:3 199:14
**depriving (1)**
195:22
**deputy (12)**
8:13,18,21,21 12:24
  13:19 14:5,8 15:19
  21:3,5 163:12
**describe (3)**
179:14,16 208:4
**described (4)**

132:14 135:12
  137:19 193:14
**describing (1)**
197:2
**description (6)**
66:13 120:2 170:8
  190:12 192:23
  208:15
**descriptor (1)**
89:9
**deserve (1)**
136:1
**designated (6)**
119:18 122:3,6,11
  124:22 125:1
**designation (7)**
44:19 123:15 124:15
  127:23 128:12
  129:6 136:16
**designed (3)**
34:10 59:20 133:17
**desk (9)**
40:8,15,16,25 56:20
  57:4 58:7 66:4 76:4
**despite (1)**
98:3
**destroy (1)**
148:17
**destroyed (1)**
151:6
**detail (5)**
30:15 34:22 52:2,8
  137:20
**detailed (2)**
49:20 86:1
**detailing (1)**
118:1
**details (3)**
26:13 37:2 133:3
**detainee (9)**
11:25 12:4 57:18
  58:2 62:15,20 68:5
  76:24 77:4
**detainees (7)**
13:5 26:25 46:17,20
  76:3 79:3 117:22
**determination (7)**
19:2 105:19 126:6
  127:4,20 180:24

185:21
**determinations (3)**
18:23 84:20 187:21
**determine (6)**
35:16 176:3 197:11
  201:13 203:6,10
**determined (6)**
40:6 84:1,7 105:17
  173:10 183:8
**Deutsch (262)**
1:22 2:9 7:21 13:16
  15:9,12 16:21 18:13
  20:24 21:2 22:10,23
  26:6 28:6,14,24
  29:8 30:16,21 31:4
  31:12,20 32:7 35:9
  35:13 36:8,14 47:2
  47:4 48:1,9 49:9,16
  49:23 50:4 51:1,13
  52:24 53:2,11 56:23
  57:12,20 58:4,14
  60:6 62:11 63:23
  64:21 66:15,23
  67:16 68:16 69:11
  69:16,19,25 70:14
  70:18,24 71:5,13,22
  73:1,20 75:3,10
  77:25 78:16,17,19
  79:18,20 81:24
  83:18 86:7 89:17
  91:22 92:6,16,22
  93:4,8,24 95:5,11
  95:17 96:18 98:8,13
  102:1,12,16,20
  103:6,9,13,21,25
  105:12 106:1
  107:10 112:21
  113:1,22 114:18
  115:20,24 117:14
  118:9,22 119:6,12
  119:14 120:18
  121:9,20,24 122:13
  122:18,20,22
  124:16,24 125:3,13
  125:19 126:3,21
  127:3 128:17
  129:15 130:3,10,15
  130:19 131:6,15,19
  132:11,19,22 133:1

133:9 136:22 137:7
  137:10,17 138:2,11
  139:13 141:13
  142:17,25 144:5,20
  144:25 145:8,15
  146:7 147:15 148:2
  148:10,15 149:5,10
  149:12 151:12,25
  152:10,11,22,25
  153:8,17 154:5,7
  155:19 156:1,7,14
  158:13,23 159:4,10
  159:16 160:15
  164:16 166:4,15,25
  167:12,19 168:7,7,8
  169:6 170:16 171:9
  173:13 174:10
  177:15,16,20 183:3
  183:17,20,23
  184:23 185:14
  187:9,22 188:21,24
  189:7,17,19,24
  190:3,7,18 192:2
  194:8,12,18 195:15
  196:12,21 197:1,19
  198:12,22 200:4,10
  200:19 201:5,15
  202:9,24 204:8,16
  205:12 206:11,19
  207:6,9,11,14 211:1
  211:6,12,16 212:1,5
  214:17 215:10,21
  215:24 216:2,4,9,13
**Deutsch's (6)**
16:23 22:9 32:23
  185:4 191:21
  195:10
**device (3)**
65:2,15 188:7
**devices (1)**
64:19
**diagnosis (1)**
197:17
**die (7)**
89:8,10,11 194:2,3
  206:8 209:22
**died (19)**
27:8 35:2 38:20
  54:18 57:10 66:11

68:22 79:15 82:11
85:23 108:18
111:14 112:2
115:12 118:6 171:6
194:9 196:20 213:3
**dies (1)**
207:3
**difference (9)**
59:7,24 60:2 112:12
112:16 140:9,10
164:2,3
**different (17)**
7:1 19:25 23:20
41:18 43:3 94:15,16
150:8 152:10 158:4
159:22 160:18
163:25,25 190:24
200:20 204:5
**differential (1)**
197:17
**differently (7)**
78:4 93:12 159:8,12
176:12 200:21
204:6
**difficult (1)**
5:24
**difficulty (5)**
53:18 62:6 66:20
74:21 81:7
**digging (1)**
103:23
**dignify (1)**
143:9
**dilate (1)**
60:13
**dilator (1)**
60:18
**direct (3)**
161:9,24 185:18
**directed (2)**
30:6 36:8
**direction (1)**
121:4
**directive (2)**
161:16,18
**directives (1)**
162:1
**directly (3)**
60:11 87:12 123:19

**director (23)**
8:11 9:5,10,14,15,18
9:19,21 10:1,6
11:13 12:6,9,22
13:8 26:16 27:17,19
27:20 37:24 119:2
172:3,6
**directors (1)**
13:4
**dis (1)**
136:25
**disadvantage (2)**
127:6 187:10
**disagree (4)**
84:20 120:9 134:13
157:25
**disciplinary (4)**
80:2 85:9 121:1
154:22
**discipline (16)**
3:16 19:12,14 40:10
79:12 86:2,12 117:4
118:14 119:5 130:7
132:10 157:12
159:19 160:6 166:5
**disciplined (10)**
57:18,25 80:5 105:24
108:4 112:3 118:19
118:25 171:12
198:10
**disciplines (2)**
11:2 18:18
**disciplining (1)**
85:19
**disclose (2)**
129:12 131:11
**disclosed (1)**
123:7
**disclosure (2)**
123:4 130:21
**disconnect (1)**
23:2
**Discovery (1)**
18:8
**discuss (3)**
50:16 94:9 120:21
**discussed (3)**
15:11 35:12 119:20
**discusses (1)**

61:6
**discussing (2)**
149:16,17
**discussion (14)**
37:5 102:5 119:16
128:20 133:6,11
143:9 144:1 150:6
151:14,17 165:18
170:19,24
**discussions (1)**
175:23
**disease (9)**
163:24 164:8 209:24
210:21 212:14,25
213:5,12,14
**disjointed (1)**
169:7
**dismissal (2)**
156:18,22
**dispensing (1)**
44:20
**disposal (1)**
192:8
**disposition (3)**
3:11 48:17 167:25
**dispute (2)**
67:10 124:12
**distinct (1)**
163:22
**distinction (1)**
76:12
**distinguishes (1)**
45:23
**distress (3)**
38:16,19,20
**divvy (1)**
172:14
**Doc (2)**
33:3,5
**DOCC's (3)**
25:8 52:2,15
**DOCCs (70)**
9:25 15:25 16:2,16
16:25 17:17,18
20:20 22:4 25:10,20
36:16 40:11 43:4
44:19 49:2 51:8
57:9,16 62:25 65:6
67:25,25 68:14 74:7

74:9,11 77:7,18
80:10 84:3,8 85:22
90:1 94:3 95:7,22
95:25 96:3,6 97:2
97:15 99:18 106:13
106:16 107:1 109:2
110:25 111:2 112:7
112:15 113:21
116:3,3,19,19,22
154:19 157:5
159:23 160:18,22
161:16 171:19
172:22 175:2
176:23 198:6 201:3
203:16
**DOCCS' (3)**
41:24 52:14 96:1
**DOCCS's (1)**
25:23
**DOCS (1)**
30:5
**doctor (22)**
31:3 38:25 54:7
67:24 68:7 78:6
103:5,16 122:3
123:13 129:14
159:16 162:15
165:25 178:7 185:3
194:23 197:5
206:16 211:17
214:21 216:1
**doctors (1)**
195:3
**document (91)**
6:19 23:6,23 24:2,25
25:17 30:4 33:12
34:14,15,17 36:2
37:9,10,11,19,20
38:7 39:4,8,9 40:2
49:3 50:23 51:3
54:12 72:1 88:16
103:15 104:4,15
108:24 119:10
120:19 122:2
123:17 125:8 126:7
126:9,18 127:5
129:17,17,21
131:10 132:16,23
137:23 138:4,10,20

141:1,5,10 144:8,17
144:18 145:2
147:19,20,23,24
149:20 150:4,4
152:21 153:6,13,25
154:14,16,17,18
155:13,25 156:2,3
156:13 157:17,18
157:20 159:11,18
160:12 164:15
168:13,13 183:1
195:11 199:23
213:2
**documentation (24)**
30:1 33:22,24 35:11
35:17,21,24 37:25
38:5,12 54:11 82:19
98:5 99:5 107:23
124:3 128:5 141:20
170:13 172:10
173:18 215:7,14,16
**documents (27)**
23:12 25:5 30:10
36:11,17 47:8,10,10
48:16 82:18 98:19
119:17 120:6
127:19 133:18
136:7 146:24
151:19,23 158:11
166:20 167:9 168:2
169:15 172:19
193:5 199:13
**doing (11)**
5:22 6:6 101:3
105:24 127:11
139:3 150:7 153:3
155:7 187:12
210:25
**door (2)**
69:5 72:15
**dose (4)**
64:25 65:1 67:11
209:12
**dot (1)**
60:20
**double (1)**
187:13
**doubt (2)**
15:12,12

**Dr (62)**
5:9 6:22 8:9 9:2,4,6
12:12,18 23:13 30:7
33:13 35:12 36:11
37:5,7,9 48:2,5,11
54:7,14 70:12 71:20
73:13 101:13,22
102:6,12 104:9,9
105:2,8 110:7
119:23 120:13
133:9,12 134:4
146:16 152:13
154:14 156:15
160:17 162:23
163:3,6 168:19
169:19 170:25
172:7,9 177:21
184:22 185:6,8
194:12 214:23,25
215:5,12,13 216:3
**draft (1)**
129:9
**drinking (1)**
181:23
**drugs (1)**
56:7
**due (5)**
61:11 194:3 210:19
212:8,8
**duly (1)**
5:5
**dusts (1)**
164:8
**duty (17)**
16:10 27:15 52:11,18
52:21,23 53:15
57:10 73:17 75:19
76:1 77:2 80:12
108:19 111:14,25
118:5
**dying (1)**
54:24

---

**E**

**E (3)**
5:5 219:3,3
**e-mail (28)**
16:19 17:2,4 18:7,10
18:20 23:1,5,16

32:23 33:4 34:8,14
43:1 69:15 71:12
88:5 99:6,7 100:1,8
100:20 123:18
125:15,16,17
153:24 172:12
**e-mailed (7)**
22:23 47:23 103:21
103:22 152:22
153:1 212:16
**e-mailing (1)**
211:10
**e-mails (13)**
17:18,21,23,24,25
18:2,3,15 98:22
99:4 100:3,4,5
**earlier (8)**
49:1 60:17,19 152:4
169:20 171:17
180:24 192:24
**early (6)**
58:12 70:6 73:18
82:4 109:15 162:7
**easier (3)**
69:17 102:3 167:18
**easiest (1)**
128:23
**easily (1)**
169:21
**edema (5)**
213:21,23 214:7,10
214:13
**Education (7)**
111:11 112:9,13,18
113:17 116:8
160:10
**effect (3)**
130:11 176:13
180:12
**effective (1)**
64:16
**effort (11)**
17:3 25:21 107:6
136:4 143:12,13,14
143:23 155:14,17
202:14
**eight (4)**
82:20 86:10 88:20
89:25

**Einstein (1)**
110:18
**either (12)**
18:8 63:10 81:11
86:10 98:15 108:2
112:1 123:17 125:7
197:4 198:2 208:22
**EKG (10)**
203:13,15,18,21,25
204:3,13,13,18
205:19
**electronic (8)**
19:18 22:8 25:7,22
34:16 42:14 99:18
100:11
**elevated (3)**
186:17,19,25
**ELMER (2)**
1:17,19
**emergencies (2)**
77:18 85:14
**emergency (13)**
38:5 62:16,21 64:1
65:8 68:14 70:22
74:20,22,24 77:8
78:14,21
**emergent (4)**
53:8 64:4 67:8 77:13
**emphasis (1)**
164:21
**emphysema (2)**
164:4,5
**Empire (1)**
41:20
**employed (6)**
5:13,14 62:19 110:18
114:16 200:16
**employee (6)**
57:9 113:21 114:20
124:9 146:17
155:10
**employees (6)**
57:16 117:23 161:4,5
161:7,15
**employment (10)**
17:7 22:16 40:11
49:2 85:22 97:2
98:17 100:24
117:11 144:19

**EMT (2)**
63:14,25
**engage (1)**
13:3
**entire (4)**
133:14 134:8 213:6,7
**entirety (1)**
120:5
**entitled (2)**
35:17 38:25
**entrance (1)**
106:18
**entranceways (1)**
107:2
**entries (2)**
171:8,13
**episodes (1)**
61:12
**equipped (1)**
63:12
**ERRATA (1)**
218:1
**error (2)**
184:20,20
**especially (5)**
6:5 7:25 52:22
   124:12 169:8
**ESQ (1)**
1:19
**essence (1)**
163:23
**essentially (1)**
150:13
**establish (2)**
99:2 164:15
**estate (2)**
15:1 92:25
**et (1)**
1:5
**etcetera (3)**
18:19 46:10 180:16
**evacuate (2)**
70:3,6
**evaluate (2)**
51:19 90:13
**evaluated (4)**
174:3 175:1 187:20
   203:9
**evaluating (1)**

205:17
**evaluation (1)**
91:10
**evaluations (1)**
90:25
**evening (4)**
58:11,11 181:6
   188:18
**event (24)**
28:4 35:20 38:1 56:5
   65:23 80:16,17,25
   82:4 111:15 112:1,2
   149:15,16 178:19
   192:18 197:22
   204:20 209:5,5,7,14
   209:18 214:10
**events (9)**
38:5,13 55:19,22
   104:15 135:23
   137:1 149:15
   179:14
**eventually (2)**
40:10 79:11
**everybody (5)**
22:3 161:8,12,12,13
**everyday (1)**
77:18
**everyone's (1)**
188:19
**evidence (5)**
105:18 146:3 169:16
   191:6 210:6
**evident (1)**
205:11
**Evidently (1)**
171:14
**evil (2)**
135:5 139:5
**exacerbation (1)**
163:18
**exact (1)**
145:4
**exactly (17)**
11:19 26:10 55:5
   88:14 100:18 106:6
   111:1 113:2 129:23
   142:25 143:21
   145:4,25 155:21
   189:6 192:4 198:7

**exam (1)**
11:7
**Examination (15)**
1:10 5:3,7 18:5 37:6
   117:18 128:23
   152:3 165:22
   177:14,19 185:1
   207:13 214:19
   216:15
**examined (1)**
4:14
**examiner (4)**
54:2 141:2 168:10
   215:1
**examining (1)**
4:13
**examples (1)**
114:25
**Exchange (1)**
1:21
**exchanged (1)**
18:3
**excited (1)**
139:21
**excitement (1)**
152:19
**excuse (13)**
5:13 12:24 39:14
   40:16 58:11 62:25
   74:20 75:23 80:11
   81:17 112:18 158:7
   199:18
**excused (1)**
161:20
**Exhibit (86)**
22:22,23 24:2,2,4,5
   32:21 33:1,8,9,12
   37:7 38:7,25 39:2
   39:23,24 47:23,25
   48:4,8,12,12,16,19
   50:23 59:3 61:8,19
   61:20,22,22 69:21
   71:20,24 79:9 83:22
   86:16 99:12,20
   102:10,11,19 103:1
   103:4,6,6,11 120:18
   123:10,13 132:13
   152:21,24 156:16
   159:5,20 164:16,19

169:24,25 170:2,3,5
   174:20 182:9,13,13
   183:14,21,22,23,24
   183:25 185:5
   189:24 190:2,4
   207:15 210:2,5
   211:5,15,21,25
   212:16
**Exhibits (8)**
3:3 5:1 23:12 164:13
   165:16 167:10
   169:17 210:2
**expect (2)**
63:11 177:17
**experience (5)**
43:10 63:21 113:23
   140:13 198:5
**expert (1)**
213:3
**experts (1)**
55:17
**expires (1)**
217:23
**explain (8)**
29:16 30:14 60:8
   93:23 94:1 97:25
   98:9 118:4
**explicitly (1)**
123:2
**expose (1)**
135:4
**exposed (1)**
133:23
**exposure (1)**
164:8
**extent (3)**
135:15 136:12 151:7
**extra (2)**
36:17 110:14
**extremely (2)**
145:16,16
**eyes (5)**
69:4 72:14 122:4
   124:22 125:2

---

**F**

**F (1)**
219:3
**F-L-U-T-I-C-A-S-...**

60:15
**face (1)**
88:10
**faced (1)**
86:2
**faces (1)**
198:15
**facilities (20)**
27:18 32:10 43:4
  44:5,11,21,23 45:2
  45:7,7,8,9,10,11
  68:14 106:13,16
  107:1 175:17
  177:10
**facility (37)**
10:6,7 16:11 25:9
  26:8,23 27:16,18,19
  27:20 30:6 32:12,12
  34:24 44:3,8,18
  45:16,20,21,24,24
  46:2,8 47:7 62:25
  63:1 73:18 77:7,12
  78:13 84:4 106:21
  107:12 115:11
  118:6 122:5
**fact (19)**
15:6 53:13 61:7
  63:10 64:16 65:22
  73:17 80:11 95:12
  98:4 122:17 128:10
  134:18 142:13
  146:5 148:13
  170:12 191:6 204:3
**facts (1)**
148:9
**faculties (2)**
201:13,17
**failed (5)**
11:23 61:10 67:19
  84:4,5
**failing (2)**
58:1 61:11
**failure (3)**
86:4 173:19 182:4
**fair (57)**
6:20 8:7 12:19 17:6
  28:23 40:21 46:18
  48:25 49:3 50:9,15
  52:19 55:3,20,23

