STATE OF NEW YORK
NORTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

WILLIAM and BARBARA CAREY, as Administrators of the
Estate of MICHAEL CAREY,

                   Plaintiffs,

        - against -   Civil Action No:
                  18-CV-6307 (DGL-MJP)

LISA SALVADORE, et. al,

                   Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - -


      TELEPHONIC DEPOSITION of Non-Party Witness,

TERRY NUDD, held on the 22nd day of December 2020,

commencing at 10:30 a.m., before Jeanne O'Connell,

Registered Professional Reporter and Notary Public in

and for the State of New York.

```
 1   APPEARANCES:

 2

 3   Elmer Robert Keach III, PC
     One Pine West Plaza
 4   Albany, New York 12205
     By:  Elmer Robert Keach III, Esq.
 5   Attorneys for Plaintiff

 6   NYS Office of the Attorney General
     144 Exchange Boulevard, Suite 200
 7   Rochester, New York  14614
     By:  Hillel Deutsch, Assistant Attorney General
 8   Attorneys for Defendants

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
```

```
 1              S T I P U L A T I O N S

 2    It is hereby stipulated and agreed by

 3    and between the attorneys for the respective

 4    parties hereto that, this examination may be signed and

 5    sworn to before any Notary Public of the State of New

 6    York.

 7

 8    It is further stipulated and agreed that the filing and

 9    certification of the said examination shall be waived.

10

11    It is further stipulated and agreed that all objections

12    to questions, except as to form, shall be reserved for

13    the trial of this action.

14

15    It is further stipulated and agreed that there are no

16    objections to Notice of this Examination Before Trial

17    and the qualifications of the court reporter to take

18    this deposition and administer an oath or affirmation.

19

20

21

22

23
```

1          THE COURT:  Good morning.

2          MR. DEUTSCH:  Good morning, Your Honor.

3          You're on speaker.  I guess I am, too.

4          Mr. Keach is here.  The witness and the

5  court reporter are on the line also.

6          THE COURT:  Okay.

7          MR. DEUTSCH:  The issue we have is

8  this:  We're here for the telephonic

9  deposition of Mr. Nudd, which I noticed

10  several months ago.  Mr. Keach is the one

11  who sent the judicial subpoena for the

12  potential deposition last week, which wound

13  up not happening because of Mr. Nudd's

14  medical condition.

15          Mr. Keach made the arrangements for the

16  court reporter.  He volunteered to do those

17  things.

18          He's now taking the position of,

19  because he did those things, it's his

20  deposition and he can ask the questions.  I

21  can simply respond afterwards if I have

22  questions.

23          It's my position, since I'm the one who

1    noticed the deposition --

2         THE COURT:  Mr. Deutsch, can you move

3    the microphone or your mouth a little

4    closer?

5         MR. DEUTSCH:  Mr. Keach's position is

6    that, because he made the arrangements for

7    the court reporter and sent the judicial

8    subpoena for last week's deposition,

9    therefore, it's his deposition.

10        My position is that I'm the one who

11   noticed this deposition months ago, and the

12   only reason it hasn't happened earlier is

13   because Mr. Keach had requested the delays

14   in order that he be given an opportunity to

15   set up a video deposition, which wound up

16   not happening, and that I was accommodating

17   all this, but at no point was this his

18   deposition.

19        So, we're at an impasse as to who

20   should begin questioning.

21        MR. KEACH:  Your Honor, may I be heard,

22   please?

23        THE COURT:  Yes, Mr. Keach.

1          MR. KEACH:  This has been an ongoing

2     issue with Mr. Deutsch now for months.  I've

3     never, to my knowledge, received a notice of

4     deposition from Mr. Deutsch for Terry Nudd's

5     deposition, and I have been trying to secure

6     Mr. Nudd's deposition for months, oftentimes

7     over objection from Mr. Deutsch, who claimed

8     at various times that the discovery deadline

9     should not be extended.

10          I made all the arrangements for today's

11     deposition because of the necessity of

12     securing Mr. Nudd's testimony.  I secured

13     the court ordered subpoena from the court,

14     and when that didn't work out, I was trying

15     to get in touch with Mr. Nudd, Mr. Nudd

16     indicated that he had an active MRSA

17     infection on his leg.  I could not in

18     conscience have him go into the Sheraton in

19     Niagara Falls with that sort of problem.

20          So, I arranged for Mr. Nudd to be

21     deposed today with him, arranged for the

22     court reporter, obviously arranged for the

23     subpoena, in trying to take Mr. Nudd's

1    testimony now for months.

2         So, to the extent that Mr. Deutsch

3    claims that this is his deposition, it would

4    have been incumbent upon him to actually set

5    it up, and he's done nothing to do that.

6         I think at this point I likely could

7    secure an affidavit from Mr. Nudd and not

8    even take this deposition today.  Certainly,

9    I don't think I've ever had this sort of

10   dispute before.

11        I don't think it's really even credible

12   to claim that the person who hasn't been the

13   motivating force to start Mr. Nudd's

14   deposition has been me, and I'd like to

15   secure his testimony pursuant to my efforts

16   to do so.

17        THE COURT:  Mr. Keach, you're the one

18   who arranged for the court reporter, you

19   said?

20        MR. KEACH:  I arranged for the court

21   reporter.  I arranged for the conference

22   call service.  I arranged the date and time

23   of Mr. Nudd's testimony.  And I have been

1      the person who's been in touch with Mr. Nudd

2      exclusively.

3          THE COURT:  Mr. Deutsch, you're the one

4      who -- you stated that you noticed this

5      particular deposition today?

6          MR. DEUTSCH:  Yes.  I'm the one who

7      reached out to Mr. Keach and stated I was

8      going to be taking the deposition.

9          Mr. Keach volunteered to do the things

10     that he was saying he was going to do.

11     Because what I said was I was going to be

12     taking it by telephone.  He interjected

13     himself and said he wanted it to be done by

14     video, which engendered a four-month delay,

15     during which he made all these arrangements,

16     because he was the one who wanted to have it

17     done by video.  I said, if you think you can

18     do it that way, I don't have an objection.

19         In the end, all his efforts fell short

20     and this is what we wound up with, but I

21     would have been perfectly happy to do all

22     the setting up but not for the fact that Mr.

23     Keach had volunteered to do those things

1    because he believed that it would benefit

2    him.

3        MR. KEACH:  Your Honor, I did those

4    things because I've been trying to secure

5    Mr. Nudd's testimony now for six months over

6    this sort of gamesmanship that we're seeing

7    today.

8        I don't have a Notice of Deposition

9    here from Mr. Deutsch to set up Mr. Nudd's

10   deposition.  I have been the one that has

11   been setting up this deposition from the

12   beginning and has been trying to do so

13   repeatedly.

14       I'd like to commence questioning

15   Mr. Nudd.

16       MR. DEUTSCH:  Your Honor, not only is

17   that inaccurate.  Literally what happened

18   was, there was an agreement between

19   Mr. Keach and myself approximately six

20   months ago that I would be taking Mr. Nudd's

21   deposition, and he did not object to it.

22       And then the only reason why Mr. Keach

23   got involved in terms of taking -- any

1    possibility of saying that he was going to

2    be taking the deposition was when I told him

3    that, if he was not able to find a way to

4    get Mr. Nudd -- to set up a video

5    conference, then I was simply going to do it

6    by telephone.

7         This was approximately a month or so

8    ago.  He then said unilaterally that he was

9    going to be taking Mr. Nudd's deposition,

10   and the Court got involved and said he was

11   not allowed to do that, and Mr. Keach had to

12   withdraw various papers, because he said he

13   was going to do things unilaterally, and the

14   Court chastised him.

15        MR. KEACH:  I'm not sure I agree with

16   that latter point, Your Honor, but there was

17   no agreement here about this was going to be

18   Mr. Deutsch's deposition.  That's just

19   false.

20        I'll leave it to Your Honor's

21   discretion how to resolve this tempest in a

22   teapot so we can move forward here.

23        THE COURT:  What is the advantage to

1        starting the deposition?

2             MR. DEUTSCH:  Well, to be perfectly

3        frank, Your Honor, the questions that I

4        intend to ask are going to be open-ended

5        questions to see what the witness knows, and

6        my concern is, based on the way Mr. Keach

7        has asked deposition questions in the past,

8        is that he's simply going to issue a

9        roadmap, and that his questions are going to

10       contain the answers that he's seeking for.

11           Then, while I obviously can object to

12       form, what I can't do is claw back any

13       information that gets provided.

14           MR. KEACH:  That's just false, Your

15       Honor.  That's not how a good examiner

16       conducts a deposition unless it's a hostile

17       witness.  I'm going to ask Mr. Nudd what he

18       knows, he's going to testify about what he

19       knows, and we're going to get this done.

20           So, that's just false.

21           THE COURT:  Hang on just a moment.  I

22       want to take a look at something.  I'll be

23       right with you.

1           Mr. Deutsch, if I'm understanding you

2      correctly, you're saying that you're the one

3      that first noticed the deposition of this

4      particular witness, and after that time,

5      Mr. Keach issued a judicial subpoena for the

6      same witness, and Mr. Keach is saying that

7      he has not received a Notice of Deposition.

8           MR. DEUTSCH:  To clarify that, Your

9      Honor, I do not -- I checked -- I do not

10     know if a formal notice of deposition was

11     ever sent out.  There was an agreement --

12     and there is an e-mail memorializing this --

13     in which I informed Mr. Keach that I would

14     be taking Mr. Nudd's deposition, and

15     Mr. Keach agreed to it.

16          MR. KEACH:  Your Honor, I saw the

17     status report.

18          I'm sorry, Your Honor.  Did I

19     interrupt?

20          THE COURT:  You can question while

21     you're on direct, and then, Mr. Deutsch, you

22     can ask questions after Mr. Keach.

23          Thank you, gentlemen.

1                (Proceedings concluded.)