56:20 59:18 65:9,17
  66:21 67:22,25
  80:18 81:3,20 89:5
  89:23 91:11 95:16
  98:13,20 102:6
  104:4,12,17 105:1
  111:22 116:25
  124:6 165:11
  166:11 173:2,5,24
  184:15 185:6 187:1
  187:6,21 188:23
  192:1 196:11,15
  197:5,18,23 205:6
**Fairly (1)**
87:20
**fall (2)**
76:15 124:18
**falling (1)**
76:11
**falls (1)**
162:1
**false (4)**
170:13 171:7,13
  199:19
**familiar (11)**
21:18 29:5 33:16
  37:21 38:1 44:7
  74:11 92:11 111:5,9
  137:21
**familiarity (1)**
36:21
**familiarizes (1)**
137:24
**family (1)**
133:17
**far (9)**
56:3 75:8 83:21 92:1
  92:9 95:25 101:10
  114:8 165:17
**fashion (2)**
5:25 134:6
**faster (1)**
60:3
**fatal (1)**
204:19
**fatality (2)**
205:9 207:5
**favor (2)**
158:7,7

**favorite (1)**
146:15
**February (2)**
22:17,17
**Federal (4)**
5:11 31:17 104:16
  165:2
**feed (1)**
107:2
**feel (4)**
29:1 100:10 204:22
  204:22
**feeling (2)**
136:19 204:23
**feet (1)**
66:5
**fell (2)**
111:14 178:17
**fellow (2)**
115:11 117:23
**felt (4)**
16:3 33:18 116:7
  155:5
**ferreted (1)**
90:16
**FHSD (1)**
27:20
**fifteen (7)**
72:17,25 73:11 128:2
  190:6,7 208:22
**fifty (2)**
110:19,19
**figure (19)**
12:2 18:2 29:16 38:9
  40:23 100:17 104:8
  115:18 124:17
  132:12 133:8 142:3
  160:23 161:21
  162:3 163:2 186:4,6
  197:5
**figured (1)**
132:9
**file (7)**
12:3 98:6 99:18
  100:13 115:1 132:1
  132:15
**filed (9)**
5:12 11:14,15,17
  12:10 15:1,22 19:12

123:15
**files (4)**
11:22 100:18,24
  122:24
**filing (2)**
4:9 199:19
**filled (4)**
12:21,25 67:11
  164:22
**final (19)**
3:6,11 48:17 59:1
  61:9,21 83:23 86:22
  87:4 97:6,9,10,11
  97:13,15,18 98:2
  101:15 167:24
**finally (3)**
7:5,13,17
**find (13)**
21:25 22:1,4 30:3,4
  34:5 46:14 61:16
  63:6 79:9 101:2
  103:24 191:5
**finding (10)**
174:2 178:16 191:15
  191:16 213:24,24
  214:1,9,9,13
**findings (8)**
84:11 86:24 87:1
  90:3 171:18,22,25
  172:24
**finds (3)**
61:9 89:21,22
**fine (30)**
23:22 39:10 69:18
  70:18,18,20 78:17
  93:9 110:3 124:16
  126:3 128:17
  131:19 133:9
  138:18,23 141:4
  142:23 144:10,12
  144:20 146:11
  152:12 156:10
  160:15 161:22
  204:11 206:23
  211:10 214:18
**finish (2)**
6:2 129:24
**Fired (1)**
119:3

**first (27)**
9:18 13:13 15:7,13
44:10 49:10 67:9
73:10 83:24 101:13
113:11 123:12
124:3 126:10
135:13 139:16
140:22 147:15
150:22 163:11,11
167:23 177:21
189:21 192:3,3
207:19
**fit (2)**
150:10 151:13
**fits (1)**
21:23
**five (6)**
9:20,23 11:7 146:19
149:8 207:19
**five-minute (1)**
119:8
**flow (8)**
180:3,8,14 186:13
188:1,1,3,7
**flows (1)**
173:18
**Fluticasone (2)**
60:14,21
**fly (1)**
127:12
**follow (12)**
84:4 117:24 121:14
140:24 141:3 153:9
165:10 166:4
194:11 206:12
207:10 214:21
**follow-up (6)**
30:11 35:25 157:16
166:2 177:14,17
**following (1)**
40:11
**follows (1)**
5:6
**food (1)**
7:9
**forced (1)**
127:8
**foregoing (1)**
219:8

**forensic (1)**
195:7
**foresee (2)**
128:6 149:24
**foreseeable (3)**
77:6,22,22
**foreseen (3)**
77:23 78:1,3
**forget (3)**
41:25 68:3 76:8
**forgive (3)**
114:5 149:2 150:24
**forgotten (1)**
114:21
**form (112)**
4:11,12 18:13 20:24
22:10 26:6,12 28:6
28:14,24 29:8 31:1
31:4,14,15,18 32:7
47:2,4 51:13 52:24
53:11 56:23 57:12
57:20 58:4,14 60:6
62:11 63:23 64:21
66:15,23 67:16
68:16 73:1,20 75:3
75:10 77:25 78:16
79:18,20 83:18 86:7
88:18 89:17 91:22
92:6,16,22 93:4,24
95:5,11,17 98:8
105:12 106:1
107:10 112:21
113:1,22 114:18
115:20 117:15,19
118:9,11,22 138:22
164:4,10,17,22
165:3 166:15
170:16 171:9
173:13 179:12,18
182:6 187:22
188:21,24 189:19
192:2 194:8,19,20
195:15 196:12,21
197:1,19 198:12
200:4,10,19 201:5
201:15 202:9,24
204:9,16 205:12
207:6 208:2 214:13
215:10,21

**Formal (1)**
38:8
**formalized (1)**
34:22
**format (3)**
33:19 34:8,12
**formed (1)**
78:2
**former (1)**
146:17
**formerly (1)**
5:14
**formulate (2)**
130:1 172:18
**forth (2)**
100:8,21
**forty (2)**
86:3 116:22
**forty-five (1)**
207:1
**forum (1)**
124:6
**forward (12)**
19:24 37:5 48:4
103:5 104:1 114:16
121:7,18 128:22
151:12 211:17
216:6
**forwarded (10)**
32:23 69:23 71:21,21
102:9 108:14
120:17 130:7
164:17 211:15
**forwarding (2)**
211:2,20
**forwards (1)**
121:8
**found (12)**
38:16 62:24 69:10
72:21 83:16 91:4
134:22 170:9 171:4
181:15 191:5,11
**foundation (1)**
157:23
**four (8)**
9:19,23 23:11,12
146:19 149:7 162:1
207:18
**frame (2)**

174:4 192:6
**Franklin (6)**
44:3,8,11,18,22,25
**frankly (2)**
123:23 139:2
**free (2)**
4:14 78:18
**Friday (2)**
175:18 176:2
**front (9)**
24:5 39:2 103:15
128:19 140:18
142:7 144:3 156:19
199:14
**FSHD (1)**
32:14
**full (3)**
113:7 127:10 184:24
**fully (1)**
150:1
**fun (1)**
152:18
**function (1)**
80:22
**fundamental (1)**
126:22
**fundamentally (1)**
149:13
**furnish (1)**
4:13
**further (9)**
133:22 153:15
157:19,24 158:10
158:14 181:3
210:19 215:23
**Furthermore (1)**
6:14
**future (1)**
158:16

**G**

**G (1)**
5:5
**gaining (4)**
147:11,11,11,12
**game (1)**
124:6
**garbage (2)**
134:9 142:8

**gasping (2)**
208:8,10
**gathering (2)**
172:16 186:1
**gathers (1)**
172:13
**general (14)**
1:20,22 36:9 46:4
78:24 79:5 96:20
98:16 132:4,7 138:9
147:6 202:6 205:13
**General's (3)**
82:17 93:15,20
**generalized (3)**
106:22 213:13,14
**generally (10)**
55:12 89:13 106:17
106:17 164:7,10
186:18 201:3 209:9
209:11
**generate (1)**
99:5
**generated (7)**
30:2 97:7 107:15
108:24 136:5
144:19 172:9
**generic (1)**
59:9
**gentleman (3)**
54:6 94:20 171:12
**gestures (1)**
5:24
**getting (5)**
45:14 67:21 155:23
190:16 198:10
**gigantic (1)**
133:16
**gist (1)**
105:8
**give (36)**
5:24 6:1 7:11 21:16
32:24 35:4 43:9
47:18 59:3,7 67:14
68:9,9,19 69:22
71:2 78:5 79:8
81:23 97:12,13
98:19 114:25
118:23 125:8,9,10
125:14 135:7 140:5

170:17 179:7
180:15 188:1 190:3
210:11
**given (27)**
6:8 20:16 30:12
44:19 54:10 55:2
78:12 81:1,10 94:4
115:4 128:1 129:14
149:25 150:3
166:25,25 167:2,3,6
167:8 180:19
181:18 193:4
208:15 209:18
217:8
**gives (2)**
36:6 115:6
**giving (3)**
127:18 135:13
209:13
**glass (4)**
189:23 190:9 192:18
192:20
**go (87)**
16:1,21 18:14 20:24
21:2 22:25 23:15
26:7 28:6,15 32:8
33:6 35:5,7,15
36:15 37:10,11 39:4
39:5,6 43:23 45:6
47:5 51:13,16 53:2
53:11 56:2 57:12,20
62:11 64:21 66:15
70:7,22 72:1 73:21
75:8,10 83:21 86:20
87:13 88:1 91:25
92:9 93:9 97:18
100:16 101:3 102:1
103:23 110:7,16
111:24 112:23
115:21,25 118:1
122:21 126:23
128:7 130:9 131:25
132:9,17,20 140:4
149:11 150:1
153:24 154:11,12
157:21 167:8 170:2
170:21 173:13
181:24 188:18
192:17 193:14

198:7 201:18
210:11,12 215:11
**goes (6)**
46:9 60:3 73:23,24
107:2 213:15
**going (187)**
6:3 8:7 12:17 16:25
19:2,6,11,13 21:15
24:19,21 25:15 28:2
28:4 29:3 31:17
32:19 36:20 39:4,22
43:9 45:10 48:11,14
49:19 55:16 59:13
61:8 64:2 68:19
70:4,9,11,19,23
71:3,25 72:3 76:25
77:8 81:21 83:23
91:25 92:23 93:11
93:12 100:11,12
102:9,18 103:11
104:10 106:9 113:4
114:5 115:5 117:14
118:2,18,25 119:7,7
120:3 121:3,6,7,14
123:24 124:11,13
124:14 125:7,9,10
125:13,14,20,21,25
126:1,18,19,20,23
127:1 128:7,8,9,11
128:11,14,15
129:11 131:18,25
132:3 133:2,3,5
134:10 135:1,2,3,15
135:18 136:10,11
136:12,13,14,20
137:14 138:7,8,13
138:17,22,22,24
139:1,6,9,11,15
140:17,23 141:24
142:1,12,15 143:9
143:20,22 146:10
146:13 147:18,24
149:1 150:19,21,24
152:2,9,20 153:5,11
153:12,14,17 154:9
154:22 155:5,9,14
155:19,20 156:5,16
157:14,24 158:2
159:9 160:21

164:15 165:19,21
170:1,6 172:1
177:18 179:8 182:9
184:2 187:18
190:19,24,25
191:10 193:23
197:5,18 202:2,19
205:18 207:15
208:17 213:9
**goings (1)**
107:8
**good (12)**
48:6 71:13 92:7 93:7
113:24 150:11
162:8,14 174:7
183:13 210:25
215:24
**Gorman (1)**
21:3
**government (17)**
11:14,23 15:2,23
83:1,9 91:19,20
92:14,20 133:15
134:9,12,21,22
135:17 156:17
**graduate (1)**
110:10
**grain (1)**
202:11
**grandfathered (1)**
11:10
**granting (1)**
150:14
**Gray (2)**
94:21,23
**great (3)**
141:24 142:5,10
**greater (1)**
39:5
**Green (4)**
9:11,16,19 10:7
**gross (5)**
74:14 117:21 177:25
178:5,6
**grossly (2)**
75:6 213:9
**ground (1)**
145:16
**group (1)**

169:1
**Groveland (14)**
16:11 25:9 30:5 44:2
    45:16 47:7 73:17
    77:12 84:3 107:12
    114:16 115:11
    118:6 172:8
**guess (14)**
48:23 70:5 76:21
    92:17 102:8 104:8
    112:22 121:17
    148:11 177:22,24
    192:16 194:21
    213:1
**guidelines (1)**
84:9

**H**

**half (5)**
10:18,19 71:6 111:2
    111:3
**hallmark (1)**
135:10
**hallways (2)**
106:20 107:1
**handful (1)**
158:19
**handheld (4)**
64:18,19 65:2,14
**handle (1)**
33:25
**handling (1)**
88:11
**hang (9)**
69:25 121:20 152:25
    158:23 167:20
    183:15 190:3
    210:22,22
**happen (11)**
14:6 55:1 68:11
    87:14 126:6,8
    127:17 148:1
    176:11 197:24
    199:10
**happened (24)**
13:4 16:17 83:2,10
    107:7 111:20
    123:10 134:10
    141:15 142:13

143:21 146:5 149:7
    149:15 166:19,23
    188:22 189:3 196:9
    196:17,22 199:3,3
    202:5
**happening (5)**
26:13 82:13 131:21
    138:12 149:24
**happens (6)**
29:23 68:13 97:17
    100:7 176:11 194:5
**happy (6)**
6:16 7:7,18 133:5
    167:13 169:10
**harassed (2)**
139:19 140:20
**harassing (3)**
139:7 140:2,7
**hard (9)**
15:24 88:6 99:9
    169:7 193:18,21,22
    214:8,8
**harder (2)**
186:21,25
**Harriman (1)**
41:21
**hat (1)**
134:7
**Haven (4)**
9:11,16,19 10:7
**he'll (1)**
216:6
**head (8)**
5:20 47:9,21 69:9
    72:20 74:5 114:19
    162:19
**health (24)**
8:24 10:6 12:25
    18:18 21:12 26:9
    27:9,16,18,20 52:4
    84:4 101:5 110:5
    148:17 161:25,25
    171:20 172:22
    174:4 175:2,5,7
    202:17
**hear (5)**
23:11 37:10,12 70:21
    116:12
**heard (7)**

15:7 21:23 94:21
    105:21 126:1
    142:21 157:2
**hearsay (1)**
187:14
**heart (21)**
54:19,23 55:8,9,9,12
    55:14 56:10 80:21
    81:15 89:9 186:21
    187:19 195:22
    204:4 205:21,24
    209:15,16 212:13
    214:11
**heart's (2)**
56:11 186:25
**heartless (2)**
135:5 139:5
**heavy (2)**
68:24 72:9
**held (7)**
1:11 17:21 99:9,9,14
    99:14 143:18
**help (17)**
8:4 43:10 55:18 56:2
    64:3 75:1,14,15,15
    76:19,19,25 77:4
    105:4 115:8 201:24
    209:10
**helped (1)**
81:19
**Hepatitis (1)**
100:19
**hereto (1)**
123:9
**hey (7)**
12:16 43:17 98:18
    104:10 108:3
    134:23 143:16
**high (2)**
146:2,3
**higher (10)**
43:20,23 46:5,11,13
    76:3,3 78:22 79:3,5
**Hill (1)**
44:6
**Hillel (37)**
1:22 31:11 36:13
    47:3,22 48:3 69:23
    70:8 102:8,15 103:3

119:9 121:25
    123:16 125:7 127:1
    128:1,21 129:24
    131:18 133:24
    136:21 139:17
    140:13 141:7 142:1
    143:3 148:7,8,22
    158:11 160:11
    168:6 169:3 210:24
    211:15 215:23
**Hilton (7)**
21:13,14,14,15,20,22
    110:4
**hire (1)**
55:17
**history (6)**
85:22 117:11 121:1
    134:16 135:20
    213:15
**hit (6)**
23:15 66:3,5 68:25
    72:10 152:15
**hitting (1)**
117:23
**Hmm (1)**
21:22
**hoc (6)**
33:17 134:2,6 136:6
    141:20 142:8
**hold (12)**
8:17 17:11,16 39:14
    39:14 96:12,23 97:3
    121:23 161:14
    167:11 210:17
**holds (1)**
17:19
**home (3)**
25:19 70:7 71:4
**honest (1)**
24:20
**hook (1)**
186:6
**hooked (1)**
107:17
**hooking (3)**
203:25 204:17
    205:18
**hope (2)**
151:5 216:12

**hopefully (1)**
166:3
**horrible (1)**
139:6
**horse (1)**
194:22
**hospital (9)**
27:24 28:1,12,22
43:24 56:13 110:18
176:24 177:10
**hospitals (3)**
28:25 29:2 177:7
**host (1)**
85:15
**hour (4)**
43:15 71:6 118:1
207:1
**hours (8)**
73:18 82:5 177:23
178:20 181:20
187:5 189:12 206:7
**housed (1)**
76:24
**houses (1)**
46:17
**hub (6)**
9:11,11,16,22 44:22
44:23
**human (3)**
109:9,21,24
**hundred (2)**
43:22 128:2
**hundreds (2)**
34:2 115:2
**hung (1)**
192:6
**hypertension (1)**
213:16
**hypertensive (4)**
210:20 212:13,24
213:4
**hypertrophy (1)**
213:15
**hypothetical (1)**
205:15

---

**I**

**IBBAI (1)**
123:8

**ID (1)**
3:4
**idea (16)**
17:14 33:10,11 52:17
67:12 94:6 97:20
98:11,11 104:14,18
107:11 109:4 161:1
162:8 196:8
**Identification (10)**
5:2 33:2 47:25 48:8
69:21 102:11 103:1
152:24 211:5,25
**identified (9)**
40:3,7,14,25 56:19
57:3 91:3 165:16
180:2
**identify (5)**
25:22 32:22 39:24
90:20 204:4
**III (2)**
1:17,19
**immediate (2)**
85:2,5
**immediately (1)**
70:4
**implicate (2)**
31:10 143:1
**implicates (1)**
134:12
**importance (2)**
134:14,15
**important (10)**
5:21 6:1 8:1 52:22
66:21 100:21 152:1
191:14 195:11
210:1
**impose (1)**
19:13
**impossible (3)**
42:12,15 198:7
**impressed (1)**
114:3
**improper (1)**
8:3
**improvement (1)**
34:5
**inaccurate (1)**
115:7
**inappropriate (1)**