2                TERRY NUDD, after first having been

3          duly sworn, was examined and testified as

4          follows:

5    EXAMINATION

6    BY MR. KEACH:

7      Q.  Mr. Nudd, my apologies for the delay in starting

8    this morning.

9                My name is Bob Keach.  I'm a civil rights lawyer

10   from Albany.  You and I have talked on the phone a

11   couple of times, and you know that I represent the

12   estate of Michael Carey relative to the circumstances of

13   his death.

14               What we're participating in today, sir, is called

15   a deposition.  It's where I get to ask you questions and

16   you have to respond.  Now, you got to let me finish my

17   questions before you respond and I'm going to show you

18   the same courtesy, and that's going to be particularly

19   important today because we're doing this on the phone.

20               So, what I tell my witnesses before they get

21   deposed is, take a breath before you answer and that way

22   you'll be sure that the question -- that the question is

23   complete.  That will obviously give Mr. Deutsch an

 1  opportunity to object to whatever questions I pose this

 2  morning.

 3       Also, you got to answer the question yes or no,

 4  not with a shake or nod of the head or uh-huh or uh-uh.

 5  Again, that's particularly important today because we

 6  have Jeanne, our court reporter, here, and she can't

 7  take down a shake or nod of the head over the phone.

 8       If you need to take a break for any reason, just

 9  let me know.  I'll be happy to accommodate your request

10  for a break.  If you have to use the bathroom, you want

11  to get some food, or you're just sick of dealing with

12  this, you let me know, and I'll be happy to do what I

13  got to do to make sure -- we'll take a break and then go

14  forward.

15       All I ask for, sir, is you not ask me for a break

16  when I've asked you a question and you haven't

17  responded.

18       Does that sound fair?

19  A.  Yeah.

20  Q.  Finally, I'm not a perfect examiner and this is a

21  less than ideal way to take testimony.  I mean,

22  obviously, under ordinary circumstances, Terry, I'd be

23  with you in Niagara Falls, we'd have our court reporter

1    there, Mr. Deutsch and I would be together, and we would

2    take your testimony that way.

3         But because of the Covid-19 epidemic, and

4    especially some of the conditions that I know you suffer

5    from, I felt more comfortable just having you deposed

6    over the phone, but that makes it more difficult for

7    everybody.

8         If you don't understand my question today, you

9    can't hear me, there's a dialogue between Mr. Deutsch

10   and I, you forget the question, whatever it is, you let

11   me know and I will restate or rephrase my question and

12   make sure that you understand me.

13        It's extremely important today for me and for

14   Mr. Deutsch that you understand my question.

15        Do you understand?

16   A.  Yes.

17   Q.  If you don't understand my questions you tell me

18   and I'll do what I have to do to make sure you

19   understand.

20   A.  Okay.

21   Q.  Mr. Nudd, tell me, do you know the decedent in

22   this case, Michael Carey?

23   A.  Yes.

1    Q.  Tell me how you know Mr. Carey.

2    A.  Well, I know Mr. Carey, know him just through

3    prison and stuff.  And we hung out together a lot in

4    prison and he was a good guy.  We used to hang out

5    together and play cards, whatever.

6    Q.  When you said you hung out with him, was that in

7    the housing unit or in the medical unit or both?

8    A.  It was both.

9    Q.  What type of housing units do they have at the

10   Groveland Correctional Facility?

11   A.  Well, each dorm is set up different.  They got

12   bunk beds on one side, singles on the other side, and

13   they got the wheelchair section.  There was like 14, 15

14   beds in the wheelchair section side.

15   Q.  So were you in the wheelchair section, as you've

16   described it?

17   A.  Yes.

18   Q.  Does the wheelchair section have a designation in

19   terms of like housing unit 5 or housing unit A,

20   something like that?

21   A.  No.  Our dorm was a medical dorm.  It was C3

22   medical dorm.  People that have medical issues would be

23   in that dorm.

1    Q.  Now, we're going to talk about both the emergency

2    room and the infirmary.

3         Do you know the emergency room?

4    A.  Yeah.

5    Q.  Do you know the infirmary?

6    A.  Yeah.

7    Q.  Was this wheelchair dorm that you talked about,

8    is that separate from the emergency room and the

9    infirmary?

10   A.  Yes.

11   Q.  Can you tell me where the wheelchair dorm would

12   be compared to where the infirmary is?

13   A.  Well, when you first come in the gate, or as you

14   entered the gate, you go around behind the visiting

15   room, and up on the left-hand side, just before the

16   hill, is the infirmary.

17        The medical dorm is a little ways down, but it

18   sits up on top of the hill.

19   Q.  So, what period of time were you incarcerated

20   for, Mr. Nudd?

21   A.  I was incarcerated for attempted criminal sex

22   act.

23   Q.  No, no, no.

1          What period of time were you incarcerated for?

2    My apologies.  When were you incarcerated?

3    A.  From '07 to 2019.

4    Q.  Were you at Groveland the entire time?

5    A.  I went to Groveland about 2015, '14, something

6    like that.

7    Q.  Did you stay at Groveland until you were released

8    in 2019?

9    A.  No.  I stayed in Groveland until 2018.  Then I

10   got transferred to Marcy Correctional Facility.

11   Q.  Was that your release facility?

12   A.  Yeah.

13   Q.  Now, Mr. Carey passed away on April 19, 2015.

14   A.  Correct.

15   Q.  How long before that day had you known Mr. Carey?

16   A.  A couple months.

17   Q.  Do you know whether or not Mr. Carey had any

18   medical problems?

19   A.  Well, it's -- from what I understand, from when

20   he came in on a Friday night into Groveland Correctional

21   Facility's infirmary, he said he had an infection in his

22   toe.  That's what I was told.

23          But what you told me was that he had a lung

1    infection.  Came in Friday, Saturday.  He slept all day.

2    He got up.  We played cards a little bit.  He got up,

3    went to the bathroom at 5:00 a.m.  in the morning.  He

4    couldn't find his inhaler.  Pounded on the windows.  The

5    nurse was sleeping in the nurses' station.

6       Q.  Now, Mr. Nudd, I may have misheard you.

7           Did you say I had told you that Mr. Carey had a

8    lung infection?

9       A.  Somebody told me that Carey had a lung infection.

10      Q.  If I informed you of that, I apologize.  That is

11   not accurate.  But let's keep going forward here.

12          Now, prior to April 19th, 2015, did you know a

13   nurse named Lisa Salvadore?

14      A.  Unfortunately, yes.

15      Q.  Why do you say "unfortunately"?

16      A.  Well, I didn't like her.

17      Q.  Why didn't you like her?

18      A.  Why I did not like her, let me see.

19          She was a snob.  She was very mean.  I asked her

20   personally for pain medication because I was hurting.

21   She wouldn't give it to me.

22      Q.  Anything else?

23      A.  She's a total mean nurse.  I mean, she's nasty to

1    everybody.  She doesn't do her job when she's supposed

2    to.  She sleeps on her job when she does work.  And I

3    just got fed up with her.  So I just wait until the next

4    shift comes on and I just ask for pain meds.

5        Q.  Prior to April 19th of 2015, had you seen Nurse

6    Salvadore sleeping on the job?

7        A.  Correct.  Yes.

8        Q.  During what shifts would you observe her

9    sleeping?

10       A.  Midnight shift.

11       Q.  How often would Nurse Salvadore work the midnight

12   shift, based on your recollection?

13       A.  Not very.  She's either sleeping in the nurses'

14   station or probably in the back where they do all the

15   medications.  She's a spiteful nurse.

16       Q.  Well, Terry, my question is:  How often would

17   Nurse Salvadore work on the midnight shift?

18       A.  Not every day.  Three, four times a week.

19       Q.  Now, Terry, one thing we don't want you to do is

20   speculate.

21           Do you know that for sure that she worked three

22   to four days a week on the midnight shift?

23       A.  Right.

1    Q.  When you say "right", what do you mean?

2    A.  Yes.

3    Q.  Had you seen her, had you seen Nurse Salvadore

4    sleeping before on the nightshift?

5    A.  When I get up, when I'm in pain, I can ring my

6    buzzer, or I look -- my room was diagonally from the

7    nurses' station.  I can see through my window, through

8    the TV room's window, and the nurses' station, and she's

9    sitting down in the chair with her feet up on the

10   counter sleeping.

11   Q.  This is before April 19, 2015 when Mr. Carey

12   died.

13   A.  Right.

14   Q.  I'm going to get an order of magnitude from you.

15        How many times had you seen Nurse Salvadore

16   sleeping before that night?

17   A.  Every time she does the midnight shift.

18        I don't know if she has another job somewhere, I

19   don't know, but she sleeps a lot.

20   Q.  Have there been occasions where you have -- well,

21   let me step back.

22        Why did you need to seek pain medication when you

23   would wake up at night?

1    A.  Because, with me having all the occasions that

2    I've been having of having my leg amputated, my legs

3    being in pain, and the bones in my legs are affected

4    because the MRSA, and I'm allowed to either ring the

5    buzzer or knock on the window and ask for medication.

6    Q.  On occasions prior to -- and I'm going to be

7    specific.  We'll talk about the late evening of 2018,

8    which would have been 10:00 until midnight, and the

9    early morning hours of April 19, 2015, which would have

10   been from midnight until roughly 6:30 in the morning.

11        So, on other occasions besides that particular

12   graveyard shift, did you try to get Nurse Salvadore's

13   attention to give you pain medication?

14   A.  Yes.  I pounded on the window.

15   Q.  Would she respond?

16   A.  No.

17   Q.  Why would she not respond?

18   A.  Because she was sleeping.

19   Q.  On those occasions when you would try to get pain

20   medication during the nighttime hours, did you observe

21   her sleeping when you hit your buzzer?

22   A.  Right.

23   Q.  She would not respond?

1    A.  No.

2    Q.  How many times did that happen, Terry?

3    A.  Several.

4        I got sick of it and I told the CO.  I can't

5    remember the CO's name that was working.  He comes to my

6    door.  I said, well, the problem was is I told him I

7    need pain medication because my legs and stuff are

8    hurting.  And he goes, I'll let the nurse know.  And he

9    never bothered -- I don't even think he even bothered

10   telling the nurse anything.  He just turned around and

11   went back and sit down and watch TV.