155:22
**inattentive (1)**
84:23
**incentive (1)**
199:2
**incident (6)**
3:13 69:14 163:16
189:21 192:24
208:24
**incidentally (1)**
195:10
**incidents (3)**
115:13,15 155:25
**include (1)**
32:11
**included (2)**
34:23 86:9
**including (6)**
25:10 71:5 86:3
117:23 180:1 217:6
**inclusive (2)**
5:1 33:19
**incorrect (2)**
90:24 91:9
**INDEX (2)**
2:3 3:3
**indicate (3)**
81:6 91:16 208:16
**indicated (9)**
129:5,10 132:5,8
155:25 194:13
215:6,15 217:9
**indicates (1)**
208:22
**indicating (4)**
12:3 130:6 215:17
218:3
**indication (1)**
75:21
**indicative (1)**
206:8
**indifference (4)**
74:16 76:18 135:11
178:1
**indifferent (6)**
75:9,15,16 76:6,13
76:20
**individual (3)**
74:8 213:19 214:5

**indulgence (2)**
59:3 78:6
**infarction (3)**
194:9,16 214:11
**infirmaries (9)**
45:8,9,10,10 64:11
175:6,8,24 203:15
**infirmary (43)**
45:16,20,22,25 46:3
46:9,12,13,16,17
51:8,20,23 52:6,7
52:12,19,25 53:19
58:10 61:13 62:25
63:1,2 64:7 65:2,3,6
67:25 68:21 72:7,24
76:1,22 78:23 79:1
79:2 107:13 174:5
175:14,17 192:7,10
**inflammation (1)**
59:21
**inflammatory (1)**
84:25
**inform (1)**
15:25
**information (34)**
16:13 17:19 21:19
22:15,19 25:16
26:15 29:20 31:10
33:20 34:24 36:5
41:10 56:24 68:19
83:1,10 106:10
117:8 122:8 123:6
123:23 124:1,8,10
124:22 125:4,5
129:12 147:11
166:21,23 167:4
172:14
**informed (3)**
14:6 16:5,5
**ingredients (1)**
60:23
**inhaled (4)**
59:20,24 68:9 164:9
**inhaler (27)**
61:7,12 64:25 65:1
67:11,15,20 68:25
72:10 179:4 181:1
181:19 190:10,23
191:3,4,6,12,14

192:8,10,15,21
209:7,10,12,19
**initial (5)**
13:25 16:1 34:19
183:10,11
**initially (4)**
10:5,18 40:8 79:10
**initiated (2)**
107:15,19
**injured (1)**
199:7
**injuries (1)**
199:8
**inmate (71)**
3:14 11:16 38:16
40:13 58:17 68:7,21
68:22,23,25 69:6,7
69:10 72:6,8,10,16
72:17,21,22 74:19
74:20,24 75:1 77:7
77:12 78:22 89:5
95:1 105:10 106:23
106:25 112:1
113:21 118:5
155:10 165:1
171:20 172:22
174:3,5 175:15
181:5 187:14 189:4
189:22,23 190:8,10
190:14 192:7,9,17
192:19,21 193:10
198:15,20 199:5,6
201:4,13 202:3,4,7
202:11 207:22
208:23,23 209:4
213:10
**inmate's (2)**
165:5 181:13
**inmates (48)**
27:7 40:7,15 41:6
56:19 57:3 58:7
66:2,13 73:15 86:5
89:10 95:15 105:3,6
105:19 106:9 135:8
176:1,7 178:21
181:20 187:11
191:1,1,16 192:1,5
193:13 196:19
197:22 198:3,6,8,9

199:13,23 200:7,18
201:3,6,7,10,23
202:10,16,21
208:16
**input (2)**
16:4 104:12
**instance (3)**
55:1 80:20 82:1
**instances (9)**
57:16 117:13,21,22
117:24 118:2 160:7
209:10,11
**instituted (1)**
34:11
**instruct (3)**
31:6 125:22 126:19
**instructions (1)**
117:25
**insufficient (1)**
105:17
**insult (2)**
148:12 151:8
**insulting (3)**
148:6,7 151:9
**insults (2)**
148:4,22
**intended (2)**
150:1 175:9
**interactions (1)**
151:4
**interest (1)**
124:1
**Interesting (2)**
63:2 91:23
**interfered (1)**
158:1
**interferes (1)**
6:8
**internal (7)**
10:22,25 16:20 91:5
98:21 99:4 110:13
**internet (1)**
22:2
**interpose (1)**
6:9
**interrupt (2)**
146:9 149:6
**interrupted (1)**
149:9

**interruption (1)**
78:7
**intervals (1)**
51:24
**intervened (1)**
82:7
**intervening (1)**
152:6
**intervention (4)**
55:7 56:7 196:24,25
**interventions (3)**
54:22 56:4,6
**interviewed (4)**
68:21 115:4 162:4,6
**interviewing (2)**
26:25 27:7
**introduced (2)**
162:10,22
**investigate (4)**
12:13 13:4 41:12
107:6
**investigated (2)**
112:12,14
**investigates (1)**
89:5
**investigating (2)**
12:15 113:25
**investigation (28)**
13:23 14:16,20 15:22
25:8,10,23 28:17
40:5,11,18 48:17
105:24 106:8
111:16,18 112:9
113:7,10,24 114:8
118:8 134:4 165:11
170:9 182:18,22,23
**investigations (31)**
14:20 18:23 25:6
39:20 40:4,18,21
41:3,5,7,8,14 42:5
42:10,17 47:14,16
48:20 105:6,17
112:14 113:14,14
113:20 114:11
167:24 168:1
182:17,20,22,23
**investigative (4)**
42:20,25 48:20
167:24

**Investigator (2)**
48:21 68:20
**investigatory (1)**
202:18
**involve (3)**
26:24 27:7 153:16
**involved (12)**
11:24 12:11 18:15
28:16 66:14 99:4
106:2 109:1,2
137:16 164:1 205:6
**involves (2)**
99:6 120:14
**involving (2)**
11:25 115:13
**iPad (2)**
23:20,21
**issue (23)**
31:6 42:10 57:5 70:1
70:15 82:11 89:14
108:6 112:24 113:5
116:5 128:18
138:24 142:11,13
142:14,14 151:21
152:5 160:13
175:21 192:11
199:11
**issued (2)**
38:16 97:14
**issues (10)**
19:18 36:3 76:10
80:1 86:11 87:25
88:11 92:8 99:1
164:7
**items (1)**
86:3

---

**J**

**Jacobi (1)**
110:17
**James (4)**
21:3 42:21,22,24
**January (3)**
47:18 48:18 103:7
**jaw (1)**
193:21
**Joan (9)**
21:9,10,11 116:2,17
116:18,18,24

172:12

**job (15)**
16:23 53:6 73:25
  74:25 92:18 97:1
  100:6 101:11
  113:25 134:17,18
  135:6 197:2 202:18
  203:9

**jog (1)**
128:4

**John (3)**
101:13,13,21

**joke (2)**
200:24 201:1

**Judge (22)**
36:6 82:16,19,25
  83:9 93:16,21
  125:25,25 126:2,20
  126:24 128:24
  133:19,20 135:12
  140:4,18 144:2,24
  149:4 151:10

**judged (1)**
180:4

**judgement (1)**
106:11

**July (1)**
96:23

**June (1)**
97:1

**Jury (1)**
142:8

**justice (6)**
133:17 165:3,5,7
  168:6,23

————————
**K**

**K (1)**
5:5

**Keach (137)**
1:17,19 2:6 5:8,10
  30:18,24 31:9,14,23
  33:3 35:4,7 37:4
  47:3,22 48:3 69:13
  69:18,22 70:8,17,21
  71:2,10,15,18 73:6
  78:5 102:4,8,14,18
  102:21 103:3,8,10
  115:22 117:17

119:9 120:3,8
121:18,23,25
122:16,19,21
123:12 124:21
125:1,7,16,24 126:8
126:25 127:25
128:21 129:23
130:5,14,16,24
131:14,17 132:3,17
132:20,25 133:5,14
137:5,9,13,22 138:8
139:12,16 141:17
142:24 143:3
144:18,22 145:1,9
145:23 146:12
147:16 148:6,14,16
149:9,11 150:18
151:15 153:4,11
154:5 155:24 156:4
156:11 157:14
158:18 159:1,6,15
160:11 165:15
167:16 169:3
170:22 177:13
179:12,18 182:6,25
183:6,16,19,22
185:2 190:1,6 191:8
206:15 207:8 208:2
210:24 211:2,10,13
211:20 212:3
214:20 215:22,25
216:3

**keep (8)**
38:17 64:19 99:18
  100:11,18 121:3
  139:1 152:9

**kept (2)**
134:17,18

**Kessel (4)**
42:21,22 48:21 68:20

**Kessel's (1)**
42:25

**kilter (1)**
139:24

**kind (35)**
7:13 15:8 17:17,20
  17:23 18:20 33:16
  33:17 37:15 45:12
  45:23 58:9 63:16

100:19 136:20
139:22,24 140:12
143:23 157:16
160:18 161:17,23
164:11 165:10,20
167:1 172:17
182:20 184:11
188:19 194:22
201:12 202:6
204:12

**knew (8)**
75:14 76:18 82:6
  86:13 111:18
  157:11 159:7
  185:12

**knock (2)**
123:20 125:12

**know (240)**
6:15 7:2,6,8,9,18,21
  8:2,5,10 9:4 11:20
  11:21 12:14,16 13:9
  13:10 15:6 16:4,12
  17:3,5 18:10 23:25
  25:21 26:20 30:7,23
  31:5 35:1,3 37:2
  39:11 41:23 42:8,16
  42:18,21 43:3,5,15
  44:3,5,17 47:6,8,9
  47:19 50:20 51:2
  52:1 53:13 54:4
  55:5,15 56:2 58:16
  60:8 63:10,16,19
  64:18 68:3,5,8 71:3
  71:8,21 72:24 74:4
  76:9,16,21 79:21
  80:9,13 82:25 83:20
  84:15,18 86:15
  87:18,23 88:3 89:8
  89:10,20,20,21 91:2
  91:20 92:8 94:12,18
  94:20 95:1,12 96:15
  97:7,14,23 99:2
  100:8,9,10 101:10
  101:24 105:18
  106:6,19,22,22
  108:7 109:15
  111:21 113:2,8
  114:11 115:18
  117:20 118:15,16

119:3 121:13 124:2
127:7 129:7 133:10
134:3,5 137:16
138:20,21 139:2,5
139:23 140:10,11
141:5,8,18,22,22
142:1,5 143:3,10,25
145:4 146:15
147:12,13 148:19
150:25 151:3,22,22
154:8 155:7 156:3
158:9,9 160:17,17
160:19,20 161:11
161:16,17,19,22
162:23,23,25,25
163:3,4,8 165:6
166:13,16 167:1,3
167:10,13 170:15
171:16 172:9,25
176:14,18 177:22
181:14,23 184:7,18
186:3 187:4,9,12
190:1 191:12,18,23
191:24 192:14
194:2,19,21,21
195:1,16 196:8,17
196:19 197:3,10
198:24 199:3 200:6
200:7,21,22,23,24
201:1,4,16,22 202:3
202:8 204:7 205:17
205:21 206:6,6
207:16 210:10
212:7 214:11

**knowing (2)**
19:23 75:15

**knowledge (20)**
11:13 75:19,23 82:24
  83:8 85:21 95:24
  104:21,22,24 107:6
  117:2 121:1 132:6,8
  166:9,19,22 171:12
  178:15

**known (2)**
82:13 187:17

**Koenigsmann (34)**
1:11 2:5 3:7 5:9 6:22
  8:9 23:13 35:12
  36:12 37:7,9 39:1

48:2,5,11 70:12
71:20 73:13 102:6
102:12 104:9 110:7
119:23 120:13
133:10,12 146:17
152:13 154:14
156:15 160:17
170:25 177:21
216:3
**Koenigsmann's (2)**
37:6 134:5

**L**

**L (2)**
4:4 5:5
**label (1)**
102:22
**labeled (1)**
103:3
**labor (22)**
40:9 57:18 79:11
80:1 85:8,8,18,18
90:22 107:24 108:2
108:7,14,20 109:1,6
109:7 112:8 135:22
155:3 160:21
202:21
**labored (1)**
205:4
**lack (4)**
89:8 95:8 109:9
196:3
**laid (1)**
145:5
**landscape (2)**
165:14 169:4
**language (12)**
7:24 8:6 32:20 84:11
86:21 87:4 90:9
92:8 150:11,11
173:23 177:2
**laptop (2)**
127:9 211:7
**larger (2)**
46:9 151:21
**lasting (2)**
191:13,13
**late (1)**
98:7

**law (5)**
1:17 146:22 150:23
199:17,18
**lawsuit (5)**
11:15,22 12:3,10
98:18
**lawyer (16)**
5:10 7:20 8:2 11:22
49:19,19 55:16
140:12,14 143:18
148:21 151:4 178:7
200:22,23 201:2
**lawyer's (2)**
148:17,24
**lawyers (3)**
96:19 200:22,25
**lay (3)**
60:8 148:4 178:3
**layperson (1)**
178:9
**lead (11)**
53:21 95:8 163:17
195:22 196:2 203:4
203:7 204:19 205:5
205:9 206:10
**leadership (1)**
116:19
**learn (1)**
13:13
**learned (5)**
16:24 17:1 135:23
167:4 198:7
**learning (1)**
15:3
**leave (12)**
17:7 19:7 36:13 40:9
79:10 98:6 99:23
108:18 156:19
194:20 202:23
208:13
**lecture (2)**
148:21 149:3
**left (14)**
22:16 23:14 49:2
100:24 101:1,11
133:12 144:19
152:16 157:9 187:9
191:9 193:21
213:14

**legal (5)**
92:7 98:11 178:2,5
178:12
**Legislature (1)**
124:5
**legs (1)**
7:10
**length (1)**
39:5
**Lester (1)**
8:15
**let's (31)**
11:21 16:15,15 28:9
35:7 67:22 68:18
71:10 130:1,11
131:8 149:3,4 152:8
158:19 167:9
168:11 169:22,22
170:25 179:20
180:23 181:12,12
181:16 194:19
196:3 210:2,10,22
212:20
**letter (36)**
15:18 17:11 19:20
20:21 39:25 40:13
41:1 56:17 57:2
79:7 82:21 83:4,7
86:2 88:7,9 89:20
95:21 96:12,24 97:3
98:1 99:8,11,12,19
99:21 105:2 108:2
108:20 115:15
117:4 157:6 159:20
161:4 173:5
**letters (2)**
17:16,16
**level (13)**
43:21,23 44:24 45:21
46:11,13 79:3,5
114:22 119:1 177:5
177:9,10
**levels (1)**
45:12
**liability (1)**
112:20
**liar (1)**
198:20
**licensed (1)**

29:18
**licensure (4)**
112:4 116:9 118:8
135:25
**lie (3)**
199:2 200:8,8
**life (10)**
55:19,23,25 56:8
81:2 82:8,14 102:3
167:17 203:11
**lifted (1)**
128:13
**light (11)**
107:15,19 118:4
123:23 124:12
126:20 133:25
135:20 136:2,25
140:5
**lighten (2)**
123:19 125:11
**lights (1)**
105:22
**limit (1)**
45:25
**limited (2)**
35:23 36:23
**Linda (1)**
101:8
**line (9)**
28:19 100:7 126:2
136:9 150:24 152:9
207:19 209:22
218:3
**lines (3)**
207:19 208:20 218:3
**link (3)**
70:25 71:1,2
**lips (4)**
200:23 201:2,4
208:11
**liquid (5)**
64:24 65:3,7,11
68:10
**Lisa (5)**
1:5 5:13 16:10 18:24
25:10
**listen (5)**
128:21 129:20
205:20,20,23

litany (1)
77:16
literally (1)
127:7
litigating (1)
139:25
litigation (11)
17:11,16,19 30:7
94:5 96:12,23 97:3
104:16 120:17
136:8
little (20)
10:9 21:16 29:1
30:14 32:9 43:11
64:18 70:6 78:3
80:15 81:23 93:12
151:16 167:12
169:7 174:8 182:9
188:2 204:6 206:7
live (2)
9:8 142:12
lives (1)
56:3
locate (2)
119:10 210:18
located (1)
63:1
location (1)
99:15
locations (1)
42:7
lock (1)
207:16
log (4)
18:9 170:13 171:8,13
long (12)
71:3 87:18 107:19
134:17,19 153:8
164:7,7 177:18
191:9,13,13
long- (1)
85:2
long-acting (2)
60:18 66:7
long-term (1)
59:17
longer (2)
60:24 157:9
look (38)

12:14,17 18:18 22:22
23:13,23,25 24:7,12
25:13 34:6,7 37:10
38:24 39:18 48:12
48:13,15,24 59:5,6
59:10 61:8,8 83:6
86:16 90:14 101:20
116:6 152:23 154:2
154:8,12 156:15
182:10 186:7
207:17 209:25
looked (12)
33:6 34:3 48:22 66:9
69:4 72:14 104:3
166:21 167:17
168:2 172:25
191:11
looking (17)
37:7,16 114:6 116:13
117:8 119:11 127:4
127:5 184:19 185:4
185:4 186:4 205:11
210:18 212:11,15
212:20
looks (7)
33:17 87:6 89:12,13
114:6 145:7 192:13
lose (2)
147:5,6
losing (1)
23:17
loss (1)
156:18
lost (3)
174:17 183:2 212:6
lot (11)
16:1 30:9 33:22,24
34:24 147:16
160:19 163:23
167:18 198:17
201:19
lots (1)
115:7
loud (1)
24:17
low (2)
180:7,7
lower (1)
45:21