12   Q.  Where was he watching TV?

13   A.  We got a little TV room between the front door

14   and the infirmary into the hospital.

15   Q.  Where was that TV room compared to your room?

16   A.  Two rooms over.

17   Q.  Now, Mr. Nudd, have you had a chance to review

18   any documentation before today's deposition?

19   A.  No.

20   Q.  Did you ever have a chance to look at any of the

21   statements that you gave to the state police?

22   A.  No.

23   Q.  Do you remember being interviewed by the state

1    police about what happened to Mr. Carey?

2         A.  Right.

3         Q.  Did you fill out a statement?

4         A.  Yes.

5         Q.  Now, what is your understanding, Terry, if you

6    fill out a statement to the New York State Police, what

7    happens to you if you lie in that statement?

8         A.  You get in trouble.

9         Q.  Before you gave your statement to the state

10   police, did they caution you about the need to tell them

11   the truth?

12        A.  I told them the truth.

13        Q.  No, I understand, but did they say to you, hey,

14   in words or substance, you have to tell the truth?

15        A.  No.

16        Q.  Did you provide a statement to the Office of

17   Special Investigations of the New York State Department

18   of Corrections?

19        A.  Some guy in a uniform.

20        Q.  What happens in prison if you make a false

21   statement, Terry?

22        A.  You get in trouble.

23        Q.  What kind of trouble could you get into?

1    A.  I'm not sure.

2    Q.  But you know you -- can you face a disciplinary

3  ticket if you make a false statement in writing?

4    A.  What's that?

5    Q.  If you're in prison and they ask you to make a

6  statement and you lie, do you get a disciplinary ticket?

7    A.  I don't know.  I never got in trouble in prison.

8    Q.  The statement I have in front of me from the

9  Department of Corrections is dated May 4, 2015, at

10  12:15, and Investigator Kessel took that statement from

11  you.

12        Do you remember giving that statement?

13    A.  May 2015?

14    Q.  Yeah.

15    A.  Yeah.

16    Q.  Now, I want you to tell me everything that you

17  remember about that morning that Mike Carey died, late

18  evening into the morning that Mike Carey died, starting

19  with when Nurse Salvadore came on duty at 10:00 p.m.

20        Tell me what you can remember.

21    A.  I remember she coming in on the shift, because I

22  don't sleep very well, and she comes in one time.  She

23  did the vitals on Carey, did the vital signs and blood

1   pressure, whatever.  He asked for something and, I don't

2   know, she didn't respond back to him.

3           But the night that -- the night that Carey died

4   -- well, that morning that Carey died Lieutenant Blonsky

5   asked -- the nurses asked her if she has been in all

6   night checking on Carey, and she told them yes, that she

7   was.

8           I was awake the whole time.  She never came in

9   the room to check on him at all, just that one time to

10  do the vitals.  And when they did the 6:00 count, he was

11  deader than a doornail.

12  Q.  Now, you talk about a lieutenant.

13          Did you speak to the lieutenant that morning, the

14  morning they found Mr. Carey had passed?

15  A.  Lieutenant Blonsky, yes.

16          She asked me -- she asked me if certain

17  individual, did she come in and check on Carey, and I

18  said no.  She never came in and checked on Carey at all.

19  Just that one time.

20  Q.  Did you ever talk with Lieutenant Blonsky about

21  using the call button that evening?

22  A.  We did push the call button.

23          The call button was --

1          MR. DEUTSCH:  There's an object to form

2      on that.  I'll reserve my concerns for a

3      later time.

4          Go ahead.

5          THE WITNESS:  The call button was

6      pushed.

7   BY MR. KEACH:

8    Q.  Did you ever or Lieutenant Blonsky test the call

9   button that morning?

10   A.  She tested the call button, she tested my call

11   button, and they both worked.

12   Q.  When you say she tested the call button, which

13   call button are you referring to?

14   A.  His call button, because as soon as you push the

15   call button, it lights up outside the door.

16   Q.  When Lieutenant Blonsky tested Mr. Carey's call

17   button, was there any sound generated?

18   A.  There was like a beeping noise.

19   Q.  Was it the same with your call button?

20   A.  Yes.

21   Q.  Did you observe Lieutenant Blonsky talk with

22   Nurse Salvadore that morning?

23   A.  I'm not sure.  They were outside the door.  I

 1   don't know.  I don't know if they were down the hallway

 2   or...

 3       Q.  Did you hear any conversations between them,

 4   between Lieutenant Blonsky and Nurse Salvadore?

 5       A.  No.

 6       Q.  Did you hear any conversations between Nurse

 7   Salvadore and anybody that morning?

 8       A.  No.

 9       Q.  So, now I want to get into kind of what happened

10   with Mr. Carey that morning.

11           Did there come a point in time when you observed

12   Mr. Carey having some problems in the late evening of

13   the 18th or the early morning of the 19th?

14       A.  Yeah.

15       Q.  Tell me about that, please.

16       A.  He was in pain.  He -- at one point he was

17   looking for his inhaler and I couldn't find his inhaler.

18       Q.  Why was he looking for his inhaler?

19       A.  Because he couldn't breathe.

20       Q.  How did you know he couldn't breathe?

21       A.  Well, he was making like, like, I don't know how.

22   He couldn't breathe.  I asked him, so, what's wrong?  He

23   said, I can't breathe.  I said, you got your inhaler?

1    Q.  When you say he told you he couldn't breathe and

2    that, did you observe him having difficulty breathing?

3    A.  No.  He said his inhaler was on the table and I

4    couldn't see it from my room.

5    Q.  Well, I understand that, Terry.

6        Was there any indication he gave physically that

7    he was having a difficult time breathing?

8    A.  He was sitting on the end of his bed.

9    Q.  Was he breathing normally?  Was he breathing

10   heavy?  Was he making noise when he breathes?

11   A.  He was wheezing.

12   Q.  Have you ever seen someone who had an asthma

13   attack?

14   A.  No.

15   Q.  When did this occur where you saw him breathing

16   heavy and he was looking for his inhaler?

17   A.  On that Saturday.

18   Q.  Do you remember what time of the day it was?

19   A.  No.  It was in the middle of the night.

20   Q.  Did you know whether or not he was ever able to

21   find his inhaler?

22   A.  I'm not sure.

23   Q.  Would you agree with me, Terry, that if you gave

1   a statement on May 4th, 2015 to someone from the Office

2   of Special Investigations that would be when your memory

3   of these events was much clearer?

4        Can we agree on that?

5   A.  Yes.

6   Q.  Was Inmate Russell helping Mr. Carey, as well?

7   A.  I'm not --

8   Q.  Let me step back.  When you went over to see --

9   when you learned that Mr. Carey was having problems

10  breathing, who did he share a room with?

11           MR. DEUTSCH:  Object to the form.

12           Go ahead.

13           THE WITNESS:  I'm not sure.

14  BY MR. KEACH:

15  Q.  Do you remember a gentleman by the name of Inmate

16  Russell?

17  A.  Inmate Russell.  I'm not sure, sir.

18  Q.  Do you know whether or not the person who shared

19  the room with Mr. Carey that night was at any point in

20  time trying to help him, as well?

21  A.  There was somebody helping him, but I wasn't sure

22  who it was.

23  Q.  Do you know, at this point in time, when you saw

1    Mr. Carey wheezing and he was looking for his inhaler,

2    did anybody hit the call button?

3        A.  Yeah.

4        Q.  What happened when you hit the call button?

5        A.  It beeped.

6            MR. DEUTSCH:  Object to form.

7            MR. KEACH:  Go ahead.  I'm sorry, sir.

8            I didn't hear you.

9            THE WITNESS:  It was beeping.

10   BY MR. KEACH:

11       Q.  After the call button was beeping, what happened

12   next?

13       A.  No one showed.

14       Q.  Were you able to see into the nurses' station

15   from where Mr. Carey's bed was?

16       A.  No.

17       Q.  Well, at any point in time that evening was Nurse

18   Salvadore sleeping?

19       A.  Yes.

20       Q.  When did you observe her sleeping?

21       A.  Right after I noticed that the call button was

22   hit, I walked over to my room, and I looked into the

23   glass window of the TV room, and I noticed Nurse

 1   Salvadore was leaning back in the chair with her feet up
 2   on the desk.
 3       Q.  Besides this first occasion where you observed
 4   Inmate Carey wheezing, were there any other occasions
 5   that morning that Inmate Carey woke you up?
 6       A.  Well, I wasn't actually sleeping.  I was actually
 7   awake.  Every time the CO hits the keys in the door, I
 8   wake up.
 9       Q.  Well, was there another point in time where
10   Inmate Carey was having a problem that particular
11   morning?
12       A.  Just when he was wheezing.  Then he got up at
13   5:00 in the morning and he went to the bathroom.
14       Q.  Are you sure that was at 5:00?
15       A.  What I could see the clock, it looked like it was
16   5:00 a.m., because I could see the clock off the window
17   of the TV room onto the CO's clock on the wall by the
18   desk.
19       Q.  Mr. Nudd, if you reviewed your statement that you
20   gave to the Office of Special Investigation, would that
21   refresh your recollection about some of these times, if
22   the times were reflected in your statement?
23       A.  Yeah.

1     Q.   I'm going to take a moment here.  Because of the

2    circumstances of deposing you by phone, I don't have the

3    ability to -- I am going to mark this, but I'm just

4    going to read it into the record.  It's the statement

5    that you gave to the Office of Special Investigations on

6    May 4th, 2015.  I'm going to read the narrative section

7    to you.