LS (8)
40:5,6,8,10,14,19
79:10 183:8
lunch (1)
70:5
lung (2)
164:9,12
lungs (5)
59:21 60:3 164:5
205:20,24
lying (5)
200:22,23 201:2,4,13

## M

M (4)
1:12 4:16 5:5 219:5
machine (8)
203:13,19,21 204:1,3
204:13,18 205:19
machines (1)
203:15
Madam (2)
32:3 165:15
mail (6)
19:18 22:8 25:7,22
42:14 87:11
main (1)
213:16
maintain (2)
10:15 143:14
maintained (1)
10:10
majority (1)
76:5
making (5)
40:24 127:4 139:22
171:12 210:25
malignant (2)
55:13 56:10
man (5)
22:4 125:25 135:19
140:4 141:12
man's (1)
133:16
management (2)
60:24 84:6
manifest (1)
207:5
manner (2)

16:20 212:23
manual (5)
161:4,5,6,7,15
March (16)
7:8 15:18 40:2 51:5
56:18 83:5,6,6
95:22 98:1 104:20
108:21 115:16
157:7 168:14,21
Marfatia (1)
68:4
mark (6)
69:14,15 102:9
103:11 141:25
211:3
marked (17)
5:1 24:8 33:1 47:25
48:8 69:21 102:11
103:1 122:16,19
126:9 152:21,24
169:16 211:5,21,25
markers (1)
201:24
Martuscello (3)
109:13,16 110:2
master (1)
172:18
material (6)
143:6,8 145:17
149:19 166:24
184:18
Materiality (1)
143:7
materials (2)
30:12 164:9
matter (6)
6:25 31:23 87:21
104:23 188:19
219:10
matters (2)
31:24 209:19
max (2)
71:6 180:8
mean (34)
11:15 27:23 28:25
33:11 34:9 36:14
38:18 57:22,24 65:5
66:17 70:14,15
79:21,23 84:25

99:17 115:1 118:1
127:25 133:2
141:21 146:5 154:5
158:24 166:18
175:12 178:7 185:8
201:16 213:6,9,16
214:9
**means (9)**
38:10 46:22,24 56:12
74:17 129:20,21
175:13 213:13
**meant (3)**
73:3,7 116:11
**measure (1)**
186:14
**mechanics (1)**
87:15
**mechanism (5)**
14:7 60:7 98:22 99:4
100:4
**med (1)**
12:24
**medical (150)**
7:25 8:10,22 9:5,9,14
9:15,17,19,21 10:1
10:11,13,16 11:12
11:14,16 12:4,6,9
12:22 13:4,8 15:20
26:14,16 27:19 29:6
37:24 40:6,14,24
43:4,5,12,19,20
44:1,4,25 45:1,5,11
45:25 46:1,5,7,14
53:8,18 54:2,22
55:6 57:17 61:9
62:15,21 65:8 68:14
74:8,10,19,20,21,24
75:20 76:1,4,10,14
76:24 77:3,8,11,13
77:16,17,18 78:14
78:21 81:3 83:16,25
84:1,3,6,6,8 88:21
92:2,5,21 93:13
95:9,15 101:12
106:12,15 107:9,13
107:18 110:7,9,9,14
110:15 111:3,6,7
112:6 117:25 119:2
135:11 137:15

154:19,24 160:22
161:21 162:13,19
163:3,7,10 168:10
170:10 171:6,21,25
172:2,3,6,23 173:10
173:10,19 174:2
176:22 183:9
185:23 187:4,11
191:1,3,11,20
196:24 197:3
203:16 213:3 215:1
**medication (15)**
44:20 58:9,15,18,19
58:22 60:3 62:24
63:3,15,17 64:3,9
66:8 191:13
**medications (1)**
63:13
**medicine (12)**
8:2 10:22,25 44:19
55:17 59:11 60:23
63:6 110:13,19
173:20 196:24
**medicines (1)**
60:23
**meet (5)**
84:2 86:22 92:3
93:14 173:11
**meeting (3)**
23:4 162:9,22
**member (1)**
75:25
**members (2)**
86:4 162:11
**memo (4)**
16:20 88:9,16 108:1
**memory (1)**
128:5
**memos (1)**
86:10
**men (2)**
198:24 199:2
**mental (2)**
110:4 148:17
**mentality (2)**
200:16 201:3
**mentioned (5)**
57:6 60:17,19 108:12
108:13

**mercifully (1)**
207:9
**merit (1)**
93:19
**messages (1)**
22:8
**met (8)**
42:9 49:23 162:15,16
162:21 163:1,4,5
**meter (3)**
65:15 188:2 209:11
**metered (5)**
64:24 65:1 67:11
**MI (1)**
214:11
**Michael (11)**
5:12 13:11,13 14:2
14:16 25:8,23 66:2
98:19 162:23
166:14
**mid (1)**
109:15
**mild (1)**
196:4
**million (1)**
114:10
**Minarik (5)**
82:25 93:16,21
133:19,20
**mind (7)**
75:12 76:7,12,17
118:10 177:9
207:24
**mine (3)**
117:13 168:19
212:12
**minimize (1)**
23:5
**minimum (1)**
51:21
**minute (3)**
30:5 32:24 212:4
**minute-by-minute ...**
38:4,13
**minutes (8)**
119:7 149:8 165:20
166:3 179:7 181:1
181:17 207:1
**mischaracterized (1)**

91:1
**misconduct (4)**
86:6 118:2 124:8
136:25
**misrepresentation ...**
126:22
**misrepresentations...**
144:7
**misrepresented (1)**
195:11
**missed (3)**
90:25 146:21 152:18
**missing (2)**
35:16 169:10
**misstatement (4)**
142:22 143:11,11,13
**mistake (2)**
23:15 184:17
**mistaken (2)**
30:10 106:4
**mistakes (2)**
115:7 173:4
**model (1)**
81:25
**modern (1)**
196:24
**modified (2)**
128:9,11
**moment (20)**
16:16 32:21 35:5
38:24 47:18 59:7
68:18 69:22 79:9
97:13 103:22
114:24 118:23
121:20 126:25
179:20 181:13,16
184:3 207:15
**moment's (2)**
59:3 78:5
**Monday (3)**
175:18 176:2,17
**money (2)**
134:1 148:23
**monitor (2)**
170:10 171:6
**Monroe (1)**
168:10
**monthly (3)**
32:12,13,17

**months (3)**
82:20 94:24 143:2
**Morley (10)**
101:14,21,22 104:9
  105:8 168:19
  169:19 184:22
  185:6,9
**Morley's (1)**
105:2
**morning (13)**
22:24 58:12 68:7
  73:18 82:5 170:11
  171:6 187:5 188:23
  192:25 196:18
  206:5,24
**mortality (1)**
80:9
**motion (2)**
133:23 148:25
**mouth (1)**
190:18
**move (16)**
22:5 23:4,18,19 37:5
  124:14 128:22
  136:13 138:10
  144:13 149:4
  151:12 153:20
  156:6 169:22 170:1
**moved (1)**
42:2
**moving (7)**
50:22 138:16 139:11
  171:15 200:23
  201:2,4
**multiple (4)**
117:13,20 160:7
  175:22
**muscle (1)**
152:2
**mute (1)**
133:10
**myocardiac (1)**
214:11
**myocardial (2)**
194:9,16

---

**N**

**N (4)**
4:4 5:5,5,5

**NA1 (3)**
26:21,22 30:8
**name (28)**
5:9 21:17,23 42:22
  52:1 54:6 59:12
  94:21,21 96:15,17
  101:7,13,14,16,19
  108:11,12 109:11
  109:20,21 110:1
  114:19,21 116:16
  162:25 163:8 215:3
**named (2)**
12:11 43:11
**narrative (1)**
209:2
**nasty (1)**
135:5
**natural (2)**
89:22 212:23
**nature (1)**
201:7
**near (5)**
14:10 33:20 61:17
  72:3 198:7
**nebulizer (9)**
64:14,17,23 65:3,7
  65:16 68:10 180:15
  188:15
**nebulizers (1)**
64:11
**necessarily (12)**
12:7 16:2 27:10 28:8
  55:14 63:3,9,18
  91:25 108:25
  154:25 164:6
**necessary (6)**
16:3 33:18 116:7
  132:15 133:4 148:4
**necessitated (1)**
148:25
**need (23)**
6:15,15 7:6,18 39:9
  45:5,5 59:4 67:8
  70:3,21 71:1 76:3
  76:25 79:3 81:21
  115:23 129:20
  130:1,6,6,8 167:1
**needed (8)**
7:1 16:4 74:19 75:14

75:15 76:19 100:1
  115:8
**needs (4)**
57:17 125:5 135:11
  185:22
**negative (1)**
84:24
**negligence (10)**
74:12,14 91:25 92:4
  92:10 93:3 117:21
  177:25 178:5,6
**negligent (6)**
58:1 75:2,6 91:20
  92:14,21
**neither (2)**
7:20 192:16
**nephro- (1)**
213:12
**never (15)**
17:21,22 25:17 102:7
  105:21 119:24
  126:9 151:3,5
  154:16 157:2,2
  163:1 165:8 198:20
**new (29)**
1:14,18,22 4:17 5:14
  9:11,14,22 10:14,20
  11:17 15:1 22:6
  30:5 35:23 40:1
  56:15 71:1,2 91:20
  93:3,15,19 103:17
  110:9 112:4 116:8
  176:12 219:7
**news (1)**
157:13
**nice (2)**
162:22 216:12
**night (3)**
68:22 75:20 178:17
**nighttime (1)**
106:6
**nine (5)**
82:20 130:12,20,20
  131:9
**ninety (1)**
119:7
**nod (1)**
5:20
**non (1)**

178:7
**noncompliance (1)**
173:19
**nonsense (3)**
134:3 136:6 140:3
**normal (3)**
89:9 141:2 208:12
**Notary (1)**
1:13 4:16 217:21
  219:6
**note (3)**
38:8 119:14 120:1
**noted (2)**
4:12 37:22
**notes (2)**
38:10 219:9
**Notice (13)**
3:16 19:11,14 86:2
  86:12 117:3 118:14
  119:4 130:7 132:10
  157:12 159:19
  160:6
**noticed (1)**
174:8
**notify (1)**
204:13
**nuance (1)**
76:12
**nuances (3)**
92:8 178:12,12
**Nudd (7)**
68:21 72:7 189:23
  190:9 198:24 202:3
  208:23
**number (22)**
36:3 39:7,7,12 41:24
  48:22,23,24,25
  54:22 74:4 86:25
  87:1 114:15 161:21
  170:7 173:16,17,17
  174:15,17,18
**numbers (4)**
160:18 161:16,18
  218:4
**nunc (2)**
130:11,16
**nurse (123)**
5:13 18:24 19:3,7,14
  26:22 27:11,14,14

27:15 28:18 29:18
32:14,16 33:18
37:21 38:8 42:10
46:23 51:9 52:11,18
52:23 53:4,7,14,19
53:20 56:19 58:7
62:18 66:1,4,13,18
66:21 67:1,5 68:6
69:3,8 72:13,19
73:16 74:19,25 75:2
75:7,18 77:2,14,23
78:12 79:14 80:12
81:16 82:5,12 84:23
85:9,19,21 86:1
105:3,4,7,10 106:9
107:23 108:3,16
111:14,24 112:3
113:15 114:16
115:1,4,13,18 116:3
116:4,16,24 117:3,9
120:14 121:1
134:12 135:5 136:1
138:6 159:23 160:2
160:9 166:5,6,7,7,8
166:10 175:20
178:16 179:8,22,23
179:24,24 181:15
181:16 182:3
184:13 187:24
188:6 197:4,8,8,14
197:23 198:3
202:22 205:14,23
**nurse's (3)**
52:2,8 78:22
**nurses (13)**
51:19,22 57:25 111:9
111:11 114:16
115:11 117:25
118:18,25 154:23
166:7 203:18
**nursing (16)**
28:18,18 43:16 73:25
113:12 114:13
115:19 116:2,5,9,12
116:13 118:8 197:9
197:10,16
**NYS (1)**
25:10

**O**

**O (3)**
4:4 5:5 21:3
**o'clock (1)**
68:6
**oath (2)**
4:17 217:9
**obey (1)**
161:9
**object (15)**
20:24 22:10 26:6
28:14,24 31:1,4
62:11 92:6 93:8
117:19 120:1 139:7
182:6 215:21
**objecting (2)**
117:15 149:17
**objection (93)**
16:21,24 18:13 28:6
29:8 31:14,15,18
32:7 36:18 47:2,4
51:13 52:24 53:2,11
56:23 57:12,20 58:4
58:14 60:6 63:23
64:21 66:15,23
67:16 68:16 73:1,20
75:3,10 77:25 78:16
79:18,20 83:18 86:7
89:17 91:22 92:16
92:22 93:4,24 95:5
95:11,17 98:8
105:12 106:1
107:10 112:21
113:1,22 114:18
115:20 118:9,22
166:15 170:16
171:9 173:13
179:12,18 187:22
188:21,24 189:19
192:2 194:8,18,19
194:20 195:15
196:12,21 197:1,19
198:12,22 200:4,10
200:19 201:5,15
202:9,24 204:9,16
205:12 207:6 208:2
215:10
**objections (4)**
4:10,11,12 6:10

**obligated (1)**
199:6
**obligation (2)**
62:20 202:17
**observation (5)**
46:5,13 185:18,23
186:1
**observe (3)**
186:7 205:1,2
**observed (1)**
199:15
**obtain (1)**
131:12
**obtained (2)**
130:21 179:25
**obtaining (1)**
123:4
**obviously (10)**
27:15 30:9 49:2
56:12 81:6 125:13
150:9 158:13
171:17 202:6
**occasion (2)**
155:4 156:24
**occasions (9)**
65:13 74:3 89:7,25
90:6 96:4 113:19
155:8,10
**occlusion (2)**
194:4,7
**occur (2)**
80:20 90:4
**occurred (10)**
14:11 34:13 36:25
38:13 98:9 115:15
137:1 143:2 145:20
197:22
**occurs (1)**
152:5
**October (2)**
8:19 17:9
**odd (1)**
55:12
**oddly (1)**
76:8
**offensive (1)**
200:25
**offer (1)**
136:2

**offhand (1)**
183:17
**office (86)**
1:20 14:19 18:22
22:15 29:21,22 36:8
39:19 40:4,17,20
41:3,5,6,8,13,15,19
41:20 42:4,5,9,17
47:14,15 48:17,19
69:4,5,9 72:14,15
72:19 82:17 88:2
93:15,20 94:3,7,10
95:7,23 96:19 97:19
98:16,16 101:4
105:5,16,23 106:8
109:2 111:5,7,10,16
112:14,17,17,19
113:5,10,14,19,23
114:8,10 118:7
127:8 134:4,5 151:5
160:9 165:4 166:5
167:23,25 168:10
170:9 182:16,18,21
182:22 185:10,10
202:15
**officer (13)**
15:20 74:11 88:21
101:12 105:23
106:2 112:7 154:19
154:24 170:9,15
171:5 187:15
**officers (6)**
69:2,10 72:12,20
105:20,21
**offices (2)**
1:17 41:19
**official (5)**
21:6 33:18 34:8,12
38:3
**officially (3)**
8:13 73:24 209:25
**oftentimes (1)**
147:24
**oh (26)**
11:8 17:14 22:25
24:13,17 39:15 49:7
55:11 59:9 62:1
85:11 100:15
103:20 134:21

135:17 141:20
145:10 156:21
164:18 167:10
168:5,17,18,18
182:8 198:9
**okay (299)**
5:9 6:25 7:1,4,11,12
8:15,25 10:20 12:8
12:16 13:13 14:9,25
15:14,15 17:15
18:22 20:4,10,13
21:9,19 22:5,14,22
22:25 23:7,10,16,21
23:24 24:2,5,7,24
24:24,25 25:3 26:3
26:10,17 28:20
29:22 30:1 31:12
32:7,21 33:5,21
34:16 37:4 38:21
39:2,12,13,21,22
40:23 41:4,23 42:4
42:8,16,20 43:9
46:17,24 47:15 48:3
48:22,25 49:10,15
50:9,15,22 51:2,7
51:22 52:7 54:21
57:8 59:5 60:20
61:2 62:1,2,5 63:5
64:6,13 66:19 69:23
70:8 71:12,13,18,25
72:2,2 74:1,6,18
75:13,17,25 76:14
76:21 78:6 79:7
80:4 83:13 86:9,16
86:18,19 87:2,7,18
87:21 88:1,4,8,15
89:3,19,25 90:8,11
91:2 94:2,18 95:13
96:11 97:21,24
99:17,23 100:6,16
100:23 101:2
102:20 103:2,3
104:4 105:1,14
107:14,17,22 109:1
110:3 111:9 112:6
112:23 114:5,24
116:15 118:23
120:8 121:5,18,23
125:19 128:21

131:7,15,19 132:19
133:1 134:7 136:22
138:2 139:13 140:7
141:3,9 142:4 144:5
144:20,24 146:10
147:1,4,15 148:9,10
149:12 150:18
152:18 153:17
154:1,4,12,13 155:1
156:7,22,22,23,24
157:4 159:4,4,10,16
160:15 161:5,17
162:15,23 163:13
164:20,25 165:23
166:2,9 167:16
168:7 169:2,22
170:5,25 171:15,24
172:19 173:2
174:14,24 176:11
176:20 177:1,22
178:10,14,19 179:3
179:13 181:6,12
182:1,24 183:14
184:1,8,11,11,12,15
184:23 185:8,14
187:3,24 188:6
190:4,7,17 193:2,15
195:9,19 196:8
197:21 198:1,9,19
199:12 200:2,15
201:12 202:14,20
205:14,23 206:2,19
208:4,14 209:3,17
209:21 210:8,10,12
210:14 211:16
212:1,5 214:4,15,17
214:21 215:5,22,25
216:3
**old (1)**
103:24
**on-call (1)**
180:21
**once (6)**
50:10 89:2 109:1
136:17 194:13
216:5
**ongoing (1)**
94:5
**Oops (1)**