8         And it says, my name is Inmate Nudd O7D1519, and

9    I am currently located in Groveland Correctional

10   Facility.  I was in the quad room infirmary with Inmates

11   Russell -- I can't make out the second name, maybe it's

12   Sadler -- and Inmate Carey the night he passed.  At

13   approximately 12:30 a.m. to 1:00 a.m., Inmate Carey woke

14   up with heavy breathing.  He went to the bathroom.  He

15   used his inhaler.  Inmate Nudd hit his call button.  I

16   banged on the window to get someone.  I couldn't see the

17   officers anywhere.  They weren't in the room in the TV

18   room.  We could see the nurse, though.  She was in her

19   office.  She had her eyes closed and looked like she was

20   sleeping.  The door to her office was closed, too.

21   Inmate Carey went to sleep at approximately 12:15 to

22   12:30.

23              MR. DEUTSCH:  Whoa, sorry.  Can you

1          reread what you just said?

2              MR. KEACH:  Which one?

3              MR. DEUTSCH:  The last five words you

4          just said, at approximately.

5              MR. KEACH:  At approximately 2:15 a.m.

6          to 2:30 a.m., Inmate Carey got up again, we

7          gave him some water, and he went back to

8          bed.  The nurse was still in her office.  I

9          could see her head down on the counter.  At

10         6:00 a.m., officers found Inmate Carey.  I

11         can't read that next word.  He was dead at

12         the point though -- I can't read.  He was

13         dead at that point.  Because I think it said

14         throughout -- yeah.  He was dead at that

15         point.

16             Throughout the night I never saw the

17         nurse make any rounds or even walk by our

18         room.  I did see staff security walk by and

19         look in our windows periodically.

20             MR. KEACH:  Hillel, do you have that

21          document open in front of you?

22             MR. DEUTSCH:  I got it.

23             MR. KEACH:  Was there any inaccuracies

1    in what I read in?

2         MR. DEUTSCH:  I'm not 100 percent sure.

3    I think that there were some misstated

4    words, but I think -- in sum and substance,

5    I think it was correct.

6         I'm concerned that -- well, I'm

7    concerned that a couple of things were

8    misread.

9         MR. KEACH:  Well, what are you

10    concerned about that was misread?  Because

11    we should correct it now before we go

12    forward.

13         MR. DEUTSCH:  Well, at approximately

14    2:15 to 2:30, I know that was corrected.

15         I also wasn't sure if you said that --

16    well, I mean, there was a few words that

17    weren't able to be read, so we can worry

18    about that.

19         I was only able to switch over to the

20    documents.  You were a few sentences in.

21    So, I'm not 100 percent sure about the first

22    few sentences because I wasn't following

23    along.  I was locating the documents.

1       MR. KEACH:  Well, I'll tell you what.

2       You have it in front of you.  I'm going to

3       read it one more time and then we'll

4       question the witness.

5       MR. DEUTSCH:  Okay.

6       MR. KEACH:  At approximately 12:30 a.m.

7       to 1:00 a.m. Inmate Carey woke up with heavy

8       breathing.  He went to the bathroom.  He

9       used his inhaler.  Inmate Russell hit his

10      call button.  I banged on his window to get

11      someone.  I couldn't see the officers

12      anywhere.  They weren't in the TV room.

13      We could see the nurse, though.  She

14      was in her office.  She had her eyes closed.

15      It looked like she was sleeping.  The door

16      to her office was closed, too.

17      Inmate Carey went to sleep.  At

18      approximately 2:15 a.m. to 2:30 a.m., Inmate

19      Carey got up again, we gave him some water,

20      and he went back to bed.  The nurse was

21      still in her office.  I could see her head

22      down on the counter.  At 6:00 a.m., officers

23      found Inmate Carey -- and the next word I

1        can't make out.  He was dead at that point.

2              Throughout the night, I never saw the

3        nurse make any rounds or even walk by our

4        room.  I did see staff security walk by and

5        look in our window periodically.

6              I think I got that accurate except for

7        the one word I couldn't read.

8              MR. DEUTSCH:  Yeah.  I believe that

9        word is "and", but that's fine.

10  BY MR. KEACH:

11    Q.  So, Inmate Nudd, having the ability, you know,

12  having an opportunity to now consider what you wrote to

13  the Office of Special Investigations, does that refresh

14  your recollection about the latter point in time that

15  evening that you saw Mr. Carey get up and go to the

16  bathroom?

17    A.  Correct.

18    Q.  When would that have been, sir?

19    A.  When he got up to use the bathroom?

20    Q.  The second time.

21    A.  He got up to use the bathroom the second time, it

22  had to have been close to 4:00.

23    Q.  In your statement it says 12:15.

```
1                    MR. DEUTSCH:  Whoa whoa whoa.  I mean,

2              it's pretty clear about the leading part of

3              things.  He made his statement.

4                    MR. KEACH:  That's fine, Hillel.  I'm

5              going to conduct my examination.

6                    If you want to make a motion to strike

7              answers, you can.  It's fine.

8                    MR. DEUTSCH:  Okay.

9      BY MR. KEACH:

10       Q.  In your statement where it says 2:15 to 2:30, you

11     told the truth at the time you put this in, correct?

12       A.  Right.

13       Q.  What was going on at the second time that you saw

14     Mr. Carey get up?

15              He just got up to use the bathroom?

16       A.  He got up to use the bathroom and laid back down.

17       Q.  It says here you got him a drink of water.

18              Do you remember that?

19       A.  Yeah, I did.  Yes.  I did give him some.

20       Q.  Why did you give him some water?

21       A.  Because he had trouble -- well, he didn't have no

22     water.  I went and grabbed my water and gave him some

23     water because he said his mouth was dry.
```

1          So, I gave him some water, and he laid back down,

2     covered up, and went back to sleep.

3     Q.   Do you know if the other inmate -- if any other

4     inmates got up at 2:30 with Inmate Carey and assisted

5     giving him some water as well?

6     A.   I believe it was Russell.

7     Q.   Do you know, at that point in time, did Inmate

8     Russell give Mr. Carey anything else?

9     A.   That, I am not for sure, sir.

10    Q.   When you saw Mr. Carey the second time, did he

11    appear to be having any problems at that point?

12    A.   He got up -- like I said, he got up to use the

13    bathroom, and he didn't have no water and I gave him

14    some water, and he laid down and went back to sleep.

15         But when he got back up to use the bathroom

16    again, I just watched him, and he just laid down on his

17    bed.  So, I don't know.  I wasn't paying attention to

18    Russell.

19    Q.   At any point in time after the first occasion

20    where you got up and observed Mr. Carey wheezing, did

21    you see Mr. Carey having difficulty breathing after that

22    first time?

23    A.   Yes.

1    Q.  When did you see Mr. Carey having difficulty

2    breathing after the first time?

3    A.  After he got up to use the bathroom.

4    Q.  Tell me exactly what -- tell me what you

5    observed.

6    A.  I observed that, when he got up, used the

7    bathroom, he laid back down.  He went to use the

8    bathroom.  I noticed he was hanging on to the wall.  And

9    I asked him -- I said, Carey, you all right?  He says

10   yes.  And he went to the bathroom and sat back down on

11   the bed.

12        I don't know if he gave himself an inhaler or

13   not, I wasn't paying attention, but I noticed he went

14   back to bed.

15   Q.  You said before that you saw him wheezing.

16        Was he wheezing on the second occasion?

17             MR. DEUTSCH:  Object to form.

18             Again, I'm just reiterating my

19        objection to this entire line of questioning

20        given the judge's instructions.

21             You can go ahead and answer for that.

22             THE WITNESS:  I did not notice he was

23        wheezing.

1          MR. KEACH:  I didn't understand what

2      you said, sir.  I'm sorry.

3          THE WITNESS:  I did not notice that he

4      was wheezing.

5  BY MR. KEACH:

6      Q.  Besides the fact that he was leaning against the

7  wall when he was on his way to the bathroom, did you see

8  anything else that would cause you to believe that he

9  was in some sort of distress?

10     A.  Yes.  I think he either, A, he got up too fast

11  and he got lightheaded.

12     Q.  What else?

13     A.  I asked him if he was all right.  He went in and

14  I noticed that the window in the bathroom -- you can see

15  both sides, and I notice that he was hanging on to the

16  window when he was in the bathroom, going to the

17  bathroom.

18     Q.  Anything else?

19     A.  He came out of the bathroom and sat on the bed.

20     Q.  What did you observe as he walked from the

21  bathroom back to his bed?

22     A.  He hung on to the doorway as he was coming out of

23  the bathroom, and he hung on to the wall, and he walked

1    slow to the bed.

2       Q.  What did you see when Mr. Carey got up from his

3    bed and walked to the bathroom?

4       A.  He probably got up too fast.  He got really

5    lightheaded when he got up.

6       Q.  Now, do you have any recollection of pounding on

7    the window that evening and trying to get someone's

8    attention?

9              MR. DEUTSCH:  Objection, form.

10             You can go ahead and answer.

11             THE WITNESS:  I pounded on the window a

12        lot of times.

13   BY MR. KEACH:

14      Q.  I'm talking about the evening -- well, what are

15   the occasions during which you pounded on the window?

16      A.  I pounded on the window.  I kicked the door.  He

17   had some kind of formal -- somebody to come down and

18   help this individual.  There was no response.

19      Q.  Was that the first or second time that you --

20      A.  That's the second time, sir.

21      Q.  How about the first time, did you do anything the

22   first time?

23      A.  I pounded on the window the first time and there

1  was no response.

2     Q.  Then the second time, as well.

3     A.  Right.

4     Q.  Is that your testimony?

5     A.  Yup.

6     Q.  The second time, when you pounded on the window,

7  at any point in time afterward did you observe Nurse

8  Salvadore?

9     A.  She was sleeping in the nurses' station.

10     Q.  Subsequent to when Mr. Carey was discovered to

11  have passed away, did you hear anything else about Nurse

12  Salvadore while you were at Groveland?

13     A.  Alls I know is she got arrested by the state

14  troopers.