21:1
**open (6)**
60:13 71:25 110:21
168:16 169:2 170:5
**opened (1)**
110:23
**opening (1)**
168:24
**opens (1)**
60:4
**operator (1)**
204:14
**opine (1)**
191:20
**opined (1)**
195:9
**opinion (14)**
73:16 115:10,18
152:10 159:25
160:4 178:4 189:8,9
190:20 195:12,17
198:2 199:22
**opinions (2)**
54:10 185:16
**OPMC (1)**
111:8
**opportunity (6)**
53:23 54:1 83:14
84:10 177:11 216:7
**option (1)**
111:22
**orally (2)**
132:14,18
**order (23)**
67:7,8,23 120:13,16
120:20 121:2,7,10
121:12,14 123:8,12
123:20 125:11
126:14 128:9 129:2
129:8,11 151:18
161:9 197:16
**orders (6)**
61:11 67:20 180:10
180:13,19,21
**ordinary (2)**
46:14 154:18
**organs (1)**
186:21
**originally (1)**

42:2
**OSI (5)**
3:11,12 142:23 183:9
184:16
**OSI's (1)**
182:19
**outcome (4)**
53:9,14,17,21
**outlined (1)**
174:4
**outright (1)**
117:24
**outside (4)**
114:6 120:21,21
133:6
**overnight (3)**
46:18 76:1 77:3
**override (1)**
63:17
**ox (2)**
181:1 186:7
**oximeter (1)**
188:9
**oximetry (2)**
180:1,7
**oxygen (5)**
56:9 180:14 186:20
186:21 195:22

P

**P (1)**
4:4
**P-R-O-P-I-O-N-A-...**
60:15
**p.m (1)**
216:16
**paddle (1)**
143:19
**page (28)**
2:4 39:8,17 40:3
60:21 61:17,25 62:1
72:1,2,4 83:24
86:20 156:16,20
171:15 174:15,19
182:11,15,15,25
183:3,4,4 184:2
217:6 218:3
**pages (4)**
34:2,3 115:2 217:6

**paid (1)**
53:6
**pain (5)**
193:21,21 201:23,25
202:1
**pants (1)**
143:17
**paper (1)**
99:18
**par (1)**
180:8
**paragraph (37)**
39:19 40:3 61:14,14
61:24 62:3 72:4,25
73:8 83:24,25 122:7
123:7 130:12,20,20
130:25,25 131:4,5,9
172:20,20 174:20
174:21,21 182:12
182:16,16,17 183:4
183:5 190:5,6,13
207:18 208:22
**paramedic (2)**
63:18,25
**paramedics (1)**
63:21
**parcel (1)**
214:12
**parents (1)**
5:12
**parse (1)**
212:8
**part (23)**
14:22 29:24 51:3
57:18 73:7 85:15
96:2 107:6 141:19
143:23 151:21
158:3 160:9 163:11
164:22 178:8 181:3
182:25 185:5
188:19 199:5,6
214:12
**participated (1)**
29:9
**participating (1)**
5:16
**particular (10)**
34:9,14 36:21 116:14
131:10 134:15

137:25 158:10
160:13 204:14
**particularly (3)**
5:20 8:1 134:14
**particulars (1)**
31:16
**parties (1)**
4:7
**party (5)**
4:13,14 100:9 123:3
145:22
**pass (2)**
8:20,25
**passages (3)**
60:12,13 164:5
**passed (1)**
27:1
**pathologist (1)**
195:7
**pathology (2)**
213:10,16
**pathophysiology (1)**
163:25
**patience (1)**
177:22
**patient (29)**
6:23 28:4,10,11,22
46:4 51:20 53:10
63:15,18 64:2,25
81:12 85:2,6 110:20
111:14 179:25
180:1,5,10,13,19,22
181:2 197:4,11,18
213:10
**patients (5)**
45:23,25 53:5 79:25
160:8
**pawn (1)**
142:9
**pay (1)**
161:20
**peak (7)**
173:18 180:3,8
186:13 187:25
188:1,6
**Pedersen (3)**
126:2 140:4 144:2
**peer (5)**
29:5,5,10,12,14

**Penal (1)**
199:18
**penalty (4)**
156:18 157:1 199:16
199:17
**pending (9)**
6:18 30:17 70:9,16
98:7,12,18 210:13
210:19
**people (16)**
6:4 8:5 18:4 19:25
43:6 45:5 55:18,22
64:19 89:8 155:3
162:16 171:24
191:20 195:19
200:16
**people's (1)**
107:8
**percent (3)**
43:22 110:19,20
**perception (1)**
200:25
**percolate (1)**
32:24
**perfection (1)**
82:1
**perfectly (4)**
129:13 136:9 137:25
141:7
**perform (1)**
56:10
**performed (2)**
54:8 215:1
**period (10)**
8:10,17 9:13,15 13:5
31:19 50:7 73:9
152:7 175:1
**perjury (1)**
199:16
**permanent (2)**
11:10,10
**permission (1)**
68:11
**person (27)**
12:16 28:21 42:10
46:3 49:24 56:13
60:8 64:4,20 75:19
80:17 81:2 89:20
95:7 97:21 109:5

114:23 137:25
155:1 187:1 205:11
205:16,21 208:7,12
208:13 212:9
**person's (2)**
56:8 182:21
**personal (3)**
113:23 151:2 166:22
**personally (5)**
25:19 29:24 133:25
151:2 163:1
**personnel (14)**
108:10 109:9 115:1
119:16 120:15
122:24 124:5
131:25 132:14
134:16 135:20
150:2 155:3 161:19
**persons (1)**
123:5
**perspective (6)**
114:7 178:3,3 200:2
200:6 202:7
**pertaining (2)**
132:24 159:5
**pertains (1)**
173:16
**pertinent (1)**
205:22
**petition (1)**
153:22
**pharmacist (2)**
44:11,20
**pharmacy (3)**
44:12,22,23
**phase (1)**
16:1
**phone (9)**
16:19 17:2 49:24,25
50:2,10 67:25 68:6
71:12
**phrase (6)**
78:3 93:12 161:23
200:20,20 204:6
**phrased (2)**
76:9 173:15
**physical (1)**
54:12
**physically (1)**

**physician (21)**
9:25 27:13,21 28:5
28:13,16,23 29:10
29:18 56:6 61:10
63:11 64:2,3 68:15
162:17 175:19
178:9 180:20
197:16,17
**physicians (3)**
29:13 175:19,19
**physiologic (1)**
201:23
**pick (2)**
5:23 68:6
**picking (1)**
169:18
**picks (1)**
67:24
**picture (2)**
109:20 190:24
**piece (1)**
167:4
**Pine (1)**
1:18
**place (7)**
19:7 21:18 51:3
120:14 126:10
181:24 217:9
**placed (10)**
16:24 40:8 43:14
79:10 108:17 114:7
122:22 170:13
171:7 202:23
**places (2)**
41:18 122:10
**Plaintiff (2)**
1:4 3:4
**Plaintiffs (1)**
1:17
**plan (5)**
37:23 71:10 85:16
180:12,18
**planning (1)**
131:2
**plans (1)**
173:18
**Plaza (1)**
1:18

**please (11)**
31:21 35:5,8 39:10
78:8 98:20 103:5
114:24 121:19
151:11 218:2
**plenty (1)**
107:1
**plus (2)**
186:1 198:5
**pocket (2)**
134:2 148:24
**point (45)**
6:14 7:5,22 10:11
12:19 15:2,21,25
16:7 32:11 34:22
50:16 61:5 96:22
98:12,12,17 115:3
117:4 119:6 120:7
128:1 132:20,21
140:22,23 149:3
150:3 151:25 152:1
153:23 160:14
171:17 173:4,16,22
180:4,9 181:5 187:5
196:5 206:9 207:3
208:1,25
**points (1)**
37:21
**police (6)**
14:15 56:15 69:13
70:3 71:8 187:15
**policies (12)**
51:7,11,18 52:3,14
52:15 84:4 161:19
161:22 174:5 175:2
175:22
**policy (15)**
51:16 52:1,4,5,6,7
73:24 161:6 175:5,8
175:14,23 176:1,5
176:13
**poorly (1)**
134:20
**population (3)**
46:4 78:24 79:6
**portion (1)**
139:3
**portions (2)**
122:11 139:4

**pose (1)**
6:10
**position (11)**
8:13,18 9:1 129:20
129:25 140:25
144:6,8,14,23
163:12
**positions (1)**
150:25
**possession (1)**
93:22
**possibility (2)**
76:23 85:19
**possible (14)**
12:20 55:7 65:24
77:11 78:12 85:9
90:15 108:8 163:19
198:15 200:11,12
200:14 207:7
**possibly (1)**
12:14
**post (5)**
134:2,6 136:6 141:20
142:8
**potentially (4)**
18:6 35:15 62:8
209:19
**practice (9)**
10:11,13,16,18,20,21
74:8 110:22 111:3
**practices (1)**
13:3
**practitioners (1)**
175:20
**preceding (1)**
61:6
**precipitate (1)**
65:22
**precipitated (1)**
76:11
**precise (1)**
97:13
**preclude (2)**
120:16 142:15
**precludes (1)**
122:1
**predominantly (1)**
100:19
**preface (1)**

**161:21**
**prefaced (1)**
159:7
**preliminary (10)**
3:8 19:22 86:17 87:8
97:25 108:21
168:11,12,14 173:5
**prepare (6)**
38:21 47:11 107:22
108:1 167:2,6
**prepared (11)**
42:21 47:18 54:2
84:16 90:23 104:5
104:15 140:14
157:6 190:19 193:2
**prepares (1)**
54:13
**preparing (1)**
81:25
**prescribed (4)**
58:17 63:15,18 67:18
**prescribing (1)**
176:17
**prescription (2)**
61:4 67:10
**presence (1)**
133:7
**present (5)**
26:25 27:7 50:1
72:23 162:11
**presented (1)**
179:21
**presents (1)**
204:12
**preserve (2)**
98:20 99:4
**preserved (4)**
99:19 100:2,13 107:3
**preserving (1)**
98:22
**pressed (2)**
154:22 179:4
**pressure (4)**
186:14,16,24 188:11
**presumably (1)**
158:15
**pretend (1)**
55:16
**pretty (6)**

**41:16**

**physiologic** — *(column 1 start)*

30:7 47:22 57:8,8
87:25 102:23
**prevent (1)**
54:23
**prevented (1)**
84:9
**previous (1)**
139:4
**previously (1)**
54:9
**primary (2)**
10:5,21
**print (3)**
100:1,3,12
**printed (1)**
100:5
**prior (15)**
9:6 15:3 16:8,17
26:14 85:25 96:7
98:13,17 117:4
123:4 130:21
131:12 166:25
172:20
**prison (2)**
46:14 201:8
**private (5)**
10:11,13,16,18
110:21
**privilege (2)**
18:9 31:5
**privileged (1)**
31:10
**privy (1)**
20:18
**pro (2)**
130:12,17
**proactive (1)**
90:15
**probably (8)**
14:5 22:3 37:23
69:16 71:6 88:13
101:4 109:18
**problem (28)**
13:7 31:12 65:20
69:18 71:11 77:3,13
77:24 103:25 119:9
119:11 121:15
124:13 138:19,19
147:14 163:15,18

172:15,15 186:5
187:19 192:12
193:17 195:23
197:3 204:14 205:6
**problematic (2)**
114:20,23
**problems (11)**
62:9 66:3 67:23
76:10 77:17 79:15
80:21 81:20 82:6
133:25 148:18
**procedure (4)**
145:4 148:12 161:6
199:17
**procedures (7)**
51:7,12 146:22
160:18,19,20,22
**proceed (4)**
24:1 150:10 152:12
165:25
**proceeding (2)**
150:9 158:4
**proceedings (2)**
98:12 133:23
**process (4)**
57:19 88:11 96:1
202:20
**produce (2)**
82:17 133:18
**produced (8)**
18:7 33:24 35:18,21
35:24 36:17 99:21
136:7
**producing (1)**
32:15
**product (1)**
59:25
**production (7)**
24:8,11,13,14 36:2
36:11 146:25
**professional (4)**
111:6,6,7 185:23
**Professions (9)**
111:10,16 112:18,19
113:5,10 114:9
118:7 166:5
**program (1)**
110:12
**progress (2)**

38:8,10
**promoted (2)**
109:13,19
**proof (1)**
136:2
**proper (4)**
36:24 84:5,7 86:5
**properly (4)**
63:12 84:4 187:20
196:5
**Propionate (2)**
60:14,22
**prosecuted (2)**
199:19 200:8
**prosecuting (1)**
122:9
**prosecution (1)**
199:24
**protected (2)**
120:19 121:2
**Protective (14)**
120:13,15,20 121:2,7
121:11,14 123:20
125:11 126:14
129:1,8,11 151:18
**protests (1)**
70:2
**protocol (4)**
85:13 96:2 155:7
181:9
**protocols (1)**
63:16
**provide (20)**
43:21 46:10 56:11
58:2 61:10,11 67:20
79:3 81:18 83:10
84:5 86:4 87:24
93:20 104:10 160:7
176:24 177:6 189:7
189:9
**provided (26)**
12:4 30:3,11 35:11
44:25 54:9,11,15
83:17 84:1 91:3,21
92:2 93:13 97:15
98:3 127:14 129:3
148:20 173:11
176:23 179:3
180:25 181:11

214:22 215:13
**provider (7)**
10:5 174:4 176:17,17
180:20,21 185:19
**providers (2)**
117:25 176:3
**provides (6)**
43:20 44:23 46:13
92:13,17,19
**providing (5)**
53:20 84:5 92:14
117:21 172:20
**public (7)**
1:13 4:17 124:1,6,9
217:21 219:6
**pull (3)**
23:5,6,22
**pulled (1)**
60:20
**pulmonary (5)**
213:21,23 214:7,10
214:12
**pulmonologist (1)**
194:23
**pulmonologists (1)**
195:1
**pulse (13)**
180:1,7 181:1 186:7
186:14,16,19 188:9
188:12 204:21,22
204:24 205:18
**pump (1)**
188:3
**punished (2)**
198:16,18
**purged (3)**
17:24,24 18:1
**purging (1)**
17:23
**purist (1)**
164:10
**purpose (2)**
43:19 153:20
**purposes (5)**
59:17 122:8 145:2
147:10 153:6
**pursuant (3)**
1:11 121:4 123:7
**pursued (1)**

111:22
**pushed (2)**
181:18 182:3
**put (19)**
34:24 46:4 88:14
114:15 128:10
130:1 134:6 156:9
166:24 180:14
189:17 190:18
191:4 199:15,23
204:10 213:18
215:7,16
**putting (1)**
172:17

---
**Q**

**QI (7)**
3:10 30:6 33:15,20
33:21 34:12 38:7
**Quackenbush (6)**
94:12,14 95:3,7,14
95:15
**qualified (2)**
189:9 203:21
**qualify (1)**
33:23
**quality (19)**
25:6,25 26:3,24 27:5
27:6,12 28:2,12,22
29:16,19 32:13,14
34:4,4 164:23
171:19 172:10
**quarter (1)**
177:23
**question (78)**
6:2,13,18 7:17,19 8:6
11:20 23:6 27:2,3
30:16,22,22 31:8,9
31:11,13,21,24,25
32:2,4,5 37:17 39:9
55:12 57:1 63:2,5
70:9,16 76:22 78:18
91:23 92:7 93:5
132:22 143:4,5,6,7
151:19 153:18
154:9 156:5,8,8,11
156:12 157:16
158:9 159:6,17
161:24 162:14

170:20 171:1 174:7
174:12 178:17
183:2,13 185:4
195:10 200:17
201:6,8,9 204:9
206:12,16,17,21,21
208:19 213:1,18
214:1
**questioned (2)**
115:14 135:25
**questioning (4)**
136:10 153:15
157:24 209:22
**questions (26)**
5:18 6:7,10 7:22
35:25 37:12 54:14
120:25 126:17
137:8 144:16 145:6
145:12 150:20
157:19 158:14,19
166:2 169:23
177:17,25 178:2
185:15 189:17
191:21 205:22
**quickly (2)**
60:4 87:20
**quite (3)**
139:2 177:25 206:21
**quote (4)**
93:13 115:5,19
143:10

---
**R**

**R (3)**
5:5,5 219:3
**rabbit (1)**
134:6
**raise (3)**
135:1 173:23 209:15
**raised (5)**
86:11 95:15 134:25
136:3,4
**ran (1)**
111:2
**rang (2)**
66:18 179:22
**range (3)**
22:19 86:5 162:1
**ranks (7)**

113:12 114:13
115:19 116:2,3,19
116:21
**rate (2)**
186:14,17
**re-reviewed (1)**
37:16
**reach (4)**
53:19 105:19 131:3
196:5
**reached (1)**
180:24
**reaction (1)**
209:4
**reactiveness (1)**
164:11
**read (41)**
7:22 24:9,10,15,18
24:18,19,24,24 32:3
32:5,23 39:12,22
58:20 62:3 72:3
78:7,9 83:23 86:21
121:25 126:4
129:21 154:13
161:13 170:21
173:24 174:10,11
178:20 184:11
189:20 192:17
194:11 206:13,14
208:3 214:5 216:1
217:5
**reading (9)**
4:9 69:11 73:4 184:6
189:25 190:5
193:23 213:2,6
**ready (4)**
24:1 33:5 48:15
165:25
**really (15)**
17:22,22 43:21 50:14
63:3 88:12 115:2
134:16 141:23
143:8 158:18 208:8
208:8,11 212:12
**reason (11)**
93:7 127:13,15 142:2
142:2 169:21 181:8
182:2 184:21 201:8
202:12

**reasonable (4)**
35:24 129:13 207:24
214:4
**reasons (2)**
46:18 65:11
**recall (33)**
16:5,12 22:21 25:18
37:15 50:11,19,20
50:25 51:12,15 91:7
94:11 96:14,21,22
97:5 104:6 106:6
108:5 114:21
147:25 157:8
160:25 161:12
162:14 163:9
172:25 178:20
181:19 183:13,17
192:4
**receipt (1)**
18:16
**receive (7)**
17:10,12 25:16 88:4
97:3 102:10 119:21
**received (7)**
14:3 18:7,9 25:19
42:24 84:7 87:7
**receiving (8)**
16:17 37:8,19 61:4
79:16 88:16 96:12
96:23
**receptors (1)**
60:11
**recertification (1)**
11:7
**recess (4)**
48:10 71:19 119:13
165:24
**recitation (1)**
193:5
**recite (1)**
138:8
**reckless (2)**
74:16 178:1
**recklessly (1)**
75:9
**recognizing (1)**
43:25
**recollection (26)**
14:9 96:11 116:24