15     Q.  Do you know anything else beyond that?

16     A.  No.

17     Q.  Now, Terry, I just want to clear the air.

18        You and I have spoken before today, haven't we?

19     A.  Yes, sir.

20     Q.  I told you what was going to go on today?

21     A.  Yes, sir.

22     Q.  Have you talked to anybody else besides me about

23  being deposed today?

```
 1     A.  No, sir.

 2     Q.  Was there a period of time where I was calling

 3  you and you didn't want to talk to me?

 4     A.  Correct.

 5     Q.  You told me that, very directly, that you didn't

 6  want anything to do with this; fair to say?

 7     A.  Yes, sir.

 8         Now I understand why you wanted to get it done.

 9  See, it's been awhile for me, I've been in prison, with

10  Terry being gone.

11         And me, they diagnosed me as bipolar

12  schizophrenic, and I can't really remember half of the

13  stuff that happened to Terry to now.  I'm trying to be

14  the best of my knowledge.

15     Q.  I appreciate that.

16         When you and I talked, that's one of the things I

17  told you to do is tell the truth about what you

18  remembered; fair to say?

19     A.  Yeah.

20         MR. KEACH:  I'll probably have some

21     questions once Mr. Deutsch is done

22     questioning you, but that concludes my

23     examination for now.
```

1               (Recess taken.)

2     EXAMINATION

3     BY MR. DEUTSCH:

4       Q.  Good morning, Mr. Nudd.

5       A.  Good morning, sir.

6       Q.  Just to introduce myself, my name is Hillel

7     Deutsch.  I'm an assistant attorney general for the

8     State of New York, and I'm going to be doing pretty much

9     exactly what Mr. Keach was doing until now.

10          I'm just going to be asking you a series of

11    questions and I need you to answer them verbally.

12          Do you understand that?

13      A.  Yes, sir.

14      Q.  Just as it was with Mr. Keach, you are sworn, and

15    the answers that you are giving are under penalty of

16    perjury.

17          Do you understand what that means?

18      A.  No.

19      Q.  So, I'll just explain to you that perjury is a

20    crime.  It's a crime that there's a person who's under

21    oath and they lie, they can be criminally convicted.

22    They can actually go to prison for that.

23          Do you understand that?

```
 1      A.  Yes.

 2              MR. KEACH:  Objection.

 3   BY MR. DEUTSCH:

 4      Q.  So, can you assure me that the answers that you

 5   are going to give to my questions are going to be

 6   truthful?

 7      A.  I'm trying as best to my knowledge.  It's been a

 8   while since I've been out of prison.  It's been a year

 9   and a half since I've been out of prison.  But the thing

10   with Terry, I -- they diagnosed me as bipolar

11   schizophrenic, and I can't remember everything as my

12   knowledge.  You know, I'm just trying to do the best I

13   can to make the courts happy and everybody else happy.

14      Q.  But let me ask you about that a little bit.

15              So, when you think back to that time -- we're

16   talking about five and a half years ago; is that right?

17      A.  Yeah.

18      Q.  Would you say you have a good memory of that

19   time, okay, bad?

20              How would you describe your memory?

21              MR. KEACH:  Objection.

22              THE WITNESS:  They didn't describe me

23          as bipolar schizophrenic until I got out of
```

1        prison.

2    BY MR. DEUTSCH:

3        Q.  Well, when did you first get that diagnosis?

4        A.  About three months ago.

5        Q.  Are you taking any medication for that?

6        A.  Yes, I am.

7        Q.  What are you taking?

8        A.  I'm taking Seroquel.  I'm taking -- why do you

9    need the listing of my medications?

10        I got it right here.  I'm taking divalproex.  I'm

11   taking sertraline HDL 100-milligram tablets, prazosin,

12   and Seroquel.  It's the no-name brand, quetiapine, 200

13   milligrams, and I'm also taking the Seroquel in the

14   morning, 50 milligrams.

15       Q.  Do you know, when you take those medications,

16   does it affect your memory in any way?

17       A.  Yes.

18       Q.  How does it affect your memory?

19       A.  It slows me down.

20       Q.  Does it make it harder to remember things?

21       A.  Correct.

22       Q.  So, let me ask you this:  When you answer

23   questions about what happened five and a half years ago,

1   how confident are you that what you're remembering now

2   is accurate?

3      A.  It is accurate.

4      Q.  So, you're confident that, even with the meds,

5   what you're telling, what you're saying is the truth?

6      A.  Right.

7      Q.  Well, how about back then, back then -- and when

8   I say back then I mean April 18th, April 19th, 2015 --

9   were you taking any medications then?

10     A.  I was taking trazodone.

11     Q.  Were you taking anything else?

12     A.  I'm not sure.  I think it's just the trazodone.

13     Q.  What were you taking trazodone for?

14     A.  Depression.

15     Q.  Did you have any physical health problems at that

16  time?

17         I mean, you were in the infirmary.

18     A.  Yeah.  I had MRSA.  I had my leg amputated and I

19  had my left foot amputated.  I had MRSA really bad.  I

20  had two surgeries.

21     Q.  I'm very sorry to hear you had to go through all

22  that.

23     A.  Right now I'm fighting with a bad infection with

1    MRSA.  I'm in pain constantly.

2        Q.  Is that affecting your ability to testify today?

3        A.  With me being in pain, yes.

4        Q.  How is it affecting you?

5        A.  I can't stay still in my mobility chair.  I'm all

6    over.  I'm a wreck.  I still got my medication in my

7    system.  I'm half asleep.

8        Q.  Is that affecting your ability to answer either

9    Mr. Keach or my questions?

10       A.  Probably, yes.

11           I want to get this done.  I just don't want to be

12   bothered.  I just want to be able to make you guys happy

13   and the courts happy and do what I got to do to --

14   finish what I got to do to make you all happy.

15           I mean, I just -- I don't know.  I lost a lot of

16   people in my family when I was in prison.  Holidays

17   around here, I'm not going to have the people I want for

18   Christmas here.  I'm just tired of it all.

19           Half the time I don't even see my family anymore

20   because, with the bad infection that I got, it's

21   actually growing in my leg, and it's very painful.  It's

22   on the bone of my shin, the bone above my knee.  I don't

23   know.

1    Q.  So, let me ask you:  Right now are you taking any

2   medications for physical stuff for your leg or for

3   anything else other than what you've described before?

4    A.  Naproxen.

5    Q.  Naproxen?

6    A.  Yeah.

7    Q.  Anything else?

8    A.  No.

9    Q.  Is there anything about your physical or mental

10   health condition right now that's going to impair your

11   ability to tell the truth?

12    A.  No.

13    Q.  Let me ask you:  Did you ever write down anything

14   about the events affecting Mr. Carey, about Mr. Carey's

15   death?

16    A.  Only that one statement to the police.

17    Q.  Did you write that down or did they write it down

18   and you signed it?

19    A.  I wrote -- I wrote it.

20    Q.  Do you have a copy of that?

21    A.  No.  I don't have nothing.

22    Q.  Do you have any documents regarding Mr. Carey's

23   death?

1    A.  No, I don't.

2    Q.  Did you keep a diary or a calendar or anything

3    like that?

4    A.  No.

5    Q.  The statement to the police that you wrote, is

6    that the statement that Mr. Keach read to you a few

7    minutes ago?

8    A.  Yes.

9    Q.  The things that you wrote down there, are

10   those -- that's a complete and true statement about what

11   happened that night?

12   A.  Yes.

13   Q.  On April 19th, 2015, you were incarcerated.

14       Why were you incarcerated?

15   A.  I broke a crime.

16   Q.  I'm sorry.  What does that mean?

17   A.  I was charged with attempted criminal sex act.

18   Q.  What were you alleged to have done?

19   A.  I was charged with -- supposed to have done -- I

20   was supposed to have touched my son, which never

21   happened.

22   Q.  There was a trial about that?

23   A.  I didn't go to trial.  I went to county court.

1    Q.  What happened when you went to county court?

2    A.  She sentenced me to 15 years.

3    Q.  Was there ever a trial about this in county court

4  or anywhere else?

5    A.  First it was Moreau Town Court.  Then, from

6  Moreau Town Court it got switched to county court.

7    Q.  And in county court, was there a trial?

8        Did you plead guilty?  What happened?

9    A.  Yes.  I plead guilty.

10    Q.  So, you plead guilty to the attempted criminal

11  sex act, but you were actually innocent.

12        You didn't do it?

13    A.  Right.

14    Q.  Why did you plead guilty?

15    A.  Because what I understand is that my

16  father-in-law paid the lawyer money to put me in jail

17  and keep me away from my daughter and my wife.  That's

18  what my wife told me.

19    Q.  I'm a little confused here.

20        If you were innocent, why did you plead guilty?

21    A.  I was being pressured by other people.  I had to

22  get away.

23    Q.  When you say you were being pressured by other

1    people, who does that mean?

2         Who was pressuring you?

3    A.  My mother-in-law.

4    Q.  How was she pressuring you?

5    A.  You touched my grandson, da, da, da.  I just got

6    tired of hearing it.

7    Q.  I'm sorry.  You got tired of hearing what?

8    A.  I just got tired of hearing it.

9    Q.  Tired of hearing what?

10   A.  What she was saying.

11   Q.  What was she saying?

12   A.  You touched my grandson.

13   Q.  So, because you were tired of hearing what your

14   mother-in-law was saying, so, you plead guilty?

15   A.  Yeah.

16        MR. KEACH:  Hillel, what possible

17        relevance does this have to this case?

18        He pled guilty.  The only thing that

19        can come into the trial would be the fact

20        that he pled guilty to a felony.

21        MR. DEUTSCH:  No.  He's not a party.

22        He's a witness.

23        MR. KEACH:  That doesn't change the

1           standard, which is the discovery that you

2           seek has to be relevant and material to the

3           lawsuit.