137:23 138:5,15
139:1,10,14 141:4
144:10,15 145:3,11
147:21,22 153:7,14
153:19 156:25
178:22,23,23 179:1
179:5,10
**recommendation (7)**
9:3 39:7,15 170:7
172:21 173:17
174:17
**recommendations ...**
90:4
**recommended (1)**
202:22
**reconvene (2)**
70:23 71:16
**reconvening (1)**
71:10
**record (42)**
4:13 24:10 32:22
35:5,8,8,10 36:22
37:2,12 39:22,24
51:16 102:2,5
107:15 110:3
119:15 120:1
121:19 122:14,23
128:20 130:2,4
133:11 139:20,22
140:18 150:2
151:14 156:6,10
157:15 165:18
170:19,22,24
171:20 204:10
210:25 216:10
**recorded (1)**
25:5
**recorder (1)**
107:3
**records (16)**
25:5 99:19 100:11
119:16 120:15
124:5 127:10
128:13 136:16,18
172:3,22 187:4
189:15 191:11
194:14
**recounted (1)**
68:20

**Recounting (1)**
72:6
**recourse (1)**
79:25
**reduce (1)**
59:21
**refer (7)**
79:25 112:7,8 116:1
116:8 178:11
213:12
**reference (4)**
58:23 61:3 106:5
124:18
**references (4)**
58:15,18 177:6,7
**referencing (1)**
211:13
**referral (1)**
108:23
**referrals (1)**
90:22
**referred (9)**
85:8 107:24 113:9
114:12 118:7,12
160:1 166:4,6
**referring (4)**
11:24 183:1 211:23
212:17
**reflect (8)**
35:9 107:8,23 175:5
175:8 177:2 187:4
194:6
**reflected (4)**
131:4 166:20 189:15
189:16
**reflecting (3)**
49:19 129:10 171:8
**reflects (3)**
24:25 134:20 155:13
**refresh (9)**
137:23 138:5,25
139:10,14 141:4
144:15 145:11
153:19
**refreshes (4)**
138:14 144:10
147:20 153:13
**refreshing (3)**
145:2 147:22 153:6

**refusal (2)**
117:24 133:18
**refused (3)**
75:14 76:19 160:7
**refusing (1)**
148:19
**regard (7)**
15:14 36:14,19 160:5
185:16 190:20
209:3
**regarding (6)**
38:8 54:10 116:9
122:24 174:5,5
**regardless (1)**
76:11
**region (1)**
9:8
**regional (26)**
9:5,7,9,13,17,19,21
10:1 11:12 12:6,9
12:22 13:4,8 26:16
37:24 43:5,12,19,20
45:5,11 46:6 172:2
172:6 176:22
**regions (1)**
9:10
**regular (2)**
63:19 119:22
**regulates (1)**
111:11
**regulatory (1)**
160:1
**reiterate (1)**
214:22
**reiterated (1)**
7:14
**reiterating (1)**
57:7
**relate (1)**
149:16
**related (4)**
18:20 36:4 74:9
96:12
**relates (4)**
29:6 84:12 89:14
95:9
**relating (1)**
25:7
**relations (20)**

40:9 57:19 79:11
80:1 85:8,18 90:22
107:24 108:2,7,15
108:20 109:1,6,7
112:8 135:22 155:3
160:21 202:21
**relative (17)**
13:10 15:2 17:4,13
19:8 33:21 36:11
44:7 74:7 91:13
98:6 112:4 118:8
155:12 185:3
191:15 196:9
**relatively (1)**
25:13
**relax (1)**
60:12
**release (1)**
55:3
**relegated (1)**
29:17
**Relevance (1)**
143:6
**relevant (5)**
18:5,6 143:4 145:17
149:18
**relied (2)**
41:10 51:3
**relief (1)**
131:1
**relieve (1)**
67:2
**rely (2)**
92:25 132:9
**relying (3)**
116:11 187:10,13
**remain (2)**
151:20,23
**remember (14)**
13:18 15:24 34:13,23
50:12 51:25 84:21
85:17 88:14 95:25
109:21 157:10
166:12 210:4
**remind (1)**
177:11
**reminding (1)**
177:4
**remotely (2)**

6:6 31:10
**removed (1)**
124:15
**rendered (1)**
85:2
**Renee (2)**
82:25 93:16
**repealed (1)**
124:4
**repeat (5)**
31:13,21 77:9 170:20
206:11
**repeatedly (3)**
119:23 135:1 146:14
**repeating (1)**
129:19
**rephrase (7)**
7:18,21 171:1 188:25
206:17,23 213:18
**report (124)**
3:6,8,10,12,13,14,15
3:17 13:22 14:4
15:4 16:9,14,18
18:11,17,17 19:23
26:9,18 30:6 32:14
32:16,17 33:15,16
33:17,20,21 34:5,17
34:21,25 37:15 38:7
39:6 41:2,4 42:21
42:25 47:12,17
48:18,20 56:14 57:7
58:25 59:1,4 61:3,9
61:21 64:1 67:17
69:14 79:13 83:15
83:23 84:18 86:17
86:22 87:5,8,24
89:14 90:2,11 91:18
92:13 93:1,13,17,21
97:6,7,9,10,11,14
97:15,18,25 98:2
99:13 108:8,21
137:3 142:23 165:7
165:9 166:21
167:24,25 168:6,9
168:10,12,12,14,25
169:14 173:5
174:25 183:10,10
183:11,11 184:2,8
184:16 194:15

197:15 199:7,9
210:3,4 211:3,14,22
212:19,21,21 213:7
214:5
**reported (5)**
22:18 111:15 113:16
160:9 165:2
**Reporter (13)**
1:13 4:16 5:19,23
32:3,6 54:13 78:10
121:8 165:15 216:6
216:11 219:6
**reporting (2)**
166:7,8
**reports (12)**
13:24 14:7 25:5
32:13 34:12 47:15
58:20 84:23 88:20
91:11 172:13 177:7
**represent (2)**
49:20 126:24
**representation (3)**
49:21 138:21 146:19
**representations (5)**
128:25 159:1,22
191:19 192:1
**represented (6)**
25:12,14 93:16 191:1
191:2,17
**representing (2)**
138:3,13
**represents (1)**
48:6
**reproduce (1)**
36:16
**reproduced (1)**
35:22
**request (7)**
6:16 7:7 24:25 25:16
120:3 157:15
160:22
**requested (1)**
82:19
**requesting (3)**
22:15,19 83:1
**require (3)**
31:2 32:11 176:7
**required (10)**
4:10 32:13 43:15

51:19,22,23 131:9
175:2 181:3 197:14
**requirement (2)**
11:9 51:25
**requires (1)**
78:14
**rescue (8)**
61:11 67:14,20
173:18 180:12,17
190:23 192:10
**research (1)**
10:9
**resembling (1)**
34:3
**reserve (2)**
153:14 157:18
**reserved (1)**
4:11
**reserving (2)**
153:21 158:5
**residency (2)**
110:12,13
**Resident (1)**
110:15
**resignation (1)**
157:5
**resigned (1)**
40:10
**resigning (1)**
86:1
**resolved (3)**
62:8 152:6 181:2
**resort (1)**
180:11
**resources (3)**
109:10,22,24
**respective (2)**
4:7 123:3
**respiration (3)**
205:2,4,19
**respond (20)**
5:18,18 6:2 13:24
20:17 66:6,18,21
90:14,14,23 130:2
135:18 140:6
144:12 165:7
181:17 182:3,4
191:21
**responded (6)**

19:22 107:20 137:7
165:8 179:22,24
**responding (1)**
173:5
**response (64)**
3:7 5:19 13:25 14:23
19:24 20:19 25:16
26:1 36:13 37:18
39:1,7,16 47:13
51:4 84:17 85:5,14
90:12 91:10,15
99:13 101:15,17,23
101:25 103:7,18
104:11,25 128:15
133:15 134:8,11
137:5 139:22
142:20 153:18
154:10 159:13
168:13,20,21
169:19,24 170:7
171:11,15,16
172:18,21 173:15
173:23 174:15,20
174:25 182:13
184:21,24 185:3,13
195:10 213:20,22
**responses (1)**
90:24
**responsibilities (1)**
6:23
**responsibility (5)**
52:2,8 115:8 197:9
197:10
**responsible (8)**
9:8 32:15 53:4 123:3
155:2 170:10 171:5
172:16
**restate (1)**
7:19
**result (5)**
53:9 55:8 112:3
199:24 207:4
**resulted (1)**
118:14
**results (1)**
197:15
**retainer (2)**
49:15,18
**retire (1)**

161:14
**retired (2)**
6:23,24
**retraining (3)**
85:12,13 90:22
**return (3)**
6:17 161:14 216:8
**returned (3)**
40:10 79:11 108:18
**review (68)**
13:21 19:25 25:25
26:4,8,11,24 27:6
27:12 28:2,13,22
29:5,5,10,17,19,25
30:2 32:12,18 34:4
37:21 39:9 47:11
52:5 53:24 54:1
56:14 61:9 73:12,13
80:10 83:14,25 84:6
84:10 91:5 111:6
116:4 119:25
127:19 129:17
130:7,8 154:18
162:13,19 163:3,7
163:10 164:23
167:9 169:8 171:19
171:21,25 172:10
172:18,20 173:10
174:2 175:22 176:5
183:9 184:3,5 216:7
**reviewed (19)**
13:22 20:11,15,21
26:2,16 47:20 61:2
89:1 95:22,24 96:1
96:2,6 171:20,24
172:3,22 189:16
**reviewing (4)**
16:8 37:14 104:23
184:18
**reviews (3)**
25:7 29:12 172:23
**revived (1)**
55:9
**rhythm (1)**
56:11
**rhythms (1)**
204:4
**right (159)**
8:9 9:4,7 10:8,11

11:21 12:21,23
15:10 16:7 17:6
22:1 24:14 29:4,9
29:15 33:6 35:4,7
37:4,14,14 38:6
40:20 43:25 44:17
45:1,14 47:10,23
48:11 50:22 52:17
53:23 54:6,17 55:4
55:5 56:4,17,22
57:11 59:1 61:22
63:8,11,20 65:5
67:3,19,21,22 68:3
74:22 76:25 77:4,6
77:19 80:14,24
85:25 89:7 91:17
92:11,18 94:2 95:19
97:10 98:10,15,25
99:8,10 104:1,2,14
104:19 108:16
114:24 116:23
117:7 122:20,22
124:24 125:17
126:4,21 128:17
129:15 130:19,23
130:24 131:11,13
131:16 132:13,23
132:24,25 136:14
137:17,21,22
141:13 144:18
147:6 148:14
150:22 152:1,15,18
152:20 153:15,21
153:25 154:12
155:15 156:1,15
157:14,19 158:5
161:2 162:3 163:2
165:10,19 167:1
169:1,22 170:6
171:3,23 172:7
173:22 174:19,24
185:8 186:3,10,12
186:19 187:8 188:4
188:17 193:25
194:21 196:23
200:23 201:14
204:5,11,14 206:23
206:25 210:10
212:16,20 214:25

**rights (4)**
5:10,12 145:23
165:11
**ring (2)**
96:17 114:20
**rise (1)**
116:18
**risen (1)**
114:22
**RMUs (1)**
46:6
**RN (10)**
40:5,6,8,10,13,19
79:9 115:5,9 183:8
**ROBERT (2)**
1:17,19
**Rochester (2)**
1:22 96:19
**role (5)**
12:21,25 74:7,10
141:23
**room (6)**
5:22 64:1 69:2 72:12
72:24 191:14
**rooms (2)**
106:23,25
**rose (2)**
116:3,21
**roughly (2)**
82:20 93:17
**rounds (13)**
40:6,14,24 51:9 52:8
105:25 170:12,13
171:7 183:9,12
184:13,17
**routinely (1)**
89:7
**Rule (1)**
146:22
**rules (7)**
31:2,17 146:3 147:8
147:9 158:6 199:6
**ruling (1)**
128:24
**run (3)**
146:14 147:3 188:25
**rung (2)**
66:19,24
**running (2)**

177:7 201:1
**runs (1)**
115:1
**rupture (1)**
95:1
**ruptured (2)**
12:1 94:23
**Russell (7)**
68:25 72:10,23
189:22 198:25
202:4 208:23
**rusty (1)**
7:16

─────────

**S**

**S (3)**
4:4,4 5:5
**S-A-L-M-E-T-E-R...**
59:14
**S-A-N-D-E-R-S (1)**
26:21
**safety (1)**
122:5
**Salmeterol (3)**
59:13 60:17,22
**salt (1)**
202:12
**Salvadore (43)**
1:5 5:13 16:10 18:24
19:3,7,14 25:11
42:11 56:19 58:7
66:1,4 77:23 79:14
80:12 81:16 82:5,12
85:19 86:1 105:3,5
105:7,10 107:23
108:4,17 111:14,25
112:3 115:6,19
116:16 117:3,9
134:12 160:2
166:11 178:17
197:23 198:3
202:22
**Salvadore's (3)**
73:16 85:22 114:17
**Salvatore's (7)**
115:1,14 116:25
120:15 121:1 157:5
159:23
**sanction (2)**

**120**:10 **149**:1
**sanctions (2)**
**134**:1 **140**:6
**sandbag (1)**
**131**:22
**Sanders (3)**
**26**:20,21 **30**:8
**Saturday (1)**
**176**:16
**save (8)**
**56**:8 **81**:2,2 **99**:24
**100**:5,17,22 **167**:12
**saved (7)**
**55**:19,23,25 **56**:3
**82**:7,14 **167**:11
**saving (1)**
**100**:4
**saw (15)**
**47**:13 **49**:8 **54**:5
**58**:24 **66**:4 **101**:18
**101**:22 **105**:20,21
**105**:22 **106**:4,5
**108**:8 **209**:23,23
**saying (33)**
**31**:20 **76**:17 **105**:9
**106**:7 **108**:3 **113**:15
**118**:15 **131**:7,20,24
**132**:2 **136**:23
**138**:25 **139**:4
**141**:14,20 **142**:18
**145**:15 **148**:3,10
**150**:10,14,16 **178**:4
**178**:24 **184**:16
**187**:14 **195**:16
**198**:8 **200**:11
**201**:22,25 **204**:7
**says (51)**
**25**:4,4 **30**:5 **33**:11,12
**38**:7 **39**:23 **40**:17
**41**:5 **56**:17,21 **61**:7
**67**:14 **79**:9,13 **89**:20
**93**:13 **105**:16
**121**:13,15 **123**:2
**125**:4 **130**:15,20,20
**131**:9,13 **139**:14
**141**:5 **144**:14
**145**:10 **171**:19,23
**174**:20 **175**:3,5,6,7
**182**:12,16 **183**:7,8

**184**:1 **188**:3 **189**:20
**202**:8,11 **207**:20,25
**209**:2 **212**:12
**scenario (1)**
**181**:10
**school (4)**
**110**:8,9 **146**:22
**150**:23
**SCOC (18)**
**84**:24 **87**:9,25 **88**:11
**88**:11 **90**:19,24,24
**101**:15,17 **108**:8
**116**:5 **168**:11,12,25
**172**:4,13 **177**:4
**scores (1)**
**115**:13
**screen (1)**
**25**:1
**search (2)**
**17**:3 **22**:2
**second (29)**
**21**:18 **39**:14 **40**:24
**69**:25 **73**:11 **83**:23
**101**:15,16 **102**:2
**121**:23 **124**:7
**140**:23 **148**:5,15
**149**:5 **152**:25
**158**:24 **167**:21
**170**:17,18,23 **183**:7
**183**:15 **190**:3,4
**192**:6,18 **210**:11,22
**second-by-second (...**
**38**:14
**secondary (3)**
**194**:16 **215**:7,16
**secretary (5)**
**97**:23 **99**:22 **100**:17
**101**:5,7
**section (4)**
**24**:8 **124**:4,20 **161**:25
**sector (1)**
**116**:12
**secure (1)**
**189**:13
**security (11)**
**18**:19,19 **21**:6,8
**106**:3 **122**:5 **160**:19
**170**:12,12 **171**:7
**172**:15

**see (67)**
**12**:17 **14**:22 **21**:25
**23**:7,10 **24**:12 **28**:19
**30**:9,11 **33**:4 **37**:13
**49**:8 **52**:5 **58**:15,22
**61**:5 **62**:1 **69**:1,3,9
**71**:23 **72**:4,11,13,19
**73**:14 **81**:18 **86**:19
**89**:14 **90**:1,9 **100**:10
**126**:1 **127**:22
**134**:24 **135**:17
**137**:24 **140**:8,9
**141**:21 **150**:10
**151**:13 **153**:13
**155**:16 **156**:16
**157**:18 **162**:6 **164**:6
**167**:8,10,22 **168**:11
**168**:23 **174**:22
**175**:10 **176**:5 **182**:7
**186**:7 **204**:18
**205**:17 **208**:9,12,14
**210**:3,10,17 **215**:3
**seeing (7)**
**25**:18 **37**:15 **123**:24
**157**:17 **169**:4,12
**197**:8
**seek (8)**
**77**:13 **131**:1 **140**:6
**155**:9,14,17 **158**:9
**197**:4
**seeking (3)**
**26**:14 **134**:1 **156**:17
**seen (37)**
**17**:15,18,18 **25**:17
**34**:1,16 **47**:9 **49**:3
**49**:11 **50**:23,24
**54**:15 **58**:17 **68**:4
**82**:1 **88**:19 **89**:19
**101**:16,25 **107**:1
**114**:3 **119**:24
**139**:24 **154**:14,16
**157**:2 **159**:11,18,19
**160**:19 **168**:5
**175**:15 **176**:1,4,7,15
**176**:16
**self- (1)**
**173**:19
**send (19)**
**33**:18 **45**:24 **71**:11