4                MR. DEUTSCH:  Right.  This is all

5           relevant, aside from the fact that he's a

6           witness, so prior bad acts are very much --

7           this is not the same admission as a party,

8           but more to the point, when he had --

9   BY MR. DEUTSCH:

10      Q.  Mr. Nudd, when you had the guilty plea, were you

11  asked to do what's called "colloquy," which is where you

12  say under oath what you did?

13      A.  I didn't say anything.

14          Why does this have to do with the case?  I mean,

15  the past is the past.  I want to deal with this case and

16  this case only.

17      Q.  Right.  No.  I understand that, but the thing is

18  that you pled guilty, which means that you said that you

19  were guilty to the crime.

20          Normally what happens is there's what's called a

21  "colloquy" where the person who's pleading guilty to the

22  crime is asked a bunch of questions about what happened,

23  and they say, yes, this happened, yes, that happened,

1    before the guilty plea is accepted.

2            So I'm asking:  Did that happen in your case?

3    A.   I can't remember.

4            THE WITNESS:  Hey, Keach, can you get

5        this gentleman off this situation?

6            The past is the past.  I don't want to

7        answer anymore what happened in the past.  I

8        just want to --

9            MR. KEACH:  Here's the problem that I

10       have, Terry, you know, I mean, I'm going to

11       give Mr. Deutsch a little bit of latitude

12       here to finish up whatever questions he has

13       for you about this, and if he keeps going

14       down this road I'm going to call the court.

15           THE WITNESS:  Why don't you call the

16       court, anyway?

17           MR. KEACH:  But you do have to answer

18       his questions.

19           He's bordering on harassment at this

20       point, but you have to answer them.

21           THE WITNESS:  I'm not going to answer

22       the question if it has nothing to do with

23       this case we're working on now.

1              MR. KEACH:  Terry, you have to answer

2         his questions, okay?

3              THE WITNESS:  About what happened in

4         the past?

5              MR. KEACH:  If he asks you more than

6         about what happened during your allocution,

7         then I'm going to call the court.  But you

8         do have to finish answering his questions.

9              THE WITNESS:  Okay.

10             MR. KEACH:  When he talked about prior

11        bad acts and like those, I mean, yeah,

12        that's just not an accurate recitation of

13        the evidentiary standard, but regardless,

14        you have to answer his questions, okay?

15        Let's just get this done.

16             THE WITNESS:  Okay.

17   BY MR. DEUTSCH:

18     Q.  So, in terms of the colloquy -- so just to go

19   back a second -- do you remember whether or not you were

20   asked about what happened, to answer questions in front

21   of the judge as to whether you did the things you were

22   accused of?

23     A.  Yes.  I talked to Judge Parazzo.

```
 1      Q.  And when you talked to the judge, did you say,

 2   yes, I did those things?

 3      A.  I had to.

 4      Q.  Were you under oath when you said those things?

 5      A.  Yes.

 6      Q.  When you said, yes, I did those things, yes, I

 7   touched my son inappropriately, were you telling the

 8   truth or were you lying?

 9            MR. KEACH:  Objection.

10            THE WITNESS:  Telling the truth.

11   BY MR. DEUTSCH:

12      Q.  I'm sorry?

13      A.  Telling the truth.

14      Q.  You were telling the truth?

15      A.  Yeah.

16      Q.  So, you did touch your son inappropriately?

17      A.  Yeah.

18      Q.  Now, a minute ago I asked if you were innocent

19   and you said that you were innocent.

20            So what did you mean by that?

21      A.  At that time my son was sick.  My son threw up

22   everywhere.  My son shit himself.  Sorry for the

23   language.  He crapped himself.  I had to wash him.  So
```

1   he went and told grandma and grandpa that I touched him

2   the wrong way.  And I told them, I said, how can I do

3   that when I'm wiping poop off him?

4        Q.  So the only thing that you did was you wiped poop

5   off him.

6            That's all you did?

7        A.  That's all I did.

8        Q.  Now, at the allocution, did they ask you whether

9   you did anything other than wipe poop off him?

10       A.  No.

11       Q.  The only question they asked you about what

12  happened was "did you wipe poop off him"?

13           That's all they asked?

14       A.  That's all they asked.

15       Q.  And you said, yeah, I wiped poop off my son.

16       A.  I had to wash his genitals because his genitals

17  was covered with poop.

18       Q.  I think that's enough.  I think that should cover

19  that.  That's enough information so that we can move on

20  to 2015.

21           You said earlier that you got to Groveland a

22  period of time before April 18th, 2015; is that right?

23       A.  Yes.

1    Q.  So you had been there at this point for -- do you

2    know about how long?

3    A.  About four and a half years before I got moved to

4    Marcy.

5    Q.  You got moved to Marcy in 2018?

6    A.  Yes.

7    Q.  So, if I'm doing my math right, on April 18th,

8    2015 you'd been at Groveland for almost a year; is that

9    right?

10    A.  About four and a half years at least.

11    Q.  So, you had been at Groveland for at least four

12    and a half years on April 18th, 2015?

13    A.  Yeah.  '15, '16.

14        I asked the CO, I said, how long have I been in

15    the certain dorm, and he said four and a half years.

16    Q.  I believe you said that Nurse Salvadore, she

17    wasn't doing the nightshift every day, but she was

18    there, like, three or four times a week; is that right?

19    A.  Yes.

20    Q.  She regularly went to sleep during her shift?

21    A.  Correct.

22    Q.  So you had seen that happen dozens, maybe

23    hundreds of times?

```
 1     A.  Right.

 2     Q.  At any point did you tell anyone?

 3         Did you say, hey, this is a nurse who sleeps on

 4   the job?

 5     A.  I told -- I said something to the lieutenant.

 6     Q.  When did you do --

 7         MR. KEACH:  Jeanne, can you read the

 8     second to last question, please, that talked

 9     about dozens or hundreds of times?

10         (Question read by reporter.)

11         MR. KEACH:  Thank you.

12   BY MR. DEUTSCH:

13     Q.  You told the lieutenant; is that right?

14     A.  Yeah.

15     Q.  First of all, which lieutenant did you tell?

16     A.  Blonsky.

17     Q.  And when did you tell that to Lieutenant Blonsky?

18     A.  The day they came and noticed that Terry was

19   passed away.

20     Q.  So before Mr. Carey passed away, you never told

21   anybody?

22     A.  No.  She was the only lieutenant I basically

23   talked to.
```

1    Q.  Well, how about the other nurses the other three

2    to four days a week, did they also sleep on the job?

3    A.  No.  They did their job.

4    Q.  So why didn't you ever write a grievance against

5    Nurse Salvadore saying, hey, she's asleep on the job?

6    A.  Because there's this thing.  You write a

7    grievance about any employee that worked at Groveland

8    Correctional Facility, they'll have your ass.

9    Q.  Did you ever write a grievance about anything?

10    A.  Just my wheelchair being broke all the time.

11    Q.  Why weren't you concerned to write a grievance

12    about that?

13    A.  Because, like I said, you write a grievance about

14    any kind of nurse or any kind of employee, officer,

15    whoever, working in the jail, you'll get in trouble for

16    it.

17    Q.  So did you ever write a grievance about any staff

18    member while you were at Groveland?

19    A.  I complained.  I never wrote no grievance.

20    Q.  Can you explain to me what's the difference?

21    A.  Writing a grievance is writing a grievance.

22    Complaining is complaining, talking.

23    Q.  So you would talk to people and say, this staff

1  member is no good, this staff member did something bad,

2  but you wouldn't put it in writing?

3     A.  Right.

4     Q.  Before you talked to Lieutenant Blonsky the day

5  that Mr. Carey passed, did you ever talk to anybody and

6  say, hey, that nurse is no good?

7     A.  I told Blonsky the nurse is no good.

8     Q.  Before Mr. Carey passed?

9     A.  Yeah.

10     Q.  When?

11     A.  Listen, every time I came into the -- into the

12  infirmary to get my bandages changed on my leg, they

13  would just put Salvadore on my -- to change my

14  dressings.  And every time she put dressings on my leg,

15  she put the dressing on the dirty table, on the dirty

16  table that has not been cleaned, sterilized, or

17  anything.

18        That's another reason why I lost my right leg,

19  because Salvadore wanted to put clean, sterilized

20  bandages on the dirty table.  That's another reason why

21  I didn't like her.

22     Q.  Do you believe that Nurse Salvadore is

23  responsible for you losing your leg?

1    A.  Yes.

2    Q.  Did you tell this to Lieutenant Blonsky?

3    A.  Yes.

4    Q.  Was that before or after Mr. Carey passed?

5    A.  It was before.

6    Q.  What, if anything, did Lieutenant Blonsky do

7  about that?

8    A.  Well, all she did is talk to her.

9         And I also wrote -- I wrote a letter to dep,

10  which is a female.  I can't remember her name.  I

11  complained to her.  I says, I'm having this nurse put on

12  dressings on my leg twice a day, morning and night, and

13  she puts sterilized bandages on a dirty table.

14         She wrote me back and told me, yeah, I stated to

15  Salvadore that -- it won't happen again.  It won't

16  happen again.  It won't happen again.  But it kept on

17  going and going and going.  So I got tired of it, her

18  complaining.  I was complaining.  So they end up having

19  different nurses that worked at Groveland Correctional

20  Facility change my bandages for me.

21    Q.  So if I'm understanding you correctly, you did

22  not like the way she changed your bandages, so you wound

23  up writing a letter of complaint to the deputy

1    superintendent; is that right?

2              MR. KEACH:  Objection.  Objection.

3              THE WITNESS:  Right.

4    BY MR. DEUTSCH:

5         Q.  Then when was that?

6         A.  Way before I had my leg amputated.

7         Q.  And when --

8         A.  I had beta statis (phonetic) ulcers on my legs.

9              My ankle, my right foot was -- the whole right

10   side -- my right leg, the whole left side of my foot was

11   one big ulcer from my heel to my toe.  It was one big

12   ulcer and I was supposed to get wet and dry dressings on

13   my foot.