**87**:19 **88**:6,8 **97**:16
**102**:21,22 **120**:18
**121**:21 **123**:17,19
**129**:9 **138**:4,22
**165**:9 **168**:24
**172**:15
**sending (2)**
**96**:7 **103**:10
**sends (2)**
**87**:17 **97**:17
**sense (5)**
**52**:17 **132**:4,7 **138**:9
**201**:20
**sent (40)**
**14**:8 **18**:9,10,17
**19**:20 **20**:1 **22**:14
**25**:19,22 **26**:9 **29**:20
**29**:22 **32**:21 **33**:8,12
**37**:24 **48**:1,3 **59**:2
**82**:21 **83**:4,7 **95**:21
**99**:12 **101**:22
**102**:16 **103**:4
**129**:18 **149**:20
**164**:18 **165**:4
**167**:20 **168**:8
**172**:11 **210**:7,8,13
**211**:16 **212**:1,18
**sentence (5)**
**40**:24 **175**:4,6,7
**183**:7
**separate (1)**
**44**:24
**September (5)**
**1**:12 **8**:19 **47**:17
**48**:21 **219**:13
**sequence (1)**
**179**:13
**sergeant (1)**
**106**:4
**serious (3)**
**57**:9 **81**:12 **135**:11
**served (10)**
**8**:10 **11**:12 **22**:18,19
**24**:21,22,23 **25**:14
**25**:15 **146**:23
**server (2)**
**99**:10,14
**service (6)**
**156**:18 **157**:9,10

161:25 174:5 175:5
**services (31)**
8:22,24 10:6 12:25
  18:19 21:6,8,12
  22:7 26:9 27:9,17
  27:18,20 44:12,23
  45:13 46:11 52:4
  53:1 62:19 76:2
  84:17 94:25 101:5
  110:5 161:25 175:2
  175:7 200:17
  202:17
**set (5)**
29:2 79:2,2 127:10
  150:16
**setting (12)**
27:24 28:2 51:8
  52:12,25 53:19 64:7
  76:23 78:23 175:24
  175:25 176:24
**seven (1)**
86:10
**seventeen (2)**
131:1,5
**severe (20)**
38:16,19,19 65:14
  179:16,17,19
  180:25 185:17
  186:6,16 189:13
  191:22,25 193:3,12
  195:13 203:2 208:5
  208:7
**severity (4)**
185:15,22 189:8,9
**shake (1)**
5:20
**share (1)**
114:7
**shared (3)**
49:9 51:1,1
**she'd (3)**
99:23 188:11,14
**sheet (8)**
38:2,4,9,11,12,22
  88:18 218:1
**shift (11)**
51:9,21,24 52:9 76:5
  76:8 77:7,11,24
  78:12,22

**shocks (2)**
117:12,13
**short (9)**
48:7,16 89:19 163:16
  193:12 206:5,6,25
  208:10
**shorthand (3)**
4:16 219:5,9
**shortly (1)**
108:18
**shortness (15)**
80:17,25 163:17
  178:25 179:14,21
  180:2 193:16,18
  203:3,24 205:10
  209:5,6,8
**shot (1)**
140:5
**shots (1)**
148:16
**show (14)**
6:3 31:17 126:11,16
  140:25 144:8 145:1
  145:24 147:18
  152:20 153:5,12
  164:14 199:12
**showed (1)**
159:19
**showing (6)**
122:2 123:16 137:22
  138:19 141:9
  147:23
**shown (2)**
119:20 120:7
**shows (1)**
54:13
**sign (12)**
49:19 119:2,4 121:10
  121:12 123:14
  126:14 129:7,10
  130:18 138:23
  216:1
**signed (3)**
13:25 127:15 199:14
**significance (2)**
44:1 45:19
**significant (2)**
57:5 119:16
**significantly (2)**

137:1 145:20
**signing (2)**
4:10 121:15
**signs (3)**
173:18 179:25
  186:13
**similar (4)**
13:3 72:22 87:3
  163:24
**single (1)**
13:6
**sir (38)**
5:16 6:17 8:6 11:25
  15:6 18:1 22:6
  24:20 32:21 33:8
  37:8 54:21 61:17
  62:5,23 63:6 65:19
  65:25 66:12 71:15
  79:13,23 81:24
  84:11 87:8 93:7
  96:22 98:25 111:13
  113:19 117:9
  120:24 165:22
  189:16 190:16
  191:23 198:19
  203:1
**sit (6)**
31:15 114:14 117:7
  136:17 142:7
  148:21
**sits (1)**
163:3
**situation (23)**
17:4 18:10 22:9 43:6
  43:18 53:9 58:5
  64:4 66:14 67:9
  71:7 94:9 95:2
  96:20 97:4 113:13
  127:9 142:21
  170:18 176:12,21
  205:15 206:24
**situations (2)**
94:16 163:8
**six (7)**
61:17,25 62:1 69:10
  72:20 177:23
  207:19
**six-page (1)**
211:2

**sixteen (8)**
72:4,5 130:25 131:4
  190:5,13 207:18
  208:22
**skills (1)**
114:3
**skin (1)**
186:9
**sleep (21)**
52:11 53:6 66:8 69:6
  72:16 73:25 147:5,7
  161:11 179:9
  181:19 190:11
  193:14 194:4
  196:19,20 207:20
  208:21,21,23,24
**sleeping (41)**
16:10 40:7,15,15,25
  52:18,20,23 53:6,8
  53:14,21 56:20 57:4
  57:10 58:7 66:1,4,9
  69:5 72:15 73:17
  74:25 75:16 76:4
  79:14 80:6,8,12
  84:23 105:3 108:9
  111:19,25 113:16
  118:5,12 135:6
  197:23,24 198:4
**sling (1)**
140:14
**slow (2)**
88:23 191:8
**small (1)**
60:11
**Smith (9)**
21:9,10,11 116:2,17
  116:18,18,24
  172:12
**smoking (1)**
164:8
**soap (1)**
149:2
**software (1)**
204:3
**somebody (8)**
27:8 66:25 76:6
  100:9 186:4 187:20
  191:4 208:5
**someone's (2)**

15:23 28:3
**soon (2)**
24:9 32:22
**sorry (15)**
11:8 27:19 47:3
   61:23 79:23 103:14
   122:18 142:19
   151:19 152:19
   162:21 201:18
   204:8 206:11
   207:21
**sort (29)**
6:7 12:9 34:16 44:4
   44:18 71:7 88:8,15
   88:17 89:14 95:2
   107:14,17,22 108:1
   108:22,23 111:15
   112:2 124:8 163:15
   164:22 181:9 202:2
   202:18 205:5 206:3
   207:16 209:21
**sorts (3)**
88:20 154:21 204:4
**sought (2)**
155:10 157:1
**sound (4)**
6:20 8:7 186:10
   193:22
**Sounds (2)**
71:13 85:7
**source (1)**
41:10
**spare (1)**
149:2
**speak (3)**
8:5 50:4 70:19
**speaking (6)**
7:24 32:19 50:19,21
   70:11 148:8
**Special (34)**
14:19 18:23 39:19
   40:4,17,21 41:3,5,7
   41:8,13 42:4,9,17
   47:14,16 48:17,19
   105:6,16,24 106:8
   112:14 113:14,20
   113:24 114:10
   134:4 167:23 168:1
   170:9 182:17,22,23

**specialize (1)**
195:2
**specialized (2)**
44:4,19
**specific (12)**
51:15 52:5 55:11
   64:25 68:19 106:21
   124:17 133:3
   146:23 155:25
   180:13,18
**specifically (10)**
34:12 79:2 84:21
   100:5 124:20 125:3
   127:16 157:10
   167:14 173:16
**specifics (1)**
157:22
**spectrum (2)**
163:24 164:10
**speculating (1)**
189:3
**speculation (4)**
185:5,7 188:19
   195:14
**speed (1)**
209:16
**spell (1)**
59:13
**spelled (1)**
60:14
**spoke (3)**
35:9 50:17 162:10
**spoken (3)**
5:19,25 50:9
**spun (1)**
143:22
**staff (10)**
76:1 77:4 84:3 85:12
   85:13 86:4 114:1,1
   137:15 173:19
**staffed (2)**
175:18,18
**staffing (1)**
46:10
**stand (1)**
104:19
**standard (8)**
65:6 155:7 175:14
   178:6,9 197:15

201:12,16
**standards (5)**
84:2 86:23 92:3
   93:14 173:12
**standing (1)**
164:7
**standpoint (3)**
27:9 80:3 116:13
**start (17)**
34:6 48:14 81:21
   82:2 131:8 140:9
   144:15 147:24
   148:2 164:16
   167:22 170:6
   177:24 191:10
   206:22 212:20
   215:11
**started (4)**
34:9 110:24 178:24
   202:20
**starts (1)**
39:19
**state (51)**
1:14 4:17 5:14 10:19
   11:14,16,17,22 12:3
   13:20,21,23 14:15
   15:2,23 16:13 22:7
   30:5 40:1,12 41:20
   43:13 47:12 56:15
   69:13 83:1,9 91:19
   91:20 92:14,19 93:3
   93:15,19 112:4
   116:8 124:4 133:15
   134:8,11,20,22
   135:16 144:23
   156:17 171:2
   187:15 191:2
   199:14 202:5 219:7
**State's (2)**
6:9 7:20
**stated (1)**
122:13
**statement (5)**
41:11 72:6,22 187:16
   199:19
**statements (7)**
25:6 41:6 66:1
   114:15 178:21
   187:10 189:4

**states (3)**
40:4 63:7 165:4
**stayed (1)**
110:14
**steno (1)**
174:11
**stenographer (1)**
206:14
**step (12)**
19:12 44:2 46:7 58:6
   75:18 77:22 82:18
   89:4 92:12 114:12
   131:20,20
**steps (3)**
82:7,12 197:21
**steroid (5)**
59:15,20,25 60:16,18
**steroids (1)**
59:16
**stethoscope (1)**
205:24
**stip (3)**
127:20 129:18
   130:13
**STIPULATED (1)**
4:6
**stipulation (8)**
119:19 121:22 123:2
   125:23 126:5 130:9
   130:18 150:12
**stock (1)**
63:3
**stones (1)**
31:16
**stop (3)**
23:15 136:12 148:7
**stops (6)**
55:8,12,14 56:10,11
   56:11
**stored (1)**
99:22
**stress (1)**
187:1
**stretch (1)**
7:10
**stricken (3)**
117:15 120:5,11
**strong (1)**
8:2

**strongest (1)**
55:16
**studies (2)**
210:13,19
**stuff (5)**
112:24 117:16
124:14 128:16
160:21
**style (1)**
102:18
**styled (5)**
8:23 21:20 48:16,19
86:17
**subacute (4)**
175:9,25 176:25
177:5
**subject (2)**
117:3 137:2
**submission (1)**
171:4
**submitted (1)**
93:23
**submitting (1)**
34:12
**subordinate (2)**
118:18 137:15
**Subpoena (7)**
1:11 3:5 22:7,14,18
24:4 146:16
**Subpoenas (4)**
35:18 112:24 113:6
146:24
**Subscribed (1)**
217:15
**subsequent (4)**
14:17 85:22 115:13
175:7
**subside (1)**
209:8
**substance (3)**
50:17 51:17 192:19
**substandard (6)**
84:2 86:22 90:9 92:3
93:14 173:11
**substantial (3)**
83:16,19,21
**successful (1)**
94:19
**successor (1)**

109:19
**suddenly (1)**
127:18
**sued (1)**
22:2
**suffered (2)**
65:21 193:3
**suffering (10)**
80:25 81:6,10 191:22
191:25 193:10,15
193:16 195:13
205:16
**suffers (1)**
59:21
**sufficient (1)**
65:15
**suggesting (1)**
18:1
**suicide (2)**
89:11,22
**Suite (1)**
1:18
**summarizing (1)**
182:19
**summary (2)**
168:9 170:14
**sums (1)**
136:21
**Sunday (1)**
176:16
**superior (1)**
117:25
**supervise (3)**
44:15 154:23 160:2
**supervised (1)**
29:12
**supervising (1)**
135:9
**supervision (2)**
5:15 108:3
**supervisor (1)**
106:3
**supplement (1)**
169:11
**support (1)**
41:9
**supported (2)**
116:10 166:7
**supposed (7)**

51:9 52:20 127:14,15
154:1 161:12,13
**sure (44)**
5:24 6:12 7:24 11:19
12:22 24:20 25:13
28:20 32:19 36:14
47:22 48:9 52:6
57:24 59:11 64:7,10
78:11 81:24 85:11
85:14 92:24 100:12
100:13 102:4
103:13 108:1
109:12 114:25
117:17 142:3 144:6
144:25 154:7
160:12 174:13
176:1 181:6 182:11
183:3 206:19
210:22,24 213:8
**surgery (1)**
55:23
**surgical (1)**
56:7
**surrounding (2)**
44:5,21
**suspended (1)**
108:17
**swapped (1)**
9:20
**swinging (2)**
135:2,3
**switch (1)**
23:16
**sworn (2)**
5:6 217:15
**symptoms (3)**
196:9,15 208:4
**system (7)**
14:7 17:20,24,24
77:19 107:18
203:16

———————————
**T**
———————————
**T (4)**
4:4,4 219:3,3
**table (1)**
6:19
**tachycardia (1)**
209:14

**Taconic (1)**
10:5
**take (42)**
5:19 6:11,15 7:6 8:15
11:7 22:22 23:23,25
24:7 25:17 38:24
39:18 46:3 48:7,12
70:5 71:4 83:6
86:16 88:13 101:20
112:24 113:6 119:8
128:15 129:25
134:1 148:23
152:23 158:19
160:13 165:19
177:18 179:7 184:2
186:13 188:11
202:7,11 204:21
212:3
**taken (16)**
4:15 41:6 48:10
71:19 82:7,12 90:21
105:11 109:16
119:13 137:14
151:1,2 157:12
159:3 165:24
**takes (1)**
115:7
**talk (8)**
36:1 116:15 129:2,4
136:17 142:8 185:8
189:21
**talked (5)**
94:14 95:2 152:3
187:25 195:20
**talking (26)**
6:4,4 7:25 32:10
34:18,20 38:15
39:15 44:7 50:13
65:1 86:24 98:13
102:14 104:5,6
116:24 129:19
148:8 149:13 161:1
161:3,6 183:10
184:8 205:15
**talks (4)**
61:15 125:3 171:16
171:16
**Tamara (1)**
96:15

**tangential (1)**
151:25
**taught (2)**
146:21 148:11
**teaching (1)**
110:19
**technical (1)**
83:20
**tell (43)**
6:11 7:10,23 33:8
37:8,9 41:9 48:15
83:22 94:2 101:6
115:23,23,25 127:1
136:14 141:10
145:13 146:13,13
146:16 147:2,3
158:20,21 163:20
164:20 166:13,16
167:5,16,19,19
178:21,22 191:8
196:11 198:17,20
199:24 201:7,20
202:3
**telling (11)**
126:15 138:3 145:11
147:18 149:23
198:3,16 200:8,12
202:13,16
**tells (2)**
161:8,8
**ten (1)**
166:3
**tendon (3)**
12:1 94:23 95:1
**tenuous (1)**
145:16
**term (13)**
8:3 11:15 44:1 55:6
60:24 74:11,14,16
76:20 85:3 95:8
108:11 196:4
**termination (5)**
155:6,9,11,14,17
**terms (8)**
8:1 17:19 49:20
123:8 151:18,21
159:12 207:2
**Terry (2)**
68:21 72:7

**testified (6)**
5:6 119:23 137:13
180:23 181:14
214:22
**testimony (25)**
4:7,9,14,15 24:12
47:11 54:9 98:10
109:16 112:24
113:6,6,21 120:11
122:23 142:22
146:25 147:13
155:12 167:6 193:3
198:19 211:24
215:19 217:8
**thank (8)**
71:13 119:12 121:24
177:21 183:6
184:23 207:12
214:18
**thanks (6)**
104:2 178:14 212:5
216:11,13,14
**theoretical (2)**
66:17 209:10
**theoretically (3)**
65:24 111:19 163:19
**theory (1)**
209:17
**thereabouts (1)**
22:17
**thereof (3)**
120:2 123:5 130:22
**they'd (1)**
119:3
**thing (29)**
12:2 17:20 34:1 36:9
44:6 55:1 61:15,18
86:23 100:19 121:6
124:24 125:20,20
129:16 150:23
157:11 168:1,18
169:18,20 188:1
192:6,9 198:6
201:22 208:9,12
209:12
**things (38)**
16:1 29:2,2 32:18
41:12 71:9 81:16
84:24 85:12,15

88:23 90:23,25 91:1
98:22 100:20
102:24 103:24
113:25 127:13
128:3 132:6 134:19
139:6,17 145:18
147:25 148:10
158:25 161:9 164:9
167:22 168:15
186:9 187:25
190:21 201:21
202:1
**think (71)**
7:13 15:17 21:16
23:14 27:21 46:8
48:5 49:8,8 50:6
51:6 54:5 58:24,25
69:19 70:24 73:2
76:5 78:1 79:1
95:19 101:13,14
108:11 109:9,18
115:5 119:3 120:9
122:1,10 123:15,23
124:11 128:14
131:17,22,23,24,25
133:14 140:3 141:6
141:14,24 142:5,10
146:8,18 149:18,18
149:19,24 151:15
151:16,21 154:9
163:10 164:14
165:14 168:17
169:11 174:1 181:4
182:8 183:14
184:25 194:22
200:24 210:2 213:2
**third (5)**
40:3 83:24 145:22
149:10,12
**third-party (1)**
146:25
**thirty (2)**
190:14 207:22
**Thomas (1)**
39:25
**thorough (4)**
113:7,25 163:14
167:5
**thoroughly (1)**