14             And she had said that, instead of soaking the

15   dressings in saline water like she's supposed to, she

16   just got the water from the faucet, squeezed it out, put

17   it on my foot, and dressed up, put a drain, put gauze on

18   it, but the gauze was on a dirty table.

19        Q.  So, compared to April 18th, 2015, when you wrote

20   the letter to the dep complaining about the dressing

21   changes, is that six months before, a year before, more

22   than a year before?

23             Can you give me a range about how long ago we're

1    talking?

2       A.  Well, I had my leg amputated 2017.  It's about a

3    year before I lost the leg.

4       Q.  So you wrote the letter of complaint in 2016?

5       A.  Yeah.

6           They said they'll take care of it, they'll take

7    care of it, but nothing never changed.  So they end up

8    -- so, I had to sit there in the infirmary, wait until a

9    nurse gets available for me to get my dressing changed.

10          Because she got -- Salvadore was mad at me

11   because I wrote a letter to the superintendent of the

12   program, whatever her name is.

13      Q.  Going back to April 19th, 2015.

14          So, that was a long time before you wrote any

15   letter, right?

16      A.  Mm-hm.

17      Q.  So, at that time did you -- you verbally told

18   Lieutenant Blonsky that she was sleeping on the job?

19      A.  I told her she was not a good nurse and she was

20   sleeping on the job.  And she did not come in the room

21   at all any time after 11:00 to check on Terry.  She

22   totally lied to the nurses.

23          The nurses even asked her if she came in there

1    and checked on Carey between such-and-such a time to the

2    time until he passed away, and she lied to the nurse by

3    saying, yeah, I was in there.  And, no, she was not in

4    there, because I was awake.

5        Q.  So you heard the nurses talking to Nurse

6    Salvadore?

7        A.  Right.  In the room.

8        Q.  When was that?

9            Was that the morning of the 19th?

10       A.  The morning that he passed away.

11       Q.  So the morning he passed away, the morning of the

12   19th, you heard conversation between Nurse Salvadore and

13   the other nurses?

14       A.  Yeah.  They were in the room.

15       Q.  What did the nurses say and what did Nurse

16   Salvadore say?

17       A.  The nurses asked Salvadore if she was in here at

18   any time between 11:00 and 6:00 a.m., and she said, yes,

19   I came in here.  And Blonsky came in after that, and I

20   told Blonsky that she was not in here at that time.

21       Q.  So, going back to that night.

22           So, actually, there's a couple of other sort of

23   background questions I'd like to ask.

1          I think Mr. Keach asked you about whether you

2    could get a misbehavior report for lying and you said

3    you've never gotten in trouble when you were

4    incarcerated; is that right?

5    A.   Right.

6    Q.   So, just to clarify, there's a bunch of different

7    levels of trouble.

8          So, are you saying that you were never in -- you

9    never had a formal -- you never had a formal misbehavior

10   report given to you; is that right?

11   A.   Right.

12   Q.   So you were never keep locked.  You were never in

13   SHU?

14   A.   No.

15   Q.   And just so you understand, by SHU, I mean, the

16   special housing unit, which is called the box or

17   solitary confinement?

18   A.   No.

19   Q.   You were never there, right?

20   A.   No.

21          When I was in Marcy, about two weeks before I got

22   released, they sent me a paper saying that I had a clean

23   bill of health from the sergeant, because they looked at

1    my records, how many times I've been in trouble or

2    whatever, and they gave me a clean bill of health.

3          I was -- they asked me how I did it.  I just told

4    them, I said, I keep my nose out of people's business.

5    If they want to fight, let them fight.  If they want to

6    stab people, let them stab people.  I stay with my own

7    people.

8    Q.  So you never had like a misbehavior hearing or

9    anything like that?

10   A.  No.

11         Well, it was just like, back in '07, I had a

12   smoking ticket, but I beat that.

13   Q.  So in '07 you got a smoking ticket.

14         Can you tell me what that means?

15   A.  A smoking ticket, you're smoking in prison and

16   not outside.  If you get caught smoking in your cell,

17   you get a ticket.  Well, I never got a ticket for 24

18   hours, so I actually beat the ticket.  I never got a

19   ticket served to me.

20   Q.  So you remember in 2007 they gave you a ticket

21   for smoking.

22         Is it fair to say that that's a pretty minor

23   infraction?

1    A.  Yeah.

2    Q.  So, they gave you a ticket and you said you

3  fought the ticket and you won?

4    A.  Yeah.

5    Q.  You didn't get any penalty or anything?

6    A.  No.

7    Q.  Since from 2007 until you were released you

8  didn't get a single other ticket; is that right?

9    A.  Yeah.

10    Q.  So you said that you were aware of the fact that

11  Nurse Salvadore had been arrested by state troopers

12  after this incident; is that right?

13    A.  Right.

14    Q.  How did you come about this knowledge?

15        How did you know that?

16    A.  How did I know that?  I looked out my window and

17  the state troopers were outside the office the night she

18  was working at the infirmary, and they came and picked

19  her up.

20    Q.  When you say they picked her up, what does that

21  mean?

22    A.  They put handcuffs on her and escorted her out

23  the door.

1    Q.  So you saw the state troopers handcuff her and

2    escort her out the door?

3    A.  Yeah, because I was in the infirmary.

4    Q.  Now, the name you gave to the court reporter was

5    Terry Nudd.

6         Is that your birth name?

7    A.  Yes.

8    Q.  Have you ever given any other names to police or

9    other officials?

10   A.  No.

11   Q.  Why were you in the infirmary on April 18th,

12   2015?

13        What was the issue that brought you to the

14   infirmary?

15   A.  I had an open wound on my legs.  I had multi

16   surgeries on my leg, on my stump.  I had major

17   infections on my stump.  They wouldn't let me out in the

18   common compound.

19        I couldn't be around anybody until I had approval

20   from my doctor to get released from the infirmary and go

21   back on the compound.

22   Q.  When you say you couldn't be around anybody, what

23   does that mean?

```
 1      A.  I can't be in the dorm with an infection in my

 2  leg.  The infection had to be completely gone before I

 3  would be able to get back in the compound, the dorm,

 4  with other people.

 5      Q.  Now, but you could be -- you were allowed to be

 6  in an infirmary dorm with other patients; is that fair?

 7      A.  It's not fair.  No.  But --

 8      Q.  Then you should not have been there either.

 9      A.  Well --

10          MR. KEACH:  Objection.

11          THE WITNESS:  I didn't have no choice.

12  BY MR. DEUTSCH:

13      Q.  So when you say it's not fair, what did you mean

14  by that?

15      A.  Well, I've been in the infirmary for eight months

16  to nine months at a time.  I had major surgeries done to

17  my stump.  I had gallbladder attacks.  It was on

18  Valentine's Day in February.  I had a gallbladder

19  attack, so they had to do surgery on that.  They had to

20  put me in the hospital for that.  I came back to the

21  infirmary.

22          Then I had surgery on my stump.  I had a major --

23  while I was in the compound, I was wearing my prosthetic
```

1  leg at the time, and the staples from surgery were

2  imbedded inside my leg.  So, they had to cut four of the

3  staples out, pull them out, until I seen another doctor,

4  until they let me see the other doctor.  I had to wait

5  for the appointment for that.  So, I had to stay in the

6  infirmary and wait for the appointment for that.

7       Then they took me to the hospital, they cut the

8  rest of the staples out, and within a couple weeks

9  later, I had to go back in again because they noticed I

10  had an infection on the part where I had the amputation

11  at.

12       So, they had to cut down so far that you could

13  put four fingers wide in my leg.  And they put a -- it

14  was a machine that sucks out the bacteria, like a wound

15  vac.

16       I couldn't be in the compound with a wound vac

17  because the bacteria and stuff was coming out of my leg,

18  and the infection was coming out of my leg.  I was stuck

19  with that on my leg.  I had to go to Wende Correctional

20  Facility to see the doctor there with the wound vac on

21  my leg.

22       Then I had to wait until the wound closes with a

23  wound vac on my leg.  Every three days it got changed.

1    The dressing in my leg got changed every three days.  So

2    I had to wait and see Dr. Hodge at Wende Correctional

3    Facility.  He was also a surgeon.

4          So, he was the only doctor that I could speak to,

5    basically, to get me out of the infirmary, to get back

6    in the compound.

7          And I didn't like being in the infirmary.  My

8    food was always cold.  I couldn't take a shower whenever

9    I wanted to because of the fact, with the wound vac in

10   your leg, you can't take a shower because you can't get

11   the wound vac wet, like that.

12         So, when I got out of the infirmary, I asked them

13   where I was going.  They said you were going to out

14   lock, which is down the hill.  I said, no, I am not

15   going to out lock or K lock.  So I stayed in the

16   hospital until I talked to a sergeant.

17         And the sergeant says, no, you're not going down

18   the hill.  You're going to go right back up to C3 where

19   you belong.  So I ended up going back to C3, the medical

20   dorm, and I went there until I got transferred to Marcy

21   Correctional Facility.

22     Q.  So, what you described was like a large block of

23   time.  So, I'm trying to figure out what your symptoms

1    were on April 18th, 2015.

2        A.  Well, with having MRSA in your bloodstream, you

3    can't be in -- you can't be outside.  You can't be in a

4    dorm with people.  You got to be in the hospital with

5    the infection medication.

6            They put you on vancomycin, it turns into a big

7    ball, and they hook the IV to your -- the IV line, it

8    runs into your shoulder.  Have that twice a day because

9    it's refrigerated.

10       Q.  When were you first diagnosed with having MRSA?

11       A.  I've been basically having MRSA basically all my

12   life.  When I had open wounds or little sores on my leg,

13   it's either -- how did I get MRSA?  Hmm.  When I was in

14   the dorm, the showers are never clean.  The water

15   bounces off the floor.  It hits your wound.  And you can

16   get MRSA that way because the showers are not clean.