170:21
**thought (18)**
13:7 17:20 47:13
51:20 67:17,17
101:22 118:25
132:3,5 153:2
155:21 162:8 177:8
190:22 191:16,18
212:6
**thoughts (1)**
165:21
**thousand (1)**
162:1
**thousands (2)**
34:2 146:23
**threatening (1)**
203:11
**three (27)**
23:11 39:7,8,12,17
40:3 45:12 51:3
68:6 72:1,2,4 94:24
136:8 179:7 181:17
182:12,13,15,16
183:3,5,5 186:9
191:19 192:5
207:18
**three-page (1)**
40:2
**tightness (1)**
193:20
**till (1)**
9:22
**time (92)**
4:11 6:14 7:5,23 8:10
8:17 9:3,11,12,15
10:16,18,19 12:11
12:19 13:5 14:1,10
14:17,21,24 15:3,7
15:13,21 16:8 20:5
21:16 27:1 34:9,11
48:6 49:10 50:7,16
68:13 73:9,10,11
83:4,7 84:21 90:17
94:4 96:23 98:7,12
98:17 104:21,23,24
109:12,13 110:2,24
111:1,2,3,25 117:8
117:10 118:16
129:25 130:6,6,8

135:23 139:20
144:4 147:16
149:22 152:6,8
158:17,20 159:3
160:20 162:17,18
163:4,5 167:13
174:4 175:1,14
177:4 187:5 192:6
193:24 194:5 203:3
217:9
**times (14)**
22:3 26:13 27:17
50:4 88:19 89:3
90:20 129:16
146:20 148:1 149:7
198:17 201:19,21
**title (6)**
15:17 21:6,7 26:20
160:24,24
**titled (1)**
33:15
**today (26)**
5:11,16,21 6:1,6,14
7:5 8:6 11:4 18:5
35:12 47:11 49:4
50:5,23 101:2 115:3
120:25 154:15
157:25 166:21
167:3,7 168:3
199:13 214:23
**told (11)**
79:1 81:24 113:20
118:13 129:1,2
153:4 157:4 164:21
200:17 202:5
**tolerate (1)**
150:21
**top (6)**
39:8,17 47:9,21 74:4
114:19
**toss (1)**
136:15
**touch (1)**
115:9
**track (1)**
38:17
**traffic (1)**
18:20
**train (1)**

212:6
**trained (8)**
185:23 187:24 188:6
188:9,11,14 203:18
205:23
**training (3)**
187:11 191:3,20
**transcript (12)**
4:14 54:2,4,12,15
121:8 122:11 169:9
216:5 217:8 218:4
219:8
**transferred (1)**
176:22
**treat (5)**
64:9 65:8,12,15,16
**treated (5)**
94:24 122:25 125:5
163:23 196:5
**treatment (9)**
59:16 61:10 84:8
85:13 173:20
180:12,15,18 195:2
**treatments (3)**
81:1,11 180:15
**tremendously (1)**
114:2
**trial (5)**
1:10 4:8,12 12:1
143:6
**tricep (2)**
94:23 95:1
**triceps (1)**
12:1
**trick (1)**
131:23
**tried (3)**
66:10 105:4 149:1
**trooper (4)**
191:2,17,18 199:14
**Troopers (1)**
202:5
**trouble (2)**
168:24 169:18
**true (12)**
63:4,9 73:16 79:13
80:6,8 91:17 111:24
118:4,12 217:7
219:8

**truly (2)**
73:22 201:25
**truth (10)**
143:12,15 198:3,16
198:18,21 199:25
200:13 202:13,16
**truthful (1)**
201:9
**try (18)**
24:21 90:15 103:24
115:17 122:10
125:10 126:18
135:15 141:25
142:1,6 143:20
146:14,16 147:2,3
152:2 197:5
**trying (36)**
12:2 18:2 29:15 38:9
40:23 99:2 104:8
107:4,4 120:10
124:17 126:4,4
127:19 128:18
129:16 131:22
132:11,13 133:7
134:1,5 138:11
142:9 145:9,13,25
146:12 148:17,23
156:4 160:23
161:20,23 163:2
178:11
**tube (1)**
188:2
**tubes (1)**
60:4
**tunc (2)**
130:12,17
**turn (3)**
135:21,21,24
**turning (2)**
178:19 184:1
**TV (2)**
69:2 72:12
**twelve- (1)**
72:16
**twelve-fifteen (2)**
73:2 207:21
**twelve-thirty (10)**
72:8,17 73:3,10
178:25 188:23

192:25,25 206:4,24
**twenty (1)**
198:5
**twenty-four (1)**
43:15
**twenty-four/seven ...**
67:24
**twenty-nine (3)**
61:15,24 62:3
**twice (2)**
50:6 89:2
**two (29)**
9:10 10:4 23:11 39:7
47:15,19 50:8 86:20
87:21 105:2 122:7
171:15 172:21
173:17 174:15,15
174:17,18,19,20,21
181:20 187:1
189:12,21,22 190:8
206:7 207:18
**two- (3)**
73:10 190:13 207:22
**two-fifteen (4)**
73:4,6 190:13 207:21
**two-thirty (6)**
73:4,6,11 192:5
196:18 208:24
**type (7)**
12:2 44:6 86:23 90:8
154:17,17 195:3
**types (1)**
17:15

---

**U**

**U (1)**
4:4
**U.S (3)**
165:2 168:6,23
**ultimately (2)**
46:6 169:19
**unacceptable (1)**
160:8
**unbelievable (2)**
134:16,17
**uncomfortable (2)**
208:9,12
**underlies (1)**
36:10

**underlying (3)**
65:20 104:16 163:15
**understand (35)**
7:17,20,23 27:4
30:22,25 31:8,21,24
32:1 38:10,11 41:23
57:22 74:17 99:3
106:24 115:21,22
115:24 118:18,24
118:24 120:22
130:10 131:6
136:22 141:8
142:17 143:25
156:14 175:4 177:1
206:17,20
**understanding (7)**
36:23 44:2,10 51:17
63:20 108:16
153:24
**understands (2)**
30:25 31:25
**understood (3)**
8:7 103:13 206:16
**undertaking (3)**
121:9,13,16
**undoubtedly (1)**
136:5
**Union (1)**
80:1
**unit (14)**
43:12,14,19,20 44:4
45:5 46:15 75:20
76:24 77:11 107:9
170:10 171:6
176:22
**United (2)**
63:7 165:4
**units (6)**
43:5 45:1,12 46:7
106:12,16
**unprofessional (1)**
135:5
**unprofessionally (1)**
115:6
**unquote (2)**
115:19 143:10
**untrained (1)**
191:1
**untreated (1)**

65:21
**untrue (1)**
198:10
**unwieldy (2)**
81:23 102:23
**updated (1)**
103:7
**Upstate (1)**
44:6
**urgent (1)**
6:25
**use (22)**
7:8 8:3 11:15 55:10
55:19,25 56:6 64:3
65:4,14 76:20
119:10 122:7 188:6
188:9,14 201:12,24
202:1 203:13,18,21
**usually (3)**
38:4 90:17 193:20
**utilize (1)**
63:14
**utilizing (1)**
120:16

---

### V

**variety (2)**
26:15 85:11
**various (4)**
45:2 46:18 51:23
86:10
**ventricular (1)**
213:15
**verdict (1)**
94:19
**verify (1)**
201:21
**Vernon (2)**
43:11,12
**version (1)**
181:13
**versus (5)**
9:14 45:20 164:1
195:14 212:9
**video (13)**
5:22 23:15 106:12,15
106:23 107:1,2,3,7
107:11,11 139:20
152:15

**videoing (1)**
106:22
**viewed (1)**
164:14
**viewing (1)**
205:19
**violation (1)**
125:23
**violence (2)**
86:4 117:22
**vital (3)**
173:18 179:25
186:13
**volunteering (1)**
45:15
**vs (1)**
1:4

---

### W

**wagons (1)**
135:16
**wait (6)**
114:13 142:6,7
158:23 190:21,21
**waited (1)**
118:11
**waiting (2)**
37:25 116:11
**waived (3)**
4:9,18 130:23
**waiver (5)**
130:12,17 150:13,15
150:19
**wake (3)**
66:6 206:4,5
**wakes (1)**
207:2
**walk (1)**
51:23
**walked (1)**
192:24
**Walker (1)**
135:12
**walking (5)**
181:21 189:12,16
190:16 207:2
**want (75)**
7:10,19 12:22 15:10
15:11,13 24:7,8,15

34:1 38:24 39:6,11
48:13 50:15 59:4,6
64:6 65:25 68:9,9
69:14 70:17 71:3
80:14 86:16,19
95:20 97:24 98:25
104:11 108:3 117:7
117:9,18 123:19
125:10 128:22
129:23 134:25
136:20 138:4 140:8
140:11,24 141:10
141:14,18 144:5,8
144:11,22 147:17
150:7 152:12,22
156:9,9 159:10
163:14 164:13
165:20 167:5,14
169:8 170:2,8,25
177:24 182:10
198:1 204:10
207:16 211:17
215:25
**wanted (5)**
101:2 103:10 114:13
119:14 157:21
**wants (1)**
147:6
**wasn't (14)**
67:11,18 94:24 99:15
101:18 113:9
114:12 118:15
129:8 155:2 178:5
187:5 191:24
199:21
**wasted (1)**
144:3
**wasting (1)**
147:16
**water (11)**
69:8 72:18 181:23,23
181:25 190:9,15
192:18,20,22
207:23
**way (36)**
6:12 33:19 55:11
69:17 78:2 83:24
84:25 88:5 102:24
105:13 106:22

108:7 116:20
121:11 122:2 125:6
128:23 129:13
135:3 147:21 150:8
150:8 151:13 158:2
173:15 175:18
186:3,6 187:17
193:13 198:2 203:6
207:5 210:1 213:1
213:19
**ways (4)**
43:3 64:13 163:23
203:9
**we'll (9)**
22:5 32:25 37:5 70:5
102:22,22 140:19
153:20 189:21
**we're (39)**
5:21,21,22 6:6 7:25
32:10,19 39:4 69:19
70:9 102:18 104:10
124:12 125:25
126:20 127:17
130:5 138:16
141:24 143:20
144:1,23 147:16
149:13,16,17
152:20 157:24
158:2 170:1,6
173:21 177:23
187:8 189:2 191:19
205:15 210:25,25
**we've (10)**
77:16 119:6 136:7
142:21 155:20
164:14 165:16
166:21 168:2
187:25
**week (2)**
93:17 176:19
**weekend (1)**
176:18
**weekends (1)**
176:7
**weeks (1)**
50:8
**weigh (2)**
113:12 114:14
**weirdest (1)**

93:5
**Wende (1)**
43:12
**went (30)**
12:1 17:22 20:11,15
20:22 66:8,10 68:24
69:6,8 72:9,16,18
85:7 110:17 162:6
181:19 190:10,15
192:22 193:1
196:17,19,20
207:23,25 208:20
208:21,23,24
**weren't (3)**
69:2 72:12 105:6
**West (1)**
1:18
**Westchester (1)**
110:14
**wheezing (5)**
180:3,6 193:11 208:8
208:9
**willful (2)**
133:19,22
**WILLIAM (1)**
1:3
**willing (5)**
51:16 130:17 150:15
199:23 200:7
**window (6)**
23:3,14,18,19 69:1
72:11
**withholding (1)**
36:5
**witness (45)**
30:24 31:25 32:1
35:22 36:16 71:17
102:23 104:2
119:21 120:7,12
121:19 123:16
125:8 126:11,16
133:7 136:10,24
139:8 140:2,2,7,21
141:1,9 144:9 145:1
145:14,21 147:19
149:14 150:20
152:4,8 153:5,12
157:16,18,23 158:6
158:10,21 216:11

216:14
**Witness' (1)**
128:22
**witnesses (5)**
2:3 6:11 139:19
147:1,25
**woke (9)**
66:8 68:23 72:8
73:10,11 188:22
189:23 190:8
192:20
**Wolf (1)**
115:4
**woman (4)**
135:4,14,25 162:15
**woman's (4)**
115:1 118:2 134:15
135:20
**word (3)**
55:4,5 207:19
**worded (1)**
78:18
**words (4)**
141:25 189:17
190:18 192:19
**work (11)**
9:25 10:3 27:21,23
71:15 99:6 100:7
101:9 116:4 186:21
211:8
**worked (5)**
10:4,4 110:17 111:2
114:2
**working (10)**
9:5 10:17,19 88:20
90:1 110:25 127:9
186:25 201:10
211:8
**works (6)**
27:16 55:13 60:9,10
68:5 141:12
**worried (1)**
98:24
**worries (1)**
211:11
**worrying (1)**
147:5
**worse (2)**
203:4 209:19

**worsening (1)**
206:9
**worst (1)**
164:3
**wouldn't (22)**
27:6,12 28:8 37:23
67:5 75:17,18 77:10
79:16 88:12 91:24
97:18 100:4 107:14
115:9 119:4 129:4
146:9 186:17
193:14 197:24
205:11
**Wow (1)**
78:1
**Wright (6)**
8:15 9:2,4,6 12:6,18
**wrist (1)**
204:23
**write (1)**
210:1
**writhing (1)**
193:11
**writing (6)**
88:17 108:5,23 117:4
131:10 159:20
**written (6)**
25:5 52:14,15 73:23
123:5 131:12
**wrong (4)**
134:23 146:4,8
197:11
**wrongdoing (1)**
143:1
**wrote (2)**
104:20 117:10

**X**

**X (1)**
108:4

**Y**

**Y (1)**
108:4
**yeah (43)**
21:22 22:12 23:9
24:16 39:17 49:14
57:24 62:4 67:19
69:22 70:14 73:14
74:15 77:1 80:7

87:10,22 100:10,15
112:17 121:5 136:9
137:5 142:5,24
155:20 156:22,22
156:23,23 158:13
162:19,21 164:18
166:18 168:16
181:22 182:8 184:4
195:16 207:11
211:1 214:17
**year (9)**
20:6 34:13,23 49:1
89:2 90:18 110:10
110:14 192:14
**yearly (1)**
88:25
**years (14)**
9:6,20,23,24 11:7
21:17,24 88:20 90:1
114:10 116:22
136:8 143:2 198:5
**yelled (1)**
140:20
**yelling (4)**
139:2 140:1,8,9
**York (24)**
1:14,18,22 4:17 5:14
9:11,14,22 10:14,20
11:17 15:2 22:6
30:5 40:1 56:15
91:20 93:3,15,19
110:9 112:4 116:8
219:7
**yup (8)**
23:15 71:17 74:17
103:8 109:25
120:23 152:17
183:19

——————————
**Z**
——————————
**Z (1)**
108:4
**zoom (5)**
1:12 23:4,14,18
70:25

——————————
**0**
——————————

——————————
**1**
——————————
**1 (8)**

3:5 5:1 22:23,23 24:3
24:4,5 165:16
**10 (7)**
3:15 102:19 103:1,4
103:6,6,12
**10:07 (1)**
5:4
**102 (1)**
3:14
**103 (1)**
3:15
**109 (1)**
1:18
**11 (7)**
3:16 152:21,24
156:16 159:5,20
165:17
**12 (6)**
3:17 211:4,5,15,22
212:16
**12:15 (1)**
69:6
**12:30 (2)**
68:23 69:7
**12205 (1)**
1:18
**12th (2)**
97:14 98:2
**13 (4)**
3:18 211:21,22,25
**14 (2)**
160:24 219:13
**144 (1)**
1:21
**14614 (1)**
1:22
**152 (1)**
3:16
**16th (2)**
47:19 48:18
**177 (1)**
2:9
**17th (2)**
47:17 48:21
**185 (1)**
2:7
**18th (1)**
58:12
**19 (1)**

14:13
**1984 (1)**
110:11
**1990 (2)**
10:19 110:23
**1999 (1)**
10:19
**19th (10)**
25:9 35:2 58:11,12
73:19 82:5 97:1,11
98:1 187:6
**1st (1)**
17:9

——————————
**2**
——————————
**2 (8)**
3:6 24:3 59:3 61:9,20
61:22,22 83:22
**2000 (1)**
49:1
**2001 (1)**
9:18
**2002 (1)**
9:18
**2010 (3)**
8:19 12:23 13:1
**2015 (13)**
14:13 25:9 35:2
47:17 48:21 50:25
51:12 58:12,13
73:19 82:5 108:19
187:6
**2017 (3)**
93:17 98:1 108:22
**2018 (28)**
8:19 12:23 13:1
15:18 17:7 20:8
22:17 40:2 51:5
56:18 83:6,7 95:22
96:23 97:1,11,14
98:1,3 104:21
108:21 109:14,15
109:15 115:16
157:7 168:14,21
**2019 (1)**
25:14
**2020 (6)**
1:12 47:19 48:18
49:7 103:7 219:13

**207 (1)**
2:10
**20th (11)**
15:18 40:2 51:5
56:18 95:22 98:1
104:21 108:21
157:7 168:14,21
**211 (2)**
3:17,18
**214 (1)**
2:8
**21st (1)**
103:7
**22 (1)**
161:18
**2209 (1)**
161:19
**27th (1)**
93:17

——————————
**3**
——————————
**3 (19)**
1:12 3:7 24:2 38:25
39:2,23,24 79:9
99:12,20 169:24,25
170:2,3,5 174:20
182:9,13,13
**33 (1)**
3:10
**3rd (1)**
96:23

——————————
**4**
——————————
**4 (5)**
3:8 5:1 22:24 42:2
86:16
**4320 (1)**
161:24
**45 (1)**
146:22
**47 (1)**
3:11
**48 (1)**
3:12

——————————
**5**
——————————
**5 (13)**
2:6 3:5,6,7,9,10
32:21 33:1,9,9,12
37:7 38:7

**5:11 (1)**
216:16
**50(b) (1)**
124:4

---

**6**

**6 (9)**
3:11 47:23,25 48:12
   48:16,22,25 49:5,6
**6(a) (4)**
123:7 124:18,19,20
**6:18-cv-6307 (1)**
1:6
**69 (1)**
3:13

---

**7**

**7 (14)**
3:12 48:4,8,12,19,23
   48:24 49:5 50:23
   183:22,23,24,25
   185:5
**7.11 (2)**
175:5,8

---

**8**

**8 (8)**
3:13 69:20,21 71:20
   71:24 190:2,4
   207:15
**8th (1)**
22:17

---

**9**

**9 (7)**
3:14 42:3 102:10,11
   125:3 164:16,19