17   You can get MRSA anywhere.

18       Q.  You said you had MRSA your whole life.

19           When was the first time you were diagnosed with

20   MRSA?

21       A.  Basically, in '07.

22       Q.  So you had MRSA on and off since '07?

23       A.  Yes.

1        I got MRSA now because I have a bad infection in

2    my leg and it's growing.  I don't see the infection

3    doctor until the end of the -- the 30th of the month.

4        Q.  Now, returning to the morning of April 19th,

5    2015.  So, I just want to make sure that there -- this

6    is a general question.

7        Is there anything involving Mr. Carey about that

8    night and that morning you haven't mentioned either to

9    myself or to Mr. Keach in response to any of our

10    questions?

11              MR. KEACH:  Objection.

12              THE WITNESS:  No.

13    BY MR. DEUTSCH:

14        Q.  So, as I understood it, what you said was, there

15    was a first incident sometime around 12:30, give or

16    take, where he was wheezing; is that right?

17        A.  Yes.

18        Q.  So, you banged on the windows and kicked the

19    door.

20        Is that what you said?

21        A.  Yes.

22        Q.  You said the call button was pushed.

23        Do you know who pushed the call button?

1    A.  I pushed it once.  Then the other dude in there,

2  Russell.

3    Q.  Whose call button did you push?

4        Did you push yours or Mr. Carey's or somebody

5  else's?

6    A.  We pushed Mr. Carey's first.  Then I went over

7  and pushed mine.

8    Q.  So, you pushed your call button and who pushed

9  Mr. Carey's button?

10    A.  Russell.

11    Q.  What happened after you pushed your call button?

12    A.  Nothing.

13    Q.  You didn't see or hear anything?

14    A.  I heard the call button go off.  It was beeping.

15    Q.  So you heard it beeping.

16        Where was the beeping coming from?

17    A.  Well, when the call button was pushed, it will

18  light up outside your door and it will ring into the

19  nurses' station.

20    Q.  You can hear that from your cell, from your bed?

21    A.  Yeah.

22        And how they shut the call button off is right

23  there by the -- on the wall next to the nurses' station,

1   in the nurses' office.

2       Q.  So, you knew that the call button had been pushed

3   because you heard the beep?

4       A.  Right.

5       Q.  How long was it beeping for?

6       A.  A good five minutes before it got shut off.

7       Q.  You said it got shut off?

8       A.  Yeah.

9       Q.  How did it get shut off?

10      A.  Probably from the nurse, because it goes off in

11  the nurses' station.

12      Q.  So, did you ever shut it off?

13      A.  Did I ever shut it off?

14      Q.  Yes.

15      A.  No, because you can't go in the nurses' station.

16      Q.  What about Mr. Russell pushing Mr. Carey's

17  button, how long was that beeping for?

18      A.  A good ten minutes, at least, before it got shut

19  off.

20      Q.  Who shut it off?

21      A.  Probably the nurse.

22      Q.  When you say "probably", meaning you didn't see

23  who it was so you're guessing?

1    A.  No.  I'm not guessing.  The only person that was

2    in the nurses' station was the nurse.

3    Q.  So because the only person in the nurses' station

4    was the nurse it must have been her.

5    A.  Yeah.

6    Q.  Then there was a second incident where Mr. Carey

7    got up to go to the bathroom; is that right?

8    A.  Yes.

9    Q.  He was holding on to the wall?

10    A.  Yes.

11    Q.  Then, when you saw him holding on to the wall,

12    you asked if he was doing okay and he said yeah; is that

13    right?

14    A.  Yeah.

15    Q.  Then, after using the bathroom, he went back to

16    bed?

17    A.  Right.

18    Q.  Did he go back to sleep?

19    A.  He laid down and covered up, so I imagine he went

20    back to sleep.

21    Q.  Did you go to sleep that night?

22    A.  No.  I was awake.

23    Q.  You were awake for the whole night?

1    A.  Yeah.

2    Q.  For the second incident, when he was leaning

3    against the wall, did you push the button or bang on

4    anything the second time around?

5    A.  The second time around I banged and kicked on the

6    wall.  I kicked the door.

7    Q.  Did you push the call button?

8    A.  Did all that.  No one responded.

9    Q.  When you say "did all that", you also pushed the

10   call button?

11   A.  Yes.

12   Q.  How long did it beep?

13   A.  Ten minutes.

14   Q.  Now, did you ever notice, over the course of the

15   night, that Mr. Carey had stopped breathing or wasn't

16   responsive to anything?

17   A.  No.

18       I had noticed something when the CO came in for

19   the count, the 6:00 a.m. count, and yelled Carey's name,

20   but he didn't respond, and that's when he hit the

21   button.

22   Q.  Gotcha.

23   A.  And all the rest of the nurses come in at 6:00 in

1   the morning, and that's when they all ran into his room.

2       Q.  That night -- I don't mean in the morning, I mean

3   that night -- did anyone -- let me ask you this.

4           There was a nurse on duty.  You said there was a

5   CO making rounds; is that right?

6       A.  Supposed to be making rounds.

7       Q.  Was the CO actually making rounds?

8       A.  Yeah, but I didn't know where he was.  He didn't

9   make no rounds.  He's supposed to make rounds every 15

10  minutes.

11      Q.  So he was supposed to be making rounds every 15

12  minutes?

13      A.  Yup.

14      Q.  How do you know he was supposed to be making

15  rounds every 15 minutes?

16      A.  Because, when I was getting X-rays done on my

17  foot, they had a new guy come in for training, and the

18  CO -- the lieutenant comes in and told the CO every 15

19  minutes you got to make rounds.

20      Q.  So when did you hear the lieutenant tell the

21  trainee that?

22          Like, what year was this?

23      A.  The same year that Terry passed away.

1    Q.  Was this before?  Was this after?

2    A.  Before he passed away.

3    Q.  You heard the lieutenant tell the CO trainee he

4  has to make rounds every 15 minutes.

5    A.  Right.

6    Q.  And was the CO -- do you know who that was?

7        Do you remember who that was?

8    A.  No.

9    Q.  Can you give me a description of what he looks

10  like?

11   A.  I don't even know.

12   Q.  Can you give me a description of what Nurse

13  Salvadore looks like?

14   A.  Tall, skinny, blonde hair.

15   Q.  Anything else?

16   A.  Old.

17   Q.  About how old?

18   A.  Maybe -- I don't know -- 40s.

19   Q.  So, that night the CO made -- how many rounds,

20  about, did the CO make?

21   A.  Probably one.

22       Because I was laying on my bed and looking out my

23  window and I seen a shadow on the window.

1    Q.  Do you know about what time that was?

2    A.  11:00.

3    Q.  So, from 11:00 on, you never saw the CO making

4    rounds.

5    A.  Right.

6    Q.  Other than the CO and the nurse, was there any

7    other member of staff on the floor that night?

8    A.  No.

9    Q.  So you never had a situation where the lieutenant

10   popped in that night?

11   A.  I have no idea.

12   Q.  Well, where your room is situated, is that the

13   first -- let me ask you this:  Can a person walk on to

14   the infirmary floor without passing by your room?

15   A.  No.  He has to check at the desk first.

16   Q.  Okay, so --

17   A.  He has to go by the CO's desk to get to my room.

18   Q.  So you go by the CO's desk and then go to your

19   room -- and then they would pass by your room?

20   A.  Yeah.

21   Q.  So, you didn't see anyone else on the floor that

22   night.

23   A.  Right, because I was looking up.  I was -- like I

1    said, I was looking out, laying on my bed, laying on my

2    side, looking out my window, and I could see the

3    reflection if anybody goes by the window.

4        Q.  And you didn't see any -- you didn't see the

5    lieutenant pass by.

6        A.  No.

7        Q.  You didn't see a sergeant pass by.

8        A.  No.

9        Q.  If they had come by, would you have noticed them?

10       A.  Yeah.

11              MR. DEUTSCH:  I think that's all I've

12          got.

13              Mr. Keach, if there's other follow-up

14          questions you've got, you can take it away.

15   FURTHER EXAMINATION

16   BY MR. KEACH:

17       Q.  Terry, what's your level of education?

18       A.  Eleventh grade.

19       Q.  What grade?

20       A.  Eleventh.

21              MR. KEACH:  That's all I've got.

22              MR. DEUTSCH:  Thank you very much.

23              I appreciate it.

```
 1              MR. KEACH:  Terry, do you want to read
 2        and sign your transcript?
 3              Basically what that means is I have to
 4        get you a copy and send it to you and you
 5        read it and sign it and send it back.
 6              Are you interested to do that, or do
 7        you want to just let the record stand?
 8              THE WITNESS:  What's that mean?
 9              MR. KEACH:  It basically means that
10        whatever you say -- what happens is, you
11        have the option to read and sign your
12        transcript to see if there's any errors in
13        it.  Some witnesses exercise their right to
14        do that; some don't.  Some just leave it to
15        the court reporter and trust that she took
16        down an accurate transcript.
17              THE WITNESS:  Let the courts do it.
18              MR. KEACH:  That concludes Mr. Nudd's
19        examination with my thanks to him, and
20        closes the record.
21              (Deposition concluded at 12:25 p.m.)
22
23
```

Page 85

1   STATE OF NEW YORK     )

2   COUNTY OF

3

4   I, TERRY NUDD, do hereby certify that I have read the

5   foregoing record of my testimony taken at the time and

6   place noted in the heading hereof and that it is a true

7   and correct transcript of the same and the whole

8   thereof.

9

10

11

12

13   _____
                       TERRY NUDD
14   Subscribed and sworn to

15   before me this _____ day

16   of _____, 2021

17

18

19

20

21   _____

22

23

```
 1                  C E R T I F I C A T I O N

 2

 3

 4    I, Jeanne O'Connell, Registered Professional Reporter

 5    and Notary Public in and for the State of New York, do

 6    hereby certify that the foregoing to be a true and

 7    accurate transcription of the stenographic notes as

 8    taken by me of the aforesaid proceedings.

 9

10

11

12    _____        _____
          Date                          Jeanne O'Connell
13

14

15

16

17

18

19

20

21

22

23
```